ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
  *rzur@elkinskalt.com*
LAUREN N. GANS, State Bar No. 247542
  *lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Nicole A. Sullivan (pro hac vice)
sullivann@whiteandwilliams.com
Thomas E. Butler (pro hac vice)
butlert@whiteandwilliams.com
WHITE AND WILLIAMS LLP
810 Seventh Avenue, Suite 500
New York, New York 10019
(212) 631-4420

Attorneys for Creditor Multiple Energy
Technologies, LLC

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>HOLOGENIX, LLC,<br><br>        Debtor and Debtor in<br>        Possession. | Case No. 2:20-bk-13849-BR<br><br>Chapter 11 (Subchapter V)<br><br>**NOTICE OF UNPUBLISHED AUTHORITIES CITED IN MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSE TO DEBTOR'S BRIEF IN SUPPORT OF CONFIRMING PLAN AFTER REMAND FROM THE DISTRICT COURT**<br><br>**Hearing:**<br>Date:     May 26, 2026<br>Time:    10:00 a.m.<br>Place:   Courtroom 1668<br>         255 E. Temple St.<br>         Los Angeles, CA 90012 |

8096905

In accordance with Local Bankruptcy Rule 9013-2(b)(4), creditor Multiple Energy Technologies, LLC hereby attaches copies of the following unpublished decisions cited in its *Response to the Debtor's Brief In Support of Confirming Plan After Remand from the District Court* [Docket No. 1141]:

**UNPUBLISHED CASES**

1. *Coffelt v. NVIDIA Corp.*, No. 16-00457, 2016 WL 7507763 (C.D. Cal. June 21, 2016), *aff'd*, 680 F. App'x 1010 (Fed. Cir. 2017);

2. *In re Premiere Network Servs., Inc.*, No. 04-33402, 2005 WL 6443624 (Bankr. N.D. Tex. July 1, 2005); and

3. *Universal Elecs. Inc. v. Roku, Inc.*, No. 18-01580, 2019 WL 1877616 (C.D. Cal. Mar. 5, 2019).

DATED: March 31, 2026                     WHITE AND WILLIAMS LLP

By: _____
NICOLE A. SULLIVAN (pro hac vice)
THOMAS E. BUTLER (pro hac vice)
Attorneys for Creditor Multiple Energy
Technologies, LLC

DATED: March 31, 2026

ELKINS KALT WEINTRAUB REUBEN
GARTSIDE LLP

By: _____
ROYE ZUR
LAUREN N. GANS
Attorneys for Creditor Multiple Energy
Technologies, LLC

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8096905

1

2016 WL 7507763
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

COFFELT

v.

NVIDIA CORP. et al.

Case No.: CV 16–00457 SJO (KKx)
|
Filed 06/21/2016

**Attorneys and Law Firms**

Louis A. Coffelt, Jr., Riverside, CA, pro se.

Michael G. Rhodes, Cooley LLP, San Francisco, CA, Jeannine Y. Sano, White and Case LLP, Lowell D. Mead, Cooley LLP, Palo Alto, CA, Carmen Lo, White and Case LLP, Los Angeles, CA, Jason Xu, Pro Hac Vice, White and Case LLP, Washington, DC, Evan Finkel, Michael S. Horikawa, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA, for NVIDIA Corp. et al.

**PROCEEDINGS (in chambers): ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR LACK OF PATENTABLE SUBJECT MATTER**

**UNDER 🚩 35 U.S.C. § 101** [Docket No. 34]

S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on Defendants NVIDIA Corp. ("NVIDIA"), Autodesk, Inc. ("Autodesk") and Pixar's (collectively, "Defendants") Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Lack of Patentable Subject Matter Under 🚩 35 U.S.C. § 101 ("Motion"), filed May 13, 2016. Plaintiff Louis A. Coffelt, Jr. ("Plaintiff"), proceeding *pro se*, opposed the Motion ("Opposition") on May 20, 2016, and Defendants replied ("Reply") on June 6, 2016. [1] The Court found this matter suitable for disposition without oral argument and vacated the hearing set for June 20, 2016. *See* Fed. R. Civ. P. 78(b). For the

following reasons, the Court **GRANTS** Defendants' Motion.

I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff initiated the instant patent infringement action against Defendants on March 14, 2016, alleging infringement of 🚩 U.S. Patent No. 8,614,710 (the "'710 Patent"). [2] (*See generally* Compl., ECF No. 1.) Defendants now move to dismiss Plaintiff's Complaint, arguing that each of the claims of the 🚩 '710 Patent are directed to abstract ideas implemented on generic computers, and as such, are invalid under 🚩 35 U.S.C. § 101 ("🚩 Section 101") and 🚩 *Alice Corp. Pty. Ltd. V. CLS Bank Int'l*, —— U.S. ——, 134 S. Ct. 2347 (2014). (*See generally* Mot., ECF No. 34–1.) Plaintiff opposes the Motion, arguing that the claims of the 🚩 '710 Patent are not directed to an abstract idea, but that even if they were, there is a sufficient "inventive concept" to transform the claims into patent-eligible inventions. (*See generally* Opp'n, ECF No. 38.)

The 🚩 '710 Patent, which issued on December 24, 2013 to Plaintiff, is directed to a method of selecting a color for a portion of a digital image by calculating and comparing various vectors within a specific region of space, known as a "steradian." (*See* Compl., Ex. 1 ("🚩 '710 Patent") at Abstract, cols. 2:37–39, 13–14.) The 🚩 '710 Patent contains one independent claim —claim 1—and five dependent claims. (*Id.*) Claim 1 reads in its entirety:

1. A method for deriving a pixel color comprising the steps of:

—a **computer calculating** a first position vector for a geometric graphic object;

—a **computer calculating** a particular steradian region of space;

—a **computer calculating** a particular steradian radius of said steradian region of space;

Case 2:20-bk-13849-BR  Doc 1142  Filed 03/31/26  Entered 03/31/26 20:57:38  Desc
Main Document  Page 4 of 35

Coffelt v. NVIDIA Corp., Not Reported in Fed. Supp. (2016)

—a **computer calculating** that said second position vector is located in said particular steradian region of space;

 **\*2**  —a **computer calculating** that said second position vector is located in said particular steradian region of space;

—a **computer calculating** a length of said first position vector

—a **computer calculating** a length of said second position vector;

—a **computer comparing** said first length to said second length;

—for a first pixel, a **computer deriving** a pixel color for said first position vector from a result of said length comparison;

—for a second pixel, a **computer deriving** a pixel color for said second position vector forma result of said length comparison

(*Id.* [formatting altered and emphasis added].)

The prosecution history of the '710 Patent reveals that on January 25, 2013, an Examiner for the United States Patent and Trademark Office ("PTO") rejected each of the four then–pending claims in part because they were directed to non-statutory subject matter under Section 101 and the Supreme Court's decision in *Bilski v. Kappos*, 561 U.S. 593 (2010). (*See* Req. for Judicial Notice in Supp. Mot. ("RJN"), Ex. A Part 1 ("Prosecution History, pt. 1") at 81–82, ECF No. 32–1.) [3] In particular, the Examiner wrote that

> [i]n the instant invention, a pixel color is derived mathematically using vectors in a particular steradian region. The calculation claimed can be done by a human mentally or with a pen and paper. There **is no machine claimed for performing the calculations**,

nor do the claims inherently require one.

(Prosecution History, pt. 1 at 81–82 [emphasis added].)

In response to this rejection, on March 7, 2013, Plaintiff amended his claims to include a limitation that the methods outlined in the claims would be performed by a "machine." (Prosecution History, pt. 1 at 90–98.) On May 23, 2013, the Examiner rejected these amended claims for still being directed to non-statutory subject matter, noting that "[t]here is no **specific** machine claimed for performing the calculations, nor do the claims inherently require one." (RJN, Ex. A Part 2 ("Prosecution History, pt. 2") at 9, ECF No. 32–2 [emphasis in original].) On June 1, 2013, Plaintiff again amended his claims, replacing each instance of the word "machine" with the word "computer." (Prosecution History, pt. 2 at 17–26.) This amendment prompted the Examiner to issue an Advisory Action on July 5, 2013 stating that "Applicant's reply has overcome the ... 35 USC 101 rejection of claims 1 and 2." (Prosecution History, pt. 2 at 28.)

## II. DISCUSSION

 **\*3**  In their Motion, Defendants argue that each of the claims of the '710 Patent is not patent-eligible under Section 101 because such claims are directed to an abstract idea—a mathematical algorithm—without adding any inventive concept. (*See* Mot. 6.) Plaintiff responds that Defendants have failed to meet their burden of proving patent-ineligibility, as Defendants (1) have not explained how "a particular steradian region of space" is abstract; and (2) have ignored the specification and exhibits in their arguments regarding "inventive concept." (*See generally* Opp'n.) With counsel's arguments laid out, the sets forth the legal standards governing motions to dismiss on Section 101 grounds.

### A. Legal Standards

#### 1. Legal Standard for Motion to Dismiss

Coffelt v. NVIDIA Corp., Not Reported in Fed. Supp. (2016)

In reviewing a motion to dismiss under Rule 12(b)(6), a court may consider the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and matters of judicial notice. *See* *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citation omitted). A court accepts the plaintiff's factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See* *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (citation omitted). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citation omitted).

Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003) (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To plead sufficiently, a plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

A document filed *pro se* is "to be liberally construed." *See* *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (citation omitted). Coffelt filed his Complaint *pro se*; thus, his Complaint will be liberally construed.

2. Section 101 Analytical Framework

"Section 101 defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Section 101 reads in its entirety: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Section 101 thus specifies four independent categories of inventions or discoveries that are eligible for patent protection: processes, machines, manufactures, and compositions of matter." *Bilski*, 561 U.S. at 601.

Although acknowledging that "[i]n choosing such expansive terms ... Congress plainly contemplated that the patent laws would be given wide scope," the Supreme Court long ago identified three exceptions to Section 101: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 308–09 (1980). Although these exceptions are not required by the statutory text, they are consistent with the idea that certain discoveries "are part of the storehouse of knowledge of all men" and are "free to all men and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948). Thus, "the concern that drives this exclusionary principle [is] one of pre-emption." *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2354 (2014). Consequently, the Supreme Court has required that "[i]f there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end." *Funk Bros.*, 333 U.S. at 130.

**\*4** *Alice Corp. v. CLS Bank* ("*Alice*") represents the Supreme Court's latest effort to clarify how courts should apply these difficult principles. In *Alice*, the Supreme Court expanded on the two-step approach for resolving Section 101 issues first articulated in *Mayo Collaborative Services v. Prometheus*

*Laboratories, Inc.*, 566 U.S. ——, 132 S. Ct. 1289, 1296–97 (2012). First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 566 U.S. at ——, 132 S. Ct. at 1296–97). If so, then the court must ask "[w]hat else is there in the claims," which requires consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (citing *Mayo*, 132 S. Ct. at 1297–98). In this second step, the court must "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (citing *Mayo*, 132 S. Ct. at 1294). This two-step analytical framework has been labeled the "*Alice/Mayo* test."

Nevertheless, "Judges of this Court have recognized that the two steps of the *Alice/Mayo* test are easier to separate in recitation than in application." *Ameranth, Inc. v. Genesis Gaming Solns., Inc.*, No. CV 11–00189 AG, 2014 WL 7012391, at *2 (C.D. Cal. Nov. 12, 2014) (internal citations omitted). Another court in this district has stated that "[d]escribing this as a two-step test may overstate the number of steps involved." *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14–00742 GW, 2014 WL 4407592, at *2–*3 (C.D. Cal. Sept. 4, 2014).

As a result, identifying whether a claim is "directed to an abstract idea" under step one of the *Alice/Mayo* test is not always a simple undertaking. Although there is some disagreement among courts as to how expansively a claim should be examined at *Alice/Mayo* step one, the Federal Circuit and courts in this district require that a court examine the *purpose* of a challenged claim to determine whether it is abstract.

*See* *Cal. Inst. Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) (requiring that a court "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract," making the *Alice/Mayo* step 1 "a sort of 'quick look'

test, the object of which is to identify a risk of preemption and ineligibility"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258–59 (Fed. Cir. 2014) (although blurring steps one and two in analyzing internet-based patent claims, finding the claims not patent-ineligible where they "specify how interaction with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of the hyperlink").

In instances in which the "purpose" of the claim can be considered "abstract," the patent-eligibility analysis becomes more difficult during the second step of the *Alice/Mayo* test. In *Alice*, the Supreme Court considered whether "[t]he introduction of a computer into the claims" directed toward the abstract idea of intermediated settlement was sufficient to "transform the nature of the claim" by adding an "inventive concept." *Alice*, 134 S. Ct. at 2358. The Supreme Court held that it did not, and made clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* "Nor is limiting the use of an abstract idea 'to a particular technological environment.'" *Id.* (citing *Bilski*, 561 U.S. at 610–11). In its discussion, the Supreme Court in *Alice* distinguished an earlier case, *Diamond v. Diehr*, in which the Court held that a computer-implemented process for curing rubber, which employed a "well-known" mathematical equation, was nevertheless patent-eligible because it used that equation in a process designed to solve a technological problem in "conventional industry practice." [4] *Alice*, 134 S. Ct. at 2358 (citing *Diehr*, 450 U.S. at 177–178).

**\*5** Lower courts have not been left without any guidance, however. With respect to the "abstract ideas" exception, the Supreme Court has stated that the prohibition embodies "the longstanding rule that '[a]n idea of itself is not patentable.'" *Benson*, 409 U.S. at 67 (quoting *Rubber–Tip Pencil Co. v. Howard*, 20 Wall. 498, 507 (1874)). Following this rule, the Supreme Court has found that claims drawn to mathematical formulae, algorithms, and fundamental economic practices such as intermediated settlement and risk hedging to be directed to "abstract ideas" even

where such claims contained computer elements. *See* *Benson*, 409 U.S. at 71–72 (finding an algorithm for converting binary-coded decimal numbers into pure binary form in a general-purpose digital computer to be "in practical effect ... a patent on the algorithm itself" and therefore an abstract idea); *Parker v. Flook*, 437 U.S. 584, 594–595 (1978) (finding a mathematical formula for computing "alarm limits" in a catalytic conversion process to be an abstract idea); *Alice,* 134 S. Ct. at 2356 ("On their face, the claims before us are drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk."); *Bilski*, 561 U.S. at 611 (finding a patent claiming a "series of steps instructing how to hedge risk" not patent eligible because hedging is a "fundamental economic practice").

Indeed, the Court of Appeals for the Federal Circuit has had occasion to grapple with Section 101 issues in the wake of *Alice*. Although the Court stops well short of proclaiming that Section 101 presents any sort of bright line, these cases appear to distinguish between patents claiming improvements to modern technology and those claiming well-known concepts untethered to any particular technology or technological environment. *Compare* *DDR Holdings,* 773 F.3d at 1258 (finding eligible under Section 101 a patent claiming a method for retaining visitors on a website through the creation of a digital "store within a store," both because "the claims recite an invention that is not merely the routine or conventional use of the Internet," and also because the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but rather claim an "inventive concept for resolving [a] particular internet-centric problem"), *with* *Ultramercial, LLC v. WildTangent, Inc.*, 772 F.3d 709 (Fed. Cir. 2014) (finding patent-ineligible claims involving the display of an advertisement in exchange for access to copyrighted media, where the limitations "simply instruct the practitioner to implement the abstract idea with routine, conventional activity" and where the "invocation of the Internet also adds no inventive concept"), *cert. denied*, 135 S. Ct. 2907 (2015); *Planet Bingo, LLC v. VKGS*

*LLC,* 576 Fed.Appx. 1005 (Fed. Cir. 2014) (finding patent-ineligible claims reciting methods and systems for "managing a game of Bingo" where the claimed computer elements—"a computer with a central processing unit," "a memory," "an input and output terminal," "a printer," possibly "a video screen," and a "program ... enabling the steps of managing a game of bingo" perform steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and comparing a winning set of bingo numbers with a selected set of bingo numbers—simply recite a generic computer implementation of the covered abstract idea).

With this fundamental understanding of the purpose and limits of Section 101, the Court addresses whether a motion to dismiss may properly be brought on Section 101 grounds.

### 3. Appropriateness of Ruling on Section 101 Motions at the Pleadings Stage

"Patent eligibility under [Section] 101 is a question of law that may, in appropriate cases, be decided on the pleadings without the benefit of a claim construction hearing." *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. CV 14–0347 DOC, 2015 WL 1239992, at *6 (C.D. Cal. Mar. 17, 2015) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming district court's decision to grant motion to dismiss based on patent-ineligible subject matter under Section 101 without having a claim construction hearing); *Ultramercial*, 772 F.3d at 711 (same)). However, "it will ordinarily be desirable —and often necessary—to resolve claim construction disputes prior to a [Section] 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assurance. Co. Can. (U.S.)*, 687 F.3d 1266,1273– 74 (Fed. Cir. 2012); *see also* *Content Extraction,* 776 F.3d at 1349 ("Although the determination of

Case 2:20-bk-13849-BR  Doc 1142  Filed 03/31/26  Entered 03/31/26 20:57:38  Desc
Main Document  Page 8 of 35

Coffelt v. NVIDIA Corp., Not Reported in Fed. Supp. (2016)

patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under [🔖Section] 101.").

#### 4. Defendant's Burden

**\*6** "Although the clear and convincing evidence standard is not applicable" to a 🔖Section 101 motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the movant "still bear[s] the burden of establishing that the claims are patent-ineligible under [🔖Section] 101." 🔖*Modern Telecom Systems*, 2015 WL 1239992, at \*8. "Additionally, in applying [🔖Section] 101 jurisprudence at the pleading stage, the Court construes the patent claims in a manner most favorable to Plaintiff." *Id.* (citing 🔖*Content Extraction*, 776 F.3d at 1349).

#### B. Analysis

Having determined that the Court can rule on Defendants' Motion at the pleadings stage, the Court now applies the *Alice/Mayo* test to determine whether the claims of the 🚩'710 Patent are patent-ineligible.

#### 1. Step 1: Whether the Claims are Directed to a Patent–Ineligible Abstract Idea

The first step in analyzing whether a claim satisfies 🔖Section 101 is determining whether the claim at issue is directed to a "patent-ineligible concept" such as an abstract idea, algorithm or mathematical formula. 🔖*Alice*, 134 S. Ct. at 2355. Defendants argue that "[t]he steps recited in method claim 1 merely express a mathematical algorithm." (Mot. 7.) They contend that the steps of claim 1 only explain how to calculate two vectors, calculate a steradian region, determine whether those vectors are located in that steradian region, compare the length of the vectors and then use that information to derive color information for the two vectors. (Mot. 7–8.) Defendants point to language in the specification defining the results of these steps

as "a mathematical relationship" and "mathematical calculations." (Mot. 7–8.)

Defendants further contend that the prosecution history of the 🚩'710 Patent confirms that claim 1 is directed to a mathematical algorithm. (Mot. 10.) In particular, they point out that the PTO rejected claim 1 as abstract because the "calculations claimed can be done by a human mentally or with a pen and paper." (Mot. 10 (quoting Prosecution History, pt. 1 at 81–82.) Defendants add that after Plaintiff amended his claims to require a "machine" to accomplish the steps, the PTO again rejected the claims on the grounds that "[t]here is no **specific** machine claimed for performing the calculations, nor do the claims inherently require one." (Mot. 10 (quoting Prosecution History, pt. 2 at 9 (emphasis in original)).) Defendants further argue that although the 🚩'710 Patent issued after Plaintiff replaced the word "machine" with "computer" to accomplish the steps in claim 1, the Examiner's implied reason for allowance directly contravenes the Supreme Court's ruling in *Alice*. (Mot. 11 (citing 🔖*Alice*, 134 S. Ct. at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent ineligible abstract idea into a patent eligible invention.")).

Plaintiff does little to rebut these contentions. Instead, Plaintiff goes to great lengths to argue that "[s]pace is not abstract," (Opp'n 18), but is instead "a region, and real object, we all exist in," (Opp'n 8). Plaintiff relies on the contentions that space "exists literally" and that the computer calculations in claim 1 "bring[ ] a particular steradian ... into existence" to support his assertion that claim 1 is directed to "Real Objects" rather than to an abstract idea. (*See generally* Opp'n.) The critical flaw with this argument, however, is that the 🚩'710 Patent does not claim "space." Instead, it claims methods of calculating a **region** of space and **comparing** various calculations to choose a pixel color. (🚩'710 Patent at cols. 2:66–3:2.) Moreover, Plaintiff's declaration that claim 1 references "Real Physical Objects," (*see* Opp'n 6), does little to convince the Court that the claimed method is directed to anything but a mathematical algorithm,[5] *see* 🚩*In re TLI Commc'ns LLC Patent Litig.*, —— F.3d ——, 2016 WL 2865693, at \*3 (Fed. Cir. May 17, 2016) ("However, not every claim that recites concrete,

Case 2:20-bk-13849-BR Doc 1142 Filed 03/31/26 Entered 03/31/26 20:57:38 Desc
Main Document Page 9 of 35

Coffelt v. NVIDIA Corp., Not Reported in Fed. Supp. (2016)

tangible components escapes the reach of the abstract-idea inquiry.").

**\*7** The Court concludes that the steps recited in claim 1 are directed to an abstract, mathematical algorithm. As the Examiner noted, "[i]n the instant invention, a pixel color is derived mathematically using vectors in a particular steradian region. The calculations claimed can be done by a human mentally or with a pen and paper. There is no [specific] machine claimed for performing the calculations, nor do the claims inherently require one." (Prosecution History, pt. 1 at 81–82.). "A method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101." *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).

Claims 2 through 6, which depend on claim 1, recite additional steps of calculating other mathematical relationships involving the steradian region. Thus, all of the dependant claims are directed to the same type mathematical algorithm outlined in claim 1. As such, all of the claims in the '710 Patent are directed to a mathematical algorithm.

2. Step 2: Whether the Claims Include an "Inventive Concept" Sufficient to "Transform the Nature of the Claim" into a Patentable Invention

Having determined that the claims of the '710 Patent are directed to an abstract mathematical algorithm for calculating and comparing regions in space, the Court now "examine[s] the limitations of the claims to determine whether the claims contain an 'inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." *Ultramercial II*, 772 F.3d at 715 (quoting *Alice,* 134 S. Ct. at 2357). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Alice,* 134 S. Ct. at 2357 (quoting *Mayo,* 132 S. Ct. at 1298). Importantly, the "mere recitation of a generic computer cannot transform a

patent-ineligible abstract idea into a patent-eligible invention." *Alice,* 134 S. Ct. at 2358.

Defendants contend that the claim elements, when viewed individually and as an "ordered combination," lack an inventive concept sufficient to render the asserted claims patent-eligible, as "the claims do nothing more than state the abstract idea to be applied using a generic 'computer.'" (Mot. 12.) Plaintiff responds by noting that the '710 Patent includes a "full, concise, and exact description" of the inventive step. (Opp'n 3.) However, Plaintiff proceeds to simply introduce and define the term "steradian." Absent from this explanation is any indication that the **claims** add to the underlying mathematical algorithm used to calculate and compare those steradians. While the '710 Patent claims methods for calculating steradian regions, it does not claim the steradian itself. [6]

Plaintiff argues that the '710 Patent's "inventive concept" is evidenced by the fact that the software built around the '710 Patent accomplishes things that the industry has struggled to do for many years. (Opp'n 4.) Although this might be true, that an invention may be new, useful, or lucrative does not demonstrate that the invention is thus eligible for patent protection under Section 101. *See Flook*, 437 U.S. at 591 ("[T]he novelty of the mathematical algorithm is not a determining factor [in Section 101 analysis] at all.") Indeed, "[a] claim for an improved method of calculation, even when tied to a specific end use, is unpatentable subject matter under § 101." *Id.* at 595 n. 18. Although Plaintiff might have discovered a new and useful mathematical formula, "the discovery of such a phenomenon cannot support a patent unless there is some other inventive concept in its application." *Id.* at 594.

**\*8** The Court concludes that the asserted claims lack sufficient "additional features" to transform the mathematical algorithm into a patent-eligible invention. Although claim 1 requires the use of a "computer," there are no limitations placed on the hardware or software required to be used in the

claimed methods or systems. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333–34 (Fed. Cir. 2012) ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."). In particular, the claims themselves do not contain any limitations regarding specific hardware or software that must be used to perform the claimed methods, and the specification provides that "[o]bviously, the mathematical calculations set forth herein may be executed by various computer programming languages." ('710 Patent col. 5:21–23.) "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1297).

F. Conclusion

On its face, the methods claimed in the '710 Patent are unpatentable under 35 U.S.C. § 101 because they recite merely a series of mathematical calculations that can be used to create a steradian region. That the claims require the use of a generic computer to perform those calculations does not constitute a sufficient "inventive concept" to transform the abstract nature of the claims into patent-eligible inventions. The claims of the '710 Patent are expressly prohibited under *Alice*, *Mayo*, and their progeny.

III. RULING

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss. This matter shall close.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7507763

---

**Footnotes**

1     Plaintiff filed a "Reply to Defendants Reply" on June 9, 2016. (*See* Pl.'s Reply to Defs. Reply, ECF No. 41.) Local Rule 7–10, however, provides that "[a]bsent prior written order of the Court, the opposing party shall not file a response to the reply." L.R. 7–10. As Plaintiff is proceeding *pro se*, the Court has considered its contents.

2     Although the instant action was initially assigned to the Honorable Beverly Reid O'Conell, it was reassigned to this Court on March 16, 2016. (*See* Order to Reassign Case, ECF No. 8.)

3     The Court takes judicial notice of the prosecution history of the '710 Patent pursuant to Federal Rule of Evidence 201(b)(2), as it is a public record that "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005); *see also* 37 C.F.R. § 1.11(a) (2010) ("The specification, drawings, and **all papers relating to the file of**: A published application; a patent; or a statutory invention registration are open to inspection by the public. ...") (emphasis added). What's more, Plaintiff does not object to or in any way oppose Defendants' request.

Coffelt v. NVIDIA Corp., Not Reported in Fed. Supp. (2016)

In particular, the Supreme Court in *Diehr* explained that the claimed contribution to the art was the step of "constantly measuring the actual temperature inside the mold" for the synthetic rubber products. ⚑*Diehr*, 450 U.S. at 178, 179 n.5.

Plaintiff mischaracterizes the nature of the claims within the ⚑'710 Patent in another way. While a user may use the steps outlined in the ⚑'710 Patent to create "a particular steradian region of space" or "a steradian radius," (Opp'n 6), the patented steps comprise **calculations** of these dimensions rather than the creation of the space or radius.

Indeed, Plaintiff cannot claim the steradian. From Plaintiff's own concessions in the prosecution history, the steradian is a well-known mathematical principle, discovered well before the filing of this patent application.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-bk-13849-BR Doc 1142 Filed 03/31/26 Entered 03/31/26 20:57:38 Desc
Main Document Page 12 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

2005 WL 6443624
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. Texas, Dallas Division.

In re PREMIERE NETWORK
SERVICES, INC., Debtor.

No. 04–33402–HDH–11.
|
July 1, 2005.

**Attorneys and Law Firms**

Claude D. Smith, Cavazos, Hendricks, Poirot & Smitham, PC, David L. Campbell, McElree Smith, Dallas, TX, George Brin, Brin & Brin, PC, San Antonio, TX, Patricia B. Tomasco, Munsch Hardt Kopf & Harr, P.C., Austin, TX, for Debtor.

*MEMORANDUM OPINION*

HARLIN D. HALE, Bankruptcy Judge.

**\*1** Came before the Court for hearing, the Debtor's Second Amended Plan of Reorganization ("Plan"). This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A), (L) & (O). After several days of hearings on the Plan, the Court took the matter under advisement and now finds that confirmation should be denied based on the Plan's failure to meet the requirements of 11 U.S.C. § 1129.

**I. BACKGROUND FACTS**

Premiere Network Services ("Premiere") is certified by the State of Texas as a local telephone company, otherwise known as a competitive local exchange carrier ("CLEC"). On March 29, 2004, Premiere filed its voluntary petition under Chapter 11, Title 11 of the United States Code. Prior to filing its petition, Southwestern Bell Telephone, L.P. d/b/a SBC TEXAS ("SBC") served as Premiere's primary incumbent exchange carrier ("ILEC"). Under a Master Services Agreement ("MSA") with UTEX Communications Corporation ("UTEX") entered into post-petition, Premiere now utilizes UTEX to provide its telecommunication network elements. Premiere has continued to operate its business as a debtor in possession and now submits its joint Plan along with UTEX. SBC has voted against the Plan and has objected to confirmation of the Plan on several grounds.

In many ways the Plan is a liquidation. The Plan continues, in large part, the migration of the Debtor's business to UTEX. That process began fairly early in the case pursuant the MSA that was approved by this Court. The Plan contemplates that the Debtor's existing stock will be canceled upon confirmation and new stock will be issued to UTEX in satisfaction of UTEX's administrative claim.

The Plan proposed by the Debtor and UTEX provides for full payment of all Allowed Administrative Claims in cash, or as otherwise agreed, after confirmation on an effective date described in the Plan. The Plan contemplates full payment of Allowed Priority Claims, including Priority Tax Claims over time. The Plan contemplates full payment or return of collateral to Allowed Secured Claims over time and payments pro rata over time in partial satisfaction of Allowed Unsecured Claims. Under the Plan, a Liquidating Trust is created to make distributions and litigate Causes of Action for the benefit of Allowed Claims.

Additionally, each executory contract and unexpired lease to which the Debtor is a party which has not previously been assumed or rejected is deemed rejected unless the Debtor expressly assumes a particular executory contract or unexpired lease before the Effective Date. No additional contracts are assumed under the Plan.

After the Confirmation Date of the Plan, all objections to Claims and all Causes of Action and Avoidance Actions shall be assigned to a Liquidating Trust and prosecuted by the Liquidating Trustee. The Liquidating Trustee may object to allowance of Claims for which liability, in whole or in part, is disputed for

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc

Main Document    Page 13 of 35

*In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)*

whatever reasons, even if Claims were not scheduled by the Debtor as disputed, contingent or unliquidated. All objections to Claims must be filed within ninety days following the Confirmation Date of the Plan, unless extended by the Bankruptcy Court.

**\*2** SBC has objected to Confirmation of the Plan on several grounds, including its failure to meet most of the confirmation standards required by the Bankruptcy Code. Therefore, the Court will address each standard in turn.

## II. ANALYSIS

### A. Confirmation Standards

Bankruptcy Code Section 1129 lists the confirmation standards for a plan of reorganization. 11 U.S.C. § 1129(a). The proponent of a plan of reorganization must show by a preponderance of evidence that the requirements of subsection 1129(a) are met. *In re Landing Assocs., Ltd.,* 157 B.R. 791 (E.D.Tex.1992). The only section of 1129(a) that is not mandatory is 1129(a)(8), which requires that all impaired classes accept the plan. In the case of rejection by an impaired class the court, at the proponent's request, may confirm the plan under the section 1129(b) "cram down" provision. 11 U.S.C. § 1129(b). The plan must, however, comply with all other provisions of section 1129(a).

The Court has a mandatory and independent duty to review the plan for compliance with section 1129. *In re Williams,* 850 F.2d 250, 253 (5th Cir.1988). In its review, the Court considers the plan in light of the facts and circumstances of the case. *In re D & F Construction,* 865 F.2d 673, 675 (5th Cir.1989). If the plan does not satisfy the requirements of section 1129(a) and (b), confirmation must be denied.

### B. The Present Plan

*Compliance*

Both the plan and the proponent of the plan must comply with the provisions of Title 11. 11 U.S.C. §§ 1129(a)(1)-(2). Having reviewed the Bankruptcy Code and considered the facts and circumstances of this case, the Court finds the proponents to be in compliance with provisions of section 1129(a)(1)-(2).

*Good Faith*

The plan must be proposed in good faith and not by any means be forbidden by law. 11 U.S.C. § 1129(a) (3); *see also Financial Sec. Assurance Inc. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship),* 116 F.3d 790, 802 (5th Cir.1997). Good faith in the Chapter 11 plan process is not defined by the Code. Generally speaking, to be proposed in good faith, a plan must "fairly achieve a result consistent with the [Bankruptcy] Code." *In re Block Shim Dev. Co.-Irving,* 939 F.2d 289, 293 (5th Cir.1991)(citing *In re Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir.1984)). Good faith is a question of fact that must be determined in light of the totality of the circumstances surrounding the bankruptcy filing. *Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir.1983). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a) (3) is satisfied." *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir.1985).

The Plan Proponents have the burden of proof to show that the plan is proposed in good faith by a preponderance of the evidence. *See, In re T–H New Orleans Ltd. P'ship,* 116 F.3d at 802. A plan may satisfy the good faith requirement even though the plan may not be one that the creditors would themselves design and indeed may not be confirmable. *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993), *cert. denied* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). Although, as discussed below, the Plan will not be confirmed, the Plan is made in good faith and in observance of law.

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document    Page 14 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

*Payment Approval*

 **\*3**  Payments under a plan must be approved by the court. Specifically,

> any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). The record before the Court suggests that payments for services or expenses have been disclosed as required by section 1129(a)(4). Court approval of payments for services and expenses is governed by various Code provisions and is contemplated by the proponents' Plan. See, 11 U.S.C, §§ 328, 329, 330, 331 and 503(b). Thus, the proponents have achieved compliance with section 1129(a)(4).

*Disclosure*

Premiere must disclose the identity and affiliation of any individual proposed to serve as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan. 11 U.S.C. § 1129(a)(5)(A). The Plan describes in general terms the proposed operations of the successor to the debtor. Sufficient disclosure has been given.

Premiere must also disclose the identity of any insider that will be employed or retained by the reorganized debtor. *Id.* at § 1129(a)(5)(B). The

testimony at the confirmation hearing made clear that no Premiere employees, officers, or other insiders would be retained by Reorganized Premiere. No evidence has been presented to indicate otherwise. The proponents have achieved compliance with section 1129(a)(5).

*Regulatory Approval*

Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor must approve any such rate change provided for in the plan, or such rate change must be expressly conditioned on such approval. The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency. The proponents have achieved compliance with section 1129(a)(6).

*Best Interest of Creditors*

To be confirmable, the record must establish that the Plan is in the best interest of all creditors. 11 U.S.C. § 1129(a)(7); *In re Voluntary Purchasing Groups, Inc.,* 222 B.R. 105, 107–108 (E.D.Tex.1998), *rev'd on other grounds* 252 B.R. 373 (E.D.Tex.2000). To satisfy the best interest test, the Plan Proponents must prove, *inter alia,* that each creditor that did not vote to accept the Plan is receiving at least as much under the Plan as that creditor would receive in a Chapter 7 liquidation of the Debtor. *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993), *cert denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). SBC has rejected the Plan; therefore, it must receive at least as much as it would receive in Chapter 7.

After considering the evidence offered at the hearing, the Court finds that the Plan Proponents have not demonstrated that confirming the proposed Plan is in the best interest of creditors. The Plan Proponents assert that Premiere has no substantial assets to liquidate, but no persuasive liquidation analysis was offered. The Plan Proponents did not introduce sufficient current financial information to permit the

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document    Page 15 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

Court to determine whether the test has been satisfied; therefore, the Court cannot reach a best interests conclusion.

**\*4** Furthermore, the Plan Proponents propose to make payments to creditors some time in the future based on a percentage of profits. The payment stream for such payments is highly speculative. "A judgment regarding whether the best interests test has been met is to be made on the basis of evidence, not assumptions." *Voluntary Purchasing Groups,* 222 B.R. at 108 (citations omitted). The Plan Proponents have failed to establish by a preponderance of evidence that the proposed Plan satisfies the best interest of creditors test. Therefore, they have not met the requirements of section 1129(a)(7).

### Acceptance by All Impaired Classes

Not all of the impaired classes have accepted the Plan. The proponents have failed to meet section 1129(a)(8). Were this the only requirement unmet, confirmation could be achieved through section 1129(b) "cram down"; however, as discussed further below, all other provisions have not been met, and cram down is unavailable to achieve confirmation.

### Treatment of Administrative Expense Claims and Priority Tax Claims

The treatment of Administrative Expense Claims under Article 6.1.1 of the Plan satisfies the requirements of section 1129(a)(9)(A)-(B) of the Bankruptcy Code. As mentioned below, the Court has serious doubts that the Chapter 11 Administrative Expense Claims will be paid as required by the Code. However, the treatment afforded such claims meets the Bankruptcy Code's requirements. The treatment of Priority Tax Claims under Article 6.5.1 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

### Acceptance by One Impaired Class

As discussed on the record at the hearing, Premiere should have been more deliberate in its ballot tallying. However, the Court finds that the final tally submitted at the hearing is correct. SBC's unsecured claim was separately classified in Class 6 and has voted to reject the Plan. Classes 2 and 7 are impaired and have voted to accept the Plan; however, SBC asserts that both classes fail to satisfy Section 1129(a)(10) when the votes of insiders are not counted. The Court finds this to be true as to Class 2; however, after omitting the members of the classes that SBC has shown to be insiders [1], the remaining members of Class 7 overwhelmingly do vote over two-thirds in amount and over one-half in number in favor of the Plan, in satisfaction of section 1126(c). *See,* 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan."). Thus one impaired class has voted in favor of the Plan.

### Feasibility

The Plan has not been shown to be feasible. The evidence has not established that the Debtor will obtain an "effective date" or that creditors really will be paid something under the Plan. Section 1129(a)(11) requires that the confirmation of the plan be accompanied by the likelihood of success. Specifically, the Code requires that:

**\*5** Confirmation of the plan is not likely to be followed by the liquidation, or the further need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Case 2:20-bk-13849-BR   Doc 1142   Filed 03/31/26   Entered 03/31/26 20:57:38   Desc
Main Document     Page 16 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

11 U.S.C. § 1129(a)(11). Feasibility is mandatory, and must be determined at the confirmation hearing. The certainty of the plan's implementation is required to be in place at the time of the confirmation hearing. *In re Sis,* 120 B.R. 93, 98 (Bankr.N.D.Ohio 1990). The burden of proving feasibility belongs to the proponents of the plan. *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 505 (Bankr.S.D.Tex.1989).

"Effective date" is not defined in the Code. As a result, courts have debated the proper rule for defining the effective date. *See, In re Jones,* 32 B.R. 951, n. 13 (Bankr.D.Utah 1983) (discussing whether effective date should be reasonably tied to the date of confirmation or the date of final order and adopting "a rule of reason"). Courts that have taken the approach that the effective date should be close to confirmation have cited the importance of the effective date to confirmation. *Id.*

The Plan defines the effective date at Article 2.23;

> The first date on which the Confirmation Order is no longer subject to appeal or certiorari proceeding, provided no such appeal or certiorari proceeding is then pending and sufficient funds exist for the Debtor to fund the Administrative Claims Reserve; provided, however, that the Effective Date must occur on a date within 120 days of the Confirmation Date or the Debtor shall be in default under the Plan.

Without appeal, a Confirmation Order would be final after 10 days. Fed. R. Bankr.P. 8002. However, appeal is almost certain in this case. This bankruptcy has been surrounded by litigation from all sides. SBC has all but assured this Court in the confirmation hearing that if this Plan is confirmed there will be an appeal.

Resolution of an appeal within the 120–day period set forth by the Plan is unlikely. [2]

It would be possible to craft an outside date that provided for the possibility of appeal. However, the outside date should not be established in an effort to buy time to comply with the other provisions of § 1129. *In re Potomac Iron Works,* 217 B.R. 170 (Bankr.D.Md.1997), dealt with the issue of whether a plan could define the effective date to be *one year* from the date of confirmation. In *Potomac,* the feasibility of debtor's plan was tied to accounts receivable that were projected by the debtor to require additional time to collect. That plan defined the effective date as the one-year anniversary of the 15th calendar day after the finalization of the confirmation order. *Id.* at 171. The court held that allowing for the exhaustion of an appeal is reasonable "in recognition of a prospective lender's reluctance to advance funds until the appeal period has passed." *Id.* at 174 (citing *In re Wonder Corp. of America,* 70 B.R. 1018, 1020–21 (Bankr.D.Conn.1987)). However, the court found, that the debtor's purpose of fixing such an extended effective date was "not to exhaust the appeal process, but solely to buy extra time to collect account receivables," *Id.*

**\*6** Importantly, under the present Plan the effective date, as filed and under the proposed modification, is further conditioned on sufficient funds. The proponents need cash to pay administrative expenses, as required by § 1129. However, they do not have the funds presently. The confirmation hearing made clear that obtaining the sufficient funds required by the Plan and the Bankruptcy Code will depend in large part, on whether Reorganized Premiere can assume the Debtor's California contracts. SBC argues that these contracts have expired. The record on the California contracts is mixed. The contracts are certainly in question, replacing the Debtor with UTEX is not a given, and a transfer from Premiere to UTEX will take time. Whether the California contracts can be assumed, and if so, whether they can provide sufficient funds is too speculative to say that the Plan is feasible.

Courts are typically reluctant to confirm a plan that shifts risk to the claimants. The plan of reorganization must provide the claimants with at least as much as

Case 2:20-bk-13849-BR Doc 1142 Filed 03/31/26 Entered 03/31/26 20:57:38 Desc
Main Document Page 17 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

they would receive in liquidation. Although the present Plan proposes to pay claimants required to be paid on the effective date, extending and creating uncertainty as to the effective date forces these priority claimants to subsidize the proposed joint Plan and bear the risks of failure. See, *In re Krueger,* 66 B.R. 463 (S.D.Fla.1986); *In re European Industrial Development Co., LLC,* 288 B.R. 572 (Bankr.N.D.Ca.2003).

Accordingly, the Plan is found and determined not to be feasible. The Debtor's ability to satisfy its financial obligations under the Plan, and the payment requirements of § 1129 is not just speculative, but is so contingent on factors beyond its control (such as resolution of appeal of the confirmation order, implementation of the effective date, litigious claims by and against SBC, the assumption of allegedly expired contracts that will most likely spur further litigation, and collection of enough funds to pay administrative expenses) that completion of the Plan is unlikely. Consequently, confirmation of the Plan is likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Premiere. Thus, the proponents have failed to meet the requirements of section 1129(a)(11).

*Payment of Fees*

All fees payable under 28 U.S.C. § 1930, as determined by the Court, have been paid or will be paid then due, pursuant to Article 6.1.2 of the Plan, thus satisfying the requirements of 11 U.S.C. § 1129(a) (12).

*Continuation of Retiree Benefits*

The Debtor has no obligation to pay "retiree benefits." The proponents have achieved compliance with section 1129(a)(13).

### III. CONCLUSION

For the reasons stated herein, the Court will not confirm the Plan. The Court will enter a separate order denying confirmation.

### All Citations

Not Reported in B.R. Rptr., 2005 WL 6443624

---

### Footnotes

1 SBC has objected to the inclusion of the vote of Debtor's former attorneys, Bickerstaff, Heath & Smiley, being included in class 7 because SBC argues that the lawfirm is an insider. The Court has addressed this issue in a separate memorandum opinion, and finds that the lawfirm is not an insider for voting purposes.

2 After the conformation hearing was commenced, the Plan Proponents filed a motion to modify certain provisions of the Plan, including the language of Article 2.23. The proposed modification provides:

> 2.23 *Effective Date:* The first business date ~~on which the Confirmation Order is no longer subject to appeal or certiorari proceeding, provided no such appeal or certiorari proceeding is then pending~~ following the tenth day (as calculated in accordance with Bankruptcy Rule 9006(a)), after the Confirmation Date, on which (a) the Confirmation Order is not stayed, and (b) sufficient funds exist for the Debtor to fund the Administrative Claims Reserve; provided, however, on a date to occur not later than 60 days following the successful interconnection between Reorganized Premiere under the existing interconnection agreement between Premiere and Pacific Bell to serve customers throughout the state of California (the "Outside Date"); provided

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document      Page 18 of 35

In re Premiere Network Services, Inc., Not Reported in B.R. Rptr. (2005)

that the Effective Date must occur on a date within 120 days of the Confirmation Date or the Debtor shall be in default under the Plan.

SBC objected to the proposed modification because it was filed after the confirmation hearing had begun, it made material modifications to the Plan, and the creditors were not able to review the changes prior to voting. The proposed modification to Article 2 .23 attempts to address some of the objections to the Plan's open-ended Effective Date, by taking out the language regarding appeal of the Confirmation Order. However, it still leaves open-ended the questions of when the necessary funds will be available to fund the Administrative Claims Reserve, if and when a successful interconnection can be accomplished by Reorganized Premiere in California under the Debtor's existing interconnection agreement, and whether any of this can be accomplished within 120 days given the objections raised by SBC and the ultimate litigation that will arguably need to be brought by the parties.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 1877616
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

UNIVERSAL ELECTRONICS INC.

v.

ROKU, INC.

Case No. SACV 18-1580 JVS (ADSx)
|
Filed 03/05/2019

**Attorneys and Law Firms**

Ryan W. Koppelman, Timothy R. Watson, Alston and Bird LLP, East Palo Alto, CA, Evan William Woolley, Alston and Bird LLP, Los Angeles, CA, Michael J. Newton, Alston and Bird LLP, Dallas, TX, for Universal Electronics Inc.

Jonathan D. Baker, Dickinson Wright PLLC, Sunnyvale, CA, Michael D. Saunders, Steven Robert Daniels, Dickinson Wright PLLC, Austin, TX, Steven A. Caloiaro, Dickinson Wright PLLC, Reno, NV, for Roku, Inc.

**Proceedings: [IN CHAMBERS]**
**Order Regarding Motion to Dismiss**

James V. Selna, District Judge

**\*1** Defendant Roku, Inc. ("Roku") filed a motion to dismiss Counts IV–IX of Plaintiff Universal Electronics Inc.'s ("UEI") First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that the asserted patents are not patent-eligible under 35 U.S.C. § 101, and that UEI fails to state a claim for willful infringement. Mot., Docket No. 32. UEI filed an opposition. Opp'n, Docket No. 37. Roku replied. Reply, Docket No. 48.

For the following reasons, the Court **denies** the motion.

**I. BACKGROUND** [1]

Plaintiff UEI filed suit against Roku on September 5, 2018, alleging infringement of nine patents. Docket No. 1; see also FAC, Docket No. 28. The FAC alleges that Roku infringes UEI's patents by selling certain Roku streaming players with remote controls, and by making the Roku Mobile App available for use in connection with certain of its streaming players. FAC, Docket No. 28 ¶¶ 28, 47, 67, 93, 113, 136, 158, 180, 199. Specifically, UEI asserts that Roku infringes U.S. Patent Nos. 7,589,642; 8,004,389; 9,911,325; 9,716,853; 7,782,309; 7,821,504; 7,821,505; 7,895,532; and 8,015,446. Id. ¶¶ 7–15. Roku now moves for dismissal of counts four through nine of the FAC on the basis that the patents asserted against it in those causes of action are directed to patent-ineligible subject matter. Mot., Docket No. 32.

**A. The Arling Patent**

U.S. Patent No. 9,716,853 ("the '853 Patent" or "Arling Patent") is the subject of Count IV of the FAC. Id. ¶¶ 89–107. The Arling Patent issued on July 25, 2017, and is titled "System and Method for Optimized Appliance Control." Docket No. 28-4.

UEI alleges that Roku infringes Claim 1 and "at least one other claim" of the Arling Patent. FAC, Docket No. 28 ¶ 94. Claim 1 of the Arling Patent recites:

**\*2** 1. A universal control engine, comprising:

a processing device; and

a memory device having stored thereon instructions executable by the processing device, the instructions, when executed by the processing device, causing the universal control engine to respond to a detected presence of an intended target appliance within a logical topography of controllable appliances which includes the universal control engine by using an identity associated with the intended target appliance to create a listing comprised of at least a first communication method and a second communication method different than the first communication method for use in controlling each of at least a first functional operation and a second functional operation of the intended target

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document    Page 20 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

appliance and to respond to a received request from a controlling device intended to cause the intended target appliance to perform a one of the first and second functional operations by causing a one of the first and second communication methods in the listing of communication methods that has been associated with the requested one of the first and second functional operations to be used to transmit to the intended target appliance a command for controlling the requested one of the first and second functional operations of the intended target appliance.

Docket No. 28-4 at 14:49–15:7. Claim 1 of the Arling Patent generally relates to a system for controlling consumer electronics devices, such as televisions or receivers, that support various different wired or wireless communication protocols such as Infrared, WiFi, Bluetooth, and HDMI. Docket No. 28-4 at 1:47. The specification describes a software and hardware solution called a "Universal Control Engine (UCE)," which selects the "optimum" way to relay a remote control's commands to a target appliance. Id. at 2:4-45. Figure 1 of the patent illustrates the UCE receiving commands from remote control and relaying them to other devices using either a wired or wireless path as appropriate. Id. at 3:39-63. The preferred embodiment of the UCE is a "command matrix" comprised of "series of data cells or elements" (i.e., a table) that, for any given operation (e.g., power on, volume down, rewind), and any given device (e.g., TV, DVR, DVD), identifies the appropriate communications path for sending the command to the selected device. Id. at Fig. 7, 7:19-29.

**B. The Janik Patents**

U.S. Patent Nos. 7,782,309 ("the '309 Patent"), 7,821,504 ("the '504 Patent") and 7,821,505 ("the '505 Patent") (together, "the Janik Patents") are the subject of Counts V–VII of the FAC. Id. ¶¶ 89–107. The '309 Patent issued on August 24, 2010, and the '504 and '505 Patents issued on October 26, 2010. Docket Nos. 28-5, 28-6, 28-7. The Janik Patents are all titled "Controlling Device With Dual-Mode, Touch-Sensitive Display." Id.

The Janik Patents generally relate to a touchscreen remote control which allows the user to switch between two input modes for controlling a device: (1) selecting an icon on the touch screen, or (2) using the motion of a finger or stylus across the screen to control a pointer. Docket No. 28-5 at 2:9–21, 3:13–15. The FAC alleges that Roku infringes at least Claim 1 of each of the '309, '504, and '505 Patents. FAC, Docket No. 28 ¶¶ 114, 137, 159.

**\*3** Roku argues that Claim 1 of the '505 Patent is representative of all of the independent claims in the Janik Patents. Mot., Docket No. 32 at 10. Claim 1 of the '505 Patent recites:

1. A universal controlling device, comprising:

a display having a touch-sensitive surface in which is displayed a plurality of graphical user interface icons;

a transmitter for transmitting data for commanding functional operations of one or more appliances located remotely from the controlling device; and

a processing device for causing the transmitter to transmit data in response to input provided to the touch-sensitive surface;

wherein, in response to the touch-sensitive surface of the universal controlling device being provided a first input type indicative of a selection of a one of the plurality of displayed graphical user interface icons, the processing device causes the transmitter to transmit first data for commanding at least a first functional operation of the one or more appliances with the first data being representative of the one of the plurality of graphical user interface icon selected by the first input type and, in response to the touch-sensitive surface being provided a second input type indicative of a motion made across the touch-sensitive surface, the processing device causes the transmitter to transmit second data for commanding at least a second functional operation of the one or more appliances with the second data being representative of the motion made across the touch-sensitive surface provided by the second input type, and wherein the

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document    Page 21 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

processing device is programmed to distinguish the first input type provided to the touch-sensitive surface from the second input type provided to the touch-sensitive surface.

Docket No. 28-7 at 7:8–37. Independent Claim 1 of the 🚩 '309 Patent and independent Claim 1 of the 🚩 '504 Patent, which Roku does not argue are representative of the Janik Patents, recite similar limitations. See Docket Nos. 28-5, 28-6. Claim 1 of the 🚩 '309 Patent recites:

1. A method for using a universal controlling device comprised of a display having a touch-sensitive surface to transmit data to one or more appliances located remotely from the controlling device, comprising:

   causing one or more graphical user interfaces comprised of graphical user interface icons to be displayed in the display of the universal controlling device;

   accepting via the touch-sensitive surface of the universal controlling device a first input type indicative of a selection of a displayed graphical user interface icon;

   causing the universal controlling device to transmit to the one or more appliances first data representative of the displayed graphical user interface icon selected by the first input type;

   accepting via the touch-sensitive surface of the universal controlling device a second input type indicative of a motion made across the touch-sensitive surface;

   causing the universal controlling device to transmit to the one or more appliances second data representative of the motion made across the touch-sensitive surface provided by the second input type; and

   causing the universal controlling device to distinguish the first input type received via the touch-sensitive surface from the second input type received via the touch-sensitive surface.

**\*4** Docket No. 28-5 at 7:4–28. Similarly, Claim 1 of the 🚩 '504 Patent recites:

1. A method for using a universal controlling device comprised of a touch-sensitive surface to command functional operations of one or more appliances located remotely from the controlling device, comprising:

   accepting via the touch-sensitive surface of the universal controlling device a first input type indicative of a static touch made upon the touch-sensitive surface;

   causing the universal controlling device to transmit first data used to command at least a first functional operation of the one or more appliances, the first data being representative of the static touch made upon the touch-sensitive surface;

   accepting via the touch-sensitive surface of the universal controlling device a second input type indicative of a moving touch made across the touch-sensitive surface;

   causing the universal controlling device to transmit second data used to command at least a second functional operation of the one or more appliances, the second data being representative of the moving touch made across the touch-sensitive surface; and

   causing the universal controlling device to distinguish the first input type received via the touch-sensitive surface from the second input type received via the touch-sensitive surface.

Docket No. 28-6 at 7:6–29.

### C. The Scott Patents
U.S. Patent Nos. 7,895,532 ("the '532 Patent") and 8,015,446 ("the '446 Patent") (together, "the Scott Patents") are the subject of counts VIII–IX of the FAC. FAC, Docket No. 28 ¶¶ 176–210. The '532 Patent was issued on February 22, 2011, and the '446 Patent was issued on September 6, 2011. Docket Nos. 28-8, 28-9. The Scott Patents are both titled "User Interface for a Remote Control Application." Id.

Case 2:20-bk-13849-BR   Doc 1142   Filed 03/31/26   Entered 03/31/26 20:57:38   Desc
Main Document      Page 22 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

The Scott Patents are related in that they share substantially identical specifications but claim different aspects of their common disclosure. The '532 Patent generally relates to a remote control device that automatically creates a sequence of instructions to be executed by the remote when an icon is selected. See Docket No. 28-8 at 39:42–40:10. The '446 Patent generally relates to a remote control device that stores data about user interactions with the device, and then uploads that data to a remote computer where it can be used for debugging. See Docket No. 28-9 at 38:43–57.

The FAC alleges that Roku infringes at least Claim 10 of the '532 Patent, which recites:

> 10. A method for automatically creating a sequence of instructions to be executed by a controlling device, comprising:
>
>> presenting to a user a graphical user interface including a representations of at least one appliance controllable by the controlling device;
>>
>> using a program to automatically create the sequence of instructions to be executed by the controlling device such that the sequence of instructions reflects one or more interactions by the user with the representations of the at least one appliance controllable by the controlling device presented via the graphical user interface; and
>>
>> causing the automatically created sequence of instructions to be executed by the controlling device in response to a selection of a user input element of the controlling device.

**\*5** Docket No. 28-8 at 39:42–40:10; see also FAC, Docket No. 28 ¶ 180.

The FAC alleges that Roku infringes at least Claim 1 of the '446 Patent, which recites:

> 1. A method for facilitating debugging of a remote control application of a controlling device, comprising:
>
>> storing within a memory of the controlling device data captured during operation of the controlling device, the data being representative of a user interaction with a user interface element of the controlling device and an action occurring within the remote control application of the controlling device resulting from the user interaction with the user interface element of the controlling device; and
>>
>> causing the controlling device to upload the captured data to a computer in communication with the controlling device whereby the uploaded captured data is available for use in debugging the remote control application of the controlling device.

Docket No. 28-9 at 38:43–57.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). A claim has "facial plausibility" if the plaintiff pleaded facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) ).

In resolving a 12(b)(6) motion under Twombly, a court must follow a two-step approach. Iqbal, 556 U.S. at 679. First, a court must accept all well-pleaded factual allegations as true, but "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 677. Furthermore, a court must not "accept as true a legal conclusion couched as a factual allegation." Id. at 677–78 (quoting Twombly, 550 U.S. at 555). Second, assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." Id. at

664. This determination is context-specific, requiring a court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id.

## B. 🚩 35 U.S.C. § 101

Under 🚩 35 U.S.C. § 101, an invention is patent-eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." However, 🚩 § 101 has a longstanding, "important implicit exception: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." 🚩 Assoc. for Molecular Pathology v. Myriad Genetics, Inc., 133 S. Ct. 2107, 2116 (2013). "[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept," but only applications of an abstract concept "to a new and useful end" remain eligible for patent protection. 🚩 Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347, 2354 (2014).

**\*6** The U.S. Supreme Court has set forth a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent eligible applications of those concepts." 🚩 Id. at 2355. First, the Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." 🚩 Id. at 2355. If so, then the second step requires the Court to search for an "inventive concept" by considering the elements of each claim—both individually and as an ordered combination—"to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." 🚩 Id. at 2355. If the claims at issue are directed to a patent-ineligible concept and the elements of each claim do not transform it into a patent-eligible application, then the claims are patent-ineligible under 🚩 35 U.S.C. § 101. See 🚩 id. at 2355, 2360. [2]

### III. DISCUSSION

The Court finds that (1) independent Claim 1 of the '853 Patent is not directed to an abstract idea and is thus patent-eligible; (2) independent Claim 1 of the 🚩 '505 Patent is directed to an abstract idea, but an inventive concept transforms it into a patent-eligible invention; (3) independent Claim 10 of the '532 Patent is not patent-eligible under either step of the Alice analysis; and (4) assuming it is directed to an abstract idea, independent Claim 1 of the '446 Patent is transformed into a patent-eligible invention because it contains an inventive concept.

### A. Alice Analysis: Case Law

1. *Alice* Step One: Whether the Claims are Directed to Patent-Ineligible Abstract Ideas

Under step one of the Alice analysis, courts must consider whether a patent claim's "character as a whole" is "directed to" excluded subject matter, such as an abstract idea. See 🚩 Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015). During this step, a court needs to avoid oversimplifying a patent's claims because, to a certain extent, all inventions are built from abstract ideas. 🚩 Mayo Collaborative Servs. v. Prometheus Labs.,Inc., 132 S. Ct. 1289, 1293 (2012). However, the concept of an abstract idea does not have a clear definition, so a court needs to compare the claim at issue with claims in previous cases. See 🚩 OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015). The patents' claims at issue in this case are regarding computer-related inventions, and courts have taken different approaches to determining whether these types of claims are abstract ideas. Compare 🚩 Alice, 134 S. Ct. at 2359, with 🚩 Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1336 (Fed. Cir. 2016).

For instance, when defining "abstract" some courts have found that mathematical algorithms, including those executed on a generic computer, are abstract ideas. See e.g., 🚩 Gottschalk v. Benson, 409 U.S. 63, 71–74 (1972); 🚩 DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1256 (Fed. Cir. 2014). The court in 🚩 Content Extraction & Transmission LLC

v. Wells Fargo Bank, National Ass'n, 776 F.3d 1343, 1347 (Fed. Cir. 2014), determined that "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" was an abstract idea. The court asserted that "[t]he concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." Id. Similarly, the court in In re TLI Communications LLC Patent Litigation, 823 F.3d 607, 613 (Fed. Cir. 2016), determined that the claims at issue were directed to the abstract idea of "classifying and storing digital images in an organized manner." Id. at 613. The court stated that the claims were not directed to a specific improvement in computer functionality because the claims were directed to the "use of conventional or generic technology in a nascent, but well-known environment, without any claim that the invention reflect[ed] an inventive solution to any problem presented by combining the two." Id. at 612. Finally, in Electric Power Group, LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016), the claims at issue were directed to the abstract idea of "collecting [specific electrical power-grid] information, analyzing it, and displaying certain results of the collection and analysis." Absent "any particular assertedly inventive technology for performing those functions," the court found that the claims were directed to a combination of abstract-idea processes. Id. at 1354.

*7 In contrast, other courts have found that claiming an improvement in computer capabilities does not always entail claiming an abstract idea. See, e.g., Enfish, 822 F.3d at 1339. The court in Enfish determined that a logical model for a computer database embodied in a self-referential table was not abstract because it was "designed to" improve the way that a computer stores and retrieves data. Id. at 1339. The claims were not regarding general-purpose computers simply performing mathematical equations. Id. Rather, the claims attempted to improve specific computer software. Id. Based on this analysis, the court found that the claims at issue were not directed to an abstract idea. Id. at 1338. In McRO, Inc. v. Bandai Namco Games America, 837 F.3d 1299, 1303–04 (Fed. Cir. 2016), the patents described a method for automatically animating the lip synchronization and facial expression of animated characters to automate a 3-D animator's duties through a series of rules. Id. at 1307. The claim thus went beyond simply "organizing [existing] information into a new form." Id. at 1315 (citation omitted). The claim was limited to achieving automated lip-synchronization of 3-D characters, and it had a computer conduct a task that humans previously performed. Id. at 1316. Therefore, the court determined that the claim was directed to improving automated lip-synchronization, so the claim was not directed to an abstract idea. Id.

2. *Alice* Step Two: Whether the Claims Include an "Inventive Concept" Sufficient to "Transform the Nature of the Claim" into a Patentable Invention

At the second step, courts must examine the "elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." See Alice, 134 S. Ct. at 2357. A court must look to the remaining elements aside from those directed to an abstract idea, either in isolation or combination with the other non-patent-ineligible elements. E.g., In re BRCA1– & BRCA2–Based Hereditary Cancer Test Patent Litig., 774 F.3d 755, 764 (Fed. Cir. 2014). However, this step does not replace the tests for validity—e.g., non-obviousness, utility, or novelty—because its only objective is to determine whether the claims attempt to solve a problem. See Versata Dev. Grp., Inc. v. SAP Am., Inc., 793 F.3d 1306, 1332 (Fed. Cir. 2015). The court may consider a patent's specification when determining whether the claims contain an inventive concept. See, e.g., Berkheimer v. HP Inc., 881 F.3d 1360, 1367 (Fed. Cir. 2018) ("Here, the specification explains ...."); Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356, 1363 (Fed. Cir. 2018) ("The specification confirms that these claims disclose an improved user interface for electronic devices, particularly those with small screens."); Electric Power, 830 F.3d at 1355 (stating that "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network,

and display technology for gathering, sending, and presenting the desired information.").

"[W]hether a claim recites patent eligible subject matter is a question of law," but it is one which may contain underlying factual determinations." Berkheimer, 881 F.3d at 1368 (citations omitted). One such factual determination is "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent." Id. at 1369. Thus, a complaint that properly alleges that individual elements of a claim are not well-understood, routine, or conventional, may be sufficient to state a claim notwithstanding an invalidity challenge under Section 101. Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1128 (Fed. Cir. 2018).

Courts have taken different approaches to determining whether claims include inventive concepts. For instance, courts have found that simply reciting routine and conventional steps is insufficient. See, e.g., In re Smith, 815 F.3d 816, 819 (Fed. Cir. 2016). Courts have also asserted an abstract idea does not become an inventive concept by having a computer conduct that abstract idea. See, e.g., Alice, 134 S. Ct. at 2359; OIP Techs, 788 F.3d at 1363; Intellectual Ventures, 792 F.3d at 1367. In contrast, courts have found that claims purporting "to improve the functioning of the computer itself or effect an improvement in any other technology or technical field" suffice under step two. See, e.g., Mortgage Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1325 (Fed. Cir. 2016) (quoting Alice, 134 S. Ct. at 2359) (quotation marks omitted).

**B. The Arling Patent: Claim 1 of the '853 Patent Is Patent-Eligible Under Either Step of the Alice Analysis**

1. Alice Step One

**\*8** Roku argues that Claim 1[3] of the Arling Patent is directed to the abstract idea of choosing one of a number of communications paths over which to send a message. Mot., Docket No. 32 at

7. Roku argues that the claim consists of generic computer components and instructions causing those components to perform functional steps without detailing how those instructions are to be carried out. Id. Stripped of surplusage, Roku argues that Claim 1 of the Arling Patent recites the long-prevalent practice of routing data/mail, and that courts have repeatedly held similar data processing and routing patents to be ineligible. Id.

UEI argues that the claims of the Arling Patent are valid under Alice step one because they are directed to specific improvements in technology in the field of universal remote controls. Opp'n, Docket No. 37 at 4–5. UEI argues that the Arling Patent eliminates the need for multiple remotes to control devices using multiple different communications protocols by creating a UCE that can control multiple appliances and select the best method for controlling multiple functions of each. Id. at 5. UEI further argues that Roku's mail routing example is inapposite because the claim at issue here is directed to a controlling device, and postal workers do not select a method for controlling an appliance. Id. at 5–6.

When considered as a whole, and in light of the specification, Claim 1 of the Arling Patent is not directed to an abstract idea. Rather, the claim is directed to a specific method for connecting remote controls to appliances with multiple communications protocols, thus "provid[ing] a specific solution to the then-existing technological problems" in remote control devices. Data Engine Technologies LLC v. Google LLC, 906 F.3d 999, 1008 (Fed. Cir. 2018). The FAC alleges that at the time of the patent, manufacturers had been slow to adopt new communications methods requiring different protocols and command formats. FAC, Docket No. 91. As a result, a problem arose: multiple devices in the same room required different communications methods, thus requiring the use of multiple control devices. Id. Indeed, the specification of the Arling Patent notes that, at the time, "the recent proliferation of wireless and wired communication and/or digital interconnection methods such as WiFi, Bluetooth, HDMI, etc., amongst and between appliances [resulted] in a corresponding proliferation of such communication protocols and command formats." Docket No. 28-4 at 1:45–50. The Arling Patent

discloses a specific solution to this problem: a device embodied in a UCE (1) adapted "to provide device control across a variety of available control methodologies" such as "infrared (IR) remote control protocols" and "Consumer Electronic Control (CEC) [ ] over a wired HDMI connection," and (2) "adapted to combine various control methods in order to realize the best control option for each individual command for each individual device." Id. at 2:4–20. For example, a UCE

> may receive command requests from such a controlling device and apply the optimum methodology to propagate the command function(s) to each intended target appliance, such as for example a TV, AV receiver, DVD player, etc. In this manner the UCE may enable a single controlling device to command the operation of all appliances in a home theater system while coordinating available methods of controlling each particular appliance in order to select the best and most reliable method for issuing each command to each given device.

**\*9** Id. at 2:39–45. In other words, Claim 1 of the Arling Patent recites a method wherein a single device is able to control multiple appliances, and to choose the best method for controlling each. The claim thus represents a more efficient, and thus improved, method of appliance control functionality. See Berkheimer, 881 F.3d at 1369 (holding that claim improved computer functionality through elimination of redundancy with inventive editing feature); Aatrix, 882 F.3d at 1128–29 (claim combination reducing risk of "thrashing," a condition which slowed down prior art systems, alleged to have improved computer functionality). Therefore, at this stage in the litigation, these statements in the patent specification support the conclusion that the

claims of the Arling Patent are drawn to a particular technological improvement in the field of appliance control. "This conclusion is particularly proper on a motion to dismiss under Rule 12(b)(6), where all factual inferences drawn from the specification must be weighed in favor of ... the non-moving party." Visual Memory LLC v. NVIDIA Corp., 867 F.3d 1253, 1261–62 (Fed. Cir. 2017).

Roku argues that the claims are directed to the abstract idea of "choosing one of a number of communications paths over which to send a message," analogizing the Arling Patent to the Postal Service determining routes through which to send mail. Mot., Docket No. 32 at 7. The Court agrees that, had the Arling Patent been directed merely at the long-prevalent practice of choosing communication routes, it would recite an abstract idea. However, Roku's arguments seek to downplay that the claims relate not only to choosing between routes of communication, but also to using such methods of communication to control each of at least a first and second functional operation of the intended target appliance. See Docket No. 28-4 at 14:54–15:7. Therefore, Roku's Postal Service analogy fails to address the entirety of Claim 1 of the Arling Patent; Postal Service workers do not control the conduct or functions of mail-recipients. See Enfish, 822 F.3d at 1327 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule."). As noted by the Federal Circuit, "it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.' " Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1050 (Fed. Cir. 2016).

**2.** Alice Step 2

Even assuming Claim 1 of the Arling Patent is drawn to an abstract idea, fact questions would also preclude dismissal at this stage. Considering the invention in the light most favorable to UEI as is required at the pleading stage, and particularly considering the invention through the lens of a person of ordinarily skill in the art at the time it was filed, it would be premature to conclude as a matter of

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document        Page 27 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

law that the claimed limitations, taken individually or as an ordered combination, were well-understood, routine, and conventional. Berkheimer, 881 F.3d at 1370 (finding certain dependent claims reciting steps such as "storing a reconciled object structure in the archive without substantial redundancy" presented fact questions precluding summary judgment). The FAC alleges that Claim 1's limitation of "using an identity associated with the intended target appliance to create a listing" comprised of at least two different communication methods for use in controlling each of at least two functional operations in the intended target appliance was not well-understood, routine, or conventional at the time of the patent. FAC, Docket No. 28 ¶ 92. The specification states that this method improves appliance control functionality with a UCE "adapted to provide device control across a variety of available control methodologies and communication media." Docket No. 28-4 at 2:6–8.

Roku cites Glasswall Solutions Ltd. v. Clearswift Ltd., No. 2018-1407, 2018 WL 6720014 (Fed. Cir. Dec. 20, 2018), to argue it is insufficient that the claim recites the use of "an identity associated with the target appliance to be controlled" because the limitation merely restates part of the abstract idea of choosing among options. Mot., Docket No. 32 at 9 (citing BSG Tech LLC v. Buyseasons, Inc., 899 F.3d 1281, 1291 (Fed. Cir. 2018) ). The Court disagrees. In Glasswall, claims directed to "generic computer-implemented steps" such as "comparing [a] file's content to a set of rules, extracting conforming data, and then duplicating the conforming data" were found to be patent ineligible under both Alice steps. 2018 WL 6720014, at *1–2. Under step two, the court held such claims recited "steps that do not amount to anything more than instruction to apply the abstract idea of filtering nonconforming data and regenerating a file without it, plus the generic steps needed to implement the data." Id. at *2. Similarly, in BSG Tech, claims focused on providing a summary of certain relevant historical database information to guide users' selections were found not to improve database functionality, but rather to improve the quality of the information stored by the database. 899 F.3d at 1288. Here, on the other hand, the Arling Patent recites more than generic computer functions directed to screening content. As discussed

above, the Arling Patent claims a method improving appliance control functionality, distinguishing this case from the authorities cited by Roku.

**\*10** Accordingly, Roku's motion is denied with respect to the Arling Patent.

### C. The Janik Patents: Claim 1 of the '505 Patent Is Patent-Eligible Under Step Two of the Alice Analysis

1. Alice Step One

Roku argues that Claim 1 of the '505 Patent is directed to the abstract idea of recognizing or distinguishing among different types of inputs. Mot., Docket No. 32 at 11. When stripped of generic computer components (e.g. a "display, "transmitter," and "processing device") and functional steps (e.g. "causes the transmitter to transmit first data"), Roku argues that Claim 1 of the '505 Patent recites merely long-prevalent practices. Id. at 12. Roku also argues that courts have held similar user interface and user input patents to be ineligible. Id. Lastly, Roku argues that the claim fails to recite any technological improvement in how tapping and swiping inputs are distinguished on touch screen remote control devices. Id.

UEI argues that the claims of the Janik Patents are directed to a specific solution to the problem of touchscreen remote devices which could only recognize one type of tapping input. Opp'n, Docket No. 37 at 10–11. UEI argues that the claims cover a technological improvement to a specific device (a remote control), receiving specific types of inputs (tapping and swiping on a touchscreen), which are processed in a specific way (distinguishing between taps and swipes), and used in a specific manner (transmitting data from the inputs to a remote appliance to perform different functions, e.g., media selection or cursor control). Id. at 12.

The Court finds that Claim 1 of the '505 Patent is directed to the abstract idea of distinguishing between types of inputs. The examples offered by Roku are instructive: it has long been known that computers can recognize that a mouse is different from a keyboard,

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document    Page 28 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

and that humans can distinguish a note written in pen or in pencil. Mot., Docket No. 32 at 12. Furthermore, Roku points out that courts have held similar user interface and user input patents to be ineligible. See, e.g., Affinity Labs of Texas, LLC v. DIRECTV, LLC, 838 F.3d 1253, 1258–62 (Fed. Cir. 2016) (patent related to streaming regional broadcast signals to cellular telephones that included a GUI allowing users to select regional content from a list of options was directed to abstract concept of providing out-of-region access to regional broadcast content); Thunder Power New Energy Vehicle Dev. Co. v. Byton N.A. Corp., 340 F. Supp. 3d 922, (N.D. Cal. 2018) (patent claiming vehicle operating system that distinguishes between driver and passenger gestures directed to abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis"). UEI argues that the Janik Patents are not directed to the abstract idea of distinguishing among different types of inputs because they do not preempt all applications of distinguishing between different types of inputs. Opp'n, Docket No. 37 at 12. However, the absence of complete preemption does not establish patent-eligibility. Synopsys, Inc. v. Mentor Graphics Corp., 839 F.3d 1138, 1150 (Fed. Cir. 2016) (argument about the absence of complete preemption "misses the mark"); FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1098 (Fed. Cir. 2016) ("But even assuming that the ... patent does not preempt the field, its lack of preemption does not save these claims."). Therefore, the fact that Claim 1 of the '505 Patent does not preempt all embodiments of the abstract idea does not make the claim any less abstract. OIP Techs., 788 F.3d at 1362–63.

### 2. Alice Step Two

**\*11**  However, the Court finds that Claim 1 of the '505 Patent recites patent-eligible inventive concepts which were not routine or conventional, satisfying step two of the Alice analysis. The FAC alleges that touchscreens were expensive and uncommon in remote controls at the time of the patent, and that to the extent touchscreens were used, they contained only the tapping functionality reminiscent of traditional hard key remotes. FAC, Docket No. 28 ¶¶ 111, 134, 156. The specification confirms that,

at the time of the patent, there was a need for "a universal controlling device wherein the display is further adapted to provide remote, cursor control functionality," i.e., a remote with an input mode for swiping across the screen (rather than tapping) causing corresponding motions on a remote display. Docket No. 28-5 at 2:4–5, 2:17–21. Notably, the '505 Patent was filed in its original form in 2004. Docket No. 28-7 at cover page. Therefore, at this stage in the litigation, UEI has sufficiently alleged that Claim 1 of the '505 Patent recites an inventive concept.

Roku argues that these allegations should not be accepted because they are contrary to the express disclosures and admitted prior art of the Janik Patents. Mot., Docket No. 32 at 13 (citing Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) ). The Court disagrees. Roku identifies one patent application cited in the Janik Patents reflecting the idea of handheld personal digital assistants ("PDA") with touchscreen displays. Docket No. 28-5 at 1:57–67. Roku further argues that the patent application for such PDAs admits that such devices supported use as remote controls. RJN, Ex. A, Docket No. 33-1 ¶¶ 29, 67. However, "[t]he mere fact that something is disclosed in a piece of prior art ... does not mean it was well-understood, routine, and conventional." Berkheimer, 881 F.3d at 1369. Without further information regarding this prior art reference, the Court declines to rely on Roku's assertions and these references alone to conclude that the Janik Patent claims are drawn to "well-known," "routine," and "conventional" elements. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." Berkheimer, 881 F.3d at 1369. Furthermore, any fact "pertinent to the invalidity conclusion must be proven by clear and convincing evidence," including the contention that a claim element or combination of elements is well-understood, routine and conventional. Id. at 1368. Therefore, in light of UEI's allegations and the standard for patent eligibility on a Rule 12(b)(6) motion to dismiss, the Court finds that Claim 1 of the '505 Patent contains a patent-eligible inventive concept.

Accordingly, Roku's motion is denied as to the Janik Patents. [4]

**D. The Scott Patents**

1. Claim 10 of the '532 Patent Is Patent-Eligible Under Step Two of the *Alice* Analysis

a. <u>Alice</u> Step One

Roku argues that the Claim 10 of the '532 Patent is directed to the abstract idea of assigning operations to user interface elements, or stated another way, representing computer operations with a user interface element. Mot., Docket No. 32 at 16. Past the technological environment of touchscreen remote controls and generic computer components, Roku argues that the claim recites nothing more than the long-prevalent practice that selection of a GUI icon in a computer application causes the application to carry out the instruction represented by the icon. Id. at 16–17. Roku further argues that the claim recites no limitations requiring or enabling the user interface to be "simpler," and instead merely recite the functional result that instructions are "created" in a manner to "reflect" "user interactions." Id. at 17.

**\*12** UEI argues that Claim 10 of the '532 Patent claims a concrete solution to a problem – cluttered remote control GUIs requiring multiple keys to control multiple functions of multiple devices – by reducing the number of keys and user interactions required for remote control operation by automating certain responses to user interaction. Opp'n, Docket No. 37 at 17. This solution is a method involving (1) a GUI icon representing a controllable appliance; (2) using an automatically created series of instructions reflecting a user interaction with the icon; and (3) executing those instructions in response to the user interaction with the icon. Id.

The Court finds that Claim 10 of the '532 Patent is directed towards the abstract idea of representing computer operations with a user interface element. As Roku notes, for example, it is beyond dispute that it is common computer-practice that the selection of the save icon in the graphical user interface of computer applications causes the application to save a

document. UEI's reliance on Trading Technologies Int'l, Inc. v. CQG, Inc., 675 F. App'x 1001 (Fed. Cir. 2017), is unpersuasive. In <u>Trading Technologies</u>, the patent covered a user interface displaying discrete securities trading information such as "bid" and "ask" regions, a "common static price axis," "indicator[s]" relating to buy and sell orders, and an "order entry" region. Id. at 1003–04. The patent also recited limitations as to how these elements interacted with each other such that the system paired orders with the static display of prices to prevent entry of orders that had changed prices. Id. By contrast, Claim 10 of the '532 Patent recites that it will display only "representations of at least one appliance controllable by the controlling device." Docket No. 28-8 at 39:46–47. Therefore, Claim 10 of the '532 Patent is significantly less specific than the user interface at issue in <u>Trading Technologies</u>. Moreover, to the extent UEI argues that the '532 Patent is directed to "automating certain processes" to "lessen the required number of keys and user interactions," the use of computers to "automate" prior practices is insufficient alone to establish patentability under <u>Alice</u> step one. See Ameranth, 842 F.3d at 1244 ("manual tasks [ ] cannot be rendered patent eligible merely by performing them with a computer"). Therefore, the limitation in Claim 10 regarding "using a program to automatically create the sequence of instructions" does not render the claim any less abstract.

b. <u>Alice</u> Step Two

The Court finds that Claim 10 of the '532 Patent contains an inventive concept sufficient to transform it into a patent-eligible invention. The FAC alleges that at the time of the '532 Patent,

the specific combination of claimed elements [in the '532 Patent] such as presenting representations of at least one appliance controllable by the controlling device, automatically creating a sequence of instructions on the controlling device for one or

Case 2:20-bk-13849-BR Doc 1142 Filed 03/31/26 Entered 03/31/26 20:57:38 Desc
Main Document Page 30 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

more interactions with at least one controllable appliance, and causing the sequence of instructions to be executed in response to selection of a user input element of the controlling device was not well understood, routine, or conventional to those in the field at the time of invention.

FAC, Docket No. 28 ¶ 179. The specification states that prior art universal remote controls had user interfaces which had become increasingly complex as a result of the increase in remotely controllable appliances in consumers' homes. Docket No. 28-8 at 1:18–30. Because the user interfaces of universal remote controls had become more cluttered, thus diminishing usability, the specification states that a need existed for a universal remote with an improved user interface which simplified the operation of universal remote controls (and the appliances they control). Id. at 1:30–36. Therefore, Claim 10 of the '532 Patent addresses a problem (how to control multiple devices with one touch screen remote control) with an inventive and specific solution (placing icons representing appliances to be controlled on a touchscreen remote control to facilitate a series of instructions to control represented appliances).

**\*13** Roku argues that the express disclosures and admitted prior art of the '532 Patent contradict the allegation that Claim 10 recites inventive concepts. Mot., Docket No. 32 at 17–18. To support the contention that the concept was routine and conventional, Roku points to references in the '532 Patent specification to hand-held electronic devices supporting the Windows CE brand operating system and PocketPC type devices with-built in support for transmitting consumer equipment IR remote control codes such as the Compaq PDA. Id. at 18 (citing Docket No. 28-8 at 2:54–64). However, as with the Arling Patent, "[t]he mere fact that something is disclosed in a piece of prior art ... does not mean it was well-understood, routine, and conventional." Berkheimer, 881 F.3d at 1369. Notably, the '532 Patent was filed in its original form in 2001, almost 20 years ago. Docket No. 28-8 at cover page.

Without further information regarding this prior art reference, the Court declines to rely on Roku's assertions and these references alone to conclude that Claim 10 of the '532 Patent is drawn to "well-known," "routine," and "conventional" elements. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." Berkheimer, 881 F.3d at 1369). Furthermore, any fact "pertinent to the invalidity conclusion must be proven by clear and convincing evidence," including the contention that a claim element or combination of elements is well-understood, routine and conventional. Id. at 1368. Here, the record does not demonstrate invalidity by clear and convincing evidence, and Roku's identification of a reference to prior art in the '532 Patent's specification is insufficient for it to prevail on a Rule 12(b)(6) motion to dismiss. Therefore, in light of UEI's allegations, the Court finds that Claim 1 of the '505 Patent contains a patent-eligible inventive concept.

Accordingly, Roku's motion is denied as to the '532 Patent.

### 2. Claim 1 of the '446 Patent Is Patent-Eligible Under Step Two of the *Alice* Analysis

Roku argues that Claim 1 of the '446 Patent is directed to the abstract idea of saving information to a remote location. Mot., Docket No. 32 at 21. Roku argues that the claim recites nothing more than long-prevalent practices in human and computer practice. Id. Specifically, Roku argues that the concept of uploading data to a website has long been known in computer practice, and the concept of saving a record to off-site storage dates back to ancient times in human practice. Id. Roku points out that courts have held similar data collection patents to be ineligible. Id. at 21–22. Furthermore, Roku argues that the claim does not recite any technological improvement in how data is captured, how data is stored, how the data reflects user interactions, or how the data can be used in debugging, and that thus the logging and debugging functionality of the '446 Patent is entirely generic. Id. at 22. Without any description of a new format or manner for logging data that improves upon problems

of the prior art, Roku argues that this claim fails Alice step one. Id.

UEI argues that the '446 Patent is directed to an improvement in debugging remote control applications through a method involving (1) capturing data during operation of the controlling device; (2) that is representative of user interactions with the controlling device and actions occurring thereby; (3) storing the captured data on the controlling device; (4) causing the controlling device to upload the data to a computer; (5) such that the data is available for debugging. Opp'n, Docket No. 37 at 20. Therefore, UEI argues that the '446 Patent is directed to a method using specific data captured in a specific way for a specific improved technological performance, satisfying Alice step one.

Assuming without deciding that Claim 1 of the '446 Patent is drawn to an abstract idea, factual issues preclude dismissal under step two of the Alice analysis. See Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (where the claim presents a "close call[ ] about how to characterize what the claims are directed to," the court may reserve analysis of the narrowing effect of specific claim limitations for step two of the Alice analysis) (quoting Enfish, 822 F.3d at 1339). Here, the FAC alleges that the use of GUIs on a remote control application, and capturing data associated with user interactions with that interface for use in debugging, were not routine or conventional in the prior art at the time of the '446 Patent. FAC, Docket No. 28 ¶ 197. Specifically, it alleges that it was not conventional or routine at the time of invention to monitor data within a controlling device, nor to track data resulting from user interacts with a remote control application. Id. These allegations present a factual dispute as to whether Claim 1 of the '446 Patent recites merely conventional, routine limitations. Therefore, it would be inappropriate for the Court to dismiss Claim 1 of the '446 Patent at this stage as patent-ineligible.

**\*14** Roku argues that Claim 1 of the '446 Patent fails to recite more than the abstract idea of saving information to a remote location in the technological environment of remote controls, citing to Electric Power. Mot., Docket No. 32 at 22–23. The Court disagrees. Unlike Electric Power, in which claims

were directed to the abstract idea of "collecting [specific electrical power-grid] information, analyzing it, and displaying certain results of the collection and analysis," Claim 1 of the '446 Patent recites more than tracking and storing information; it recites the storage of specific information (data representing user interactions with the controlling device) in a specific place (on the controlling device) for a purpose more specific than merely displaying the information (uploading the data to a computer so that it is available for debugging). Docket No. 28-9 at 28:43–57. The specification states that this method results in improvements to remote control technology; for example, the remote control application may capture data associated with recently viewed channels to create and update a favorites list. Id. at 6:25–35. Therefore, Claim 1 of the '446 Patent is alleged to have been an inventive solution, and Roku does not persuade the Court that the claim is facially conventional. As previously noted, a complaint that properly alleges that individual elements of a claim are not well-understood, routine, or conventional, may be sufficient to state a claim notwithstanding an invalidity challenge under Section 101. Aatrix, 882 F.3d at 1128. In light of the claims and allegations in the FAC and in the '446 Patent specification, the Court will not dismiss the '446 Patent as patent-ineligible under § 101 at this stage in the litigation.

Accordingly, Roku's motion is denied with respect to the '446 Patent.[5]

### E. Willful Infringement
Roku argues that the FAC fails to state a claim for willful infringement because it fails to plausibly allege egregious conduct. Mot., Docket No. 32 at 24–25. Specifically, Roku argues that allegations of knowledge of a patent and continued infringement alone are insufficient to state a claim for willful infringement, and that the barebones allegations of copying in the FAC lack plausibility. Id.

Under 35 U.S.C. § 284, a court may "increase the damages up to three times the amount found or assessed" in a patent claim. "Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in

Case 2:20-bk-13849-BR    Doc 1142    Filed 03/31/26    Entered 03/31/26 20:57:38    Desc
Main Document        Page 32 of 35

Universal Electronics Inc. v. Roku, Inc., Not Reported in Fed. Supp. (2019)

a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior .... variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, [or] flagrant...." Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1932 (2016). This Court has previously joined the majority of district courts in the Ninth Circuit by holding that allegations of knowledge and continued infringement alone are insufficient to state a claim for willful infringement. Document Security Systems, Inc. v. Lite-On, Inc., No. CV 17-06050 JVS (JCGx), 2018 WL 2422589, at *2, 3 (C.D. Cal. Feb. 5, 2018) (Selna, J.) (collecting cases). The court may consider whether an infringer "deliberately copied the ideas of another" and the defendant's "size and financial condition" in deciding whether the accused infringer's behavior is egregious. Read Corp. v. Portec Inc., 970 F.2d 816, 826 (Fed. Cir. 1992). However, the Read factors are not mandatory or exclusive because "[t]he Halo test merely requires the district court to consider the particular circumstances of the case to determine whether it is egregious." Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1383 (Fed. Cir. 2017).

In the FAC, UEI makes the same allegation of willful infringement as to each of the patents-in-suit:

> Roku's infringement of the [ ] Patent has been willful, wanton, malicious, and/or deliberate and constitutes egregious behavior justifying an award of enhanced damages. More specifically, Roku knew or should have known about the [ ] Patent and its infringement of that patent, as discussed above, but continued to engage in the using, making, offering to sell, and/or selling of the [ ] Patent Accused Products despite an objectively high likelihood that

this conduct would infringe the [ ] Patent.

**\*15**  FAC, Docket No. 28 ¶¶ 41, 61, 87, 106, 129, 151, 174, 192, 209. The FAC also alleges that Roku knew or should have known that implementing such technology without UEI's consent would infringe UEI's patents prior to this litigation, and at least as of September 2017, when UEI informed Roku in writing of UEI's issued and pending patents covering its control solutions. Id. ¶ 22. Furthermore, UEI alleges that "it is believed Roku copied various aspects of UEI's patented technology." Id. ¶¶ 37, 57, 83, 102, 125, 147, 170, 188, 205.

The Court finds that the allegations in the FAC are sufficient to state a claim for willful infringement of the patents-in-suit. The FAC goes beyond merely alleging that Roku knew of the asserted patents and continued to infringe them; the FAC alleges further that Roku copied patented technology of which it had knowledge, and that Roku then included such technology in its own products without UEI's consent. With respect to the '642, '389, '325, and '853 Patents, UEI alleges that the patents relate to features incorporated into versions of UEI's "QuickSet" product family. Id. ¶¶ 20, 22. UEI also alleges that it provided Roku with access to technical information and "software developer kits" that "allowed Roku to copy patented aspects of UEI's Quickset® technology," and that after receiving access to such information, Roku released products and/or software with features infringing the asserted patents. Id. ¶ 22. With respect to the '309, '504, '505, '532, and '446 Patents, UEI alleges that Roku tested UEI's "Nevo" products and, after gaining possession and knowledge of the products, copied the patented features and released such features into the accused products. Id. ¶¶ 126, 148, 171, 189, 206. Lastly, the FAC alleges that Roku is a large public company with hundreds of millions of dollars in annual revenue which opted not to pay when offered a license to UEI's technology. Id. ¶¶ 37, 57, 83, 102. These allegations weigh in favor of a finding that UEI adequately states a claim for willful patent infringement.

In sum, the facts as alleged support the plausible inference that Roku's conduct warrants enhanced

damages under Halo and § 284. Therefore, the motion to dismiss UEI's claims for willful infringement is denied.

For the foregoing reasons, the Court **denies** the motion to dismiss.

**IT IS SO ORDERED.**

### IV. CONCLUSION

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1877616

---

### Footnotes

1 Roku submitted a Request for Judicial Notice ("RJN") in support of the instant motion. RJN, Docket No. 33. UEI objected to the RJN, and Roku replied. Docket Nos. 38, 47. Roku seeks judicial notice of U.S. Published Patent Application No. 2003/0103088 ("the '088 Application"). RJN, Docket No. 33. A court may take judicial notice of undisputed matters of public record. Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001); see also Fed. R. Evid. 201(b). However, a court may not take judicial notice of disputed facts contained in such public records. Id. at 689. The '088 Application is a matter of public record issued by the U.S. Patent and Trademark Office whose accuracy and authenticity cannot reasonably be disputed. Therefore, the Court takes judicial notice of the '088 Application's existence and the content therein. However, to the extent Roku requests the Court to take judicial notice of its interpretation of the legal effect of prior art disclosed in the '088 Application, the Court denies the request for judicial notice because that contention is disputed by UEI. Accordingly, the Court **grants** Roku's request for judicial notice as to the '088 Application, but denies the request to the extent it seeks judicial notice of the disputed legal effect of the '088 Application's content.

2 For the remainder of this Order, this two-step analysis will be referred to as the "Alice analysis."

3 UEI does not dispute that Claim 1 of the Arling Patent is representative. Therefore, the Court finds it appropriate to treat the claim as representative. See Berkheimer, 881 F.3d at 1365.

4 The parties dispute whether Claim 1 of the '505 Patent is representative of the claims in the Janik Patents. Mot., Docket No. 32 at 10; Opp'n, Docket No. 37 at 15. Because the Court denies the motion on the basis of Claim 1 of the '505 Patent, which the moving party asserts is representative, it need not determine whether the claim is properly representative of all the claims in the Janik Patents.

5 The parties dispute whether Claim 1 of the '446 Patent is representative of the claims in the '446 Patent. Mot., Docket No. 32 at 21; Opp'n, Docket No. 37 at 22. Because the Court denies the motion on the basis of Claim 1, which the moving party asserts is representative, it need not determine at this juncture whether the claim is properly representative of all the claims in the '446 Patent.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10345 Olympic Boulevard, Los Angeles, California 90064.

A true and correct copy of the foregoing documents entitled (*specify*): **NOTICE OF UNPUBLISHED AUTHORITIES CITED IN MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSE TO DEBTOR'S BRIEF IN SUPPORT OF CONFIRMING PLAN AFTER REMAND FROM THE DISTRICT COURT** will be served or were served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 31, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Todd M Arnold    tma@lnbyg.com**
- **Ron Bender    rb@lnbyg.com**
- **Thomas E Butler    butlert@whiteandwilliams.com,
  sullivann@whiteandwilliams.com;millnamowm@whiteandwilliams.com;panchavatis@whiteandwilliams.com**
- **Robert Carrasco    rmc@lnbyg.com, rmc@lnbyg.com**
- **Oscar Estrada    oestrada@ttc.lacounty.gov**
- **Theodore W Frank    frank@psmlawyers.com,
  knarfdet@gmail.com;navarro@parkermillsllp.com**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Michael S Greger    mgreger@allenmatkins.com, kpreston@allenmatkins.com**
- **Brian T Harvey    bharvey@buchalter.com,
  docket@buchalter.com;dbodkin@buchalter.com;pjolley@buchalter.com**
- **Gregory Kent Jones (TR)    gjones@sycr.com,
  smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com**
- **Raffi Khatchadourian    raffi@hemar-rousso.com**
- **Tinho Mang    tmang@marshackhays.com,
  tmang@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com**
- **Ron Maroko    ron.maroko@usdoj.gov**
- **Juliet Y. Oh    jyo@lnbyg.com, jyo@lnbyb.com**
- **Carmela Pagay    ctp@lnbyg.com**
- **Yvonne Ramirez-Browning    yvonne@browninglawgroup.com,
  veronica@browninglawgroup.com**
- **Kurt Ramlo    RamloLegal@gmail.com, kr@ecf.courtdrive.com,ramlo@recap.email**
- **Gregory M Salvato    gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com**
- **James R Selth    jselth@yahoo.com,
  jselth@yahoo.com,maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com**
- **Zev Shechtman    Zev.Shechtman@saul.com,
  zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul.com;Shelly.Guise@saul.com;Isaiah.Bribiesca@saul.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                           **F 9013-3.1.PROOF.SERVICE**

- **Heidi J Sorvino    sorvinoh@whiteandwilliams.com,
  millnamowm@whiteandwilliams.com;sullivann@whiteandwilliams.com;panchavatis@whiteandw
  illiams.com;butlert@whiteandwilliams.com**
- **Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com**
- **Annie Y Stoops    annie.stoops@afslaw.com, yvonne.li@afslaw.com**
- **Nicole Sullivan    sullivann@whiteandwilliams.com,
  vulpioa@whiteandwilliams.com,arthura@whiteandwilliams.com**
- **Derrick Talerico    dtalerico@wztslaw.com,
  maraki@wztlfirm.com,sfritz@wztlfirm.com,admin@wztlfirm.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Larry D Webb    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com**
- **David Wood    dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alina
  res@ecf.courtdrive.com**
- **Roye Zur    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse
  @elkinskalt.com**

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **March 31, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 31, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 31, 2026 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**