ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
   *rzur@elkinskalt.com*
LAUREN N. GANS, State Bar No. 247542
   *lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Nicole A. Sullivan (pro hac vice)
sullivann@whiteandwilliams.com
Thomas E. Butler (pro hac vice)
butlert@whiteandwilliams.com
WHITE AND WILLIAMS LLP
810 Seventh Avenue, Suite 500
New York, New York 10019
(212) 631-4420

Attorneys for Creditor Multiple Energy
Technologies, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>HOLOGENIX, LLC,<br><br>              Debtor and Debtor in<br>              Possession. | Case No. 2:20-bk-13849-BR<br><br>Chapter 11 (Subchapter V)<br><br>Adversary Case No. 2:22-ap-01098-BR<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSES TO DEBTOR'S BRIEFS FILED AFTER REMAND FROM THE DISTRICT COURT**<br><br>**Hearing:**<br>Date:     May 26, 2026<br>Time:    10:00 a.m.<br>Place:   Courtroom 1668<br>          255 E. Temple St.<br>          Los Angeles, CA 90012 |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400  •  Facsimile: 310.746.4499

8097005

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Multiple Energy Technologies, LLC ("MET") respectfully requests that this Court take judicial notice of the documents described below and attached hereto pursuant to the Federal Rule of Evidence 201. This Request for Judicial Notice is made in support of (1) MET's Response to Debtor's Brief in Support of Confirming Plan After Remand from the District Court; (2) MET's Response to Debtor's Brief in Support of Summary Judgment After Remand from District Court; (3) MET's Response to Debtor's Brief in Support of Granting Motion to Assume Executory Employment Contract with Seth Casden After Remand from the District Court.

## REQUEST FOR JUDICIAL NOTICE

As a general rule, the Court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court "may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

Judicial notice of patent prosecution history files is regularly permitted. *See*, *e.g.*, *Coffelt v. NVIDIA Corp.*, No. 16-00457, 2016 WL 7507763, at *2 (C.D. Cal. June 21, 2016), *aff'd*, 680 F. App'x 1010 (Fed. Cir. 2017). Additionally, courts regularly take judicial notice of public documents from the United States Patent and Trademark Office. *See*, *e.g.*, *Universal Elecs. Inc. v. Roku, Inc.*, No. 18-01580, 2019 WL 1877616, at *1 n.1 (C.D. Cal. Mar. 5, 2019).

In accordance with this rule, Plaintiff requests that the Court consider the following documents, true and correct copies of which are attached hereto:

1.      Exhibit 1 – the Debtor's U.S. Patent No. 12,514,179 B2 (issued Jan. 6, 2026);

2.      Exhibit 2 – the Debtor's opening brief in the Ninth Circuit Case 21-2881;

3.      Exhibit 3 – MET's and the Debtor's Joint Brief submitted to the District Court in Case No. 2:22-cv-07510-FMO filed at Doc. 40-4; and

/ / /

/ / /

/ / /

8097005

1

4.      Exhibit 4 – Transcript of Hearing Held on February 17, 2026.

DATED:  March 31, 2026                    WHITE AND WILLIAMS LLP


By:  _____
     NICOLE A. SULLIVAN (pro hac vice)
     THOMAS E. BUTLER (pro hac vice)
     Attorneys for Creditor Multiple Energy
     Technologies, LLC


DATED:  March 31, 2026                    ELKINS KALT WEINTRAUB REUBEN
                                          GARTSIDE LLP


By:  _____
     ROYE ZUR
     LAUREN N. GANS
     Attorneys for Creditor Multiple Energy
     Technologies, LLC

8097005                                        2

# EXHIBIT 1

US012514179B2

## (12) United States Patent
### Bassin et al.

(10) Patent No.:    **US 12,514,179 B2**

(45) Date of Patent:    **Jan. 6, 2026**

(54) **KIT HAVING ACTIVE POLYMER MATERIALS FOR GROWING MORE VIGOROUS, LARGER, AND HEALTHIER PLANTS**

(71) Applicant: **Hologenix LLC**, Pacific Palisades, CA (US)

(72) Inventors: **Zev Samuel Bassin**, Pacific Palisades, CA (US); **David Drew Horinek**, Pacific Palisades, CA (US)

(73) Assignee: **Hologenix LLC**, Pacific Palisades (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/826,041**

(22) Filed: **Sep. 5, 2024**

(65) **Prior Publication Data**

US 2024/0423146 A1    Dec. 26, 2024

**Related U.S. Application Data**

(63) Continuation of application No. 15/798,088, filed on Oct. 30, 2017, now Pat. No. 12,108,711, which is a continuation-in-part of application No. 14/860,082, filed on Sep. 21, 2015, now Pat. No. 10,694,685.

(60) Provisional application No. 62/054,158, filed on Sep. 23, 2014.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A01G 31/02* | (2006.01) | |
| *A01G 7/06* | (2006.01) | |
| *A01G 24/35* | (2018.01) | |
| *A01H 4/00* | (2006.01) | |

(Continued)

(52) **U.S. Cl.**
CPC ............... *A01G 31/02* (2013.01); *A01G 7/06* (2013.01); *A01G 24/35* (2018.02); *A01H 4/00*
(2013.01); *A01H 4/008* (2013.01); *A01H 6/28* (2018.05); *A01G 13/33* (2025.01)

(58) **Field of Classification Search**
CPC .. A01G 9/02; A01G 9/102; A01G 2009/1053; A01G 1/046; A01G 24/35; A01G 13/0275; A01G 13/0262; A01G 13/0287; A01G 24/18; A01G 9/1438; A01G 13/02; A01G 13/0231; A01G 13/0256; A01G 13/0268; A01G 22/00; A01G 22/15;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,341,512 A | 9/1967 | Wegmuller et al. | |
| 3,377,129 A | 4/1968 | Wegmuller et al. | |
| 3,590,528 A | 7/1971 | Shepherd | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 103224660 A | 7/2013 |
| EP | 0579835 A1 | 1/1994 |

(Continued)

OTHER PUBLICATIONS

Bakel H.V., et al., "The Draft Genome and Transcriptome of Cannabis Sativa", Genome Biology, vol. 12: R102, 2011, pp. 1-17.

(Continued)

*Primary Examiner* — Kimberly S Berona
*Assistant Examiner* — Steven J Shur
(74) *Attorney, Agent, or Firm* — Buchalter; Jared Aizad

(57)    **ABSTRACT**

The present invention provides compositions, kits and methods for growing more vigorous, larger and healthier plants, including from clone cuttings.

**20 Claims, 3 Drawing Sheets**



## US 12,514,179 B2

Page 2

(51) **Int. Cl.**
**A01H 6/28**          (2018.01)
**A01G 13/33**          (2025.01)

(58) **Field of Classification Search**
CPC .......... A01G 24/00; A01G 31/02; A01G 7/06;
A01G 9/026; A01H 4/008; A01H 6/28
See application file for complete search history.

(56)                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,839,078 A | * | 10/1974 | Birchall ...................... C08J 7/06 |
| | | | 427/377 |
| 3,923,729 A | * | 12/1975 | Clendinning ............ C08K 5/00 |
| | | | 523/125 |
| 4,113,794 A | | 9/1978 | Thompson et al. |
| 4,270,913 A | | 6/1981 | Tse |
| 4,384,450 A | | 5/1983 | Sawyer |
| 4,442,626 A | | 4/1984 | Hammond |
| 4,466,237 A | | 8/1984 | Sawyer |
| 4,666,454 A | | 5/1987 | DeMartino et al. |
| 4,741,909 A | | 5/1988 | Guthrie |
| 4,975,233 A | | 12/1990 | Blaeser et al. |
| 5,008,230 A | | 4/1991 | Nichols |
| 5,091,504 A | | 2/1992 | Blaeser et al. |
| 5,135,697 A | | 8/1992 | Roderiguez et al. |
| 5,138,792 A | | 8/1992 | Allingham |
| 5,191,734 A | | 3/1993 | Weber et al. |
| 5,272,246 A | | 12/1993 | Roderiguez et al. |
| 5,532,298 A | | 7/1996 | Monroe et al. |
| 5,649,495 A | | 7/1997 | Salestrom |
| 5,694,754 A | | 12/1997 | Shuknecht et al. |
| 5,868,087 A | | 2/1999 | Salestrom |
| 5,879,695 A | | 3/1999 | Bastiaansen et al. |
| 5,958,294 A | | 9/1999 | Anissimov et al. |
| 5,998,085 A | | 12/1999 | Isberg et al. |
| 6,041,546 A | | 3/2000 | Baranova |
| 6,061,957 A | | 5/2000 | Takashima |
| 6,067,785 A | | 5/2000 | Russell et al. |
| 6,204,317 B1 | | 3/2001 | Lilly |
| 6,214,264 B1 | | 4/2001 | Aneja |
| 6,218,007 B1 | | 4/2001 | Russell et al. |
| 6,339,898 B1 | | 1/2002 | Toye |
| 6,560,923 B1 | | 5/2003 | Kamei et al. |
| 6,601,338 B1 | | 8/2003 | Peled et al. |
| 6,615,539 B1 | | 9/2003 | Obonai et al. |
| 6,630,507 B1 | | 10/2003 | Hampson et al. |
| 7,074,499 B2 | | 7/2006 | Schnurer et al. |
| 7,247,311 B2 | | 7/2007 | Stein et al. |
| 7,342,058 B2 | | 3/2008 | Peppmoller et al. |
| 7,459,501 B2 | | 12/2008 | Doane et al. |
| 7,683,982 B2 | | 3/2010 | Cho |
| 7,698,594 B2 | | 4/2010 | Aizawa |
| 8,017,863 B2 | | 9/2011 | Forrest et al. |
| 8,034,843 B2 | | 10/2011 | Whittle et al. |
| 8,142,804 B2 | | 3/2012 | Barazani |
| 8,143,333 B2 | | 3/2012 | Peppmoller et al. |
| 8,632,825 B2 | | 1/2014 | Velasco Diez et al. |
| 8,898,955 B2 | | 12/2014 | Akay et al. |
| 9,095,554 B2 | | 8/2015 | Lewis et al. |
| 9,370,164 B2 | | 6/2016 | Lewis et al. |
| 9,642,317 B2 | | 5/2017 | Lewis et al. |
| 9,883,637 B2 | * | 2/2018 | Toye ...................... A01G 13/20 |
| 10,694,685 B2 | | 6/2020 | Horinek |
| 12,108,711 B2 | | 10/2024 | Bassin et al. |
| 2005/0268544 A1 | | 12/2005 | Maffei |
| 2006/0185238 A1 | | 8/2006 | Burge |
| 2007/0271841 A1 | | 11/2007 | Bissonnette et al. |
| 2008/0311392 A1 | | 12/2008 | Tsu |
| 2010/0064578 A1 | | 3/2010 | Karl et al. |
| 2010/0299993 A1 | | 12/2010 | Lais et al. |
| 2011/0098348 A1 | | 4/2011 | De Meijer |
| 2011/0308154 A1 | | 12/2011 | Akay et al. |
| 2013/0097922 A1 | | 4/2013 | Lempidakis et al. |
| 2014/0245494 A1 | | 8/2014 | Cohen |
| 2014/0245495 A1 | | 8/2014 | Cohen |

| | | | |
|---|---|---|---|
| 2014/0259228 A1 | | 9/2014 | Cohen |
| 2014/0274706 A1 | | 9/2014 | Hyde et al. |
| 2014/0287068 A1 | | 9/2014 | Lewis et al. |
| 2014/0298511 A1 | * | 10/2014 | Lewis .................. A61K 36/185 |
| | | | 800/298 |
| 2014/0305036 A1 | * | 10/2014 | Pretsch .................... A01G 9/14 |
| | | | 47/17 |
| 2014/0331555 A1 | | 11/2014 | Nonomura |
| 2016/0000843 A1 | | 1/2016 | Lowe et al. |
| 2016/0073566 P1 | | 3/2016 | Cohen |
| 2016/0073567 P1 | | 3/2016 | Cohen |
| 2016/0073568 P1 | | 3/2016 | Cohen |
| 2016/0081281 A1 | | 3/2016 | Horinek |
| 2016/0324091 A1 | | 11/2016 | Lewis et al. |
| 2016/0345477 P1 | | 11/2016 | Kubby |
| 2016/0353677 A1 | | 12/2016 | Toye |
| 2016/0360721 A1 | | 12/2016 | De Meijer |
| 2017/0172040 P1 | | 6/2017 | Carter et al. |
| 2017/0359967 A1 | | 12/2017 | Tetrault et al. |
| 2018/0213730 A1 | | 8/2018 | Tambay et al. |
| 2018/0310490 A1 | | 11/2018 | Du et al. |
| 2018/0371316 A1 | | 12/2018 | Backfolk et al. |
| 2019/0160796 A1 | | 5/2019 | Ponti |
| 2019/0284471 A1 | | 9/2019 | Gu et al. |
| 2019/0375932 A1 | | 12/2019 | Okamoto et al. |
| 2020/0396910 A1 | | 12/2020 | Horinek |
| 2022/0304264 A9 | | 9/2022 | Bassin et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0964042 A1 | 12/1999 | |
| EP | 1859674 A1 | 11/2007 | |
| FR | 3000427 A1 | 7/2014 | |
| KR | 20090085941 A | 8/2009 | |
| WO | 2007074899 A1 | 7/2007 | |
| WO | 2016049025 A1 | 3/2016 | |

### OTHER PUBLICATIONS

Davidson E.A., et al., "Temperature Sensitivity of Soil Carbon Decomposition and Feedbacks to Climate Change", Nature, vol. 440, Mar. 9, 2006, pp. 165-173.

De Zeeuw R.A., et al., "Cannabinoids with a Propyl Side Chain in Cannabis: Occurrence and Chromatographic Behavior", Science, vol. 175, Feb. 18, 1972, pp. 778-779.

El-Alfy A.T., et al., "Antidepressant-like Effect of Delta9-tetrahydrocannabinol and Other Cannabinoids Isolated from *Cannabis Sativa* L", Pharmacology Biochemistry and Behavior, vol. 95, No. 4, Jun. 2010, pp. 434-442.

Hillig K.W., "A Chemotaxonomic Analysis of Terpenoid Variation in Cannabis", Biochemical Systematics and Ecology, vol. 32, No. 10, Oct. 2004, pp. 875-891.

Holley J.H., et al., "Constituents of *Cannabis Sativa* L. XI: Cannabidiol and Cannabichromene in Samples of Known Geographical Origin", Journal of Pharmaceutical Sciences, vol. 64, No. 5, May 1975, pp. 892-894.

Lunau K., et al., "Innate Colour Preferences of Flower Visitors", Journal of Comparative Physiology A, 1995, vol. 177, pp. 1-19.

Russo E.B., "Taming THC: Potential Cannabis Synergy and Phytocannabinoid-terpenoid Entourage Effects", British Journal of Pharmacology, vol. 163, Aug. 2011, pp. 1344-1364.

Vignolini S., et al., "The Flower of Hibiscus Trionum Is Both Visibly and Measurably Iridescent", New Phytologist, vol. 205, No. 1, Jul. 16, 2014, pp. 97-101.

Wang Y., et al., "Contributions of Green Light to Plant Growth and Development", American Journal of Botany, vol. 100, No. 1, Jan. 1, 2013, pp. 70-78.

Al-Helal I.M., et al., "Measuring and Evaluating Solar Radiative Properties of Plastic Shading Nets," Solar Energy Materials Solar Cells, 2011, vol. 95, pp. 677-683.

Canright S., "Infrared Light", NASA, Mar. 18, 2004, www.nasa.gov/audience/forstudents/5-8/features/F_Infrared_Light_5-8.html, pp. 1-2.

**US 12,514,179 B2**

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Chang M-Y., "Production of Silicon Carbide Liquid Fertilizer by Hydrothermal Carbonization Processes from Silicon Containing Agricultural Waste Biomass." Engineering Journal, vol. 20, No. 4, Aug. 1, 2016, pp. 11-17.

Communication Pursuant to Article 94(3) EPC for European Application No. 15844141.0, dated Jan. 5, 2022, 4 pages.

Extended European Search Report for European Application No. 15844141.0, dated May 8, 2018, 47 pages.

Final Office Action for U.S. Appl. No. 15/798,088, dated Feb. 28, 2022, 14 pages.

Final Office Action for U.S. Appl. No. 15/798,088, dated Feb. 29, 2024, 35 pages.

Folta K.M., et al., "Light as a Growth Regulator: Controlling Plant Biology with Narrow-bandwidth Solid-state Lighting Systems," Horticultural Science, 2008, vol. 43 (7), pp. 1957-1964.

Ghosal M.K., et al., "Modeling and Experimental Validation of a Greenhouse with Evaporative Cooling by Moving Water Film Over External Shade Cloth," Energy and Buildings, 2003, vol. 35 (8), pp. 843-850.

International Search Report and Written Opinion for International Application No. PCT/US2015/051447 dated Dec. 14, 2015, 9 pages.

Non-Final Office Action for U.S. Appl. No. 15/798,088, dated Nov. 8, 2023, 39 pages.

Notice of Allowance for U.S. Appl. No. 15/798,088, dated Jun. 3, 2024, 08 pages.

Office Action for Canadian Application No. 2962342, dated Oct. 14, 2021, 3 pages.

Shibayev P.P., et al., "The Effect of Circularly Polarized Light on the Growth of Plants," International Journal of Botany, 2011, vol. 7 (1), pp. 113-117.

* cited by examiner



# FIG. 1



# FIG. 2



FIG. 3

US 12,514,179 B2

**1**

# KIT HAVING ACTIVE POLYMER MATERIALS FOR GROWING MORE VIGOROUS, LARGER, AND HEALTHIER PLANTS

## CROSS REFERENCE TO RELATED APPLICATIONS

This U.S. Patent Application is a continuation of U.S. patent application Ser. No. 15/798,088 filed Oct. 30, 2017, which is a continuation in part of U.S. patent application Ser. No. 14/860,082 filed Sep. 21, 2015, which claims priority to U.S. Provisional Patent Application No. 62/054,158 filed Sep. 23, 2014, the disclosures of which are hereby incorporated by reference in their entireties.

## FIELD OF THE INVENTION

This invention relates to the field of agricultural cloning devices, agricultural cloning technology, seed cloning technology, seed sprouting technology, *Cannabis* plant cloning technology, the *Cannabis* farming industry, hydroponic systems, *Cannabis* industry, and *Cannabis* cloning.

## BACKGROUND OF THE INVENTION

As the *Cannabis* industry grows, so does the need for more efficient cloning techniques and materials. There is a need for improvements with seed and cloning materials.

There is a need for a growing medium that is reusable, recyclable and safe that accelerates the cloning process in the *Cannabis* industry. "The International Agency for Research on Cancer (IARC) has reviewed the carcinogenicity of man-made mineral fibres in October 2002. The IARC Monograph's working group concluded only the more biopersistent materials remain classified by IARC as "possibly carcinogenic to humans" (Group 2B). These include refractory ceramic fibres, which are used industrially as insulation in high-temperature environments such as blast furnaces, and certain special-purpose glass wools not used as insulating materials."

As a result of the aforementioned problem, there is a need for a growing media material that has little to no carcinogenicity in that it will not leach carcinogens into the air, soil, or *Cannabis* plants. There is a need for a reusable material that can be washed of all mold and bacteria while maintaining the thermal properties of the growing media. The present invention meets all of these needs and requirements.

## SUMMARY OF THE INVENTION

The present invention provides methods for improving *Cannabis* plant growth, said methods comprising: (a) placing an active polymer within 30 cm of the *Cannabis* plant; and (b) allowing said *Cannabis* plant to grow; wherein said active polymer comprises one or more minerals suspended, embedded or otherwise incorporated in a polymer matrix, and wherein an infrared radiation absorbance by said active polymer is greater than an infrared radiation absorbance by said polymer matrix alone provided the same source of a radiation; wherein said *Cannabis* plant exhibits improved growth compared to a control *Cannabis* plant grown without said active polymer.

The methods of the present invention encompass utilizing an active polymer that absorbs electromagnetic radiation between 400 nm to 14000 nm wavelength.

**2**

The methods of the present invention also encompass utilizing an active polymer that polarizes electromagnetic radiation between 400 nm to 14000 nm wavelength.

In other embodiments, the methods of the present invention encompass utilizing an active polymer that absorbs electromagnetic radiation and emits light between 200 and 1100 nm wavelength.

In some embodiments of the present invention, the methods utilize an active polymer that comprises one or more mineral types selected from the group consisting of silicon carbide (SiC), calcium carbide ($CaC_2$), titanium dioxide ($TiO_2$), aluminum oxide ($Al_2O_3$), and silicon dioxide ($SiO_2$).

In some embodiments, the methods of the present invention utilize an active polymer that comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex. In some embodiments, the present invention utilizes such polymers wherein the mineral is suspended, embedded or otherwise incorporated in the polymer matrix comprises about 1% to about 2% of a total weight of the active polymer. In some embodiments, the active polymer is extruded into a form selected from the group consisting of a fiber, a staple fiber, a film, and a sheet.

The present invention includes methods wherein the active polymer is placed in contact with the growth media for said *Cannabis* plant. In some embodiments of the present invention the selected form of the active polymer is a fiber, and wherein said fiber is made into a textile using a technique selected from the group consisting of weaving, stitching, sewing, knitting, bonding, fusing, and felting.

The present invention provides kits comprising a *Cannabis* plant and an active polymer, wherein said active polymer comprises one or more minerals suspended, embedded or otherwise incorporated in a polymer matrix, and wherein an infrared radiation absorbance by said active polymer is greater than an infrared radiation absorbance by said polymer matrix alone provided the same source of a radiation. In some embodiments, the kit is in a form of a bagged or a potted *Cannabis* plant.

The present invention also provides kits comprising a *Cannabis* plant growth media and an active polymer, wherein said active polymer comprises one or more minerals suspended, embedded or otherwise incorporated in a polymer matrix, and wherein an infrared radiation absorbance by said active polymer is greater than an infrared radiation absorbance by said polymer matrix alone provided the same source of a radiation.

In some embodiments, the kits of the present invention are in a form of a bagged or potted growth media.

The present invention also provides agricultural materials comprising an active polymer wherein said active polymer comprises one or more minerals suspended, embedded or otherwise incorporated in a polymer matrix, and wherein an infrared radiation absorbance by said active polymer is greater than an infrared radiation absorbance by said polymer matrix alone provided the same source of a radiation. In some embodiments, the agricultural materials used in the present invention comprise an active polymer covers a growth media. In some embodiments of the present invention, the agricultural material that comprises the active polymer is a bag. In some embodiments, the agricultural material that comprises the active polymer is a non-woven textile.

In some embodiments, the methods and kits of the present invention can be used for any *Cannabis* plant or plant part, including *Cannabis* clones, *Cannabis* seedlings, parts of a

US 12,514,179 B2

3

*Cannabis* plant, the top of a *Cannabis* plant, the bottom of a *Cannabis* plant, or a whole *Cannabis* plant.

In some embodiments, the *Cannabis* plants or plant parts used in the present invention can be or be from male or female plants.

In some embodiments, the *Cannabis* plants or plant parts used in the present invention can be or be from *Cannabis indica, Cannabis sativa*, or a hybrid between these two species.

In some embodiments, the present invention provides methods and kits used for seed cloning technologies.

The present invention provides methods of growing a *Cannabis* plant or plant part thereof comprising placing the *Cannabis* plant or plant part thereof in a growing medium comprising an active polymer material, wherein the active polymer material emits light in a wavelength between about 200 nm to about 1,100 nm and absorbs ultraviolet light in the range of about 10 nm to about 400 nm; and growing the *Cannabis* plant or plant thereof. In some embodiments of the present invention, these methods utilize an active polymer material that emits light in a wavelength between about 350 nm to about 800 nm.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a lateral view of the control and experimental (i.e., inventive) kits for growing the *Cannabis* plants. FIG. **1** shows the dramatic difference in *Cannabis* plant top and root growth of the present invention based on using control growing media (two outside plants **104**, **124**) versus the present invention (middle plant **114**). This example demonstrates the positive growing effects the present invention has on both the upward *Cannabis* plant growth (aka aboveground growth, top growth, shoot growth) and the downward *Cannabis* plant growth (aka below-ground growth, bottom growth, root growth **113**).

FIG. **2** is similar to FIG. **1** except it also includes a separate sample of the growing media **115** (see, lower right-hand corner) used to grow the experimental (i.e., center) plant **114**.

FIG. **3** is similar to FIG. **1** except it also includes a view of the physical system **130** used for growing the control **104**, **124** and experimental **114** *Cannabis* kits/plants.

DETAILED DESCRIPTION OF THE
INVENTION

The present invention is an improvement to growing media that are used in the *Cannabis* growing industry. In one embodiment, the present invention is an improvement to the use of stone wool materials in growing plants hydroponically (e.g., RockWool™) in indoor and outdoor hydroponic growing systems. In another embodiment, the present invention is an improvement to growing bricks that are placed in growing trays for indoor and outdoor *Cannabis* cloning devices.

The present invention is flexible material which allows for downward growth of a root and an upward growth of the *Cannabis* plant from the sprouted clone to grow easier where the *Cannabis* plant can manipulate the tensile arrangement of the present invention.

One goal of the present invention is to increase the speed and cycle time of growing *Cannabis* without modifying the *Cannabis* plants by using genetic engineering (i.e., biotechnological methods). Avoiding genetic engineering for *Cannabis* improvement is highly desirable as genetic modifica-

4

tion is gaining medical controversy and is being avoided by a more health-focused consumer.

The present invention comprises a polymeric fiber embedded with far infrared emissive compositions that has the ability to increase the rate of *Cannabis* plant growth through thermally conductive particles embedded in the fiber of the technology.

In some embodiments, the thermal compositions of the present invention comprise one or more of the following materials that are about 1 micron (aka about 1 μ or about 1 micrometer) in particle size: silicon carbide powder, zinc oxide powder and titanium dioxide powder.

In one embodiment, the polymeric composition comprises polyethylene terephthalate (otherwise known as P.E.T.).

The present disclosure addresses the need for versatile materials that can, in some embodiments, be used to improve or otherwise alter *Cannabis* plant growth, development, health and/or production. In some embodiments, an active polymer material capable of harvesting photon energy is used in an agricultural setting. In some embodiments, the present invention provides a composition of an active polymer material comprising one or more minerals suspended, embedded or otherwise incorporated in a polymer matrix which is useful in an agricultural setting.

In some embodiments, the active polymer material is placed in close proximity to and/or touching a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture. In one embodiment, the active polymer material is placed within about 30 cm from a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture. In another embodiment, the active polymer material is placed on or mixed with the growth media in proximity to a *Cannabis* plant or a *Cannabis* plant part.

The active polymer material described herein exhibits interesting, useful and beneficial optical properties. In some embodiments, the active polymer material interacts with electromagnetic radiation by absorption, reflection, refraction, polarization, or wavelength shifting. In one embodiment, the active polymer material of this present disclosure absorbs a greater amount of infrared radiation when compared to a material made with only the polymer matrix provided with the same source of radiation.

In some embodiments, the active polymer material absorbs electromagnetic radiation in the range between about 400 nm (aka 400 nanometers, which equals 0.4μ) to about 14,000 nm (aka 14,000 nanometers, which equals 14μ). In some embodiments, the active polymer material polarizes electromagnetic radiation in the range between about 400 nm to about 14,000 nm. In other embodiments, the active polymer material emits light in the range between about 200 nm and about 1,100 nm. In yet another embodiment, said active polymer material emits light in the wavelength between about 350 nm and about 800 nm.

The active polymer material can be constructed into different forms and shapes, which makes this material system very versatile. In some embodiments, the active polymer material is extruded into a fiber. In some embodiments, said fiber is meshed.

In other embodiments, the active polymer material is extruded as a staple fiber. In some embodiments, the active polymer material is extruded into a film. These are additional basic forms of the active polymer material that can be further manipulated into more complex material forms. In some embodiments, any of these basic forms of the active polymer material is placed in close proximity to and/or touching a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture.

US 12,514,179 B2

5

In some embodiments, said fiber comprising the active polymer material is woven, stitched, knitted, or sewn into a textile or a fabric. In some embodiments, the textile is in a form of a bag. In a specific embodiment, the bag may be meshed. The bag may be used to hold a *Cannabis* plant and its growth media. In some embodiments, said bag is filled with growth media and a *Cannabis* plant is *Cannabis* planted in the growth media.

In some embodiments, the textile is in the form of a sheet. In some embodiments, the sheet is meshed. In other embodiments, the sheet can be placed over the growth media. In a specific embodiment, an opening is cut out in the sheet to accommodate a stem or a trunk of the *Cannabis* plant in order to place the sheet over the growth media and around the stems or trunks of the *Cannabis* plants.

The fiber comprising the active polymer material is, in some embodiments, non-woven by felting, bonding, or fusing. In other embodiments, the active polymer material is non-woven into a batting material. In some embodiments, the batting material is die-cut into desired shapes such as squares, rectangles, circles, ovals, donut-like shape, or triangles, for example. In other embodiments, said die-cut material comprising the active polymer material is placed on top of the growth media and around a trunk or a stem of the *Cannabis* plant.

In other embodiments, the fiber comprising the active polymer material is non-woven into a sphere-like shape, like a cotton ball, having a diameter of about 0.5 cm (aka centimeters) to about 5 cm.

In some embodiments, the sphere-like shaped material comprising the active polymer material is placed on top of the growth media and around a trunk or a stem of the *Cannabis* plant. In a specific embodiment, the sphere-like shaped material is mixed in with the soil and the soil is placed around a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture. For one example of a sphere-like shaped material, see Example 7.

The active polymer material may comprise a variety of mineral compounds.

In some embodiments, the active polymer material comprises one or more mineral types selected from the group consisting of silicon carbide (SiC), titanium dioxide ($TiO_2$), aluminum oxide ($Al_2O_3$), and silicon dioxide ($SiO_2$). In some embodiments, the total amount of all mineral comprises about 1% to about 2% of a total weight of the active polymer material.

The active polymer material may comprise one or more types of polymer matrix. In some embodiments, the active polymer material comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex.

The active polymer material used in agriculture, in some embodiments, is Celliant™. See U.S. Pat. No. 7,074,499, which is incorporated by reference in its entirety herein, for a description of Celliant™.

A kit can be put together with the active polymer material with those components deemed important to be used in combination. In some embodiments, a kit comprises a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture and an active polymer material according to the present invention which is capable of harvesting photon energy. The active polymer material comprises a polymer matrix and at least one type of mineral powder, wherein the mineral powder is suspended, embedded or otherwise incorporated in the polymer matrix. In some embodiments, the active polymer material which is a part of the kit interacts with electromagnetic radiation by absorption, reflection,

6

refraction, polarization, or wavelength shifting. In one embodiment, the active polymer material absorbs greater amount of infrared radiation when compared to a material made with only the polymer matrix and provided the same source of radiation.

In some embodiments, the kit is in the form of a bagged or a potted *Cannabis* plant. In other embodiments, the kit comprises a *Cannabis* plant seed, *Cannabis* clone, *Cannabis* stem, root, shoot, shoot plus root, or any plant part embedded or enclosed in the active polymer material.

A different kit, in some embodiments, comprises a *Cannabis* planting pot or a *Cannabis* planting container and an active polymer material which is capable of harvesting photon energy. The active polymer material comprises a polymer matrix and at least one type of mineral powder, wherein the mineral powder is suspended, embedded or otherwise incorporated in the polymer matrix. In some embodiments, the kit comprises a *Cannabis* planting pot or a *Cannabis* planting container with the active polymer material placed inside it. In other embodiments, the kit comprises the *Cannabis* planting pot or the *Cannabis* planting container with the active polymer material lining the inside and/or outside walls of the *Cannabis* planting pot or the *Cannabis* planting container.

In some embodiments, a kit comprises a *Cannabis* plant growth media and an active polymer material which is capable of harvesting photon energy. Said active polymer material comprises a polymer matrix and at least one type of mineral powder, wherein the mineral powder is suspended, embedded or otherwise incorporated in the polymer matrix.

In some embodiments, the kit is in the form of a bagged growth media.

In some embodiments, one or more kits described previously comprise an active polymer material that emits light in the wavelength between about 200 nm and about 1,100 nm. In other embodiments, one or more kits described previously comprise an active polymer material that emits light in the wavelength between about 350 nm and about 800 nm. In some embodiments, one or more kits described previously comprise an active polymer material that is Celliant™.

One or more kits described herein, in some embodiments, comprise an active polymer material wherein one or more mineral types is selected from the group consisting of silicon carbide (SiC), titanium dioxide ($TiO_2$), aluminum oxide ($Al_2O_3$), and silicon dioxide ($SiO_2$). In other embodiments, one or more kits described previously comprise an active polymer material where one or more polymer type is selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex. In a specific embodiment, one or more kits mentioned previously comprise an active polymer material wherein the minerals comprise about 1% to about 2% of a total weight of the total active polymer material.

Harvesting photon energy, as mentioned earlier, encompasses a wide range of electromagnetic radiation. Some of the range in the electromagnetic spectrum is not beneficial to *Cannabis* plants. In general ultraviolet light range (about 10-390 nm) may be harmful to *Cannabis* plants. A material that could convert ultraviolet light range into visible light region (about 390-770 nm) would be beneficial for *Cannabis* plant growth.

In some embodiments, an active polymer material capable of absorbing ultraviolet light in the range of about 10 nm to about 400 nm is used in an agricultural setting. The active polymer material comprises a polymer matrix and at least one type of mineral powder, which is suspended, embedded or otherwise incorporated in the polymer matrix. In a

US 12,514,179 B2

7

specific embodiment, the active polymer material is placed in close proximity to and/or touching the *Cannabis* plant, *Cannabis* plant part, or *Cannabis* plant tissue culture.

In some embodiments, the active polymer material emits light in the wavelength between 200 nm and 1100 nm. In other embodiments, the active polymer material emits light in the wavelength between 350 and 800 nm in wavelength.

The active polymer material capable of absorbing ultraviolet light may be comprised of a variety of mineral compounds. In some embodiments, the active polymer material comprises one or more mineral types selected from the group consisting of silicon carbide (SiC), titanium dioxide ($TiO_2$), aluminum oxide ($Al_2O_3$), and silicon dioxide ($SiO_2$). In some embodiments, the total amount of all minerals comprises about 1% to about 2% of a total weight of said active polymer material.

The active polymer material capable of absorbing ultraviolet light may comprise one or more types of polymer matrix. In some embodiments, the active polymer material comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex.

The active polymer material, capable of absorbing ultraviolet light, used in agriculture, in some embodiments, is Celliant™.

Definitions

While the following terms are believed to be well understood by one of ordinary skill in the art, the following definitions are set forth to facilitate explanation of the presently disclosed subject matter.

The term "a" or "an" refers to one or more of that entity; for example, "a *Cannabis* plant" refers to one or more *Cannabis* plants or at least one *Cannabis* plant. As such, the terms "a" (or "an"), "one or more" and "at least one" are used interchangeably herein. In addition, reference to "an element" by the indefinite article "a" or "an" does not exclude the possibility that more than one of the elements is present, unless the context clearly requires that there is one and only one of the elements.

As used herein, the verb "comprise" as is used in this description and in the claims and its conjugations are used in its non-limiting sense to mean that items following the word are included, but items not specifically mentioned are not excluded.

As used herein, the term "plant" refers to any living organism belonging to the kingdom Plantae (i.e., any genus/species in the Plant Kingdom). According to the context of its use, in some instances the term "*Cannabis* plant" as used herein may also be intended to include any *Cannabis* plant propagules, *Cannabis* seedlings, *Cannabis* clones, *Cannabis* plant parts, or *Cannabis* plant tissue cultures in addition to the whole *Cannabis* plant. Such plants may or may not comprise an inflorescence.

As used herein, the term "*Cannabis* plant part" refers to both complete *Cannabis* plants and parts of *Cannabis* plant. Non-limiting examples of *Cannabis* plant part may include embryos, pollen, ovules, seeds, leaves, flowers, branches, stalks, roots, root tips, anthers, stem shoots, scions, rootstocks, *Cannabis* plant protoplasts, *Cannabis* plant cells including *Cannabis* plant cells that are intact in *Cannabis* plants and/or parts of *Cannabis* plants, *Cannabis* plant calli, *Cannabis* plant clumps, *Cannabis* plant tissues, *Cannabis* plant tissue cultures, and the like.

As used herein, the term "*Cannabis* plant tissue culture" refers to a composition comprising isolated cells of the same

8

or a different type or a collection of such cells organized into parts of a *Cannabis* plant. Non-limiting examples of *Cannabis* plant tissue cultures include *Cannabis* plant protoplasts, *Cannabis* plant calli, *Cannabis* plant clumps, and *Cannabis* plant cells that can generate tissue culture that are intact in *Cannabis* plants or parts of *Cannabis* plants, such as embryos, pollen, flowers, seeds, pods, leaves, stems, roots, root tips, anthers, pistils and the like.

As used herein, the term "agricultural use" refers to use of the designated compound or a material in association with growing a *Cannabis* plant or in association with the land used to glow *Cannabis* plants or to raise animals for food or economic gain. Agriculture use encompasses all types of agricultural landscapes and types. Non-limiting examples of different agricultural types or technique include greenhouses, plains, fields, paddy fields, deserts, marsh, terraces, hills, fells, hydroponics, semi-hydroponics, acroponics, fogponics, organoponics, undergrounds, tunnels, walls, indoor fields, indoor gardens, gardens, rooftops, bonsai, *Cannabis* planters and pots, grow boxes, grow rooms, and the like.

As used herein, "improved *Cannabis* plant growth" or "improved growth characteristic" refer to the improvement of at least one morphological, physiological and/or phenotypical characteristic of a treated *Cannabis* plant (i.e., a test *Cannabis* plant) when compared to an untreated *Cannabis* plant (i.e., a control *Cannabis* plant). Representative *Cannabis* plant growth parameters include but are not limited to the following: above ground height, above ground *Cannabis* plant width, root mass, number of branches, branch angle, total above ground *Cannabis* plant mass, total *Cannabis* plant weight, days to first flower, number of fruits, weight of fruits, mean fruit weight, number of seeds, weight of seeds, mean seed weight, tuber weight, tuber diameter, leaf size, leaf weight, leaf length, leaf width, leaf area, number of leaves, stem length, stem weight, stem. diameter, number of petioles, length of petioles, number of ovaries, pollen amount, pollen size, standability, resistance to lodging, disease resistance, disease avoidance, cold hardiness, heat tolerance, drought tolerance, days to maturity, days to pollen release, color, emergence, rate of photosynthesis, number of nodes, length of node, number of lateral roots, length of primary root, number of stomata, density of stomata, number of stolans, stolan length, number of rhizomes, rhizome length, and harvestability. In some embodiments, weight of a *Cannabis* plant or a *Cannabis* plant part refers to fresh weight or dried weight.

As used herein, the term "active polymer" refers to a system comprising one or more types of minerals and a polymer matrix wherein said mineral particles are suspended, embedded, or otherwise incorporated in said polymer matrix. The active polymer is capable of harvesting photon energy. The active polymer will be described in greater detail elsewhere herein. For the purposes of this application, the terms "active polymer" and "active polymer material" are used interchangeably.

As used herein, the phrase "harvest photon energy" refers to the act of absorbing photons whereby a molecule or atom comprising the material absorbing the photon transitions from the ground state to the excited state. Photons are particles representing quantum units of light, both visible and invisible to the naked eye, and carrying energy proportional to the electromagnetic radiation frequency.

As used herein, the term "absorption" refers to the physical process of absorbing light and term "absorbance" refers to a mathematical quantity expressing the ratio of light or

US 12,514,179 B2

9

radiation that falls upon a material and the amount that gets transmitted through the material.

As used herein, the term "absorptivity" and "absorbance" refers to the optical absorption properties exhibited by a material.

As used herein, the term "transmission of light" refers to the light that is passed through a material without being absorbed. As used herein, the term "transmissivity" and "transmittance" refers to the optical transmission properties exhibited by a material.

As used herein, the term "reflection" refers to the light that bounces back upon hitting a material or the light and its energy that is re-emitted upon hitting a material. As used herein, the term "reflectivity" or "reflectance" refers to the optical reflection properties exhibited by a material.

As used herein, the term "refraction" refers to a change in the transmitted light direction due to change in the transmission medium such as water or glass.

As used herein, the term "polarize" refers to the physical process in which light or radiation reflects off of or partially passes through a particle or a material where the direction of electric and magnetic field vectors in the wave is altered. Polarization of light or radiation may be partial or complete.

As used herein, the terms "emit light," "emitting light," or "emission of light" each refer to the physical process in which the excited state of the molecule or an atom due to absorption of energy falls back to its ground state thereby releasing energy in the form that can be quantified by its wavelength or a range of wavelengths. As used herein, the terms "emissivity" or "emittance" each refer to the optical emission properties exhibited by a material.

It is noted that the National institute of Standards and Technology (NIST) has recommended to reserve the ending "-ivity" (such as in reflectivity and transmissivity) for radiative properties of pure, perfectly smooth materials and using the ending "-ance" (such as in reflectance and transmittance) for rough and contaminated surfaces.

As used herein, the term "light scattering" refers to a physical process in which light is reflected off of an object in many different directions due to the irregularities of the hitting surface or when hitting interfering particles, that is in between the object and the source of light. Small particles suspended in air can cause light scattering.

As used herein, the term "refractive index" refers to the ability of a particular substance to bend light when light is entering said substance.

As used herein, the term "extrude" refers to a process in which a material is forced out through a die to form material into certain shapes.

As used herein, the term "fiber" refers to an elongated, thread-like structured material having a characteristic longitudinal dimension (length) and a characteristic transverse dimension (diameter), wherein fibers can be used as component of a composite material by weaving or stitching. Fibers can be short (discontinuous) or long (continuous).

As used herein, the term "denier" refers to a unit of measure for the linear mass density of fibers. For example, a fiber having a length of 9000 m and weighing 1 gram has a denier of 1 (aka 1-denier).

As used herein, the term "staple fiber" refers to a short or discontinuous fiber where the length of the fiber is cut in the length approximately from about 0.1 cm to about 15 cm.

As used herein, the term "film" refers to a flat or tubular flexible structure of the material used.

As used herein, the term "mesh" refers to a composition constructed of a material having the appearance of a net (e.g., with holes, or pores).

10

As used herein, the term "batting material" refers to a material made of a soft, bulky assembly of non-woven fibers or foam.

As used herein, the term "die-cut" refers to a process in which fiber, textile, or material is cut into shapes using a die.

As used herein, the term "growth media," "growing media," or "Cannabis plant growth media" refers to various natural and artificial media which support Cannabis plant growth. Non-limiting examples include natural or artificial soil, peat moss, sand, clay, pumice, organic mulch, rock, wool, rockwool, vermiculite, growstones, coir, rice hulls, perlite, gravel, wood fiber, sheep wool, brick shards, polystyrene packing peanuts, natural and synthetic fibers, potting mixtures of organic and inorganic matter, artificial media such as polyurethane foam, and the like.

As used herein, the term "kit" refers to components intended for use together. An indication that components of a kit are for use together can be, for example, packaging of the components in a single package, or labeling either or both of the components as being for use in combination, or both.

As used herein, the term "Celliant™" refers to a patented material and technology described by U.S. Pat. No. 7,074, 499. Celliant is a bi-component material comprising of thermo-reactive particles which are embedded into fibers. Textile made from Celliant fiber is shown to effectively convert body heat into medically useful infrared radiation. Therapeutic values of infrared radiation include promotion of blood circulation and increase in oxygen level in the blood stream. In some embodiments Celliant comprises 55% SiC, 25% $TiO_2$, 5% $SiO_2$, and 15% $Al_2O_3$ minerals composition.

Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art to which this invention belongs. Preferred methods, devices, and materials are described, although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention. All references cited herein are incorporated for all purposes by reference in their entirety.

Cannabis

Cannabis, more commonly known as marijuana, is a genus of flowering plants that includes at least three species, Cannabis sativa, Cannabis indica, and Cannabis ruderalis as determined by plant phenotypes and secondary metabolite profiles. In practice however, Cannabis nomenclature is often used incorrectly or interchangeably. Cannabis literature can be found referring to all Cannabis varieties as "sativas" or all cannabinoid producing plants as "indicas". Indeed the promiscuous crosses of indoor Cannabis breeding programs have made it difficult to distinguish varieties, with most Cannabis being sold in the United States having features of both sativa and indica species.

Cannabis is one of the world's oldest and most useful cultivated genus of plants. Humans have used hemp varieties of Cannabis for the production of industrial materials, including food, paper, textiles, plastics, detergents, and biofuels. Humans also have a long history of using psychoactive varieties of Cannabis for medical and recreational applications. Cannabis has long been used for drug and industrial purposes, fiber (hemp), for seed and seed oils, for medicinal purposes, and as a recreational drug. Industrial hemp products are made from Cannabis plants selected to produce an abundance of fiber. Some Cannabis strains have been bred to produce minimal levels of THC, the principal psychoactive constituent responsible for the psychoactivity

US 12,514,179 B2

11

associated with marijuana. Marijuana has historically consisted of the dried flowers of *Cannabis* plants selectively bred to produce high levels of THC and other psychoactive cannabinoids. Various extracts including hashish and hash oil are also produced from the plant.

Interest in psychoactive varieties of *Cannabis* has recently exploded following the relaxation drug laws within the United States, and with the discovery of previously unrecognized applications for *Cannabis* in the treatment of human diseases such as diabetes, epilepsy, schizophrenia, and cancer.

*Cannabis* is diploid, having a chromosome complement of 2n=20, although polyploid individuals have been artificially produced. The first genome sequence of *Cannabis*, which is estimated to be 820 Mb in size, was published in 2011 by a team of Canadian scientists (Bakel et al, "The draft genome and transcriptome of *Cannabis sativa*" Genome Biology 12:R102).

All known strains of *Cannabis* are wind-pollinated and the fruit is an achene. Most strains of *Cannabis* are short day plants, with the possible exception of *C. sativa* subsp. *sativa* var. *spontanea* (=*C. ruderalis*), which is commonly described as "auto-flowering" and may be day-neutral.

The genus *Cannabis* was formerly placed in the Nettle (Urticaceae) or Mulberry (Moraceae) family, and later, along with the *Humulus* genus (hops), in a separate family, the Hemp family (Cannabaccae sensu stricto). http://en.wikipedia.org/wiki/Cannabis-cite_note-schultes2001a-21. Recent phylogenetic studies based on cpDNA restriction site analysis and gene sequencing strongly suggest that the Cannabaceae sensu stricto arose from within the former Celtidaceae family, and that the two families should be merged to form a single monophyletic family, the Cannabaceae sensu lato.

*Cannabis* plants produce a unique family of terpeno-phenolic compounds called cannabinoids. Cannabinoids, terpenoids, and other compounds are secreted by glandular trichomes that occur most abundantly on the floral calyxes and bracts of female plants. As a drug it usually comes in the form of dried flower buds (marijuana), resin (hashish), or various extracts collectively known as hashish oil. There are at least 483 identifiable chemical constituents known to exist in the *Cannabis* plant (Rudolf Brenneisen, 2007, Chemistry and Analysis of Phytocannabinoids (cannabinoids produced by *Cannabis*) and other *Cannabis* Constituents, In Marijuana and the Cannabinoids, ElSohly, ed.; incorporated herein by reference) and at least 85 different cannabinoids have been isolated from the plant (El-Alfy, Abir T, et al., 2010, "Antidepressant-like effect of delta-9-tetrahydrocannabinol and other cannabinoids isolated from *Cannabis sativa* L", Pharmacology Biochemistry and Behavior 95 (4): 434-42; incorporated herein by reference). http://en.wikipedia.org/wiki/Cannabis-cite_note-26. The two cannabinoids usually produced in greatest abundance are cannabidiol (CBD) and/or $\Delta^9$-tetrahydrocannabinol (THC). THC is psychoactive while CBD is not. See, ElSohly, ed. (Marijuana and the Cannabinoids, Humana Press Inc., 321 papers, 2007), which is incorporated herein by reference in its entirety, for a detailed description and literature review on the cannabinoids found in marijuana.

Cannabinoids are the most studied group of secondary metabolites in *Cannabis*. Most exist in two forms, as acids and in neutral (decarboxylated) forms. The acid form is designated by an "A" at the end of its acronym (i.e. THCA). The phytocannabinoids are synthesized in the plant as acid forms, and while some decarboxylation does occur in the plant, it increases significantly post-harvest and the kinetics

12

increase at high temperatures. (Sanchez and Verpoorte 2008). The biologically active forms for human consumption are the neutral forms. Decarboxylation is usually achieved by thorough drying of the plant material followed by heating it, often by either combustion, vaporization, or heating or baking in an oven. Unless otherwise noted, references to cannabinoids in a plant include both the acidic and decarboxylated versions (e.g., CBD and CBDA).

The cannabinoids in *Cannabis* plants include, but are not limited to, $\Delta^9$-Tetrahydrocannabinol ($\Delta^9$-THC), $\Delta^8$-Tetrahydrocannabinol ($\Delta^8$-THC), Cannabichromene (CBC), Cannabicyclol (CBL), Cannabidiol (CBD), Cannabielsoin (CBE), Cannabigerol (CBG), Cannabinidiol (CBND), Cannabinol (CBN), Cannabitriol (CBT), and their propyl homologs, including, but are not limited to cannabidivarin (CBDV), $\Delta^9$-Tetrahydrocannabivarin (THCV), cannabichromevarin (CBCV), and cannabigerovarin (CBGV). See Holley et al. (Constituents of *Cannabis sativa* L. XI Cannabidiol and cannabichromene in samples of known geographical origin, *J. Pharm. Sci.* 64:892-894, 1975) and De Zeeuw et al. (Cannabinoids with a propyl side chain in *Cannabis*, Occurrence and chromatographic behavior, Science 175:778-779), each of which is herein incorporated by reference in its entirety for all purposes. Non-THC cannabinoids can be collectively referred to as "CBs", wherein CBs can be one of THCV, CBDV, CBGV, CBCV, CBD, CBC, CBE, CBG, CBN, CBND, and CBT cannabinoids.

In addition to cannabinoids, *Cannabis* also produces over 120 different terpenes (Russo **2011**, Taming THC: potential *Cannabis* synergy and phytocannabinoid-terpenoid entourage effects, *British Journal of Pharmacology,* 163:1344-1364). Within the context and verbiage of this document the terms 'terpenoid' and 'terpene' are used interchangeably. Examples of representative terpines include, but are not limited to, terpinolene, alpha phelladrene, beta ocimene, carene, limonene, gamma terpinene, alpha pinene, alpha terpinene, beta pinene, fenchol, camphene, alpha terpineol, alpha humulene, beta caryophyllene, linalool, cary oxide, and myrcene.

Cannabinoids are odorless, so terpenoids are responsible for the unique odor of *Cannabis*, and each variety has a slightly different profile that can potentially be used as a tool for identification of different varieties or geographical origins of samples (Hillig 2004. "A chemotaxonomic analysis of terpenoid variation in *Cannabis*" Biochem System and Ecology 875-891). It also provides a unique and complex flavor smell, and effect profile for each variety that is appreciated by both novice users and connoisseurs. In addition to many circulatory and muscular effects, some terpenes interact with neurological receptors. A few terpenes produced by *Cannabis* plants also bind weakly to Cannabinoid receptors. Some terpenes can alter the permeability of cell membranes and allow in either more or less THC, while other terpenes can affect serotonin and dopamine chemistry as neurotransmitters. Terpenoids are lipophilic, and can interact with lipid membranes, ion channels, a variety of different receptors (including both G-protein coupled odorant and neurotransmitter receptors), and enzymes. Some are capable of absorption through human skin and passing the blood brain barrier.

*Cannabis* is an annual, dioecious, flowering herb. The leaves are palmately compound or digitate, with serrate leaflets. *Cannabis* normally has imperfect flowers, with staminate "male" and pistillate "female" flowers occurring on separate plants. It is not unusual, however, for individual plants to separately bear both male and female flowers (i.e., have monoccious plants). Although monoccious plants are

US 12,514,179 B2

13

often referred to as "hermaphrodites," true hermaphrodites (which are less common in *Cannabis*) bear staminate and pistillate structures on individual flowers, whereas monoccious plants bear male and female flowers at different locations on the same plant.

The life cycle of *Cannabis* varies with each variety but can be generally summarized into germination (or rooting/recovery after asexual propagation), vegetative growth, and reproductive stages. Because of heavy breeding and selection by humans, most *Cannabis* seeds have lost dormancy mechanisms and do not require any pre-treatments or winterization to induce germination (See Clarke, R C et al. "*Cannabis*: Evolution and Ethnobotany" University of California Press 2013). Seeds placed in viable growth conditions are expected to germinate in about 3 to 7 days. The first true leaves of a *Cannabis* plant contain a single leaflet, with subsequent leaves developing in opposite formation. In some embodiments, subsequent leaves develop with increasing number of leaflets. Leaflets can be narrow or broad depending on the morphology of the plant grown. *Cannabis* plants are normally allowed to grow vegetatively for the first 4 to 8 weeks. During this period, the plant responds to increasing light with faster and faster growth. Under ideal conditions, *Cannabis* plants can grow up to 2.5 inches a day, and are capable of reaching heights of up to 20 feet. Indoor growth pruning techniques tend to limit *Cannabis* size through careful pruning of apical or side shoots.

Although, some *Cannabis* varieties will flower without the need for external stimuli, most varieties have an absolute requirement for inductive photoperiods in the form of short days or long nights to induce fertile flowering. The first sign of flowering in *Cannabis* is the appearance of undifferentiated flower primordial along the main stem of the nodes. At this stage, the sex of the plants are still not distinguishable. As the flower primordia continue to develop, female (pistillate), and male (staminate) flowers can be distinguished.

For most cannabinoid producing purposes, only female plants are desired. The presence of male flowers is considered undesirable as pollination is known to reduce the cannabinoid yield, and potentially ruin a crop. For this reason, most *Cannabis* is grown "sinsemilla" through vegetative (i.e., asexual) propagation. In this way, only female plants are produced and no space is wasted on male plants.

Commercial production of these medicinal and recreational *Cannabis* varieties however, has been slowed down by the lack of true-breeding psychoactive genetics. Indeed, most popular *Cannabis* strains in the market do not have fixed genetics, and are unable to produce uniform progeny when propagated through seeds. Modern *Cannabis* production techniques thus rely on asexual cuttings of single *Cannabis* "mother" plants to produce uniform crops of genetically identical plants. Current asexual reproduction techniques however, still represent a major bottleneck in *Cannabis* production yields. Improper techniques and incorrect hormones and nutrient formulations result in low propagation yields, and slow rooting and recovery of successful clones. Although asexual reproduction of *Cannabis* is somewhat easily performed, its inherent constraints of time, space and resources severely limits the total number of plants that can be produced in large scale commercial operations. Furthermore, asexual reproduction of *Cannabis* is constantly plagued by a host of other problems, including, but not limited to, abiotic disorders (e.g., nutrition, light quality and quantity, water availability, etc.); pathogens (e.g., Powdery Mildew and Pythium root rots); mites (e.g., two spotted spider mites and hemp russet mite); aphids (e.g., rice root

14

aphid and hop aphid); white flies; viruses (e.g., Tobacco Mosaic Virus) and fungus gnats.

The present disclosure generally relates to compositions, systems, and methods for growing *Cannabis* tissues, plant parts and whole plants. The disclosures of the present invention circumvent many of the problems associated with the large or mass scale production of *Cannabis*.

The compositions, systems and methods of the present invention can be used for the growing and production of any *Cannabis* germplasm. Around one-fifth of Americans now live in states where marijuana is legal for adult use, according to the Brookings Institution, and an estimated 200 million live in places where medicinal marijuana is legal. *Cannabis* germplasms, strains, varieties and/or lines are now publicly and commercially available in many states. U.S. Pat. No. 6,630,507 issued on Oct. 7, 2003 and assigned on the patent face to The United States of America, is directed to methods of treating diseases caused by oxidative stress by administering therapeutically effective amounts of a cannabidiol (CBD) cannabinoid from *Cannabis* plants that has substantially no binding to the N-methyl-D-aspartate (NMDA) receptor, wherein the CBD acts as an antioxidant and neuroprotectant. A search of the U.S.P.T.O Patent Application Information Retrieval (PAIR) system also reveals the existence of thousands of *Cannabis*-related applications and issued patents including U.S. Pat. No. 8,034,843 (use of cannabinoids for treating nausea, vomiting, emesis, motion sickness), U.S. Pat. No. 7,698,594 (cannabinoid compositions for treatment of pain), and U.S. Pat. No. 8,632,825 (anti-tumoural effects of cannabinoid combinations) among many others. Some examples of publicly-disclosed *Cannabis* germplasms, strains, varieties and/or lines each of which produce different amounts and/or ratios of *Cannabis* metabolites can be found, e.g., in U.S. Pat. Nos. 9,095,554; 9,370,164; and 9,642,317; and U.S. Published patents application Ser. Nos. 20110098348; 20140287068; 20160324091; and 20160360721, each of which is specifically incorporated by reference herein in its entireties, including all of the tables and figures. Specific strains of *Cannabis* are disclosed in U.S. Published patents application Ser. Nos. 20140245494 and 20160073567 ('*Cannabis* Plant Named Erez'); 20140245495 20160073568 ('*Cannabis* Plant Named Midnight'); 20140259228 and 20160073566 ('*Cannabis* Plant Named Avidekel'); 20160000843 ('High Cannabinol *Cannabis* Strains'); 20160345477 ('*Cannabis* Plant Named Ecuadorian Sativa'); and 20170172040 ('*Cannabis* Plant Named Katelyn Faith').

*Cannabis* Plants and Electromagnetic Radiation

The sun produces electromagnetic radiation over a broad spectrum including ultraviolet light, visible light, and infrared light. Ultraviolet (UV) light has wavelengths from about 10 nm to about 390 nm which can be further subdivided into far (10 to 200 nm), mid (200 to 300 nm), and near (300 to 390 nm) spectra regions. Next to the UV light region is the visible light region which carries less energy than UV light. Visible light is only a small band in the electromagnetic spectrum with wavelengths between about 390 nm and about 770 nm, which are further divided into violet (390-450 nm), blue (450-495 nm), green (495-570 nm), yellow (570-590 nm), orange (590-620 nm), and red light (620-770 nm). Infrared (IR) light, even less energy than the visible light, spans from about 770 nm to about 1060 μm and includes near (770 to 1500 nm), mid (1500 nm to 6 μm) and far (6 to 1060 μm) regions.

*Cannabis* plants depend on energy from the sun to grow. Photosynthesis is a well-known chemical reaction by which electromagnetic radiation is absorbed through chlorophyll

US 12,514,179 B2

15

pigments to trigger electron transport chains, and ultimately lead to the production of chemical energy stored in the form of proteins, sugars, and oils. This process however only utilizes a small portion of the solar radiation.

Photosynthesis typically only occurs with visible light in the range of about 400 nm to 700 nm, which makes up about 42% of the total solar radiation energy. Even within this narrow range, light absorption by the chlorophyll pigments of green *Cannabis* plants is further focused on the 430 nm (blue) and 670 nm (red) regions of the spectrum. (Singhal, G. S. et. al. "Concepts in Photobiology: Photosynthesis and Photomorphogenesis" Eds. 1999, Kluwer Academic Publishers). Thus photosynthesis, while critical to *Cannabis* plant growth only utilizes a small portion of the electromagnetic radiation emitted by the sun.

Other portions of the light spectrum can affect *Cannabis* plant growth and development in other ways. For example, *Cannabis* plants have evolved light receptors which allow them. To "sense" their environments and respond to changing conditions (Photomorphogenesis, Singhal, G. S. et. al. "Concepts in Photobiology: Photosynthesis and Photomorphogenesis" Eds. 1999, Kluwer Academic Publishers). Changes in light intensities, periods, and wavelengths can have profound effects on *Cannabis* plant morphologies ranging from germination, flowering times, shade avoidance, vegetative growth, anthocyanin accumulation, and stomatal openings (Wang et al. Contributions of green light to *Cannabis* plant growth and development" Am. J. Botany 2013, 1, 70-78). Furthermore, each *Cannabis* plant's response to various light cues will depend on the species, growth stage, and geographical acclimation of said *Cannabis* plant. For example, the germination of certain species is triggered by red light, while the germination of other species is triggered by blue light, or a combination of blue or red light with green light (Wang et al. "Contributions of green light to *Cannabis* plant growth and development" Am. J. Botany 2013, 1, 70-78).

Another important role of solar radiation is its ability to produce heat. IR radiation accounts for almost half of the solar radiation reaching the earth (about 49%). This IR portion of the spectrum is readily absorbed by water and carbon dioxide molecules which in turn convert that energy into heat released into the environment. By affecting the temperature of soils and *Cannabis* plants, IR light can influence the growth and development of *Cannabis* plants ("Soil Temperature and *Cannabis* Plant Growth in the Northern Great Plains" Willis, W. 0 et al. Prairie: A Multiple View: 1975, University of North Dakota Press, Grand Forks, Wali, Mohan K. Ed.). Indeed soil temperature can have profound effects on the timing and speed of *Cannabis* plant seed germinations (Roberts E H et al., "Temperature and Seed Germination." Sympo Soc Exp Biol 1988; 42:109-32). IR radiation has also been found to increase microbial activity and result in favorable conditions for *Cannabis* plant growth such as faster breakdown of nutrients by microbes (Nature 2006, 440, 165-173).

*Cannabis* Plants themselves may also use solar radiation for their own purposes. By carefully controlling the spectrum of reflected light, *Cannabis* plants have evolved visual cues to discourage potential predators (e.g., herbivores), and attract desired pollinators (e.g., insects and birds) (Lunau, K. et. al. "Innate Colour Preferences of Flower Visitors" J. Comp. Physiol. A 1995, 177, 1-19). In some cases, the reflective properties of a flower have evolved such that the reflected spectrum is only visible to selected organisms

16

(Vignolini et al. 2014, "The flower of Hibiscus trionurn is both visibly and measurably iridescent." New Phytol July 16).

Solar radiation outside of the visible light range can also be harmful to *Cannabis* plants, especially when shined in excess. UV light constitutes only about 8% of total solar radiation, but can cause serious damages to *Cannabis* plant DNA, proteins, and membranes (U-V-B light 280-315 nm) (Trends in *Cannabis* Plant Science 1998, 3, 131-135). UV-B light is present even if the sunlight is mostly blocked by the clouds on an overcast day. The ratio of UV-B light and visible light is also important in protecting the *Cannabis* plants from UV-B damage. Thus, consecutive cloudy days may be damaging to *Cannabis* plants because the ratio of UV-B to visible light is high (*Cannabis* Plant, Cell & Environment 1994, 17, 295-301).

Optimizing *Cannabis* Plant Growth Through Light Manipulation

The manipulation of light to optimize *Cannabis* plant growth has been a goal of growers for many years. One type of light manipulation has been the attenuation of light intensity through the use of shade coverings (Ghosal et al. 2003. "Modeling and experimental validation of a greenhouse with evaporative cooling by moving water film, over external shade cloth" Energy and Buildings Vol 35:8 pg 843-850). Other attempts at using colored materials have led to limited control of visible spectrums through coverings or nettings (Al-Fielal, I. M. et. al. "Measuring and Evaluating Solar Radiative Properties of Plastic Shading Nets" 2011, 95, 677-683).

Perhaps one of the most obvious examples of light manipulation has been the use of greenhouses for indoor *Cannabis* plant cultivation. Greenhouses are traditionally built to retain the effects of IR radiation, while also using glass panels to filter out harmful UV spectrums. Modem greenhouses are also equipped with sophisticated shading and lighting systems to supplement for reduced solar radiation, or protect *Cannabis* plants from excess exposure.

More recently, the use of custom light emitting diode lamps (LEDs) have allowed researchers to carefully tailor light profiles to meet individual *Cannabis* plant's needs in laboratory settings and limited greenhouse settings. For example, in a particular experiment, increased levels of blue light were found to stunt strawberry *Cannabis* plant elongation, while increased red light was found to increase *Cannabis* plant height and flowering rate (Folta et al., 2008 "Light as a Growth Regulator: Controlling *Cannabis* Plant Biology with Narrow-bandwidth Solid-state Lighting Systems" HortScience 2008, 7, 1951-1956).

Another example of light manipulation to regulate *Cannabis* plant growth is the use of polarized light. Polarization refers to the physical process in which the direction of light wave vibration is altered. Solar radiation is not polarized as it shines onto the Earth. Non-polarized light from the sun thus exhibits wave vibrations in all directions. Polarizers are materials that filter specific directions of wave vibration, only allowing single direction wave orientations to pass through. One of the most familiar examples of this phenomenon is the production of polarized sunglasses which can be designed to reduce light reflections with certain wave orientations. Certain polarizers, such as a circular polarizer, have been shown to affect *Cannabis* plant growth when the polarized light is absorbed by the interior of the leaves or the stems (Shibayev, P. P. et. al. "The Effect of Circularly Polarized Light on the Growth of *Cannabis* Plants" Int. J. Botany 2011, 7, 113-117).

US 12,514,179 B2

17                                            18

These experiments, while key for developing the concepts of dynamic light manipulation, are not practical for consumer application. The equipment and energy costs associated with LED lighting make efforts to provide artificial lighting at a large scale very expensive if not cost-prohibitive. Similarly, the indiscriminate use of polarizing filters can significantly reduce light intensity and lead to undesirable *Cannabis* plant morphologies. Finally, the above described laboratory approaches only accounted for the use of light as a biological signal, and did not include teachings of the outdoor manipulation of the effects of IR heating, or the selective mitigation of UV radiation. Furthermore, current limiting applications of LED lighting for the use in greenhouses have excluded far IR considerations as an effective wavelength use.

Thus there still exists a need for alternative methods to manipulate light spectra in commercial greenhouse and field settings.

Active Polymer Material

The present disclosure addresses the challenges associated with harvesting solar energy and effectively utilizing it for *Cannabis* plant growth. The present disclosure is based in part on the inventors' discovery that active polymer materials (APM) can be produced to create custom light reflection and absorption profiles designed to enhance *Cannabis* plant growth and/or direct *Cannabis* plant development. The present disclosure teaches APM compositions, and methods for producing and using said APMs.

In some embodiments, APMs comprise at least one type of mineral and a polymer matrix, wherein the mineral is suspended, embedded or otherwise incorporated in the polymer matrix. In some embodiments, the active polymer material is capable of absorbing photon energy in the electromagnetic light spectrum and shifting the wavelength of light to another desired portion of the spectrum. In other embodiments, the active polymer material interacts with electromagnetic light by absorbing, reflecting, refracting, polarizing and/or shifting the wavelength. Thus in some embodiments the APM combines the mineral and polymer components to create custom light absorption and reflective profiles.

Mineral Used in the Active Polymer Material

In some embodiments, the active polymer material comprises at least one type of mineral. Said mineral is selected based upon several characteristics. In some embodiments, mineral of the present invention are biologically benign, or inert. In other embodiments, said mineral exhibits optical properties of being transparent or semi-transparent.

Fluorescence

In some embodiments, the mineral of the present invention is chosen for its ability to fluoresce. For example, in some embodiments, the present invention teaches the use of minerals such as calcites and ambers which fluoresce under UV light in various colors of the visible range. Thus in some embodiments, the minerals of the present invention absorb radiation in the UV spectrum, not visible to human eyes, and release said energy in the form of light in the visible light range. For representative examples of UV shifting minerals, sec EP 0579835, U.S. Pat. No. 5,958,294, and Chinese Pat. App. No. 103,224,660.

In some embodiments, the mineral of the present invention comprise one or more compounds of the general descriptor $X_mY_n$, wherein X does not equal Y (e.g., $X \neq Y$), one or more elements can be selected to form X, one or more elements can be selected to form Y, and m and n are greater than or equal to 1 and less than or equal to 100, independently (m,n: $\geq 1$ and $\leq 100$). The elements that make up the

compositions of X and Y are independently selected from the group consisting of hydrogen (H), lithium (Li), beryllium (Be), sodium (Na), magnesium (Mg), potassium (K), calcium (Ca), rubidium (Rb), strontium (Sr), cesium (Cs), barium (Ba), francium (Fr), radium (Ra), scandium (Sc), titanium go, vanadium (V), chromium (Cr), manganese (Mn), iron (Fe), cobalt (Co), nickel (Ni), copper (Cu), zinc (Zn), yttrium (Y), zirconium (Zr), niobium (Nb), molybdenum (Mo), technetium (Tc), ruthenium (Ru), rhodium (Rh), palladium (Pd), silver (Ag), cadmium (Cd), lutetium (Lu), hafnium (HO), tantalum (Ta), tungsten (W,) rhenium (Re), osmium (Os), iridium (Ir), platinum (Pt), gold (Au), mercury (Hg), lawrencium (Lr), rutherfordium (RO), dubniurn (Db), scaborgium (Sg), bohriurn (Bh), hassium (Hs), meitneriurn (Mt), darmstadtium (Ds), randon (Rn), indium (In), boron (B), carbon (C), nitrogen (N), oxygen (**0**), fluorine (F), aluminum (Al), silicon (Si), phosphorus (P), sulfur(S), chlorine (CI), gallium (Ga), germanium (Ge), arsenic (As), selenium (Sc), bromine (Br), indium (In), tin (Sn), antimony (Sb), tellurium (re), iodine (I), lead (Pb), bismuth (Bi), polonium (Po), astatine (At), ununtrium (Uut), thallium (Ti), ununpentium (pup), lutetium (Lu), ununseptium (Uus), lanthanum (La), cerium (Ce), prascodymium (Pr), neodymium (Nd), promethium (Pm), samarium (Sm), curopium (Eu), gadolinium (Gd), terbium (Tb), dysprosium (Dy), holmium (Ho), erbium (Er), thulium (Tm), ytterbium (Yb), actinium (Ac), thorium (Th), protactinium (Pa), uranium (U), neptunium (Np), plutonium (Pu), americium (Am), curium (Cm), berkelium (Bk), californium (CO), einsteinium (Es), fermium (Fm), mendelevium (Md), and nobelium (No).

In some embodiments, the mineral comprises one type of mineral compound.

In other embodiments, the mineral comprises one or more types of mineral compounds. Thus in some embodiments the mineral may comprise $X_mY_nZ_o$, formula, where X, Y and Z each represent an element or a mineral compound and m, n and o represent the relative ratios of their respective elements or mineral compounds. In other embodiments, the mineral may comprise $X_mY_nZ_oW_p$ formula, where X, Y, Z, and W each represent an element or a mineral compound and m, n, o, and p represent the relative ratios of their respective elements.

In some embodiments, X, Y, Z, and W in the mineral composition of $X_mY_nZ_oW_p$, is each selected from the group consisting of Si, Ti, Al, Ca, Na, Cu C, O, N, and S.

In other embodiments, one or more minerals in the active polymer material are selected from the group consisting of silicon carbide (SiC), calcium carbide ($CaC_2$), titanium dioxide ($TiO_2$), aluminum oxide ($Al_2O_3$), and silicon dioxide ($SiO_2$).

In some embodiments, the minerals in the active polymer material comprise SiC, $TiO_2$, $SiO_2$, and $Al_2O_3$.

Mineral Size and Shape

In some embodiments, the mineral particles of the present invention are processed into certain sizes or shapes to alter their optical properties. In some embodiments, the mineral particles are reduced in size and shape by a process known in the art, such as grinding, polishing, or tumbling. These processes help to determine the particle size of the mineral, the concentration of each type of minerals, and the physical characteristics of the mineral. The physical characteristics may include the smoothness and/or shape of the mineral particles.

In some embodiments, the mineral particles are reduced in size to a substantially scalloped shape. Said substantially scalloped shaped mineral particles may shift wavelengths of received light. In other embodiments, the mineral particles

US 12,514,179 B2

19                                                          20

are reduced in size to substantially spherical shape. Said substantially spherical shaped mineral particles may shorten wavelength of the received light. In other embodiments, the mineral particles are reduced in size to substantially triangular shape with round edges. Said substantially triangular shaped mineral particles with round edges may reflect, absorb, or scatter the received light. In other embodiments, the mineral particles are reduced in size to substantially convex shape. While not wishing to be bound to any particular theory, we believe said substantially convex shaped mineral particles allow for maximum surface area to interact with light.

In some embodiments, the average mineral particle size is about 0.5 to about 2.0 microns. That is, the mineral particle may have an average size of about 0.50 microns, 0.55 microns, 0.60 microns, 0.65 microns, 0.70 microns, 0.75 microns, 0.80 microns, 0.85 microns, 0.90 microns, 0.95 microns, 1.00 microns, 1.05 microns, 1.10 microns, 1.15 microns, 1.20 microns, 1.25 microns, 1.30 microns, 1.35 microns, 1.40 microns, 1.45 microns, 1.50 microns, 1.55 microns, 1.55 microns, 1.60 microns, 1.65 microns, 1.70 microns, 1.75 microns, 1.80 microns, 1.85 microns, 1.90 microns, 1.95 microns, or 2.00 microns.

In some embodiments, the average mineral particle size is about 0.5 to about 2.0 microns. That is, the mineral particle may have an average size is in the range of about 0.50-0.60 microns, 0.60-0.70 microns, 0.70-0.80 microns, 0.80-0.90 microns, 0.90-1.00 microns, 1.00-1.10 microns, 1.10-1.20 microns, 1.20-1.30 microns, 1.30-1.40 microns, 1.40-1.50 microns, 1.50-1.60 microns, 1.60-1.70 microns, 1.70-1.80 microns, 1.80-1.90 microns, and 1.90-2.00 microns.

In some embodiments, the mineral particle size may be related to the target wavelength of its absorption. For example, if the target absorption is about 750 nm, then the mineral particle may be reduced to a size of about 750 nm.

In some embodiments, the mineral particles may be ground to reach an approximate particle size of about 0.5 microns to about 2.0 microns. For example, titanium dioxide may be ground to a grain size of between about 1 micron and about 2 microns and may be triangular with rounded edges. Aluminum oxide may be ground to a grain size of between about 1 and about 1.5 microns and may be scalloped-shaped. Silicon dioxide may be ground to a gain size of about 1 to about 1.5 microns and is generally rounded.

In some embodiments, the present invention teaches a dry weight ratio of the active materials of 55% SiC, 25% $TiO_2$, 5% $SiO_2$, and 15% $Al_2O_3$.

Polymer Matrix

In some embodiments, the minerals of the APMs are embedded within a polymer matrix. In some embodiments, the polymers for the APMs are chosen for their ability to hold the mineral particles. In other embodiments, the polymers for the APMs are chosen so that the mineral and the polymer matrix do not chemically react.

In other embodiments, the polymers of the APMs are chosen for their ability to be shaped or manufactured for particular uses. Some polymers are flexible and can be manipulated and re-shaped multiple times. For example, polyethylene terephthalate (PET) is a thermally induced shape-memory polymer that can lose its form at high temperatures, and be reformed into useful shapes.

In some embodiments, the polymers of the APMs are chosen for their compatibility with the environment. For example, soil covers made from polymer carbohydrates and vegetable fillers are known to be biodegradable (see for example U.S. Pat. No. 5,879,695). In another example, a soil cover made of polyethylene polymer fibers are durable yet

photodegradable and slowly degrades when used outdoors (U.S. Pat. No. 5,532,298). In some embodiments, the APMs can be formed into useful materials such as fibers and films based on the properties of the polymer matrix used.

In other embodiments, the polymers of the present invention are selected based on their ability to interact with light radiation by absorbing, reflecting, refracting, and/or changing the wavelength. In some embodiments, PET polymers are effective in polarizing solar radiation.

In some embodiments, the polymer matrix of the present invention may be selected from a group consisting of rayon, acrylonitrile butadiene styrene, acrylic, celluloid, cellulose acetate, cycloolefin copolymer, ethylene-vinyl acetate, ethylene vinyl alcohol, fluoroplastics, ionomers, KYDEXO, liquid crystal polymer, polyacetal, polyacrylates, polyacrylonitrile, polyamide, polyamide-imide, polyaryletherketone, polybutadiene, polybutylene, polybutylene terephthalate, polycaprolactone, polychlorotrifluoroethylene, polyethylene terephthalate, polycyclohexylene dimethylene terephthalate, polycarbonate, polyhydroxyalkanoates, polyketone, polyester, polyethylene, polyetheretherketone, polyetherketoneketone, polyetherimide, polyethersulfone, polyethylenechlorinates, polyimide, polylactic acid, polymethylpentene, polyphenylene oxide, polyphenylene sulfide, polyphthalamide, polystyrene, polysulfone, polytrimethylene terephthalate, polyurethane, polyvinyl acetate, polyvinyl chloride, polyvinylidene chloride, and styrene-acrylonitrile.

In some embodiments, the polymer matrix comprises one type of a polymer. In other embodiments, the polymer matrix comprises one or more types of polymers.

In some embodiments, the APM comprises one or more polymers that have a polarizing filter. In some embodiments, the APM comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex. In some embodiments, the polymer matrix is PET.

In some embodiments, the polymer matrix may contain additives such as coloring agent, surface stabilizer, surfactants, UV stabilizers, plasticizers, slip agents, mineral fillers, bonding agents, antistatic agents, oils, antioxidants, adhesives, and the like. In some embodiments the coloring agent affects the optical properties of said polymer.

For additional information on the active polymeric material see U.S. Pat. No. 7,074,499 (Polymeric Fiber Composition and Method), which is incorporated herein in its entirety.

Properties of Active Polymer Material

In some embodiments, the APM may absorb a light wave and emit a different wave. Thus in some embodiments, the APM may shorten the wavelength of the absorbed light. In other embodiments, the APM may lengthen the wavelength of the absorbed light, depending on the desired effect. In yet other embodiments the APM of the present invention may be designed to absorb a portion of the light spectrum and convert it to heat or other type of energy. In some embodiments the APM of the present invention may allow for the transmission of portions of the spectrum such that selected wavelengths are allowed to pass through the APM. In other embodiments the APM of the present invention may reflect selected portions of the light spectrum. In yet other embodiments, the APM may be designed to selectively polarize certain portions of the spectrum, either during transmission, or reflection of said waves.

In some embodiments, a combination of the mineral and the polymer matrix may result in the APM that emits light at a specific range. For example, in some embodiments, aluminum oxide promotes IR light lengthening. When said

US 12,514,179 B2

21

22

APM comprising aluminum oxide interacts with IR light, in some embodiments, the material releases light in a longer IR range than the range it absorbed.

Similarly, silicon dioxide has a unique property of interacting with UV light when combined with certain polymer matrices. In some embodiments, an APM comprising silicon dioxide may absorb one range of UV light but emit a UV light in shorter wavelengths.

In some embodiments, when more than one type of mineral is used to construct the APM, the material may exhibit synergistic optical properties of those different minerals.

In some embodiments, the mineral particles and the polymer matrix, independently, may have a light transmission in the range of about 200 nm to about 1100 nm.

That is, the mineral particles and the polymer matrix, independently, may have a light transmission of about 200 nm, 225 nm, 250 nm, 275 nm, 300 nm, 325 nm, 350 nm, 375 nm, 400 nm, 425 nm, 450 nm, 475 nm, 500 nm, 525 nm, 550 nm, 575 nm, 600 nm, 625 nm, 650 nm, 675 nm, 700 nm, 725 nm, 750 nm, 775 nm, 800 nm, 825 nm, 850 nm, 875 nm, 900 nm, 925 nm, 950 nm, 975 nm, 1000 nm, 1025 nm, 1050 nm, 1075 nm, and/or 1100 nm.

In some embodiments the mineral particles and the polymer matrix, independently, may have a light transmission in the range of about 200 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may have a light transmission of in the range of about 200-250 nm, 250-300 nm, 300-350 nm, 350-400 nm, 400-450 nm, 450-500 nm, 500-550 nm, 550-600 nm, 600-650 nm, 650-700 nm, 700-750 nm, 750-800 nm, 800-850 nm, 850-900 nm, 900-950 nm, 950-1000 nm, 1000-1050 nm, and/or 1050-1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 10 nm to about 15000 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 10 nm to about 200 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light at about 10 nm, 20 nm, 30 nm, 40 nm, 50 nm, 60 nm, 70 nm, 80 nm, 90 nm, 100 nm, 110 nm, 120 nm, 130 nm, 140 nm, 150 nm, 160 nm, 170 nm, 180 nm, and/or 200 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 10 nm to about 200 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 10-20 nm, 20-40 nm, 40-60 nm, 60-80 nm, 80-100 nm, 100-120 nm, 120-140 nm, 140-160 nm, 160-180 nm, and/or 180-200 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 200 nm to about 500 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light at about 200 nm, 225 nm, 250 nm, 275 nm, 300 nm, 325 nm, 350 nm, 375 nm, 400 nm, 425 nm, 450 nm, 475 nm, and/or 500 mm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 200 nm to about 500 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 200-250 nm, 250-300 nm, 300-350 nm, 350-400 nm, 400-450 nm, and/or 450-500 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 500 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may absorb

light at about 500 nm, 525 nm, 550 nm, 575 nm, 600 nm, 625 nm, 650 nm, 675 nm, 700 nm, 725 nm, 750 nm, 775 nm, 800 nm, 825 nm, 850 nm, 875 nm, 900 nm, 925 nm, 950 nm, 975 nm, 1000 nm, 1025 nm, 1050 nm, 1075 nm, and/or 1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 500 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 500-550 nm, 550-600 nm, 600-650 nm, 650-700 nm, 700-750 nm, 750-800 nm, 800-850 nm, 850-900 nm, 900-950 nm, 950-1000 nm, 1000-1050 nm, and/or 1050-1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 1100 nm to about 15000 nm. That is, the mineral particles and the polymer matrix, independently, may absorb light at about 1100 nm, 1200 nm, 1300 nm, 1400 nm, 1500 nm, 1600 nm, 1700 nm, 1800 nm, 1900 nm, 2000 nm, 2100 nm, 2200 nm, 2300 nm, 2400 nm, 2500 nm, 2600 nm, 2700 nm, 2800 nm, 2900 nm, 3000 nm, 3100 nm, 3200 nm, 3300 nm, 3400 nm, 3500 nm, 3600 nm, 3700 nm, 3800 nm, 3900 nm, 4000 nm, 4100 nm, 4200 nm, 4300 nm, 4400 nm, 4500 nm, 4600 nm, 4700 nm, 4800 nm, 4900 nm, 5000 nm, 5100 nm, 5200 nm, 5300 nm, 5400 nm, 5500 nm, 5600 nm, 5700 nm, 5800 nm, 5900 nm, 6000 nm, 6100 nm, 6200 nm, 6300 nm, 6400 nm, 6500 nm, 6600 nm, 6700 nm, 6800 nm, 6900 nm, 7000 nm, 7100 nm, 7200 nm, 7300 nm, 7400 nm, 7500 nm, 7600 nm, 7700 nm, 7800 nm, 7900 nm, 8000 nm, 8100 nm, 8200 nm, 8300 nm, 8400 nm, 8500 nm, 8600 nm, 8700 nm, 8800 nm, 8900 nm, 9000 nm, 9100 nm, 9200 nm, 9300 nm, 9400 nm, 9500 nm, 9600 nm, 9700 nm, 9800 nm, 9900 nm, 10000 nm, 10100 nm, 10200 nm, 10300 nm, 10400 nm, 10500 nm, 10600 nm, 10700 nm, 10800 nm, 10900 nm, 11000 nm, 11100 nm, 11200 nm, 11300 nm, 11400 nm, 11500 nm, 11600 nm, 11700 nm, 11800 nm, 11900 nm, 12000 nm, 12100 nm, 12200 nm, 12300 nm, 12400 nm, 12500 nm, 12600 nm, 12700 nm, 12800 nm, 12900 nm, 13000 nm, 13100 nm, 13200 nm, 13300 nm, 13400 nm, 13500 nm, 13600 nm, 13700 nm, 13800 nm, 13900 nm, 14000 nm, 14100 nm, 14200 nm, 14300 nm, 14400 nm, 14500 nm, 14600 nm, 14700 nm, 14800 nm, 14900 nm, and/or 15000 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may absorb light in the range of about 1100 nm to about 15000 nm. That is, the mineral particles in the mineral powder may absorb light in the range of about 1100-1200 nm, 1200-1400 nm, 1400-1600 nm, 1600-1800 nm, 1800-2000 nm, 2000-2200 nm, 2200-2400 mini, 2400-2600 nm, 2600-2800 nm, 2800-3000 nm, 3000-3200 nm, 3200-3400 nm, 3400-3600 nm, 3600-3800 nm, 3800-4000 nm, 4000-4200 nm, 4200-4400 nm, 4400-4600 nm, 4600-4800 nm, 4800-5000 nm, 5000-5200 nm, 5200-5400 nm, 5400-5600 nm, 5600-5800 nm, 5800-6000 nm, 6000-6200 nm, 6200-6400 nm, 6400-6600 nm, 6600-6800 nm, 6800-7000 nm, 7000-7200 nm, 7200-7400 nm, 7400-7600 nm, 7600-7800 nm, 7800-8000 nm, 8000-8200 nm, 8200-8400 nm, 8400-8600 nm, 8600-8800 nm, 8800-9000 nm, 9000-9200 nm, 9200-9400 nm, 9400-9600 nm, 9600-9800 nm, 9800-10000 nm, 10000-10200 nm, 10200-10400 nm, 10400-10600 nm, 10600-10800 nm, 10800-11000 nm, 11000-11200 nm, 11200-11400 nm, 11400-11600 nm, 11600-11800 nm, 11800-12000 nm, 12000-12200 nm, 12200-12400 nm, 12400-12600 nm, 12600-12800 nm, 12800-13000 nm, 13000-13200 nm, 13200-13400 nm, 13400-13600 nm, 13600-13800 nm, 13800-14000 nm, 14000-14200 nm, 14200-14400 nm,

US 12,514,179 B2

23

14400-14600 nm, 14600-14800 nm, and/or 14800-15000 nm. In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 200 nm to about 15000 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 200 nm to about 500 nm, That is, the mineral particles and the polymer matrix, independently, may polarize light at about 200 nm, 225 nm, 250 nm, 275 nm, 300 nm, 325 nm, 350 nm, 375 nm, 400 nm, 425 nm, 450 nm, 475 nm, and/or 500 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 200 nm to about 500 nm. That is, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 200-250 nm, 250-300 nm, 300-350 nm, 350-400 nm, 400-450 nm, and/or 450-500 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 500 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may polarize light at about 500 nm, 525 nm, 550 nm, 575 nm, 600 nm, 625 nm, 650 nm, 675 nm, 700 nm, 725 nm, 750 nm, 775 nm, 800 nm, 825 nm, 850 nm, 875 nm, 900 nm, 925 nm, 950 nm, 975 nm, 1000 nm, 1025 nm, 1050 nm, 1075 nm, and/or 1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 500 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 500 nm, 525 nm, 550 nm, 575 nm, 600 nm, 625 nm, 650 nm, 675 nm, 700 nm, 725 nm, 750 nm, 775 nm, 800 nm, 825 nm, 850 nm, 875 nm, 900 nm, 925 nm, 950 nm, 975 nm, 1000 nm, 1025 nm, 1050 nm, 1075 nm, and/or 1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 1100 nm to about 15000 nm. That is, the mineral particles and the polymer matrix, independently, may polarize light at about 1100 nm, 1200 nm, 1300 nm, 1400 nm, 1500 nm, 1600 nm, 1700 nm, 1800 nm, 1900 nm, 2000 nm, 2100 nm, 2200 nm, 2300 nm, 2400 nm, 2500 nm, 2600 nm, 2700 nm, 2800 nm, 2900 nm, 3000 nm, 3100 nm, 3200 nm, 3300 nm, 3400 nm, 3500 nm, 3600 nm, 3700 nm, 3800 nm, 3900 nm, 4000 nm, 4100 nm, 4200 nm, 4300 nm, 4400 nm, 4500 nm, 4600 nm, 4700 nm, 4800 nm, 4900 nm, 5000 nm, 5100 nm, 5200 nm, 5300 nm, 5400 nm, 5500 nm, 5600 nm, 5700 nm, 5800 nm, 5900 nm, 6000 nm, 6100 nm, 6200 nm, 6300 nm, 6400 nm, 6500 nm, 6600 nm, 6700 nm, 6800 nm, 6900 nm, 7000 nm, 7100 nm, 7200 nm, 7300 nm, 7400 nm, 7500 nm, 7600 nm, 7700 nm, 7800 nm, 7900 nm, 8000 nm, 8100 nm, 8200 nm, 8300 nm, 8400 nm, 8500 nm, 8600 nm, 8700 nm, 8800 nm, 8900 nm, 9000 nm, 9100 nm, 9200 nm, 9300 nm, 9400 nm, 9500 nm, 9600 nm, 9700 nm, 9800 nm, 9900 nm, 10000 nm, 10100 nm, 10200 nm, 10300 nm, 10400 nm, 10500 nm, 10600 nm, 10700 nm, 10800 nm, 10900 nm, 11000 nm, 11100 nm, 11200 nm, 11300 nm, 11400 nm, 11500 nm, 11600 nm, 11700 nm, 11800 nm, 11900 nm, 12000 nm, 12100 nm, 12200 nm, 12300 nm, 12400 nm, 12500 nm, 12600 nm, 12700 nm, 12800 nm, 12900 nm, 13000 nm, 13100 nm, 13200 nm, 13300 nm, 13400 nm, 13500 nm, 13600 nm, 13700 nm, 13800 nm, 13900 nm, 14000 nm, 14100 nm, 14200 nm, 14300 nm, 14400 nm, 14500 nm, 14600 nm, 14700 nm, 14800 nm, 14900 nm, and or 15000 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light in the

24

range of about 1100 nm to about 15000 nm. That is, the mineral particles and the polymer matrix, independently, may polarize light in the range of about 1100-1200 nm, 1200-1400 nm, 1400-1600 nm, 1600-1800 nm, 1800-2000 nm, 2000-2200 nm, 2200-2400 nm, 2400-2600 nm, 2600-2800 nm, 2800-3000 nm, 3000-3200 nm, 3200-3400 nm, 3400-3600 nm, 3600-3800 nm, 3800-4000 nm, 4000-4200 nm, 4200-4400 nm, 4400-4600 nm, 4600-4800 nm, 4800-5000 nm, 5000-5200 nm, 5200-5400 nm, 5400-5600 nm, 5600-5800 nm, 5800-6000 nm, 6000-6200 nm, 6200-6400 nm, 6400-6600 nm, 6600-6800 nm, 6800-7000 nm, 7000-7200 nm, 7200-7400 nm, 7400-7600 nm, 7600-7800 nm, 7800-8000 nm, 8000-8200 nm, 8200-8400 nm, 8400-8600 nm, 8600-8800 nm, 8800-9000 nm, 9000-9200 nm, 9200-9400 nm, 9400-9600 nm, 9600-9800 nm, 9800-10000 nm, 10000-10200 nm, 10200-10400 nm, 10400-10600 nm, 10600-10800 nm, 10800-11000 nm, 11000-11200 nm, 11200-11400 nm, 11400-11600 nm, 11600-11800 nm, 11800-12000 nm, 12000-12200 nm, 12200-12400 nm, 12400-12600 nm, 12600-12800 nm, 12800-13000 nm, 13000-13200 nm, 13200-13400 nm, 13400-13600 nm, 13600-13800 nm, 13800-14000 nm, 14200 nm, 14200-14400 nm, 14400-14600 nm, 14600-14800 nm, and/or 14800-15000 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may polarize light completely. In other embodiments, the mineral particles and the polymer matrix, independently, may polarize light partially.

In some embodiments, the mineral particles and the polymer matrix, independently, may emit light in the range of about 200 nm to about 1100 nm. That is, the mineral particles in the mineral powder may emit light at about 200 nm, 225 nm, 250 nm, 275 nm, 300 nm, 325 nm, 350 nm, 375 nm, 400 nm, 425 nm, 450 nm, 475 nm, 500 nm, 525 nm, 550 nm, 575 nm, 600 nm, 625 nm, 650 nm, 675 nm, 700 nm, 725 nm, 750 nm, 775 nm, 800 nm, 825 nm, 850 nm, 875 nm, 900 nm, 925 nm, 950 nm, 975 nm, 1000 nm, 1025 nm, 1050 nm, 1075 nm, and/or 1100 nm.

In some embodiments, the mineral particles and the polymer matrix, independently, may emit light in the range of about 200 nm to about 1100 nm. That is, the mineral particles and the polymer matrix, independently, may emit light in the range of about 200-250 nm, 250-300 nm, 300-350 nm, 350-400 nm, 400-450 μm, 450-500 nm, 500-550 nm, 550-600 nm, 600-650 nm, 650-700 nm, 700-750 nm, 750-800 nm, 800-850 nm, 850-900 nm, 900-950 nm, 950-1000 nm, 1000-1050 nm, and/or 1050-1100 nm.

Active Polymer Material Manufacturing

Once the polymer matrix is chosen and the mineral is selected and ground into a powder of desired size and shape, the active polymer material is constructed.

In some embodiments, the mineral powder may be dispersed, suspended, embedded, or otherwise incorporated into the polymer matrix by methods known in the art, such as in a rotating drum with paddle-type mixers. In other embodiments, the mineral powder may be introduced to the polymer matrix by other processes known in the art such as compounding. The examples of the process of grinding and combining can be found in U.S. Pat. Nos. 6,204,317, 6,214, 264, and 6,218,007.

In some embodiments, the polymer matrix may initially be in pellet form and dried to remove moisture by using, for example, a desiccant dryer. In some embodiments, heating or cooling may be necessary prior and/or during the steps of dispersing, suspending, embedding, or incorporating the mineral to obtain an even dispersion.

US 12,514,179 B2

25 26

In some embodiments, once the mineral is dispersed in the polymer matrix, the resulting active polymer material may be cured or hardened.

In some embodiments, the mineral comprise about 0.5% to about 20% of the active polymer material. That is, the mineral may comprise about 0.5%, 1.0%, 1.5%, 2.0%, 2.5%, 3.0%, 3.5%, 4.0%, 4.5%, 5.0%, 5.5%, 6.0%, 6.5%, 7.0%, 7.5%, 8.0%, 8.5%, 9.0%, 9.5%, 10.0%, 10.5%, 11.0%, 11.5%, 12.0%, 12.5%, 13.0%, 13.5%, 14.0%, 14.5%, 15.0%, 15.5%, 16.0%, 16.5%, 17.0%, 17.5%, 18.0%, 18.5%, 19.0%, 19.5% or 20% of the active polymer material.

In some embodiments, the mineral comprise from about 0.5% to about 20% of the active polymer material. That is, the mineral may comprise in the range of about 0.5-1.0%, 1.0-1.5%, 1.5-2.0%, 2.0-2.5%, 2.5-3.0%, 3.0-4.0%, 4.0-5.0%, 5.0-6.0%, 6.0-7.0%, 7.0-8.0%, 8.0-9.0%, 9.0-10.0%, 10.0-11.0%, 11.0-12.0%, 12.0-13.0%, 13.0-14.0%, 14.0-15.0%, 15.0-16.0%, 16.0-17.0%, 17.0-18.0%, 18.0-19.0%, or 19.0-20% of the active polymer material.

In some embodiments, the active polymer material is Celliant (U.S. Pat. No. 7,074,499).

Manipulation of Active Polymer Material

The APM described herein can be manipulated into different forms depending on the application requirements. In some embodiments, the APM can be formed into useful building blocks such as fibers or films. In other embodiments, the APM is formed into small beads or particles having an average size of less than about 5 cm, less than about 1 cm, or less than about 0.5 cm.

Once the mineral powder and the polymer matrix are combined, the resulting liquid, viscous oil, or semi-solid may be extruded into various shapes and forms. In some embodiments, the APM is extruded into a fiber. In other embodiments, the APM is extruded into staple fibers of various lengths. The examples of this process of extrusion, known in the art, can be found in previously disclosed references and in U.S. Pat. No. 6,067,785.

In some embodiments, once the active polymer material is extruded into various forms, it may need to be dried, cured, and/or hardened.

Once the polymer material system is extruded into a fiber form, in some embodiments, the fibers may be combined together by a spinning process, for example using a rotary spinning machine, to yield a yarn. The range of the size of the apertures in the rotary spinning machine may be from about 6 microns to about 30 microns.

In some embodiments, the step of spinning the fibers into a yarn comprises spinning staple fiber having a denier per fiber of between about 1 and about 3; accordingly, the prior step of spinning the melted polyester into fiber likewise comprises forming a fiber of those dimensions. The fiber is typically heat set before being cut into staple fibers with conventional techniques. While the extruded fibers are solidifying, they may be drawn by methods known in the art to impart strength.

In some embodiments, yarn made of the APM is further formed into fabrics or textiles, typically woven or knitted fabrics by combination with both natural and synthetic fibers. Non-limiting examples of natural fibers may include cotton, wool, hemp, silk, ramie, and jute. Non-limiting examples of synthetic fibers may include acrylic, acetate, Lycra, spandex, polyester, nylon, and rayon.

In some embodiments, yarn made of the APM is dyed. In other embodiments, the fabric or textile made of the APM comprising yarn may be dyed. Dyes can be synthetic or natural. Non-limiting examples of the types of dyes include direct, acid, disperse, reactive, basic, mordant, sulfur and vat dyes.

In some embodiments, yarn made of the APM is incorporated into blends with cotton and polyester in any proportion. In some embodiments, the blend includes between about 35% and about 65% by weight of cotton with the remainder being polyester. That is, said blend may be about 35/65 (35% by weight of cotton and 65% by weight of polyester), 36/64, 37/63, 38/62, 39/61, 40/60, 41/59, 42/58, 43/57, 44/56, 45/55, 46/54, 47/53, 48/52, 49/51, 50/50, 51/49, 52/48, 53/47, 54/46, 55/45, 56/44, 57/43, 58/42, 59/41, 60/40, 61/39, 62/38, 63/37, 64/36, or 65/35.

In some embodiments, yarn made of the APM is incorporated into blends with cotton and polyester of 50% cotton and 50% polyester (50/50).

In some embodiments, the APM can be produced into different fibers.

Other methods of production of fibers are equally suitable such as those described in U.S. Pat. Nos. 3,341,512; 3,377,129; 4,666,454; 4,975,233; 5,008,230; 5,091,504; 5,135,697; 5,272,246; 4,270,913; 4,384,450; 4,466,237; 4,113,794; and 5,694,754, all of which are expressly incorporated by reference in their entirety herein.

In some embodiments, the APM is extruded into a staple fiber with a length in the range of about 0.1 cm to 15 cm. That is, the staple fiber may be about 0.1 cm, 0.2 cm, 0.3 cm, 0.4 cm, 0.5 cm, 0.6 cm, 0.7 cm, 0.8 cm, 0.9 cm, 1.0 cm, 1.1 cm, 1.2 cm, 1.3 cm, 1.4 cm, 1.5 cm, 1.6 cm, 1.7 cm, 1.8 cm, 1.9 cm, 2.0 cm, 2.1 cm, 2.2 cm, 2.3 cm, 2.4 cm, 2.5 cm, 2.6 cm, 2.7 cm, 2.8 cm, 2.9 cm, 3.0 cm, 3.1 cm, 3.2 cm, 3.3 cm, 3.4 cm., 3.5 cm, 3.6 cm, 3.7 cm., 3.8 cm., 3.9 cm, 4.0 cm, 4.1 cm, 4.2 cm, 4.3 cm, 4.4 cm, 4.5 cm, 4.6 cm, 4.7 cm, 4.8 cm, 4.9 cm, 5.0 cm, 5.1 cm, 5.2 cm, 5.3 cm, 5.4 cm, 5.5 cm, 5.6 cm, 5.7 cm, 5.8 cm, 5.9 cm, 6.0 cm, 6.1 cm, 6.2 cm, 6.3 cm, 6.4 cm, 6.5 cm, 6.6 cm., 6.7 cm, 6.8 cm, 6.9 cm, 7.0 cm, 7.1 cm, 7.2 cm, 7.3 cm, 7.4 cm, 7.5 cm, 7.6 cm, 7.7 cm, 7.8 cm, 7.9 cm, 8.0 cm, 8.1 cm, 8.2 cm, 8.3 cm, 8.4 cm, 8.5 cm, 8.6 cm, 8.7 cm, 8.8 cm, 8.9 cm, 9.0 cm, 9.1 cm, 9.2 cm, 9.3 cm, 9.4 cm, 9.5 cm, 9.6 cm, 9.7 cm, 9.8 cm, 9.9 cm, 10.0 cm, 10.1 cm, 10.2 cm, 10.3 cm, 10.4 cm, 10.5 cm, 10.6 cm, 10.7 cm., 10.8 cm, 10.9 cm, 11.0 cm, 11.1 cm, 11.2 cm, 11.3 cm, 11.4 cm, 11.5 cm, 11.6 cm, 11.7 cm, 11.8 cm, 11.9 cm, 12.0 cm, 12.1 cm, 12.2 cm, 12.3 cm, 12.4 cm, 12.5 cm, 12.6 cm, 12.7 cm, 12.8 cm, 12.9 cm, 13.0 cm, 13.1 cm, 13.2 cm, 13.3 cm, 13.4 cm, 13.5 cm., 13.6 cm, 13.7 cm, 13.8 cm, 13.9 cm, 14.0 cm, 14.1 cm, 14.2 cm, 14.3 cm, 14.4 cm, 14.5 cm, 14.6 cm, 14.7 cm, 14.8 cm, 14.9 cm, or 15.0 cm.

In some embodiments, the polyester mixture may be used to create a staple fiber. The staple fiber may then be used to create a non-woven membrane. This membrane may be bonded to another fabric, membrane, or material. In some embodiments, staple fibers made from APM can be non-woven into a batting material.

In some embodiments, the APM is extruded into a film with a thickness in the range of about 0.05 mm to 1.00 mm. That is, the film extruded from the APM may have a thickness of about 0.05 mm, 0.06 mm, 0.07 mm, 0.08 mm, 0.09 mm, 0.10 mm, 0.11 mm, 0.12 mm, 0.13 mm, 0.14 mm, 0.15 mm, 0.16 mm, 0.17 mm, 0.18 mm, 0.19 mm, 0.20 mm, 0.21 mm, 0.22 mm, 0.23 nm, 0.24 mm, 0.25 mm, 0.26 mm, 0.27 mm, 0.28 mm, 0.29 mm, 0.30 mm, 0.31 mm, 0.32 mm, 0.33 mm, 0.34 mm, 0.35 mm, 0.36 mm, 0.37 mm, 0.38 mm, 0.39 mm, 0.40 mm, 0.41 mm, 0.42 mm, 0.43 mm, 0.44 mm, 0.45 mm, 0.46 mm, 0.47 mm, 0.48 mm, 0.49 mm, 0.50 mm, 0.51 mm, 0.52 mm, 0.53 mm, 0.54 mm, 0.55 mm, 0.56 mm, 0.57 mm, 0.58 mm, 0.59 mm, 0.60 mm, 0.61 mm, 0.62 mm,

US 12,514,179 B2

27

0.63 mm, 0.64 mm, 0.65 mm, 0.66 mm, 0.67 mm, 0.68 mm, 0.69 mm, 0.70 mm, 0.71 mm, 0.72 mm, 0.73 mm, 0.74 mm, 0.75 mm, 0.76 mm, 0.77 mm, 0.78 mm, 0.79 mm, 0.80 mm, 0.81 mm, 0.82 mm, 0.83 mm, 0.84 mm, 0.85 mm, 0.86 mm, 0.87 mm, 0.88 mm, 0.89 mm, 0.90 mm, 0.91 mm, 0.92 mm, 0.93 mm, 0.94 mm, 0.95 mm, 0.96 mm, 0.97 mm, 0.98 mm, 0.99 mm, or 1.00 mm.

In some embodiments, the ARM is extruded into a film with a thickness in the range of about 0.05 mm to 0.5 mm. That is, the film extruded from the active polymer material may have a thickness in the range of about 0.05-0.06 mm, 0.06-0.08 mm, 0.09-0.10 mm, 0.10-0.12 mm, 0.12-0.14 mm, 0.14-0.16 mm, 0.16-0.18 mm, 0.18-0.20 mm, 0.20-0.22 mm, 0.22-0.24 mm, 0.24-0.26 mm, 0.26-0.28 mm, 0.28-0.30 mm, 0.30-0.32 mm, 032-0.34 mm, 0.34-0.36 mm, 0.36-0.38 mm, 0.38-0.40 nm, 0.40-0.42 mm, 0.42-0.44 mm, 0.44-0.46 mm, 0.46-0.48 mm, or 0.48-0.50 mm.

In some embodiments, the APM is extruded, woven, or non-woven into a sheet with a thickness in the range of about 1 mm to 100 mm. That is, the film extruded from the APM may have a thickness of about 1 mm, 2 mm, 3 mm, 4 mm, 5 mm, 6 mm, 7 mm, 8 mm, 9 mm, 10 mm, 11 mm, 12 mm, 13 mm, 14 mm, 15 mm, 16 mm, 17 mm, 18 mm, 19 mm, 20 mm, 21 mm, 22 mm, 23 mm, 24 mm, 25 mm, 26 mm, 27 mm, 28 mm, 29 mm, 30 mm, 31 mm, 32 mm, 33 mm, 34 mm, 35 mm, 36 mm, 37 mm, 38 mm, 39 mm, 40 mm, 41 mm, 42 mm, 43 mm, 44 mm, 45 mm, 46 mm, 47 mm, 48 mm, 49 mm, 50 mm, 51 mm, 52 mm, 53 mm, 54 mm, 55 mm, 56 mm, 57 mm, 58 mm, 59 mm, 60 mm, 61 mm, 62 mm, 63 mm, 64 mm, 65 mm, 66 mm, 67 mm, 68 mm, 69 mm, 70 mm, 71 mm, 72 mm, 73 mm, 74 mm, 75 mm, 76 mm, 77 mm, 78 mm, 79 mm, 80 mm, 81 mm, 82 mm, 83 mm, 84 mm, 85 mm, 86 mm, 87 mm, 88 mm, 89 mm, 90 mm, 91 mm, 92 mm, 93 mm, 94 mm, 95 mm, 96 mm, 97 mm, 98 mm, 99 mm, or 100 mm.

Products Made from Active Polymer Material Useful in Agriculture

As described herein, the APM can be extruded into different types of fibers to form fabrics or textiles or it can be extruded into a film. These materials can then be transformed into various products that are useful in agricultural settings. In some embodiments, the APM is a solid. In another embodiment, the APM is a semi-solid. For examples of non-Cannabis plant/agricultural applications, see U.S. Patent Application Publication No. 2016/0081281 and International Publication No. WO 2016/049025 (Active Polymer Material for Agricultural Use), each of which is specifically incorporated by reference herein in its entirety.

In some embodiments, a fabric comprising the APM can be formed into a bag used to hold Cannabis plants. The bag may, in some embodiments, hold the growth media and the Cannabis plant. In some embodiments, the bag is meshed.

Standard Cannabis plant bags, such as burlap or polypropylene bags, do not have the material that is capable of storing and emitting photons that may, in some embodiments, assist in Cannabis plant growth.

In other embodiments, a fabric, a film, a sheet, a batting material, or a composition of staple fibers comprising the APM may be used to wrap the roots or roots and growth media surrounding the roots of a Cannabis plant. In some embodiments, said fabric, film, or sheet may be meshed.

In some embodiments the APMs of the present invention are used to produce soil covers. In some embodiments, a fabric, a film, a sheet, a batting material, and a composition of staple fibers comprising the APM may be placed on top of the soil. In other embodiments, said fabric, film, sheet, batting material or a composition of staple fibers may be

28

placed on top of the soil and around the stem of the Cannabis plant. In some embodiments, said fabric, film, or sheet may be meshed. In other embodiments, said fabric, film, or sheet may be cut to create an opening to accommodate the stem of the Cannabis plant. In some embodiments, said fabric, film, or sheet may be meshed.

In some embodiments, the soil covers of the present invention warm. The soil by trapping heat and/or transmitting IR radiation, mitigate weed growth by blocking visible light, and reflect light towards the Cannabis plants for additional energy and warding off pests. In some embodiments the soil cover of the present invention is infused with pesticides, or other chemicals for additional protection of the Cannabis plants (see for example U.S. Pat. Nos. 3,590,528; 7,247,311; 5,879,695; 5,532,298; and 8,142,804).

In some embodiments, the soil covers of the present invention are colored to further tailor the light absorption, transmission, and reflection beneficial for Cannabis plant protection or growth (see for example U.S. Pat. Nos. 5,138, 792 and 6,601,338).

In some embodiments, a fabric, a film, a sheet, a batting material, and a composition of staple fibers comprising the APM may be mixed into the growth media of the Cannabis plant. In some embodiments, said fabric, film, or sheet may be cut into smaller pieces prior to mixing with the growth media. In some embodiments, said fabric, film, or sheet may be meshed.

In some embodiments, a fabric, a film, a sheet, a batting material, or a composition of staple fibers comprising the APM may be mixed with mulch. In some embodiments, said fabric, film, or sheet may be cut into smaller pieces prior to mixing with mulch. In some embodiments, said fabric, film, or sheet may be meshed.

In some embodiments, a fabric, a film, a sheet, a batting material, or a composition of staple fibers comprising the APM may be used as mulch.

In some embodiments, said fabric, film, or sheet may be cut into smaller pieces prior to use for said mulch. In. some embodiments, said fabric, film, or sheet may be meshed.

Mulch act similarly to soil covers by retaining soil warmth and blocking sunlight to pass to the soil. In some embodiments, the APM mulch of the present invention may exhibit water and nutrient retaining properties (see for example U.S. Pat. Nos. 5,649,495; 5,868,087; and 7,459, 501). In some embodiments, the water-retaining APM mulch of the present invention may be especially useful in dry climates. In some embodiments, the APM mulch of the present invention is processed into small particles such that it does not affect the soil composition as it swells when water is absorbed.

In some embodiments, a fabric, a film, or a sheet comprising the APM may be placed over the Cannabis plant as a cover. In some embodiments, the cover may enclose the Cannabis plant completely.

In other embodiments, the cover may only provide partial coverage of the Cannabis plant. In some embodiments, the cover may come in contact with the Cannabis plant. In other embodiments, the cover may not be in contact with the Cannabis plant. In some embodiments, said fabric, film, or sheet may be meshed.

In some embodiments, the APM of the present invention may be used to produce Cannabis plant protectors. In some embodiments, a fabric, a film, or a sheet comprising the APM may be placed around the Cannabis plant forming a cylindrical shape. In some embodiments, said fabric, film, or sheet may be placed around the Cannabis plant forming an arch (i.e. not completely enclosed in a cylindrical shape). In

US 12,514,179 B2

29

some embodiments, said fabric, film, or sheet may be meshed. In some embodiments, said *Cannabis* plant protector may be inflatable.

In some embodiments, a fabric, a batting material, or a composition of staple fibers comprising the APM may be used as the growth media for the *Cannabis* plant. In other embodiments, said fabric, batting material, or composition of staple fibers may be used as a component in the growth media mixture.

In some embodiments, the APM may be chemically incorporated or embedded into *Cannabis* planting pots and *Cannabis* planting containers.

Non-Limiting Uses for Active Polymer Material

The APM that has been formed in various shapes as described previously can, in some embodiments, be placed in close proximity to a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture. In some embodiments, said APM can be mixed in with the growth media of the *Cannabis* plant.

In other embodiments, said APM is the growth media of the *Cannabis* plant.

In some embodiments, at least one part of the said APM is placed within 100 cm of the *Cannabis* plant, *Cannabis* plant part, or *Cannabis* plant tissue culture. That is, at least one part of the said APM is placed at about 1 cm, 2 cm, 3 cm, 4 cm, 5 cm, 6 cm, 7 cm, 8 cm, 9 cm, 10 cm, 11 cm, 12 cm, 13 cm, 14 cm, 15 cm, 16 cm, 17 cm, 18 cm, 19 cm, 20 cm, 21 cm, 22 cm, 23 cm, 24 cm, 25 cm, 26 cm, 27 cm, 28 cm, 29 cm, 30 cm, 31 cm, 32 cm, 33 cm, 34 cm, 35 cm, 36 cm, 37 cm, 38 cm, 39 cm, 40 cm, 41 cm, 42 cm, 43 cm, 44 cm, 45 cm, 46 cm, 47 cm, 48 cm, 49 cm, 50 cm, 51 cm, 52 cm, 53 cm, 54 cm, 55 cm, 56 cm, 57 cm, 58 cm, 59 cm, 60 cm, 61 cm, 62 cm, 63 cm, 64 cm, 65 cm, 66 cm, 67 cm, 68 cm, 69 cm, 70 cm, 71 cm, 72 cm, 73 cm, 74 cm, 75 cm, 76 cm, 77 cm, 78 cm, 79 cm, 80 cm, 81 cm, 82 cm, 83 cm, 84 cm, 85 cm, 86 cm, 87 cm, 88 cm, 89 cm, 90 cm, 91 cm, 92 cm, 93 cm, 94 cm, 95 cm, 96 cm, 97 cm, 98 cm, 99 cm, or 100 cm from a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture.

In some embodiments, at least one part of the said APM touches the *Cannabis* plant, *Cannabis* plant part, or tissue culture.

In some embodiments, the APM can be reused. In other embodiments, the APM can be reused multiple times.

Once the APM is placed in close proximity to and/or touching the *Cannabis* plant, normal care should ensure proper growth of the *Cannabis* plant.

Active Polymer Material Kits

In some embodiments, the APM described previously can form a kit with another material that would benefit to be used in combination. Said kit may comprise the APM and a *Cannabis* plant, a *Cannabis* plant part, or a *Cannabis* plant tissue culture. In some embodiments, said kit is a bagged or a potted *Cannabis* plant. In some embodiments, said kit comprises seeds, bulbs, tubers, tuberous roots, rhizomes, and/or corms which are embedded or enclosed in said active polymer material.

In some embodiments, a kit may comprise the APM and a *Cannabis* planting pot or a *Cannabis* planting container. In some embodiments, said kit comprises the APM to be placed inside the *Cannabis* planting pot or the *Cannabis* planting container. In other embodiments, said kit comprises a *Cannabis* planting pot or the *Cannabis* planting container where the wall of said pot or container is lined with the APM.

In some embodiments, a kit may comprise the APM and *Cannabis* plant growth media. Said kit may comprise *Cannabis* plant growth media that is mixed in with APM. In

30

other embodiments, said kit comprises the APM layered on or placed in between the *Cannabis* plant growth media. In some embodiments, the kit may comprise the APM integrated into *Cannabis* plant growth media in which a *Cannabis* plant or a *Cannabis* plant part, such as a *Cannabis* plant seed, is placed or embedded.

EXAMPLES

Example 1: Formation of Active Polymer Material

The mineral particles of titanium dioxide, silicon carbide, and aluminum oxide are ground to a fine powder in a composition of 30:60:10 (i.e., 3:6:1), respectively. The mineral powder composition (100 pounds) was mixed with PET resin (1000 pounds) in a heated rotating drum with paddle-type mixers. This produced active polymer material comprising about 1 percent of mineral by weight of the total weight of the active polymer material.

Example 2: Extruding Active Polymer Material Into a Fiber

An active polymer material which was produced as described in Example 1, which is a viscous liquid, was passed through a spinneret to form, continuous filaments of semi-solid material, which is then solidified upon cooling.

Example 3: Extruding Active Polymer Material Into a Staple Fiber

An active polymer material fiber which was produced as described in Example 2 was cut in shorter uniform strands of about 3 cm to obtain staple fibers.

Example 4: Formation of Non-Woven Batting Material

A staple fiber made with an active polymer material, produced as described in Example 3, was combined together in a non-woven fashion to form a batting material.

Example 5: Formation of Non-Woven Batting Material in Spherical Shapes

A staple fiber made with an active polymer material, produced as described in Example 3, was combined together in a non-woven fashion and rolled to a spherical shape having a diameter of about 2 cm.

Example 6: Extruding Active Polymer Material Into a Film

An active polymer material which was produced as described in Example 1, which is a viscous liquid, was passed through a plastic extruder to form a uniform and continuous thin film having thickness of about 0.5 mm.

Example 7: Comparison Study of Active Polymer Material

An active polymer material, comprising of Celliant™, was extruded into undyed polyester fibers pry 75/36) and knitted to form a fabric (100% APM). A controlled fabric was prepared by knitting undyed polyester fibers (DTY 75/36) which contained no APM (Control). The reflectance, transmittance, and absorbance properties of these fabrics

US 12,514,179 B2

31

were studied. The obtained data are shown in Table 1. The measurements were made in accordance with ASTM (American Society for Testing and Materials) standard test method E903, Solar Absorbance, Reflectance, and Transmittance of Material Using Integrating Spheres. The uncertainty in the measurement statistic is ±0.03 of a full-scale value of 1.0. The repeatability of the measurement statistic is ±0.005 of a full-scale value of 1.0. The instrument used was LPSR 200 IR (S/N 108) by AZ Technology, Inc., with sphere geometry of absolute integrating sphere of 15°/h. The solar spectral irradiance distribution and the weighting method used for the computation of the solar optical property are in compliance with the standard as called out in paragraphs of section 8.3 of ASTM E903.

Table 1 illustrates that the fabric made with active polymer material system absorbs solar radiation in greater amount than the control fabric which contained no mineral compounds.

TABLE 1

| | Optical Properties: Full scale = 1.000 | | |
|---|---|---|---|
| Sample | Solar Reflectance* | Solar Transmittance* | Solar Absorbance* |
| 100% APM | 0.512 | 0.190 | 0.298 |
| Control | 0.610 | 0.214 | 0.176 |

*At air mass = 0.

32

Example 8: Comparison Study of Active Polymer Material

An active polymer material, comprising of Celliant™, was extruded into fibers, undyed, and knitted to form a fabric (100% APM, F1). The same active polymer material that was extruded into fibers and dyed in black was knitted with black polyester fibers in a 1:1 ratio (50% APM, F2). A controlled fabric was prepared by knitting black polyester fibers which contained no active polymer material (Control, F3). The reflectance, transmittance, and absorbance properties of the three fabrics were studied using the real solar spectrum, namely the incidental solar spectrum on the ground considering the atmospheric absorption.

The obtained data are shown in Tables 2-4. The measurements were obtained using spectrometers (Perkin Elmer and Bio-rad) at an ambient temperature.

The results in Tables 2-4 demonstrate that the largest optical property differences between the fabrics are in the interaction with the close IR spectrum. In particular, active polymer material (F1) demonstrates improved absorption of the close IR at 17.74% when compared to the control material (F3) of 5.79%.

TABLE 2

| | Reflectance Study Results: % of the source which is reflected on the fabric | | | |
|---|---|---|---|---|
| Sample | Total Reflectance | Reflectance [0.3-0.4 μm][1] UV Range | Reflectance [0.4-0.78 μm][2] Visible Range | Reflectance [0.78-2.2 μm][3] Close IR Range |
| 100% APM (F1) | 20.41 | 3.98 | 5.56 | 53.08 |
| 50% APM (F2) | 21.81 | 3.92 | 5.77 | 57.08 |
| Control (F3) | 22.02 | 3.94 | 5.80 | 57.69 |

[1]300 nm-400 nm.

[2]400 nm-780 nm.

[3]780 nm-2200 nm.

TABLE 3

| | Transmittance Study Results: % of the source which transmits through the fabric | | | |
|---|---|---|---|---|
| Sample | Total Reflectance | Reflectance [0.3-0.4 μm][1] UV Range | Reflectance [0.4-0.78 μm][2] Visible Range | Reflectance [0.78-2.2 μm][3] Close IR Range |
| 100% APM (F1) | 11.97 | 3.32 | 4.11 | 29.19 |
| 50% APM (F2) | 13.20 | 3.50 | 4.36 | 32.57 |
| Control (F3) | 15.53 | 5.09 | 5.94 | 36.52 |

[1]300 nm-400 nm.

[2]400 nm-780 nm.

[3]780 nm-2200 nm.

US 12,514,179 B2

33

34

## TABLE 4

Absorbance Study Results: % of the source which is absorbed by the fabric

| Sample | Total Reflectance | Reflectance [0.3-0.4 μm][1] UV Range | Reflectance [0.4-0.78 μm][2] Visible Range | Reflectance [0.78-2.2 μm][3] Close IR Range |
|---|---|---|---|---|
| 100% APM (F1) | 67.92 | 92.70 | 90.34 | 17.74 |
| 50% APM (F2) | 64.99 | 92.58 | 89.87 | 10.36 |
| Control (F3) | 62.44 | 90.97 | 88.25 | 5.79 |

[1]300 nm-400 nm.
[2]400 nm-780 nm.
[3]780 nm-2200 nm.

These results demonstrate the effect of the active polymer materials of the present invention in altering specific light absorption, reflection, and transmittance properties. The Celliant active mineral composition of 55% SiC, 25% TiO$_2$, 5% SiO$_2$, and 15% increases the absorption of IR range wavelengths. In some embodiment, this formulation of Celliant demonstrates absorption and excitation of the solar radiation where 65% of the absorption is of the band in the infrared spectrum.

### Example 9: Emittance Study of Active Polymer Material

An active polymer material, comprising of Celliant®, can be extruded into undyed polyester fibers (DTY 75/36) and knitted to form a fabric (100% APM). A controlled fabric can be prepared by knitting undyed polyester fibers (DTY 75/36) which contained no APM (Control). The emittance properties of these fabrics are then studied. The measurements will be made in accordance with AZ Technology test methods for near-normal emittance and total hemispherical emittance at 300 K. Near-normal emittance measurements are traceable to ASTM standard test method E408 through round robin testing with the Gier Dunkel DB-100. The instrument used will be TESA 2000 by AZ Technology, Inc., with absolute ellipsoidal cavity of 15/h. Prior to each use, the instrument will be calibrated using Hemispheric Emittance Calibration Puck by AZ Technology, Inc.

### Example 10: Formation of an EcoBag With a Cannabis Plant

An active polymer material fiber which was produced as described in Example 2 can be woven into a potting bag with an opening of about 10 cm diameter and a depth of about 15 cm. The bags of this example can be used as temporary or permanent growth containers for Cannabis tissue, plant parts and whole plants.

### Example 11: Formation of a Collar (Soil Cover)

An active polymer batting material which was produced as described in Example 4 was die-cut in a square shape having a dimension of 10×10 cm with a circular opening in the center of about 2 cm diameter. The die-cut material was then placed around the stem of the Cannabis plant.

### Example 12: Formation of a Mulch made with the Active Polymer Material

An active polymer material staple fiber, having length of about 1 cm, produced as described in Example 3 was non-woven into a spherical shape of approximately 1 cm in diameter. The resulting non-woven spherical shaped materials can be mixed in with the top layer of the soil surrounding a Cannabis plant.

### Example 13: Formation of a Soil Cover

An active polymer material film which was produced as described in Example 6 can be placed over a row of growth media. The film contained various opening to allow water permeation as well as to allow Cannabis plant to grow.

### Example 14: Comparison Study of Cannabis Plant Growth

Two separate types of Cannabis plant containers 102, 112, 122 were prepared and tested according to the following procedure. Clones of Cannabis plant strain 'Blueberry Kush' used for testing were each cut 4 inches high from same plant. For each set of three, two of the clones 104, 124 were placed in traditional rock wool which is the standard of the industry and placed in a conventional hydro grow device 130 (AeroGarden®) (FIG. 3).

The third clone 114 is placed in a net bag 112 comprising 2 grams of solar mulch 115 (FIG. 2) which is a polymer composite prepared according to the process set forth in Example 2. The netting helps retain a shape useful for holding and growing the plants. The solar mulch 115 is comprised of polyester staple fiber with a size of 1.8 denier by 1.5 inches. This staple fiber is then processed into small balls or spheres each being approximately the size of Q-Tips®. The balls help to create an interlocking phenomenon that keeps the clone 114 upright. The Cannabis clone 114 is placed in the center and then put into the same conventional hydro grow (AeroGarden®) device 130 (FIG. 3).

The hydro grow device 130 was set for a temperature between about 85 to 90 degrees Fahrenheit; a light cycle of 16 hours lights on and 8 hours lights off; and, an airflow standard for a greenhouse environment. Following nine days plant growth in the hydro grow device, the clones 114 grown in the solar mulch 115 were observed to have roots about 2×, 3×, 4×, 5× or longer than the clones 104, 124 grown in the traditional rock wool (FIG. 1). It was also observed that the top growth of the clone 114 grown in solar mulch 115 was considerably greener and much larger (i.e., about 2×, 3×, 4×, 5× larger) (see, e.g., FIG. 1) than those 104, 124 grown in rock wool.

This test was preformed multiple times with the same result. For all of these tests we observed that there was over a 99% survival rating with the solar mulch clones compared to 80% survival rating for the plants grown in rock wool.

It should be understood that the above description is only representative of illustrative embodiments and examples.

US 12,514,179 B2

35

For the convenience of the reader, the above description has focused on a limited number of representative examples of all possible embodiments, examples that teach the principles of the disclosure. The description has not attempted to exhaustively enumerate all possible variations or even combinations of those variations described. That alternate embodiments may not have been presented for a specific portion of the disclosure, or that further undescribed alternate embodiments may be available for a portion, is not to be considered a disclaimer of those alternate embodiments.

One of ordinary skill will appreciate that many of those undescribed embodiments, involve differences in technology and materials rather than differences in the application of the principles of the disclosure. Accordingly, the disclosure is not intended to be limited to less than the scope set forth in the following claims and equivalents.

All references, articles, publications, patents, patent publications, and patent applications cited herein are incorporated by reference in their entireties for all purposes.

However, mention of any reference, article, publication, patent, patent publication, and patent application cited herein is not, and should not be taken as an acknowledgment or any form of suggestion that they constitute valid prior art or form part of the common general knowledge in any country in the world.

The invention claimed is:

1. A kit, comprising:
a plant, wherein at least one portion of the plant is contained by one or more of a bag or a pot filled with growth media; and
an active polymer comprising one or more minerals suspended, embedded, or otherwise incorporated in a polymer matrix, wherein the active polymer is operable to absorb light, convert the absorbed light into infrared light, and emit the infrared light, and wherein the one or more minerals are selected from the group consisting of silicon carbide (SiC), calcium carbide (CaC$_2$), titanium dioxide (TiO$_2$), aluminum oxide (Al$_2$O$_3$), and silicon dioxide (SiO$_2$),
wherein the active polymer forms the one or more of the bag or the pot,
wherein the plant exhibits improved growth compared to a control plant grown without the active polymer, and
wherein at least one part of the active polymer touches the plant.

2. The kit of claim 1, wherein the one or more minerals comprises silicon carbide present in a ratio of greater than or equal to 3:2.

3. The kit of claim 1, wherein the active polymer comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex.

4. The kit of claim 1, wherein the one or more minerals suspended, embedded or otherwise incorporated in the polymer matrix comprises about 1% to about 2% of a total weight of the active polymer.

5. The kit of claim 1, wherein the active polymer is extruded into a form selected from the group consisting of a fiber, a staple fiber, a film, and a sheet.

6. The kit of claim 5, wherein the selected form of the active polymer is a fiber, and wherein the fiber is made into a textile using a technique selected from the group consisting of weaving, stitching, sewing, knitting, bonding, fusing, and felting.

36

7. The kit of claim 1, further comprising:
a planting container, wherein the active polymer material comprises the polymer matrix and a mineral powder, wherein the active polymer material lines the inside of the planting container.

8. The kit of claim 1, wherein the plant is one or more of: a clone, a male, a female, or in a seedling form.

9. The kit of claim 1, wherein the active polymer is mixed with the growth media.

10. A kit comprising:
a plant, wherein at least one portion of the plant is contained by one or more of a bag or a pot filled with growth media; and
an active polymer comprising one or more minerals suspended, embedded, or otherwise incorporated in a polymer matrix, wherein the one or more minerals comprises silicon carbide present in a ratio of greater than or equal to 3:2, and
wherein the plant or a part thereof touches the active polymer.

11. The kit of claim 10, wherein the active polymer is operable to absorb light, convert the absorbed light into infrared light, and emit the infrared light.

12. The kit of claim 10, wherein the plant exhibits improved growth compared to a control plant grown without the active polymer.

13. The kit of claim 10, wherein the active polymer comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex.

14. The kit of claim 10, wherein the one or more minerals suspended, embedded or otherwise incorporated in the polymer matrix comprises about 1% to about 2% of a total weight of the active polymer.

15. The kit of claim 10, wherein the active polymer is mixed with the growth media.

16. A kit, comprising:
an active polymer comprising one or more minerals suspended, embedded, or otherwise incorporated in a polymer matrix, wherein the one or more minerals comprises silicon carbide present in a ratio of greater than or equal to 3:2;
a growth media; and
a plant,
wherein at least one part of the active polymer touches the plant,
wherein the plant exhibits improved growth compared to a control plant grown without the active polymer, and
wherein the active polymer is operable to absorb light, convert the absorbed light into infrared light, and emit the infrared light.

17. The kit of claim 16, wherein the active polymer comprises one or more polymer types selected from the group consisting of polyethylene terephthalate (PET), polyester, nylon, rayon, and spandex.

18. The kit of claim 16, wherein the one or more minerals suspended, embedded or otherwise incorporated in the polymer matrix comprises about 1% to about 2% of a total weight of the active polymer.

19. The kit of claim 16, wherein the one or more minerals further comprises one or more of calcium carbide (CaC$_2$), titanium dioxide (TiO$_2$), aluminum oxide (Al$_2$O$_3$), or silicon dioxide (SiO$_2$).

20. The kit of claim 16, wherein the active polymer is mixed with the growth media.

* * * * *

**EXHIBIT 2**

No. 24-2881

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

In re: HOLOGENIX, LLC, Debtor.

Hologenix, LLC
*Appellant*

v.

Multiple Energy Technologies, LLC
*Appellee*

---

On appeal from the District Court for the Central District of California
*Multiple Energy Technologies, LLC. v. Hologenix, LLC*
District Court Case No. 2:22-cv-0751-FMO

reversing and remanding the U.S. Bankruptcy Court, Central District of California
*In re Hologenix, LLC*
Bankruptcy Case No. 2:20-bk-13849-BR

---

## APPELLANT'S OPENING BRIEF

---

JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:   (310) 229-1234
Facsimile:   (310) 229-1244
*JPF@LNBYG.COM*

## DISCLOSURE STATEMENT

## F.R.A.P. 26.1

Appellant Hologenix, LLC is the debtor and debtor in possession in the above-captioned appeal.  Hologenix, LLC hereby discloses that it is a nongovernmental corporate party, and that no parent corporation or publicly held corporation owns 10% or more of its stock.

Dated:  June 6, 2025             LEVENE, NEALE, BENDER,
                                 YOO & GOLUBCHIK L.L.P.


                    By:    _____/s/ John-Patrick M. Fritz_____
                           JOHN-PATRICK M. FRITZ
                           Attorneys for Appellant Hologenix, LLC

<u>**Page**</u>

## TABLE OF CONTENTS

I.  PREFACE ............................................................................................................1

II.  INTRODUCTION ..............................................................................................1

III. JURISDICTION ................................................................................................2

IV. STATEMENT OF ISSUES ON APPEAL ........................................................8

V.  STANDARD OF REVIEW ...............................................................................9

VI. STATEMENT OF THE CASE .......................................................................10

      A.      Findings of Fact and Conclusions of Law .............................................10

      B.      Bankruptcy Case ...................................................................................11

      C.      Plan .......................................................................................................12

      D.      District Court Decision ..........................................................................14

VII.  SUMMARY OF ARGUMENT .......................................................................15

VIII. ARGUMENT ..................................................................................................17

      A.      "Fair and Equitable" Under §1191(c)(2) Does Not Permit
             Courts to Exceed Congress' 3-to-5-Year Commitment Period ..........17

          1.      Historically, "Fair and Equitable" Are "Words of Art"
                  That Do Not "Include" Commitment Periods Longer than
                  3-to-5 Years ................................................................................18

          a.      "Fair and Equitable" Prior to 1978 Bankruptcy Code ..............19

          b.      "Fair and Equitable" Under The Bankruptcy Code - 1978
                 to 2019 .......................................................................................23

          c.      "Good Faith" Under Chapter 13 of the 1978 Bankruptcy
                Code ...........................................................................................25

          d.      "Fair and Equitable" Under Subchapter V .............................26

          2.      Statutory Construction – The Specific Governs the
                General and Supports a 3-to-5-Year Limit Under
                §1191(c)(2)(A) ...........................................................................35

i

## TABLE OF CONTENTS
### (Continued)

**Page**

3. Statutory Construction – Context Governs Over Strict Textual Arguments and Supports a 3-to-5-Year Limit Under §1191(c)(2)(A).................................................36

4. Statutory Construction – Overall Statutory Scheme.................38

5. District Court's Cases Are Inapposite ....................................44

6. The District Court Should Not Have *Sua Sponte* Raised the Issue of a Commitment Period Longer than Three Years ...................................................................46

7. The Plan Is "Fair and Equitable" Under §1191(c)....................47

B. The Plan Did Not Discriminate Unfairly Under §1191(b) .................48

C. Debtor Complied with §1129(a)(2)........................................54

D. The Plan Satisfies the "Good Faith" Requirement of §1129(a)(3) ...................................................................56

E. The Plan Satisfied §1129(a)(5) ...........................................57

F. The Plan Satisfies the "Best Interest of Creditors" Test of §1129(a)(7).................................................................58

G. MET Was Not Denied Due Process at the Plan Hearing....................58

IX. CONCLUSION...........................................................................63

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Acequia, Inc.,*
  787 F.2d 1352 (9th Cir. 1986) ..........................................................5, 10, 49, 57

*Adair v. Sunwest Bank (In re Adair),*
  965 F.2d 777 (9th Cir.1992) ....................................................................58, 59, 61

*In re Ambanc La Mesa LP,*
  115 F.3d 650 (9th Cir.1997) ...........................................................................9, 52

*American United Mutual Insurance Co. v. City of Avon Park,*
  311 U.S. 138 (1940)...........................................................................................28

*In re Arnold,*
  806 F.2d 937 (9th Cir.1986) .............................................................................10

*In re Art & Architecture Books of the 21st Century,*
  2016 WL 118743 (Bankr.C.D.Cal. Mar.18, 2016).............................................60

*In re Aztec Co.,*
  107 B.R. 585 (Bankr.M.D.Tenn.1989)...............................................................49

*Bank of America Nat. Trust and Sav. Ass'n v. 203 N. LaSalle Street
  P'ship,*
  526 U.S. 434 (1999)....................................................................................17, 33

*In re Brotby,*
  393 B.R. 177 (9th Cir.B.A.P.2003) .....................................................................9

*Case v. Los Angeles Lumber Products Co.,*
  308 U.S. 106 (1939).................................................................................20, 21, 28

*Matter of Central R. Co. of New Jersey,*
  579 F.2d 804 (3d Cir.1978) ..............................................................................54

*In re Cleary Packaging, LLC,*
  36 F.4th 509 (4th Cir.2022) .......................................................................41, 42

iii

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Consolidated Rock Products Co. v. Du Bois,*
  312 U.S. 510 (1941) ................................................................20, 24

*In re Curiel,*
  651 B.R. 548 (9th Cir.B.A.P.2023) ................................................26

*Czyzewski v. Jevic Holding Corp.,*
  580 U.S. 451 (2017) .................................................................31, 37

*In re Downtown Inv. Club III,*
  89 B.R. 59 (9th Cir.B.A.P.1988) ...................................................55

*In re Dunlop Oil Co., Inc.,*
  2014 WL 6883069 (9th Cir.B.A.P. Dec.5, 2014) ...........................55

*In re Farwest Pump Co.,*
  2020 WL 5588808 (9th Cir.B.A.P. Sep.18, 2020) ...........................9

*In re Fitness Holdings Intern., Inc.,*
  714 F.3d 1141 (9th Cir.1993) ........................................................51

*In re Flores,*
  735 F.3d 855 (9th Cir.2013) ..........................................37, 38, 43, 44

*In re Goeb,*
  675 F.2d 1386 (9th Cir.1982) ..........................................26, 28, 29, 38

*In re Gossett,*
  86 B.R. 941 (Bankr.S.D. Ohio 1988) ..............................................47

*In re Gugliuzza,*
  852 F.3d 884 (9th Cir.2017) .............................................2, 3, 5, 7

*Hamilton v. Lanning,*
  560 U.S. 505 (2010) .................................................................29, 38

*In re Jacobs,*
  644 B.R. 883 (Bankr.D.N.M.2022) .............................................45, 46

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Krug v. Lutz,*
  329 F.3d 692 (9th Cir.2003) ........................................................................9

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018)............................................................................19, 40

*In re Landing Associates, Ltd.,*
  157 B.R. 791 (Bankr.W.D.Tex.1993)............................................................56

*In re Landmark Fence Co., Inc.,*
  801 F.3d 1099 (9th Cir.2015) .......................................................................7

*Matter of LeBlanc,*
  622 F.2d 872 (5th Cir.1980) ......................................................................53

*Lee-Benner v. Gergely (In re Gergely),*
  110 F.3d 1448 (9th Cir.1997) ...........................................................59, 61, 62

*Lorber v. Vista Irr. Dist.,*
  143 2d 282, 285 (9th Cir.1944) ...............................................................34, 54

*In re Metz,*
  620 F.2d 1495 (9th Cir.1987) .............................................................26, 29, 45

*In re Monarch Beach Ventures,*
  166 B.R. 428 ...................................................................................49, 50

*In re Moore and Moore Trucking LLC,*
  2022 WL 120189 (Bankr.E.D.La. Jan.12, 2022)................................................55

*In re Myrvang,*
  232 F.3d 1116 (9th Cir.2000) .....................................................................47

*Northern Pacific Ry. Co. v. Boyd,*
  228 U.S. 482 (1939)..........................................................................20, 21, 22

*Norwest Bank Worthington v. Ahlers,*
  485 U.S. 197 (1988)..........................................................................23, 29, 30

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*In re Perez,*
   30 F.3d 1200 (9th Cir.1994) ...................................................................44

*In re Porter,*
   102 B.R. 773 (9th Cir.B.A.P.1989) ........................................................47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) .................................................................17, 35, 43

*In re Sisk,*
   962 F.3d 1133 (9th Cir.2020) ...........................................................29, 43

*In re Texaco, Inc.,*
   84 B.R. 893 (Bankr.S.D.N.Y.1988) .......................................................55

*In re Tribune Co.,*
   972 F.3d 228 (3d Cir.2020) ...................................................................49

*U.S. v. 10.48 Acres of Land,*
   621 F.2d 338 (9th Cir.1980) ..................................................................59

*U.S. v. Mitan,*
   966 F.2d 1165 (7th Cir.1992) ................................................................61

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's Ltd,*
   484 U.S. 365 (1988).................................................................................39

*United States v. Miller,*
   145 S. Ct. 839 (2025).......................................................................37, 46

*Vieux v. East Bay Regional Park Dist.,*
   906 F.2d 1330 (9th Cir.1990) ................................................................59

*In re Villanueva,*
   274 B.R. 836 (9th Cir.B.A.P.2002) ........................................................47

*In re Welsh,*
   711 F.3d 1120 (9th Cir.2013) ...........................................26, 28, 36, 45

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Zachary v. California Bank & Trust,*
    811 F.3d 1191 (9th Cir.2016) .......................................................................23, 30

**Federal Statutes**

11 U.S.C.
    §§ 101-1532 ..........................................................................................................1
    § 101................................................................................................18, 38, 52
    § 103................................................................................................................44
    § 707................................................................................................................38
    § 727................................................................................................................38
    § 1121..........................................................................................................52, 55
    § 1129......................................... 5, 9, 18. 19, 24, 27, 33, 37
    § 1181................................................................................................................33
    § 1189................................................................................................................33
    § 1191................................................... 5, 9, 18, 27, 37, 42, 44
    §§ 1191(b) & (c) ................................................................................9, 66
    §§ 1191(c)(2)(A), 1191(c)(2)(B), 1192, and 1193(c)........................................39
    § 1192................................................................................39, 41, 42, 44
    § 1193................................................................................33, 39, 43, 44


28 U.S.C.
    § 157 and § 1334(b) ...........................................................................................2
    § 158(a) ..............................................................................................................2
    § 158(d) ..............................................................................................................2
    § 158(d)(2) .........................................................................................................7

1938 Bankruptcy Act Chapters X and XI.............................................................18

Bankruptcy Act ....................................................................................................20

Bankruptcy Act of 1938 Chapter X .......................................................20, 21, 33, 53

Bankruptcy Act
    § 77B(f)(1) ........................................................................................................20

## TABLE OF AUTHORITIES
### (Continued)

**Page**

**Other Authorities**

Paul W. Bonapfel, A Guide to the Small Business Reorganization Act of 2019, 93 Am. Bankr. L.J. 571, 612-13 (Winter 2019) ..................................27

Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. ..................22, 33

7 COLLIER ON BANKRUPTCY ¶ 1129.LH[6][b] ..........................................21

4 COLLIER ¶ 410-02[3] ...............................................................51

7 COLLIER ¶ 1129.03[4][a] ..........................................................21

7 COLLIER ¶ 1129.03[4][a] ..........................................................33

7 COLLIER ¶ 1129.03[4][a] ..........................................................53

8 COLLIER ¶ 1200.01[2] .............................................................27

8 COLLIER ¶ 1322.LH[3] .............................................................45

Debtor's "Disposable Income" .......................................................48

F.R.A.P. 32(a)(7) ...................................................................64

FED.R.EVID. 702 ....................................................................60

FRAP 4(a)(1)(A) .....................................................................2

FRAP 6(b)(1) ........................................................................2

Kenneth N. Klee, Bankruptcy and the Supreme Court (2008) .........................49, 51

Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133, 143 n.80, 81 (1979) ..........................................................................23

Klee, Cramdown II, 64 Am. Bankr. L.J. 229, 231-41 (1990) ...........................23

Volume B COLLIER ...............................................................25, 45

## I.

## PREFACE

Appellant Hologenix, LLC ("**Hologenix**" and "**Debtor**") asks this Court to reverse the District Court and affirm the Bankruptcy Court's order ("**Order**") confirming Debtor's Chapter 11, Subchapter V, plan of reorganization (the "**Plan**").[1]

## II.

## INTRODUCTION

On October 12, 2022, the Bankruptcy Court confirmed Debtor's Plan over the objection of creditor Multiple Energy Technologies, LLC ("**MET**"). On appeal MET raised seven issues.[2] On March 29, 2024, the District Court reversed and remanded – not deciding the seven issues raised – but *sua sponte* raising a new eighth issue on interpreting "fair and equitable" under §1191(c)(2)(A).[3]

Interpreting "fair and equitable" under §1191(c) is distinct from, but related to, the issue of whether the Plan "discriminates unfairly," and other issues raised by MET. Debtor urges this Court to affirm the Bankruptcy Court on the seven issues raised by MET and reverse the District Court on the eighth issue it raised.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") and the Federal Rules of Appellate Procedure (the "**FRAP**").

[2] 2-ER-0143 – 2-ER-0144.

[3] The relevant text of §1191 is in this brief's statutory addendum.

1

## III.

## <u>JURISDICTION</u>

Pursuant to 28 U.S.C. §157 and §1334(b) and the reference made by the United States District Court for the Central District of California by General Order No. 266 entered on October 9, 1984, the Bankruptcy Court had jurisdiction to hear the proceeding from which this appeal is taken. The Order was entered on October 12, 2022 (amended, December 20, 2022),[4] and is a "final" order. MET's notice of appeal was timely filed on October 13, 2022.[5]

The District Court properly exercised jurisdiction over this appeal pursuant to 28 U.S.C. §158(a). The District Court's order and judgment ("**Decision**") were dated March 29, 2024, but entered on the docket on April 1, 2024, reversing and remanding the Order.[6] Debtor's notice of appeal was filed on April 30, 2024,[7] within the 30-day period provided by FRAP 4(a)(1)(A) (made applicable by FRAP 6(b)(1)).

This Court accepted the appeal on March 6, 2025, and instructed the parties to address jurisdiction.[8] This Court has jurisdiction pursuant to 28 U.S.C. §158(d) based on *In re Gugliuzza*, 852 F.3d 884, 894 (9th Cir.2017). "[W]hen an appeal is

---

[4] 8-ER-1912, 8-ER-1927.

[5] 8-ER-1912.

[6] 8-ER-1793.

[7] 8-ER-1794.

[8] 2-ER-0123.

taken from a district court… ruling that remands the case for further proceedings in the bankruptcy court, we have applied a four-factor test, considering (1) the need to avoid piecemeal litigation; (2) judicial efficiency; (3) the systemic interest in preserving the bankruptcy court's role as the finder of fact; and (4) whether delaying review would cause either party irreparable harm." *Id*.

Appeals should avoid delays and inefficiencies resulting from "multiple climbs up and down the appellate ladder and slides down the chute." *Id.*   Hologenix and MET have already gone up and down the ladder and chute twice since 2020 with little guidance, and remand perpetuates piecemeal litigation, delay, and judicial inefficiency. Hologenix confirmed its first plan in 2020, and MET raised four issues on appeal, ***including whether the 2020 plan was "fair and equitable" under §1191(c)(2) with "only three (3) years' disposable income."*** [9]   On September 27, 2021, the District Court vacated and remanded on issues under §1129(a)(7) and §1129(a)(3) ***but*** declined to rule whether the plan was "fair and equitable" under §1191(c)(2).[10] On remand, Hologenix proposed a new plan in January 2022, endured extensive plan discovery with MET over six months, modified the plan in June 2022, and confirmed the Plan at a two-day trial with extensive post-trial briefing, resulting

---

[9] 7-ER-1673, 7-ER-1692.

[10] 7-ER-1631, 7-ER-1634, 7-ER-1640; 7-ER-1619.

in a highly detailed 85-page Findings of Fact and Conclusions of Law ("**FFCL**").[11]

MET appealed and raised seven issues, including – again – that the plan is not "fair and equitable" under §1191(c).[12]

On March 29, 2024, the District Court reversed and remanded, declining to rule on any of the seven issues MET raised, and instead raising an eighth new issue *sua sponte*, that the Bankruptcy Court applied the incorrect rule of law because "§1191(c)(2)(A) does not prohibit the provision of some amount of debtor's disposable income that is less than 100% after five years… the Bankruptcy Court erred in finding that Met was entitled to only 'three-to-five years' of projected Disposable Income.'"[13]  This Decision was inefficient and caused years of delay because MET previously raised the issue that the 2020 plan was not "fair and equitable" under §1191(c)(2) in part because of "only three (3) years' disposable income," and Hologenix replied it was "fair and equitable" because courts are not permitted to impose a different, more burdensome requirement than what is set forth in the statute for projected disposable income for the three-to-five-year period of §1191(c)(2)(A), citing *In re Sisk*, 962 F.3d 1133, 1148-49 (9th Cir.2020).[14]

---

[11] 1-ER-0017 - 1-ER-0039; 8-ER-1909; 8-ER-1911.

[12] 2-ER-0143 – 2-ER-0144.

[13] 1-ER-0007 – 1-ER-0008.

[14] 7-ER-1692, 7-ER-1698.

Declining to rule on §1191(c)(2) in the first round of appeal, only to then rule on §1191(c)(2) (and nothing else) on the second round of appeal is highly inefficient because plan confirmation is complex, involving numerous statutory requirements and aggregating all facts and proceedings throughout the case.[15] Understanding the scope of "fair and equitable" is critically important because it "has significant implications for the relative bargaining power of debtors and creditors in Chapter 11 cases."[16]

Hologenix's case is distinguishable from other decisions finding no appellate jurisdiction upon remand because those decisions remanded "with explicit instructions to engage in 'further fact-finding.'"[17] Here, the District Court did not remand for further factual findings,[18] but announced a novel interpretation of §1191(c)(2)(A) and remanded generally.[19] The District Court's novel ruling will have a profound domino effect on issues already raised by MET on appeal, including whether the Plan is "fair and equitable" and "discriminates unfairly" under §1191(b),

---

[15] §1191(a) (incorporating most of §1129(a)(1)-(15)); §1191(b)-(d); *In re Acequia, Inc.*, 787 F.2d 1352, 1359 (9th Cir. 1986).

[16] *In re Bonner Mall Partnerships*, 2 F.3d 899, 901 (9th Cir.1993), *appeal dismissed*, 115 S.Ct. 386 (deciding "new value exception" survived enactment of "fair and equitable" in § 1129(b)).

[17] *Gugliuzza*, 852 F.3d at 894-95 (collecting cases).

[18] 1-ER-0012.

[19] 1-ER-0006 – 1-ER-0008.

and the District Court indicated it would likely reverse on those issues: "Although the court makes no conclusions regarding whether the Plan unfairly discriminates against Class 3 creditors as compared to Class 2 and 4 creditors, it does note that the disparity between 12.5% (class 3) recovery for some creditors and 100% (Class 2 and 4) recovery for others is dramatic."[20]

If this Court refuses this appeal, Hologenix must prepare a new plan to address the District Court's view of a "dramatic" disparity in discrimination between classes in light of its novel interpretation of §1191(c)(2)(A).  But if this Court accepts this appeal and reverses this novel interpretation of §1191(c)(2)(A), the seven issues raised by MET on the appeal can be decided on the record of the detailed 85-page FFCL.  Hearing this appeal will not undermine "the systemic interest in preserving the bankruptcy court's role as the finder of fact" because the Bankruptcy Court already issued a detailed 85-page FFCL in support of the seven issues that MET raised, and there are no factual findings required to address the District Court's purely legal interpretation of §1191(c)(2)(A).

Refusing the appeal will cause Hologenix irreparable harm by additional delay and substantial attorneys' fees.  The 2020 plan cost approximately $300,000

---

[20] 1-ER-0008.

6

in attorneys' fees,[21] and the 2022 Plan cost more than $1,000,000.[22]  Another plan would cost Hologenix $500,000.[23]  More problematically, the District Court's novel interpretation of §1191(c)(2)(A) makes the "fair and equitable" requirement of §1191(c) practically limitless and unpredictable and invites roaming courts of equity that this Court warned against (*see* §VIII.A.1.d (below)).

"[T]he fluid and sometimes chaotic nature of bankruptcy proceedings necessitates a degree of jurisdictional flexibility."[24]   Where, as here, Hologenix has already had two rounds of appeal and obtained a detailed 85-page FFCL, costing more than $1.5 million in attorneys' fees, only to be remanded on a novel statutory interpretation (which should be reversed),  jurisdictional flexibility is needed.

If this Court finds it does not have jurisdiction, Hologenix requests permission to move the District Court to certify interlocutory review pursuant to 28 U.S.C. §158(d)(2).[25] The District Court denied without prejudice Hologenix's motion to certify interlocutory review because it was divested of jurisdiction when this Court accepted the appeal.[26]

---

[21] 7-ER-1718 – 7-ER-1719.

[22] 7-ER-1643 – 7-ER-1644; 6-ER-1460 – 6-ER-1461; 2-ER-0203 – 2-ER-0204.

[23] 6-ER-1460 – 6-ER-1461; 2-ER-0203 – 2-ER-0204.

[24] *In re Landmark Fence Co., Inc.*, 801 F.3d 1099, 1102 (9th Cir.2015).

[25] *Gugliuzza*, 852 F.3d at 898.

[26] 2-ER-0121.

7

**IV.**

**STATEMENT OF ISSUES ON APPEAL**

The issue is whether to confirm Debtor's Plan, and the questions to be decided therein are:[27]

1.    Whether the Plan discriminately unfairly (§1191(b)).

2.    Whether the Plan is "fair and equitable" (§1191(c)).

3.    Whether Debtor complied with the Bankruptcy Code (§1129(a)(2)).

4.    Whether the Plan satisfied §1129(a)(3).

5.    Whether the Plan satisfied §1129(a)(5).

6.    Whether the Plan satisfied §1129(a)(7).

7.    Whether the Bankruptcy Court denied MET due process at the Plan confirmation hearing.

8.    Whether the District Court erred in interpreting §1191(c)(2)(A) to mean a court can compel a debtor to provide more than a debtor's projected disposable income for a three-to-five-year period (the "**Commitment Period**")[28] in determining whether a plan is "fair and equitable."

---

[27] The first seven questions constitute MET's appeal to the District Court.  The eighth question was raised *sua sponte* by the District Court.

[28] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.AP.2022) (referring to the three-to-five-year period as "commitment period").

8

## V.

## <u>STANDARD OF REVIEW</u>

This Court "review[s] de novo a district court's decision on appeal from a bankruptcy court, applying the same standard of review to the bankruptcy court's decision as did the district court."[29] A bankruptcy court's decision to confirm a plan is reviewed for abuse of discretion.[30] A bankruptcy court abuses its discretion if it applies an incorrect legal standard or its factual findings are clearly erroneous – that is, illogical, implausible, or without support in the record.[31]

The first six issues are reviewed for clear error.[32] The seventh issue on due process is reviewed de novo.[33]

The eighth issue from the District Court's decision interpreting §1191(c) is a question of law reviewed de novo.[34] If the Bankruptcy Court applied the correct

---

[29] *In re PG&E Corp.*, 46 F.4th 1047, 1052 (9th Cir.2022).

[30] *In re Orange County Bail Bonds*, 638 B.R. at 145.

[31] *Id.*

[32] *Id.* at 146 (§1191(b) & (c) "fair and equitable" reviewed for clear error); *In re Ambanc La Mesa LP*, 115 F.3d 650, 654 (9th Cir.1997) ("clear error" for unfair discrimination); *In re Brotby*, 393 B.R. 177, 184 (9th Cir.B.A.P.2003) (§1129(a)(3), clear error); *In re Farwest Pump Co.*, 2020 WL 5588808 *1, *5 & *6 (9th Cir.B.A.P. Sep.18, 2020) (§§1129(a)(5) and (7), clear error).

[33] *Krug v. Lutz*, 329 F.3d 692, 695 (9th Cir.2003).

[34] *In re Bonner Mall Partnership*, 2 F.3d at 903.

9

interpretation of §1191(c), then whether the Bankruptcy Court applied § 1191(c) correctly is reviewed for clear error.[35]

## VI.

## STATEMENT OF THE CASE

### A.    Findings of Fact and Conclusions of Law

Plan confirmation entails the entire cumulative record and evidence amassed throughout the bankruptcy case.[36]  It is impossible to adequately summarize a 30-month case with 870 docket entries up within the page limits of an appellate brief – especially when, as here, good faith based on the totality of the circumstances under §1129(a)(3) is one of the issues.[37]

The Bankruptcy Court held a two-day hearing with live cross-examination and took judicial notice of the entirety of its docket in the case stating "… this case has been a lot of twists and turns, and I've spent a lot – to say I've spent a lot of time would be an understatement…"[38] Hologenix incorporates hereby reference the detailed 85-page FFCL.[39]

---

[35] *Id.*, at 909 ("The resolution of this question turns on whether there is a reasonable possibility that a bankruptcy judge could find [debtor's] Plan 'fair and equitable.'")

[36] *In re Acequia, Inc.*, 787 F.2d 1352, 1359 (9th Cir.1986).

[37] *In re Arnold*, 806 F.2d 937, 939 (9th Cir.1986).

[38] 1-ER-0025.

[39] 1-ER-0018-0023, 1-ER-0025-0043.

### B.      Bankruptcy Case

Debtor filed bankruptcy on April 22, 2020 ("**Petition Date**").[40]  On October 6, 2020, the Bankruptcy Court confirmed Debtor's first plan ("**2020 plan**") and denied MET's motion to dismiss the bankruptcy case ("**2020 MTD**").   MET appealed both orders.[41]  On November 12, 2020, the first plan went into effect.[42]  But 39 days after the plan effective date, on December 21, 2020, the District Court issued a stay pending appeal.[43]  On September 27, 2021, the District Court remanded the plan confirmation order for further proceedings.[44]  At a status conference on November 16, 2021, Debtor and MET stipulated to withdraw the 2020 plan and 2020 MTD, with Debtor to file a new plan by January 4, 2022.

On January 4, 2022, Debtor filed its second plan ("**January 2022 plan**"), set for hearing on February 15, 2022.[45]  On January 25, 2022, MET filed its renewed motion to dismiss the bankruptcy case ("**2022 MTD**") set for hearing concurrently with the plan hearing. [46]  The next day MET filed an *ex parte* motion to delay the

---

[40] 8-ER-1799.

[41] 8-ER-1841.

[42] 8-ER-1844.

[43] 1-ER-0035.

[44] 7-ER-1619.

[45] 8-ER-1866.

[46] 8-ER-1868.

11

plan hearing and have its 2022 MTD heard first and the case dismissed before any plan hearing could take place.[47]

The Bankruptcy Court continued the hearings on both the plan and 2022 MTD to be held concurrently, providing MET with over six months of factual and expert discovery.[48]  On June 7, 2022, the Bankruptcy Court set the plan hearing for August 9, 2022, and acknowledged that MET had been given too much deference in delaying plan confirmation by refusing to commit to any deadlines.[49]

## C.    **Plan**

On June 21, 2022, Debtor file the Plan (which modified the January 2022 plan to incorporate updated financial plan projections, liquidation analysis, and new settlements from the preceding five months), supported by a motion and multiple declarations.[50]

The Plan reorganizes Debtor's financial affairs and pays creditors a prorated share of their recovery with four classes of claims and two classes of equity interest holders: Class 1 is an empty class; Class 2 is comprised of convertible promissory notes of three insiders (Class 2A) and one non-insider,

---

[47] 8-ER-1869.

[48] 7-ER-1484, 1485; 7-ER-1474; 1-ER-0040.

[49] 6-ER-1423, 1429, 1432, 1443.

[50] 8-ER-1894 - 8-ER-1895.

Murali Sundar, (Class 2B); Class 3 is comprised of all allowed non-insider prepetition general unsecured claims (including MET's claim); Class 4 is comprised of allowed insider claims, other than convertible notes in Class 2; and Classes 5 and 6 are comprised of equity interests.[51]

The Plan is funded by cash from Debtor's ongoing operations, though Debtor will explore financing opportunities to prepay Class 3.[52]

The Plan provides Class 3 with three years of projected disposable income, paid over 3 years, or within 90 days of the Plan effective date at a present value discount.[53]  Classes 2 and 4 will not be paid anything for five years.[54]  The contrasting treatment was designed to show that Class 3 would receive all of Debtor's projected disposable income for a three-year Commitment Period, while Classes 2 and 4 would receive none.[55]

The Plan projections showed Hologenix could not pay the $3.7 million of insider claims (Classes 2 and 4) at any point during or at the end of the three-year Plan.[56]  To avoid any confusion about the inability to pay insider Classes 2 and 4

---

[51] 1-ER-0047; 6-ER-1374- 6-ER-1382.

[52] 6-ER-1383.

[53] 1-ER-0048; 6-ER-1379- 6-ER-1380.

[54] 1-ER-0048; 6-ER-1376, 6-ER-1381.

[55] 1-ER-0048.

[56] 6-ER-1396.

within the three-to-five-year window of §1191(c)(2), the Plan set a maturity date on 9/30/2027, well beyond the three-year period of the Plan.[57]

The Plan made ***no payments*** to insider Classes 2 and 4, insiders retained ***no liens***, and insider Classes 2 and 4 were subordinated to non-insider Class 3 so non-insiders could receive 100% of the Plan's projected disposable income for the 3-year Commitment Period.[58]

At the two-day Plan trial MET cross-examined Debtor's CEO, Mr. Casden (the only factual witness), for hours, and the Bankruptcy Court: "… found Mr. Casden to be a very credible witness, answered directly.  I've been a Judge for many years… But at least as far as him being – answered the questions and credibility, my feeling was that he was a very credible witness."[59]

## D.    District Court Decision

The District Court reversed and remanded the Order, not deciding any of the seven issues MET raised, but *sua sponte* raising its own new eighth issue interpreting §1191(c),[60] which states, in pertinent part (emphasis added):

---

[57] 1-ER-0048.

[58] 1-ER-048.

[59] 3-ER-0486; 1-ER-0050. 1-ER-0085.

[60] 1-ER-0006 – 1-ER-0007..

14

(c) For purposes of this section, the condition that a plan be *fair and equitable* with respect to each class of claims or interests *includes* the following requirements:

***

(2) As of the effective date of the plan –

(A) The plan provides that *all* of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan;

The District Court reasoned that in §1191(c), the word "includes" is not limiting, the word "all" means 100%, and taken together, a court may require a debtor's income beyond the Commitment Period in deciding "fair and equitable" so long as it is less than 100%: "that is, a plan could require 100% of debtor's disposable income in years one through five, 75% in years six through eight, and so on."[61]

## VII.

## SUMMARY OF ARGUMENT

This Court should hold upon *de novo* review that the District Court erred in its decision that the "fair and equitable" requirement of §1191(c)(2)(A) may include projected disposable income in years after the Commitment Period set by Congress.

---

[61] 1-ER-0006 – 1-ER-0007.

The combination of "includes" and "all" in §1191(c) does not create a pregnant negative that Congress intended *sub silentio* to permit a quantum less than 100% of disposable income beyond Congress' specifically defined 3-to-5-year period.  The phrase "fair and equitable" are "words of art" in bankruptcy that "include" specific aspects of reorganization developed over more than 100 years of bankruptcy case law and statutory codification by Congress, and the non-limiting word "includes," does not give courts free-floating authority to deviate from Congress' distributive scheme on account of each judge's personal view.  The canons of statutory construction also support Debtor's position that §1191(c)(2) is not to exceed 5 years because of context, the overall statutory scheme of Subchapter V, and the cannon that the specific governs over the general.  Because the interpretation of §1191(c)(2) is key to determining whether the Plan is "fair and equitable" and whether it "does not discriminate unfairly" under §1191(b), that issue is addressed first, followed by the seven issues that MET raised in its appeal to the District Court.

Upon establishing that the Commitment Period of §1191(c)(2) cannot exceed 5 years, this Court should hold that the Bankruptcy Court did not clearly err in confirming the Plan on the first through sixth plan issues raised by MET, as the factual record is well developed in the Bankruptcy Court's FFCL.

And, finally, upon *de novo* review, this Court should hold that the Bankruptcy
Court did not err on the seventh issue raised by MET on due process where MET's
expert witness gave written declaration testimony rather than live testimony.

## VIII.

## ARGUMENT

**A.** **"Fair and Equitable" Under §1191(c)(2) Does Not Permit Courts to Exceed Congress' 3-to-5-Year Commitment Period**

This Court should reverse the District Court and decide that §1191(c)(2)(A)
does not permit courts to require projected disposable income beyond Congress'
three-to-five-year Commitment Period for treatment of general unsecured claims.

Subchapter V plans are confirmed pursuant to §1191.[62] Section 1191(a)
incorporates most of the Chapter 11 plan confirmation requirements of §1129(a).[63]
If non-insider creditors reject a plan, a court may nonetheless still confirm such a
plan under §1191(b) if the plan is "fair and equitable" and does not discriminate
unfairly against that rejecting class.[64]

---

[62] §1191.

[63] §1191(a).

[64] §1191(b); *In re Orange County Bail Bonds, Inc.*, 638 B.R. at 145; *Bank of America Nat. Trust and Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 441-42 & n.12, 14 (1999) (explaining plan confirmation in Chapter 11 when creditors reject a plan); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 641-42 (2012) (same); *In re Bonner Mall P'ship*, 2 F.3d at 906 (same).

Notwithstanding the non-limiting word "includes" in §1191(c), the Commitment Period of §1191(c)(2)(A) cannot exceed 5 years based on the historical origin of "fair and equitable" traced from pre-code equity receiverships, Chapters X and XI of the 1938 Bankruptcy Act, Chapters 11 and 13 of the 1978 Bankruptcy Code, and enactment of Subchapter V. Furthermore, the cannons of statutory construction that the specific govern the general, context, and overall statutory scheme lead to the conclusion that the Commitment Period of §1191(c)(2)(A) cannot exceed 5 years.

1.    **Historically, "Fair and Equitable" Are "Words of Art" That Do Not "Include" Commitment Periods Longer than 3-to-5 Years**

The "fair and equitable" concept of Subchapter V comes from traditional Chapter 11, that a plan may be confirmed by "cramdown" on classes that reject the plan so long as the court finds it is "fair and equitable,"[65] for which "the condition that a plan be fair and equitable… *includes* the following requirements …"[66]

The word "includes" is not limiting,[67] and "all" means "100%," but this Court should reverse the District Court's ruling on §1191(c)(2)(A) as overly broad and

---

[65] §1129(b)(1), §1191(b) ("cramdown" provisions permitting confirmation only "if the plan does not discriminate unfairly, and is fair and equitable"); *In re Bonner Mall Partnership*, 2 F.3d at 906 ("commonly known … as a 'cramdown' because the plan is crammed down the throats of objecting classes of creditors.").

[66] §1129(b)(2), §1191(c) (emphasis added).

[67] §102(3); *In re Bonner Mall Partnership*, 2 F.3 at 912.

inconsistent with a large body of case law because "fair and equitable" are "words of art" interpreted to "include" specific pre-codification requirements developed over decades of bankruptcy jurisprudence,[68] not provide courts "free-floating discretion" to add new concepts *ad hoc*.[69] "When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statue indicates, a general matter, the intent to incorporate its administrative and judicial interpretations as well."[70] "Statutory analysis of the Bankruptcy Code is a 'holistic endeavor,'" which may often "require[] reference to various statutory and historic sources."[71]

### a. **"Fair and Equitable" Prior to 1978 Bankruptcy Code**

"Fair and equitable" are "words of art" in the Bankruptcy Code,[72] having their origin in equity receivership reorganization and first codified (without definition) in

---

[68] *Id.* (recognizing that "fair and equitable" of §1129(b)(2) "includes" the new value exception because "[t]he Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so."); *id.* at 913 n.33 (one aspect of uncodified "fair and equitable" is the long-established rule that no senior class be paid more than in full).

[69] *See*, *In re PG&E Corp.*, 46 F.4th 1047, 1064 (9th Cir.2022).

[70] *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018).

[71] *In re PG&E Corp.*, 46 F.4th at 1053 (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 365, 371 (1988)).

[72] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 452 (1940) (citing *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482 (1939) and *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939)).

1934 as §77B(f)(1) of the Bankruptcy Act, then repealed and replaced by Chapter X of the Bankruptcy Act of 1938.[73]  "The Chandler Act [1938] revised the Bankruptcy Act of 1898… and, in chapters X, XI… [and] XIII…., provided for corporate reorganizations, arrangements, … [and] wage earners' plans," each chapter using the words of art "fair and equitable" but each with its own meaning on account of each's important differences.[74]

"Chapter X, devised as a substitute for the equity receivership, [was] specially adapted to the reorganization of large corporations whose securities [were] held by the public… while Chapter XI which is particularly adapted to the speedy composition of debts of small individual and corporate businesses, omits the machinery for reorganization set up by Chapter X…"[75]

What is "fair and equitable" for a public corporation in a plan of reorganization in Chapter X is the absolute priority rule set forth in *Case v. Los Angeles Lumber*.[76]  The "traditional" absolute priority rule was a prominent requirement of "fair and equitable" for equity receiverships,[77] requiring senior

---

[73] *In re Bonner Mall Partnership*, 2 F.3 at 913 n.32.

[74] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. at 461 (1940) (J. Roberts, dissenting); *id.* at 467.

[75] *Id.* at 447.

[76] *Id.* at 452-53; *see*, *Case*, 308 U.S. at 116-17 (the "fixed principle" of *Boyd*, of the "rule of full or absolute priority").

[77] *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 520-21 (1941).

classes to be paid in full before junior classes received anything, regardless of whether the junior class dissented. [78]

But that absolute priority rule was neither applicable to nor practical for Chapter XI, which was an "arrangement only with respect to unsecured creditors without alteration of the relations of any other class of security holders."[79] "Congress deleted the 'fair and equitable' requirement from Chapter XI in 1952."[80] As of 1952, "Chapter X had an absolute priority rule; Chapter XI did not."[81]  For "small individual or corporate businesses," "where subordinate creditors or the stockholders are the managers of its business, the preservation of going-concern

---

("The full and absolute priority rule of *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482 (1913) and *Case…*, would preclude participation by the equity interests in any of those assets until the bondholders had been made whole.")

[78] *See*, Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 143 n.80, 81 (1979) (herein, "Cramdown I").

[79] *U.S. Realty & Imp. Co.*, 310 U.S. at 452-53.

[80] 7 COLLIER ON BANKRUPTCY ¶1129.LH[6][b] at 1129-201, 1129-202 (Richard Levin & Henry J. Sommer eds. 16th ed.) (herein, "COLLIER"); *see*, 7 COLLIER ¶1129.03[4][a] at 1129-92 ("Chapter XI was not subject to the fair and equitable requirement"); *id.* at ¶1129.03[4][c][i][A] at 1129-111 n.181 ("Congress deleted the fair and equitable requirement from Chapter XI in 1952. …  As the accompanying House Report stated, 'the fair and equitable rule, as interpreted in [*Boyd* and *Case*] cannot be realistically applied in a Chapter XI… Were it so applied… no corporate debtor where the stock ownership is substantially identical with management could effectuate an arrangement except by payment of the claims of all creditors in full.'") (internal citations omitted).

[81] *In re Bonner Mall Partnership*, 2 F.3d at 915 n.34.

21

value through their continued management of the business may compensate for reduction of the claims of the prior creditors without alternation of the management's interests, which would otherwise be required by the *Boyd* case [228 U.S. 482 (1913) (i.e., absolute priority rule)]."[82]

> This was part and parcel of the theory of composition: if you had to pay the full going concern value of the enterprise to your creditors, even though they might agree to accept less, composition was never possible. This might have been acceptable public policy to an enterprise like a publicly-held corporation, where the equity ownership might come and go. It was less palatable in the case of the typical Chapter 11 debtor – a sole proprietorship or a closely-held 'family' corporation.[83]

Chapter XIII also involved "composition" plans.[84]

---

[82] *U.S. Realty & Imp. Co.*, 310 U.S. at 454 (citing *Case*, 308 U.S. at 121-22); Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989) ("This absolute priority rule had never been a principle of composition law").

[83] Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. at 977.

[84] 8 COLLIER, ¶1300.36[3] at 1300-81.

### b. "Fair and Equitable" Under The Bankruptcy Code -

### 1978 to 2019

In 1978, Congress codified "fair and equitable" to "include" specific treatment of secured claims, unsecured claims, and equity interests in §1129(b).[85]  The 1978 Bankruptcy Code's treatment of secured creditors under §1129(b)(2)(A) was "completely novel."[86]  The absolute priority rule was codified under §1129(b)(2)(B) and (C) with respect to general unsecured creditors and equity holders in 1978.[87] As contrasted with the "traditional" absolute priority rule, in 1978 Congress enacted a "relaxed" version of the absolute priority rule in § 1129(b)(2) where senior classes could give up something to junior classes so long as intervening junior classes did not dissent. [88]  Because §1129(b)(2) uses the word "includes," it continues to embrace uncodified aspects of "fair and equitable," but these are meant to be limited to the concepts in these "words of art" developed over more than 100 years of pre-Bankruptcy Code case law, such as:[89]

(A) No senior class may be compensated more than in full;[90]

---

[85] *Zachary v. California Bank & Trust*, 811 F.3d 1191, 1194 (9th Cir.2016).

[86] Klee, "*Cramdown I*", 53 Am. Bankr. L.J. 133, 143 (1979).

[87] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citations omitted).

[88] *See*, Klee, "*Cramdown I*", 53 Am. Bankr. L.J. at 143 n.80, n.81.

[89] *See*, Klee, *Cramdown II*, 64 Am. Bankr. L.J. 229, 231-41 (1990).

[90] *In re Bonner Mall Partnerships*, 2 F.3d at 913 n.33 ("well-established

(B) A senior dissenting class must be compensated for its loss of priority relative to a junior class (sometimes referred to as "step-up");[91]

(C) Potentially, a senior dissenting class is entitled to be compensated for rights to postpetition interest;[92]

(D) Potentially, forcing a senior dissenting class to take inferior securities if a junior class receives superior securities or cash;

(E) No issuing 'worthless securities';

(F) No gratis issuance of reorganization securities to preserve continuity of management;

(G) The new value exception.[93]

---

[uncodified] component of 'fair and equitable'" in §1129(b)(2)).

[91] *Du Bois*, 312 U.S. at 528-29.

[92] *Id.* at 527; (the "solvent debtor exception" requires payment of post-petition interest to creditors as one of the traditional uncodified aspects of the absolute priority rule); *In re PG&E Corp.*, 46 F.4th at 1054.

[93] *In re Bonner Mall Partnerships*, 2 F.3d at 901.

24

### c.  "Good Faith" Under Chapter 13 of the 1978
### Bankruptcy Code

Despite "fair and equitable" being part of Chapter XIII, Chapter 13 never uses the phrase "fair and equitable."[94] Nonetheless, Congress enacted Chapter 13 in 1978 with an equally malleable phrase "good faith" as a plan confirmation requirement.[95]

Importantly, Congress also set a plan duration of not "longer than three years, unless the court, for cause, approves a longer period… not… longer than five years."[96]   The limited 3-to-5-year Commitment Period was a direct evolution from Chapter XIII and Congress' concern that creditor pressure resulted in plans of seven to ten years as a type of "involuntary servitude."[97]

By early 1980, many lower court decisions were denying chapter 13 plans as failing the "good faith" requirement because – regardless of the length of the plan – they did not provide "substantial repayment" to unsecured creditors.[98]   In 1982, this

---

[94] *See generally*, §§1301-1330; *see also*, §§1201-1230 ("fair and equitable" not used in Chapter 12).

[95] Volume B COLLIER App. Pt. 4(a), 4-141 (§1325(a)(3) as enacted in 1978).

[96] *Id.* at 4-140 (§1322(c) as enacted in 1978).

[97] *In re Greer*, 60 B.R. 547, 555 (Bankr.C.D.Cal.1986) ("Under Chapter XIII of the Bankruptcy Act, plans frequently extended as long as seven to ten years. Congress was concerned that this amounted to involuntary servitude… In consequence, in the Bankruptcy Code Congress limited the duration of a plan to three years, except upon a finding of 'cause.'") (internal citation omitted).

[98] *Id.* at 550-52 (recounting history).

Court overruled these lower courts and "decline[d] to impose a substantial-repayment requirement… under the guise of interpreting 'good faith.'"[99]  Congress set a minimum repayment standard in §1325(a)(4), that creditors must receive at least what they would have received in a hypothetical chapter 7 liquidation.[100]  "The presence of an explicit statutory standard… strongly suggests that Congress did not intend to substitute a more rigorous standard when it impose a general good-faith requirement."[101]  Prompted by the rash of decisions imposing a "substantial-repayment" requirement, Congress enacted a new subsection 1325(b) specifying a mandatory minimum of three years of "all of the debtor's projected disposable income" for Chapter 13 plans if a trustee or unsecured creditor objected.[102]

### d. **"Fair and Equitable" Under Subchapter V**

In August 2019, Congress enacted the Small Business Reorganization Act, commonly referred to as "Subchapter V."[103] Subchapter V codifies "fair and equitable" in §1191(b) to "include" specific detailed provisions in §1191(c),[104] with

---

[99] *In re Goeb*, 675 F.2d 1386, 1389 (9th Cir.1982).

[100] *Id.* at 1388.

[101]  *Id.*

[102] *In re Greer*, 60 B.R. at 552 and n.7; *In re Metz*, 620 F.2d 1495, 1499 (9th Cir.1987); *In re Welsh*, 711 F.3d 1120, 1128-29 (9th Cir.2013).

[103] *In re Orange County Bail Bonds*, 638 B.R. 137, 143 n.5 (9th Cir.B.A.P.2022).

[104] *In re Curiel*, 651 B.R. 548, 561 (9th Cir.B.A.P.2023).

language almost identical to Chapter 11's §1129(b).[105] Subchapter V adopts specific cramdown treatment for secured claims directly from Chapter 11,[106] but Subchapter V has no specific cramdown treatment for unsecured creditors or equity interest holders and specifically rejects the traditional Chapter 11 cramdown treatment for those stakeholders. [107]

Instead, without mentioning unsecured creditors or equity, §1191(c)(2)(A) provides that "all projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years, as the court may fix" must be applied to make plan payments.[108]   The 3-to-5-year period of §1191(c)(2) clearly has its origins in Chapters 12 and 13.[109] Yet, neither Chapter 12 nor Chapter 13 have a "fair and equitable" plan requirement, and, thus, this Court should look to case law discussing "good faith" in Chapter 13 for guidance on what "fair and equitable" in relation to the 3-to-5-year Commitment Period in Subchapter V means.

---

[105] §1129(b)(2) & §1191(c) ("fair and equitable… includes the following…").

[106] §1191(c)(1) (incorporating §1129(b)(2)(A)).

[107] §1191(c); §1181(a) (making §1129(b) inapplicable in Subchapter V).

[108] §1191(c)(2)(A).

[109] *See*, Paul W. Bonapfel, <u>A Guide to the Small Business Reorganization Act of 2019</u>, 93 Am. Bankr. L.J. 571, 612-13 (Winter 2019) (comparing Chapters). 8 COLLIER ¶1200.01[2] at 1200-4 ("In modeling chapter 12 on chapter 13, which does not have the absolute priority rule, Congress allowed farmers to confirm reorganization plans without providing for payment in full to unsecured creditors."); *compare*, §1222(c) & §1322(d)(1)&(2).

In *Goeb*, this Court noted that "good faith" is not defined, then analyzed its history in bankruptcy law through the phraseology of "fair" and "equitable."[110] "One case that we … find instructive is *American United Mutual Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940), under former Chapter IX, that 'the offer of the plan and its acceptance are in good faith,' … the [Supreme] Court… focused on '***equity*** and good conscience."[111] "A bankruptcy court is a court of equity… and is guided by equitable doctrines…"[112] "A bankruptcy court must inquire whether the debtor… ***unfairly*** manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an ***inequitable*** manner."[113] The inquiry of whether something is "unfair" and "inequitable," is quite clearly the same inquiry as whether something is "fair and equitable."[114] Thus, case law addressing the chapter 13 "good faith" requirement for 3-to-5-year plans are informative to addressing the Subchapter V "fair and equitable" requirement for 3-to-5-year plans.

---

[110] *In re Goeb*, 675 F.2d at 1390-91.

[111] *Id.* at 1390. (emphasis added). The decision, *City of Avon Park*, 311 U.S. 138, 140-41 (1940), involved a Chapter IX composition plan.

[112] *Id.*

[113] *Id.*; *see also*, *In re Welsh*, 711 F.3d at 1128 (citing *Goeb* for same "acted equitably" and not "unfairly manipulated").

[114] *See*, *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 118 (1939) (relating "fair and equitable" to similar phrases of "equitable and fair" and "fairly and equitably treated" and "adequate and equitable" and "just, fair, and equitable and like phrases").

More recently, this Court cited *Goeb* (with its similar language of "unfairly" and "inequitable") and held that courts cannot use the rubric of "good faith" to alter what Congress has already determined for plans.[115] Even "zero-payment" plans can be proposed in good faith so long as they pass the best-interest-of-creditors test in §1325(a)(4) and devote all projected disposable income to the plan as required by §1325(b)(1)(B).[116]

"The Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so."[117] While 'the Bankruptcy Code can of course override by implication,' any such implication must be unambiguous.'"[118] "[T]he normal rule of statutory construction [is] that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."[119] "This rule is followed with particularity in

---

[115] *In re Sisk*, 962 F.3d 1133, 1150 (9th Cir.2020) ("The good faith inquiry is not a vehicle to promulgate bankruptcy requirements not already in the Code. Courts cannot add to what Congress has enacted under the guise of interpreting good faith."); *Ahlers*, 485 U.S. at 206 ("whatever equitable powers remain in bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

[116] *In re Metz*, 820 F.2d at 1499.

[117] *In re Bonner Mall Partnership*, 2 F.3 at 912; *In re PG&E Corp.*, 46 F.4th at 1057-58 (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998)); *see, Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (same, regarding chapter 13 projected disposable income).

[118] *In re PG&E Corp.*, 46 F.4th at 1058 (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 546 (1994)).

[119] *In re Bonner Mall Partnership*, 2 F.3 at 912 (cleaned up, internal citation

29

construing the Bankruptcy Code."[120]  "Once it has been shown that Congress was a

aware of a pre-Code practice, the remaining inquiry… is whether it has made clear

its intent to change that practice."[121]  As can be shown from the historical origins of

the 3-to-5-year Commitment Period in Chapters 13, Congress was aware of an

established practice of this limited period.

"Where, as here, Congress adopts a new law, it normally can be presumed to

have had knowledge of the interpretation given to the old law."[122]    Congress

presumably knew that there is no body of case law interpreting the 3-to-5-year

Commitment Period of Chapter 13 as being limited to 100% of income for that

Commitment period plus an additional quantum less than 100% for periods after

year 5, and, therefore, there is no basis to interpret §1191(c)(2)(A) in such a way.

"[T]his Court has been reluctant to interpret the Bankruptcy Code, however vague

the particular language under consideration might be, to effect a major change in

pre-Code practice that is not the subject of at least some discussion in the legislative

history."[123]  Hologenix has found no legislative history in favor of reading

---

omitted).

[120] *Id.*

[121] *Id.*

[122] *Ahlers*, 485 U.S. at 211 (cleaned up, internal quotes and cites omitted).

[123] *Zachary v. California Bank & Trust*, 811 F.3d 1191, 1198 n.5 (9th Cir.2016) (quoting *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992)).

§1191(c)(2)(A) beyond the 3-to5-year Commitment Period,[124] and, moreover, legislative history on the Commitment Period in Chapter 13 suggests that Congress prohibited any such expansion beyond five years as "involuntary servitude."[125] "Where the text of the Code does not unambiguously abrogate pre-Code practice, courts should presume that Congress intended it to continue unless the legislative history dictates a contrary result."[126] Thus, in modeling Subchapter V on Chapter 13 with the 3-to-5-year limitation on plans, there is no basis to extend a Commitment Period beyond 5 years on the thin reed of an ambiguous *sub silentio* combination of "includes" and "all" in §1191(c)(2)(A) to permit at judicial roaming inquiry of any quantum of the Debtor's projected disposable income less than 100% for any number of years *ad infinitum*. The Court should "expect more than simply statutory silence if, and when Congress were to intend a major departure" from a longstanding norm.[127]

Furthermore, interpreting "all" in §1191(c)(2)(A) as meaning "100%" in conjunction with the non-limiting "includes" of the "fair and equitable" requirement

---

[124] F Collier App.Pt. 41cc at App.Pt. 41-370 to App.Pt. 41ff at App.Pt. 41-411.

[125] *In re Greer*, 60 B.R. at 555.

[126] *In re Bonner Mall Partnerships*, 2 F.3d at 913 (citing *Dewsnup*, 502 U.S. at 419).

[127] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) ("Congress… does not … hide elephants in mousehole.").

31

of §1191(b) to provide courts with *carte blanche* to rove beyond Congress' very specific 3-to-5-year Commitment Period, simply invites the very problem that this Circuit warned of when interpreting the Bankruptcy Code's equitable principles in for the fair and equitable requirement: "We join our sibling circuits… in emphasizing that the solvent-debtor exception, though equitable in nature does not give bankruptcy judges free-floating discretion to redistribute rights in accordance with their personal views of justice and fairness."[128] There is no reason, here, to interpret §1191(c) in a manner to disregard Congress' clear 3-to-5-year structure in favor of a judicial free-floating exercise of redistributive rights based on each different judge's personal views of justice and fairness.

From a practical perspective, the District Court's interpretation of §1191(c)(2)(A) is not workable. "Congress enacted subchapter V as an expedited process for small business debtors to reorganize quicky, inexpensively, and efficiently."[129] An interpretation of §1191(c)(2)(A) devoid a Congress' 3-to-5-year temporal limit increases unpredictability and expense for cramdown confirmation leaving the debtor and creditors of each case wondering where each particular

---

[128] *In re PG&E Corp.*, 46 F.4th at 1064 (internal quotes omitted).

[129] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.A.P.2022) (internal citations and quotations omitted).

32

bankruptcy judge will fall on the spectrum between 3-to-5 years, at the one end, and full repayment of debt, at the other.

Subchapter V does not have an absolute priority rule.[130] This is reinforced by Congress' formulation of a debtor's exclusive right to propose and modify a plan in Subchapter V.[131] An equity holder's exclusive right to propose a plan is a type of property right that violates the absolute priority rule in a cramdown plan in Chapter 11.[132] However, Subchapter V provides the right to propose a plan exclusively to the debtor and no other.[133] This harkens back to the origins of Chapter XI and composition law: "This was part and parcel of the theory of composition: if you had to pay the full going concern value of the enterprise to your creditors, even though they might agree to accept less, composition was never possible."[134] Chapter XI was "an extension, adjustment, or accommodation of unsecured claims without

---

[130] §1181(a) (excluding §1129(b) from Subchapter V).

[131] §1189(a) and §1193.

[132] *Bank of America Nat. Trust and Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 456 (1999); *see*, 7 COLLIER ¶1129.03[4][a] at 1129-91 & 1129-92 (as contrasted with Chapter X, because Chapter XI had no absolute priority rule, it was not a problem that the Chapter XI debtor remained a debtor-in-possession in control of the estate with exclusive right to propose the reorganization plan).

[133] §1189(a).

[134] Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989).

33

disturbing either secured claims or stock interests."[135]  "Composition contemplates that the business proceeds with the eventual end of rehabilitation."[136]

Synthesizing the foregoing bankruptcy jurisprudence into Subchapter V, Congress rejected the absolute priority rule in favor of a modern composition law where equity interests keep their interests in the debtor, unsecured creditors are paid some quantum of their claims, and the rehabilitation eventually ends.  Moreover, Congress set a very specific 3-to-5-year Commitment Period, aware that composition plans of seven or ten years were akin to "involuntary servitude." [137] An interpretation of §1191(c)(2)(A) that permits courts to consider the debtor's disposable income beyond the 3-to-5-year Commitment Period begins a slippery slope towards looking for a "substantial repayment" and eventually leads to the judicial reenactment of the absolute priority rule where equity holders cannot keep their interests until the senior creditors are paid in full, resulting in involuntary servitude for small business owners who can keep their businesses only after completing plans much longer than 3-to-5 years, adjudged by each court on a case-by-case basis.

---

[135] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 464 (1940) (J. Roberts, dissenting).

[136] *Lorber v. Vista Irr. Dist.*, 143 2d 282, 285 (9th Cir.1944) (Chapter IX municipality case).

[137] *In re Greer*, 60 B.R. at 555.

**2.     Statutory Construction – The Specific Governs the General and Supports a 3-to-5-Year Limit Under §1191(c)(2)(A)**

The Supreme Court applies the statutory canon of construction that the specific governs the general when interpreting "fair and equitable" cramdown requirements.[138] "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," requiring that a specific cramdown condition apply to specific facts, notwithstanding the generalized freedom that might be granted from a hyperliteral reading of the statute.[139] "[T]he canon avoids… the superfluity of a specific provision that is swallowed by the general one." [140] "[G]eneral language of a statutory provision, although broad enough to include, will not be held to apply to a matter specifically dealt with in another part of the same enactment." [141]

In interpreting "fair and equitable" for Chapter 11, the Supreme Court opined that interpreting "or" in §1129(b)(2)(A) to avoid what the statute specifically proscribes would be "hyperliteral and contrary to common sense."[142]  Likewise,

---

[138] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

[139] *Id.*

[140] *Id.*

[141] *Id.* at 646.

[142] *Id.* at 645.

35

reading "includes" and "all" in §1191(b) and §1191(c)(2)(A) to expand §1191(c)(2)(A)'s Commitment period beyond five years in derogation of the explicit proscription "not to exceed 5 years" would be hyperliteral and contrary to common sense. The District Court's interpretation renders the Congressional limit "not to exceed 5 years" practically meaningless, as creditors and courts could add 99% of projected disposable income from year 6 onward until paid in full (i.e., the return of the absolute priority rule).

When Congress enacted a detailed statute regarding 3-to-5-years of "all projected disposable income" in Chapter 13, this Court observed that the judicial inquiry under the malleable phrase "good faith" is narrowed accordingly."[143] Congress spoke directly on the 3-to-5-year limit of Subchapter V plans in §1191(c)(2)(A), §1191(c)(2)(B), §1192(1), and §1193(c) "not to exceed five years," and the judicial "fair and equitable" inquiry is narrowed accordingly.

3. **Statutory Construction – Context Governs Over Strict Textual Arguments and Supports a 3-to-5-Year Limit Under §1191(c)(2)(A)**

"In interpreting statutory language we are not confined to the specific provision at issue but may look to the structure of the law as a whole and to its object

---

[143] *In re Welsh*, 711 F.3d 1120, 1129-1131 (9th Cir.2013).

and policy."[144]  Strict textual arguments using malleable phrases cannot be used to give breadth to a discrete statutory term without "flout[ing] a 'fundamental canon of statutory construction': that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"[145]

"[I]n interpreting a statute, a court must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."[146] Courts cannot alter the balance that Congress has struck among creditors and debtors in the Bankruptcy Code's distribution scheme, even where the courts believe that the creditors would be sincerely better off.[147] Congress created Subchapter V with no absolute priority rule, set a minimum for creditor payment in the best interest of creditors test, and set a specific 3-to-5-year limit "not to exceed 5 years" for unsecured creditors' claims.[148]  A capacious reading of "all" and "includes" to expand beyond that five-year limit disregards Congress' distribution

---

[144] *In re Bonner Mall Partnership*, 2 F.3d at 915.

[145] *United States v. Miller*, 145 S. Ct. 839, 853 (2025) (quoting *Davids v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)); *In re Flores*, 735 F.3d 855, 859 (9th Cir.2013).

[146] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466-67 (2017) (internal cites and quotes omitted); *id.* ("the word 'cause' is too weak a reed upon which to rest so weighty a power" as to disregard Congress' distribution scheme in the Bankruptcy Code).

[147] *Id.* at 471.

[148] §VIII.A.d  (above); §1129(a)(7); §1191(c)(2).

scheme and backslides towards the absolute priority rule by judicial fiat, primarily

on the basis that "they fear a windfall to the debtor at the expense of [] unsecured

creditors," which this Court admonished against in Chapter 13 decades ago.[149]

The ordinary meaning of all is "all" may be 100%, but the ordinary meaning

of a word is not to be extrapolated into similar but different contexts.[150] When

Congress refers to percentages in the Bankruptcy Code, including "100%" and less

than 100%, it does so specifically.[151]  If Congress had meant §1191(c)(2)(A) to be

expressed in percentages with "all" meaning "100 percent," for 3-to-5 years, plus

other quanta less than 100% after year 5, Congress would have done so expressly.

### 4.      **Statutory Construction – Overall Statutory Scheme**

"[T]he words of a statute must be read in their context and with a view to their

place in the overall statutory scheme."[152]   Often a word or phrase may have multiple

---

[149]   *In re Goeb*, 675 F.2d 1386, 1388 (9th Cir.1982); §VIII.A.1.d (above).

[150] *Hamilton v. Lanning*, 560 U.S. 505, 515 (2010) (contrasting "multiplied" and "projected" for determining disposable income).

[151]   *See*, §727(a)(9)(A) ("100 percent"); §727(a)(9)(B)(i) ("70 percent"); §1182(1)(A) ("50 percent"); §101(2(A) ("20 percent"); §101(18) ("50 percent"); §101(19A)(i) ("80 percent"); §326(a) ("25 percent… 10 percent… 5 percent… 3 percent…"); §702(b) ("20 percent"); §707(b)(2)(A)(i)(I) ("25 percent"); §1325(b)(2)(A)(ii) ("15 percent"); §1326(b)(3)(B)(ii) ("5 percent"); *see also*, *In re Greer*, 60 B.R. 547, 553 (Bankr.C.D.Cal.1986) ("Congress could have required that a  chapter 13 plan provide that unsecured creditors to be paid in full [i.e., 100%] [or] … 70%, or 30%, or some other minimum amount of their claim.  However, Congressed decided against this approach.").

[152] *In re Flores*, 735 F.3d at 859.

reasonable meanings in isolated context, but "[s]tatutory construction is a holistic endeavor," and "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because the same terminology is used elsewhere in a context that makes its meaning clear… or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."[153]

Subchapter V refers to a Commitment Period of 3-to-5 years "not to exceed 5 years" in four subsections, but the word "all" is used only in §1191(c)(2)(A). [154]  If "all" is read to mean "100%" and then combined with the non-limiting word "includes" to mean that the Commitment Period of 1191(c)(2)(A) can be expanded beyond 5 years at any quantum of income less than 100%, then the overall statutory scheme will not work as a whole because the other three subsections are each limited "not  to exceed 5 years" without using the word "all."  Congress did not write subchapter V with a very specific 3-to-5-year Commitment Period throughout subchapter V in 11 U.S.C. §§ 1191(c)(2)(A), 1191(c)(2)(B), 1192, and 1193(c), only to have that very specific 3-to-5-year limitation undone by the generalized use of the

---

[153] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's Ltd*, 484 U.S. 365, 371 (1988) (internal citation omitted).

[154] §1191(c)(2)(A), §1191(c)(2)(B), §1192(1), and §1193(c).

39

word "includes" in §1191(c).  The Supreme Court has admonished against statutory interpretations that yield such incoherent results.[155]

### a.  §§1191(c)(2)(A)&(B)

Congress wrote §1191(c)(2)(A) and (B) as parallel provisions, permitting debtors to pay (A) 3-to-5 years of projected disposable income over 3 to 5 years, or (B) the present value of that same period.[156]  Although §1191(c)(2)(A) refers to "***all of the*** projected disposable income… in the 3-year period… not to exceed 5 years," §1191(c)(2)(B) omits "all of," and instead refers only to "the value of property to be distributed under the plan in the 3-year period… not to exceed 5 years… is not less than ***the*** projected disposable income of the debtor."[157]  If §1191(c)(2)(A) is interpreted in a manner where "all" means "100%" of projected disposable income for a 3-to-5-year Commitment Period such that courts have authority to require additional income beyond that Commitment Period, then there will be an irreconcilable disconnect between the parallel provisions of §1191(c)(2)(A) and §1191(c)(2)(B).

Debtor's Plan provided payment of the present "value of the property to be distributed under the plan in the 3-year period… not less than the projected

---

[155] *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720 (2018).

[156] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.A.P.2022).

[157] §1191(c)(2) (emphasis added).

40

disposable income of the debtor" under §1191(c)(2)(B).[158]   Thus, even if the District

Court was correct on §1191(c)(2)(A), the Bankruptcy Court still applied the correct

standard under §1191(b)(2)(B) without the complication of the District Court's

"100%" interpretation of "all" found only in §1191(c)(2)(A).

### b. §1192(1)

Section 1192(1) governs the discharge of debts for plans confirmed under

§1191(b): "If the plan … is confirmed under section 1191(b)… the court shall grant

the debtor a discharge of all debts… except any debt – (1) on which the last payment

is due after the first 3 years of the plan, or such other time ***not to exceed 5 years***

fixed by the court."[159]   Interpreting §1191(c)(2)(A) to have cramdown plans exceed

5 years is statutorily irreconcilable with a natural reading of §1192.

The District Court quoted *In re Cleary Packaging, LLC*, 36 F.4th 509, 514

(4th Cir.2022), for the proposition that plans confirmed under §1191(b) have no

temporal limitation.[160]   However, that case is inapposite because the District Court

quoted only dicta paraphrasing §1192(1) – the real issue in *Cleary Packaging* was

§1192(2) and whether §523(a) applies to Subchapter V corporate debtors.[161]  *Cleary*

---

[158] 1-ER-0089-0090.

[159] §1192 (emphasis added).

[160] 1-ER-0008.

[161] *Cleary Packaging, LLC*, 36 F.4th at 512.

41

*Packaging* did not address the length of plans confirmed under §1191(b) or discharge beyond 5 years under §1192(1).[162]  Furthermore, *Cleary Packaging* acknowledged (in dicta) that unsecured cramdown plans are limited to three to five years.[163]  The full statutory quote of §1192(1) clearly shows a five-year temporal limit on plans confirmed under §1191(b).[164]

Even if §1192(1) were read to except from discharge plan payments beyond a 5-year limit, there is still a logical reading of §1192(1) consistent with maintaining a 3-to-5-year limit on "fair and equitable" under §1191(c)(2)(A).  A plan may have multiple classes of creditors – secured and unsecured, accepting and rejecting – Hologenix's Plan is one such example.[165]  Even where multiple classes accept a plan (thus, without resort to §1191(b) as to them), if only one class rejects, then the plan must be confirmed by §1191(b) as to that class, and accordingly §1192 will apply.[166]  Yet, the 3-to-5-year temporal limit of §1191(c)(2) is only for those specific classes

---

[162] *Id.* at 514-15.

[163] *Id.* at 514 ("Under the governing rules of a Subchapter V proceeding, the bankruptcy court **need only find** that such a plan provide that **all** of the debtor's projected disposable income is paid to creditors for a ***3-to-5-year period*** and that it be feasible.") (emphasis added).

[164] §1192(2) ("If the plan… is confirmed under section 1191(b)… the court shall grant the debtor a discharge of all debts… except any debt … due after the first 3 years of the plan, or such other time ***not to exceed 5 years*** fixed by the court") (emphasis added)

[165] 1-ER-0041; 6-ER-1374- 6-ER-1382.

[166] §1191(a)&(b); §1192.

42

confirmed pursuant to §1191(c)(2), no temporal limit applies to accepting classes,[167]

and there is no temporal limit for secured creditor cramdown.[168]

### c. §1193(c)

Section 1193(c) places a temporal limit on post-confirmation modification of

plans confirmed under §1191(b): "If a plan has been confirmed under section

1191(b)… the debtor may modify the plan at any time within 3 years, or such longer

time *not to exceed 5 years*, as fixed by the court."[169]  Similarly, §1329(c) for post-

confirmation plan modification in Chapter 13 also has a temporal limit of not more

than five years, and this Court reasoned that the statutory temporal limitation for

modification logically implied that the same temporal limitation applied to the length

of the chapter 13 plans generally.[170]  In Subchapter V, both §1191(c)(2) and §1193(c)

have nearly identical language respecting temporal limitation.[171]   The statutory

scheme makes no sense if a court is permitted to exceed a 5-year Commitment Period

---

[167] *See*, §1191(a) (no temporal limit); *see*, *In re Sisk*, 962 F.3d 1133, 1146 (9th Cir.2020) (no minimum duration for consensual plans in Chapter 13 because Bankruptcy Code sets no such minimum, and §1322(b)(11) permits any provision not inconsistent with the code); *see*, §1123(b)(6) (permitting any provision in plan not inconsistent with the code).

[168] *See*, §1191(c)(1); *see*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specified cramdown treatment applies).

[169] §1193(c) (emphasis added).

[170] *In re Flores*, 735 F.3d at 859.

[171] §1191(c)(2)(A)&(B) ("not to exceed 5 years, as the court may fix"); *cf.* §1193(c) ("not to exceed 5 years, as fixed by the court.").

43

in § 1191(c)(2)(A) while §1193(c) constrains the court to not exceed 5 years for modification.   The temporal commitment period of the plan section and plan modification section must be read in parallel.[172]

### 5.    District Court's Cases Are Inapposite

The District Court cites *In re Perez*, 30 F.3d 1200, 1216 (9th Cir.1994), asserting that §1322 does not apply in Subchapter V, and, thus, there is no temporal limit in Subchapter V like in Chapter 13.[173]   Hologenix agrees that §1322(d) does not apply in Chapter 11,[174] but reliance on *Perez* is misplaced because it did not involve Subchapter V, and a statute to mirror §1322(d) is unnecessary in Subchapter V because multiple other sections limit the Commitment Period "not to exceed 5 years."[175]

Subchapter V's temporal limitation looks different from Chapter 13's §1322 almost certainly because Chater 13 developed over many amendments. Originally, Congress enacted Chapter 13 with a plan duration of not "longer than three years, unless the court, for cause, approves a longer period… not… longer than five

---

[172] *In re Flores*, 735 F.3d at 862.

[173] 1-ER-0008.

[174] §103(j).

[175] §103(i); §1191(c)(2)(A); §1191(c)(2)(B); §1192; §1192(1); §1193(c).

years,"[176] and no "projected disposable income" requirement.[177] Over decades of amendments – particularly BAFJA and BAPCPA – Chapter 13 renumbered the original §1325(b) to the present §1325(c) and added an expansive new §1325(b) for unsecured creditor "cramdown" requiring "projected disposable income" with a "commitment period" of 3-to-5 years.[178]  Subchapter V does not need a statute to mirror §1322(d) (originally §1322(c))[179] because §1191(c) from its inception set forth both the "disposable income" concept and its limit "not exceed 5 years."

The District Court relied on *Jacobs*, but that case did not involve Subchapter V, but explained the difference between Chapter 13 and Chapter 11 on paying residential mortgage arrears – that, while §1322(b) and §1123(b)(5) are identical, Chapter 11 has no 5-year limit on curing mortgage arrears like in §1322(d).[180]  The District Court's partial mid-sentence quote from *Jacobs*: "… Chapter 11 does not contain chapter 13's safeguards, including a maximum repayment period of five years…," leaves the impression that this is a blanket statement as to all aspects of Chapter 11 compared to Chapter 13, but the entire sentence from *Jacobs* clearly

---

[176] Volume B COLLIER App.Pt. 4(a), 4-140 (§1322(c) as enacted in 1978).

[177] *See*, *id.* at 4-140, 4-141 (§1325 as enacted in 1978).

[178] *In re Greer*, 60 B.R. at 552 and n.7; *In re Metz*, 620 F.2d 1495, 1499 (9th Cir.1987); *In re Welsh*, 711 F.3d 1120, 1128-29 (9th Cir.2013).

[179] 8 COLLIER ¶1322.LH[3] at 1322-67.

[180] 1-ER-0008; *In re Jacobs*, 644 B.R. 883, 894 (Bankr.D.N.M.2022); *id.* at 883.

refers and is limited to the anti-modification prohibition on residential mortgage secured claims, which has no bearing on §1191(c)(2).[181]    Moreover, in a footnote, *Jacobs* acknowledged that a three-to-five-year limit ***does*** apply in Subchapter V, except with respect to secured mortgage claims.[182]   A standalone subsection like §1322(d) capping the Commitment Period in Subchapter V is unnecessary, and, moreover would interfere with Congress' specific mandate that secured creditor cramdown be governed by §1129(b)(2)(A), which has no temporal limits.[183]

**6.      The District Court Should Not Have *Sua Sponte* Raised the Issue of a Commitment Period Longer than Three Years**

The District Court should not have reversed on an issue it raised *sua sponte*. "If a non-jurisdictional argument was not raised below, we generally will not consider it as an alternative ground for affirmance."[184]  It is unfair and inefficient for new non-jurisdictional issues to be raised for the first time on appeal, especially

---

[181] *Id.* at 905.

[182] *Id.* at 896 n.64 ("Chapter 11 contains no statutory limit on the length of a plan, ***although*** for cases governed by ***Subchapter V*** of chapter 11 the Code ***requires*** that certain payments be made under the plan over a ***three-to-five-year period***. *See* §1191(c)(2) applicable in Subchapter V cases.  However, Subchapter V does not require that mortgage arrears be cured within the three-to-five-year period.") (emphasis added).

[183] §1191(c)(1).

[184] *United States v. Miller*, 145 S.Ct. 839, 856 (2025).

where plan confirmation already entails numerous disputes raised by the parties themselves.

Despite a heavily contested plan confirmation, MET never objected that the 2022 Plan Commitment Period should be more than 3 years to meet the "fair and equitable" requirement.[185] "Most courts have taken [§1322(d)] to mean that, at least in the case of Chapter 13, debtors are under no obligation to propose a plan longer than three years and cannot be forced into a plan of longer duration on the insistence of a creditor."[186]

### 7.     The Plan Is "Fair and Equitable" Under §1191(c)

The Bankruptcy Court did not clearly err in ruling that the Plan is "fair and equitable" under §1191(c) because the Plan provides Class 3 with three years of projected disposable income, as defined by §1191(c)(2) and §1191(d)(2).[187] The Bankruptcy Court's FFCL provided detailed pinpoint cites to the record to support its finding that the Plan projections were appropriate.[188] The detailed FFCL are logical and plausible with support from inferences from the record.

---

[185] MET raised the 3-year versus 5-year issue in the 2020 plan and 2020 appeal, but not in the 2022 Plan or 2022 appeal.  *See*, §III ("Jurisdiction") (above).

[186] *In re Myrvang*, 232 F.3d 1116, 1122 n.4 (9th Cir.2000); *In re Villanueva*, 274 B.R. 836, 841-42 (9th Cir.B.A.P.2002); *In re Porter*, 102 B.R. 773, 777 (9th Cir.B.A.P.1989); *In re Gossett*, 86 B.R. 941, 944 (Bankr.S.D. Ohio 1988) (relating parallels of Chapters 12 and 13).

[187] 1-ER-0084-0081, 1-ER-0098.

[188]  1-ER-0049-0050,  1-ER-0065-0067,  1-ER-0085-0086,  1-ER-0088-0089;  3-

Regarding application of §1191(c)(2)(B), the Bankruptcy Court received and considered: (1) reports and declarations of two competing expert witnesses addressing the net present value ("NPV") discount rate to use for an early payment of the Debtor's "Disposable Income" to Class 3 under the Plan;[189] (2) the two experts' deposition transcripts;[190] (3) Debtor's expert's explanation of the 40% NPV in his expert declaration;[191] and (4) MET's live cross-examination of Debtor's expert at trial.[192] Debtor's expert's testimony on cross-examination regarding the 40% NPV discount rate was extensive, as was his written declaration testimony, and Debtor's briefing.[193]

**B.      The Plan Did Not Discriminate Unfairly Under §1191(b)**

The Bankruptcy Court did not clearly err in finding that the Plan did not discriminate unfairly under §1191(b).  Determining fair or unfair discrimination for unsecured creditors in Subchapter V requires understanding what Congress mandated unsecured creditors must receive in Subchapter V, termed "fair and equitable" under

---

ER-0534-0539; 3-ER-0431-0433; 2-ER-0239, 2-ER-0255-0256, 2-ER-0311-0328, 2-ER-0348-0356; 3-ER-0511-0512; 3-ER-0514-0516; 3-ER-0522-0523; 7-ER-1534, 7-ER-1542.

[189] 1-ER-0018-0020.

[190] 1-ER-0019, 1-ER-0022.

[191] 1-ER-0091; 3-ER-0518-0522.

[192] 1-ER-0017.

[193] 3-ER-0419-0428; 3-ER-0575; 3-ER-0518-0519.

§1191(b) and §1191(c).[194] For unsecured creditors, "fair and equitable" is grounded upon the disposable income of the 3-to-5-year Commitment Period,[195] and the issue of "unfair discrimination" becomes how to allocate that disposable income.[196]

The Bankruptcy Code permits some discrimination among similarly situated creditors – only unfair discrimination is prohibited.[197] "Unfair discrimination" concerns allocation, "requir[ing] that a plan '**allocate value** to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.'"[198] But in allocating value among creditors, no creditor is entitled to more than full payment or any surplus above that.[199] Because the Commitment Period's projected disposable income ("**Disposable Income**") is the set amount of value mandated by Congress for allocation among unsecured creditors, how to allocate that Disposable

---

[194] §VIII.A  (above).

[195] §VIII.A  (above).

[196] MET neither objected to the 3-year period in favor of a 5-year period nor raised that issue on appeal for the 2022 Plan. §III, §VIII.A.6  (above).

[197] *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr.M.D.Tenn.1989) (collecting examples of fair and unfair discrimination).

[198] *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986); *see*, Kenneth N. Klee, Bankruptcy and the Supreme Court at 385 (2008) (appropriate allocation of assets among creditors); *In re Monarch Beach Ventures*, 166 B.R. 428, 437 (C.D.Ca.1993); *In re Tribune Co.*, 972 F.3d 228, 238 (3d Cir.2020) ("unfair discrimination" concerns allocation and intercreditor subordination agreements).

[199] Kenneth N. Klee, Bankruptcy and the Supreme Court at 387 (2008) (citing *Reconstruction Fin. Corp. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 530-31 (1946)); *In re Acequia, Inc.*, 787 F.2d at 1364.

49

Income for that limited Commitment Period is the benchmark for determining whether discrimination is fair or unfair.[200]

To have a plan without any discrimination, the Plan could have combined all insider (Classes 2 and 4) and non-insider (Class 3) unsecured claims into one class sharing equally on a prorated basis, but this would have doubled the dollar amount of claims in the unitary class and had the detrimental effect that non-insiders would have received only 50.46% of the Plan's Disposable Income with the other half paid to insiders.[201] The Plan fairly discriminated by paying all 100% of the Disposable Income to the non-insider Class 3 and paying nothing to insider Classes 2 and 4.[202]

There is no "unfair discrimination" in Hologenix's Plan because the insider and non-insider creditors are not similarly situated. The prohibition that a plan "not discriminate unfairly" applies only "with respect to equal classes" and means that "creditors who are **similarly situated** regarding legal rights and priority cannot be given unequal treatment under a plan of reorganization."[203] Insiders are different from non-insiders for several reasons, including that they have the "chance to share in the

---

[200] 1-ER-0082.

[201] 3-ER-0567-0568; 3-ER-0533; 1-ER-0083.

[202] 1-ER-0043; 6-ER-1381; 3-ER-0532.

[203] *In re Monarch Beach Venture*, 166 B.R. at 436-37 (emphasis added).

50

unlimited dividends that might be earned and paid on the common stock to have a part in the 'lush years.'"[204]

"Bankruptcy law is very formalistic in that it treats the debtor, the debtor-in-possession, and old equity as legally distinct entities when in reality they may all be one and the same. The risk of self-dealing among these entities at the expense of creditors is a risk created by the Code itself."[205]  The Bankruptcy Code gives courts the authority to recharacterize claims [as equity] in bankruptcy proceedings,"[206] "[t]ypically, … when an equity holder asserts a claim based on a 'loan' made by the equity holder to the debtor company…"[207]  A plan (like this Plan) that voluntarily removes insider debts (Classes 2 and 4) from sharing in the Commitment Period Disposable Income achieves the same result as recharacterization so that non-insiders (Class 3) take 100% of that Disposable Income, and the insiders will realize the "lush years" only after the Commitment Period ends, and irrespective of whether they characterize their interests as "debt" or "equity."

The insider and non-insider distinction is important in Subchapter V because Congress treats those claims differently in setting the threshold for Subchapter V eligibility, significantly altering non-insider creditors' rights as compared with their

---

[204] Kenneth N. Klee, Bankruptcy and the Supreme Court at 386 (2008) (citing *Reconstruction Finance Corp.*, 328 U.S. at 518).

[205] *In re Bonner Mall Partnership*, 2 F.3d at 915 (internal citation omitted).

[206] *In re Fitness Holdings Intern., Inc.*, 714 F.3d 1141, 1148 (9th Cir.1993).

[207] 4 COLLIER ¶410-02[3] at 510-6.

rights in a traditional Chapter 11 case.[208]  Although insiders may hold substantial claims against a debtor, those claims are not counted when determining eligibility for subchapter V.[209]  Hologenix would have been over the $7,500,000 debt limit on the Petition Date if the insider claims had been included in the calculation.[210]  Subchapter V prevented MET from proposing a competing plan (§1121(c)), vetoing plan confirmation (§1129(a)(8) and §1129(a)(10)), and demanding payment in full under the absolute priority rule (§1129(b)(2)(B)).[211]  The Debtor's insiders will realize the "lush years" in the future,[212] while non-insider unsecured creditors are limited to the Commitment Period's Disposable Income.[213]   Insiders and non-insiders are not similarly situated in Subchapter V.

Even if they were similarly situated (which they are not), discriminatory treatment would still be fair according to *In re Ambanc La Mesa LP*, 115 F.3d 650, 656 (9th Cir.1996).[214]  With allegations of potential insider dealing, it was reasonable,

---

[208] §101(51D); §1181(a) (eliminating specific sections of creditor rights); 1-ER-0077-0078.

[209] §101(51D); 1-ER-0077.

[210] 1-ER-0077-0078; 8-ER-1730 ($7,722,206.27 of debt); §1182 (higher debt limit in 2020 due to CARES Act) (P.L.116-136 §1113).

[211] 1-ER-0078; §1181(a).

[212] 1-ER-0078.

[213] §VIII.A  (above).

[214] 1-ER-0080-0081.

rationally related, and a good faith proposal to give 100% of the Disposable Income to non-insiders.[215]  Moreover, it appeared necessary to show good faith for §1129(a)(3), and, separately to provide Class 3 with more than what might be recovered in liquidation under §1129(a)(7).[216]  It is fair discrimination to separately classify insider creditors and pay them nothing so that non-insider creditors can receive more.[217]

Historically, one may see some of Subchapter V's origins in Chapter XI, which had no means for restructuring secured claims – thus Subchapter V adopted cramdown from §1129(b)(2)(A) – and only rearranged unsecured debt while leaving equity interests unchanged.[218]  "[Congress] thus clearly drew a distinction between a reorganization [under Chapter X] which affects various classes of creditors and stockholders and an arrangement [under Chapter XI] which is merely an extension, adjustment, or accommodation of unsecured claims without disturbing either secured claims or stock interests."[219]  "It must always be borne in mind that the

---

[215] 1-ER-0080-0081.

[216] 1-ER-0080.

[217] *Matter of LeBlanc*, 622 F.2d 872, 879 (5th Cir.1980) (affirming plan that separately classified insiders and paid insiders nothing while non-insider trade creditors received 40% recovery); 1-ER-0078.

[218] 7 COLLIER ¶1129.03[4][a] at 1129-92 n.75 ("Chapter XI also did not purport to affect the claims of secured creditors or of equity interests."); *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 446 (1940) ("Chapter XI provide[d] a summary procedure by which a debtor may secure judicial confirmation of an 'arrangement' of his unsecured debts.").

[219] *Id.* at 464 (J. Roberts, dissenting).

composition law acts differently from the ordinary liquidating bankruptcy proceeding. … Composition contemplates that the business proceeds with the eventual end of rehabilitation."[220]  With this background, it is fair discrimination to allocate all Commitment Period Disposable Income exclusively to non-insider Class 3 while leaving insider Classes 2 and 4 to divide their insider debt-equity structure after the Plan is completed.

Without ruling on the issue, the District Court implied that the Plan unfairly discriminates against Class 3, which receives 12.5% recovery on claims, while insider Classes 2 and 4 receive 100% recovery. [221]  But the District Court's formulation ignores that Class 3 is paid first and paid in cash within three years, while Class 2 holds convertible notes meant to be converted to equity, and the Class 2 and 4 maturity dates are extended for 5 years.[222] Cash is superior to promissory notes because the former is certain and the latter is speculative.[223]

## C.    Debtor Complied with §1129(a)(2)

The Bankruptcy Court did not clearly err in finding that Hologenix met the requirements of §1129(a)(2) in proposing and confirming its plan. The "principal

---

[220] *Lorber v. Vista Irr. Dist.*, 143 2d 282, 285 (9th Cir.1944) (Chapter IX municipality case).

[221] 1-ER-0008.

[222]  6-ER-1376- 6-ER-1381.

[223] *Matter of Central R. Co. of New Jersey*, 579 F.2d 804, 812 n.18 (3d Cir.1978).

purpose of… §1129(a)(2) is to ensure that the proponents have complied with the requirements of… §1125 in the solicitation of acceptances to the plan,"[224] and with the requirements of §1121 and §1127.[225] The FFCL detail why the Plan met these requirements, which is logical, plausible, and supported by inferences drawn from the record.[226]   The Bankruptcy Court correctly overruled MET's draconian interpretation of §1129(a)(2) that would turn this subsection into a minefield of non-confirmability by retreading every alleged contested matter throughout the case.[227]

The Ninth Circuit BAP rejected MET's minefield approach, finding no support within the circuit for such an approach and noting that even if such an approach were adopted, the bankruptcy court would have wide discretion to find exception to its application.[228]   One Subchapter V decision rejected the minefield approach noting "those violations were brought to the Court pre-confirmation and fully cured; thus… Debtor has satisfied §1129(a)(2)."[229] The minefield approach has no place in Subchapter V where only the debtor can ever file the plan, even if removed from possession for

---

[224] *In re Texaco, Inc.*, 84 B.R. 893, 906-07 (Bankr.S.D.N.Y.1988).

[225] *In re Downtown Inv. Club III*, 89 B.R. 59, 65 (9th Cir.B.A.P.1988).

[226] 1-ER-0053-0054.

[227] 1-ER-0054-0056.

[228] *In re Dunlop Oil Co., Inc.*, 2014 WL 6883069 *1, *12 (9th Cir.B.A.P. Dec.5, 2014).

[229] *In re Moore and Moore Trucking LLC*, 2022 WL 120189 *1, *5 (Bankr.E.D.La. Jan.12, 2022); 1-ER-0055.

fraud or gross mismanagement.[230] "[I]f Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express."[231]

The Bankruptcy Court considered the cumulative record of the case at plan confirmation, all the issues raised by MET on §1129(a)(2) had been fully addressed through highly contested matters earlier in the case resulting in final orders that neither side appealed, and the Bankruptcy Court cited to the record in support of its ruling on those issues.[232]

## D.    The Plan Satisfies the "Good Faith" Requirement of §1129(a)(3)

The Bankruptcy Court did not clearly err in finding the Plan satisfied the "good faith" requirement of §1129(a)(3).[233]    In a practice admonished by this Court, MET improperly attempted to use the good faith test of §1129(a)(3) to duplicate other plan confirmation requirements (specifically, §1129(a)(2), §1129(a)(5), and §1191(b), all of

---

[230] §1185; §1189(a); 1-ER-0055.

[231] *In re Landing Associates, Ltd.*, 157 B.R. 791, 811 (Bankr.W.D.Tex.1993) (emphasis supplied).

[232] 1-ER-0023-0025; 1-ER-0035-0037; 1-ER-0056.

[233] 1-ER-0057-0063.

56

which are addressed elsewhere in this appellate brief) in a practice admonished by this Court.[234]

The Bankruptcy Court considered the evidence and overruled MET, setting out its FFCL in detail in 85 pages, particularly in response to MET's allegations of bad faith, which were refuted for several pages.[235]  The only factual witness was Mr. Casden, and, despite MET's counsel cross-examining him for hours at trial, ultimately, the Bankruptcy Court found Mr. Casden to be very credible.[236]  The Bankruptcy Court's detailed findings are not illogical, implausible, or without support from inferences that can be drawn from the record, and, therefore, should be upheld on appeal.

### E.    The Plan Satisfied §1129(a)(5)

The Bankruptcy Court did not clearly err in finding the Plan satisfied §1129(a)(5)(A)(ii) with regard to Mr. Casden continuing as Hologenix's CEO.[237] Despite a half-day of thorough cross-examination by MET's counsel in an attempt to discredit Mr. Casden, the Bankruptcy Court found Mr. Casden to be intimately familiar with Debtor's business, Debtor's books had no red flags, and Mr. Casden was very credible.[238]

---

[234]   *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir.1986); 1-ER-0057-0058.

[235] 1-ER-0057-0063.

[236] 3-ER-0486; 1-ER-0050, 1-ER-0085.

[237] 1-ER-0064-0065.

[238] 1-ER-0017-0018, 1-ER-0050, 1-ER-0055, 1-ER-0061, 1-ER-0085- 0086, 1-

MET's allegations to the contrary were largely unsupported by the record and relied extensively on the argumentative declarations of MET's counsel.[239]  Motion practice required MET to support its argumentative allegations with competent evidence, which MET failed to do, as noted by the Bankruptcy Court.[240]

## F.      The Plan Satisfies the "Best Interest of Creditors" Test of §1129(a)(7)

The Bankruptcy Court did not clearly err in finding the Plan satisfied the best interest of creditors test (§1129(a)(7)), supported by the detailed FFCL, which was not implausible, illogical, or arbitrary.[241]  This issue was thoroughly addressed by Debtor's expert on cross-examination at trial, and in all instances the Plan payment to Class 3 of a 12.5% dividend is always more than the hypothetical liquidation dividend.[242]

## G.      MET Was Not Denied Due Process at the Plan Hearing

The Bankruptcy Court did not deny MET due process at the plan confirmation hearing by taking direct testimony by declaration and limiting live testimony to cross-examination.  This Court has upheld the bankruptcy court's practice of presenting direct testimony by declaration as being consistent with due process.[243]   Thereafter,

---

ER-0094, 1-ER-0098; 3-ER-0486; 2-ER-0221, 2-ER-0280.

[239] 1-ER-0019, 1-ER-0021-0022.

[240] 1-ER-0044.

[241] 1-ER-0067-0074.

[242] 1-ER-0056-0057; 3-ER-0418-0419; 3-ER-0584.

[243] *Adair v. Sunwest Bank (In re Adair)*, 965 F.2d 777, 779 (9th Cir.1992).

"the scope and extent of cross-examination of expert witnesses rests in the sound discretion of the trial court" and is reviewed for abuse of discretion.[244]  Although this Court noted that under the circumstances of that particular case, the bankruptcy court had the benefit of observing live testimony through cross and redirect examination, nothing in *In re Adair* sets forth a requirement of live cross or redirect.[245]

The bankruptcy court does not abuse its discretion "in accepting only declarations and exhibits on a particular issue where the parties were afforded ample opportunity to submit their evidence."[246]  This is especially so where, as here, the parties have agreed to a procedure in advance and the complaining party fails to follow it.[247]  MET knew of this evidentiary procedure for months, as the direct-testimony and cross-examination procedure was discussed on the record on February 1, 2022,[248] and again on June 7, 2022,[249] and again July 21, 2023[250] – and MET never objected.

---

[244] *U.S. v. 10.48 Acres of Land*, 621 F.2d 338, 340 (9th Cir.1980).

[245] *Adair*, 965 F.2d at 780.

[246] *Id.* at 779 (quoting *Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330, 1342 (9th Cir.1990)); *Vieux*, 906 F.2d at 1342 (district court did not abuse its discretion in requiring and allowing only documentary declarations, exhibits, and counter-exhibits instead of live testimony).

[247] *Lee-Benner v. Gergely (In re Gergely)*, 110 F.3d 1448, 1452 (9th Cir.1997).

[248] 7-ER-1502 – 7-ER-1504.

[249] 6-ER-1429-1430, 1432.

[250] 3-ER-0659-0660.

MET knew that its plan objection must be a complete written statement of all reasons in opposition with declarations and evidence, direct testimony is taken by declaration, and the failure to file a written and fully supported opposition may be deemed by the Court to be waiver of objection.[251]   MET also knew that "for those creditors who object, it is up to that objecting party to 'produce evidence to establish the validity of the objection before the ultimate burden … is shifted to the plan proponent.'"[252]

MET's opposition papers were highly inadequate.[253] Despite MET's expert, Mr. Pastore, being given unfettered access to all of Debtor's bank records, general ledgers, QuickBooks, and financial statements going back to at least 2019, Mr. Pastore's declaration and his deposition testimony showed he had not undertaken the "due diligence" to formulate an actual opinion, rendering his expert testimony of no use to the Bankruptcy Court.[254]  With MET having presented inadequate expert testimony on direct with Mr. Pastore' declaration, Hologenix determined that there was no need to cross-examine him.[255]

---

[251] 6-ER-1255; 1-ER-0019, 1-ER-0044; Local Bankruptcy Rule ("LBR") 9013-1(f)(2); LBR 9013-1(i)(3); LBR 9013-1(h),

[252] *In re Art & Architecture Books of the 21st Century*, 2016 WL 118743 *7 (Bankr.C.D.Cal. Mar.18, 2016); 6-ER-1255; 1-ER-0019, 1-ER-0044.

[253] 1-ER-0044; LBR 9013-1(c)(3) & (i).

[254] 1-ER-0044; 1-ER-0089; *see*, FED.R.EVID. 702.

[255] 3-ER-0439-0440.

When a litigant puts on a deficient case in chief, the error lies with the litigant, not the court.[256]  MET put on a deficient case in chief with the direct declaration testimony of its expert such that Hologenix had no need to cross-examine.  Where a litigant takes a risky strategy to withhold evidence from his case in chief in the hope that his opponent will provide some opening so that he can use it on rebuttal, the error in that risky strategy lies with the litigant, not the court.[257]   When Hologenix rightfully chose to not cross-examine Mr. Pastore, MET may have been unable to put on its case in chief under the guise of redirect of Mr. Pastore, but the blame for the strategic error lies with MET, not the trial court.[258]

On appeal MET essentially argues that it should have been permitted *sua sponte* to deviate from the agreed-upon procedure and put on direct oral testimony at trial.  But MET never even asked the Bankruptcy Court to deviate from the procedure and put Mr. Pastore on the stand. At the hearing, Hologenix determined

---

[256] *Gergely*, 110 F.3d at 1452.

[257] *See*, *Gergely*, 110 F.3d at 1450 ("Instead of offering evidence, [plaintiff] Lee-Benner  sought to make his case primarily in rebuttal, but was thwarted by several evidentiary rulings," affirmed); *see also*, *U.S. v. Mitan*, 966 F.2d 1165, 1176 (7th Cir.1992) reh'g and reh'g *en banc* denied Aug.19, 1992, reh'g denied Sept.28, 1992 (no abuse of discretion where District Court refused to allow sur-rebuttal witness in case where defendant strategically withheld a witness that could have been presented in his case in chief in the hope of using that witness for sur-rebuttal).

[258] *See*, *Adair*, 965 F.2d at 780 ("Appellants argue that the declaration procedure deprived Marty Adair of the opportunity to establish her credibility with the court in the first instance… Appellant, however, has no basis for charging the trial court with error.").

that it did not need cross-examination and rested its case.[259]  The Bankruptcy Court permitted a half-hour recess, and when the hearing resumed, MET's counsel (Ms. Sullivan) specifically addressed the Court to ensure that Mr. Pastore's declaration was submitted into evidence, which the Court affirmed, and MET neither objected to the fact that Mr. Pastore was not called as a live witness nor sought to modify the procedures to call Mr. Pastore to the witness stand, and, on this record, the parties commenced closing arguments.[260] When a litigant makes a strategically poor decision in the presentation of its evidence at trial, the fault is with the litigant, not with the trial court, and cannot be reversed on appeal.[261]

---

[259] 3-ER-0439-0440 (the transcript incorrectly states MET's counsel Ms, Sullivan as the speaker at lines 23-25 and the next page line 2. This speaker was Hologenix's counsel, Ms. Young.)

[260] 3-ER-0440-0442.

[261] *Gergely*, 110 F.3d at 1452 (bankruptcy court did not abuse its discretion in adhering to the requirements of its pretrial order requiring written declarations in lieu of direct oral evidence).

## IX.

## <u>CONCLUSION</u>

This Court should reverse the District Court and affirm the Bankruptcy Court.

Dated:  June 6, 2025

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By:      */s/ John-Patrick M. Fritz*
John-Patrick M. Fritz
Attorneys for Appellant Hologenix, LLC

## CERTIFICATION REQUIRED BY F.R.A.P. 32(a)(7)

I certify that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,571 words, as determined by the Word Count feature of Microsoft Word, the word-processing system used to prepare the brief.

Dated:  June 6, 2025                LEVENE, NEALE, BENDER, YOO &
                                    GOLUBCHIK L.L.P.


                        By:        */s/ John-Patrick M. Fritz*
                                John-Patrick M. Fritz
                                Attorneys for Appellant Hologenix, LLC

## STATEMENT OF RELATED CASES

## (CIRCUIT RULE 28-2.6)

To the best of Appellant Hologenix, LLC's knowledge, no case currently pending before the Court arises out of Hologenix, LLC's bankruptcy case and involves the same transactions or events, except for the following appeals:

- 24-2881 (*Multiple Energy Technologies, LLC. v. Hologenix, LLC*) relating to confirmation of Hologenix's chapter 11 plan;

- 24-2883 (*Multiple Energy Technologies, LLC. v. Hologenix, LLC*) relating to the assumption of executory contract between Hologenix and its CEO, Seth Casden;

- 24-2884 (*Multiple Energy Technologies, LLC. v. Hologenix, LLC*) relating to the avoidance and recovery of a preferential transfer from Hologenix to Multiple Energy Technologies, LLC .

Dated:  June 6, 2025          LEVENE, NEALE, BENDER, YOO &
                             GOLUBCHIK L.L.P.


                  By:      */s/ John-Patrick M. Fritz*
                           John-Patrick M. Fritz
                           Attorneys for Appellant Hologenix, LLC

65

## STATUTORY ADDENDA

## (CIRCUIT RULE 28-2.7)

## 11 U.S.C. §§ 1191(b) & (c)

(b)  **Exception.** – Notwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has no accepted, the plan.

(c)  **Rule of Construction.** – For purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:

(1)   With respect to a class of secured claims, the plan meets the requirements of section 1129(b)(2)(A) of this title.

(2)  As of the effective date of the plan –

(A)  The plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

(B)  The value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

\*\*\*

66

67

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 6, 2025.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Executed on June 6, 2025, at Los Angeles, California.

/s/ John -Patrick M. Fritz
JOHN-PATRICK M. FRITZ

# EXHIBIT 3

Nicole A. Sullivan (*pro hac vice*)
sullivann@whiteandwilliams.com
Thomas E. Butler (*pro hac vice*)
butlert@whiteandwilliams.com
WHITE AND WILLIAMS LLP
7 Times Square – Suite 2900
New York, New York 10036
(212) 631-4420
*Attorneys for Appellant/Creditor Multiple Energy Technologies, LLC*

RON BENDER (State Bar No. 143364)
JOHN-PATRICK M. FRITZ (State Bar No. 245240)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Email: RB@LNBYG.COM; JPF@LNBYG.COM
*Attorneys for Appellee Hologenix, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Hologenix, LLC,<br><br>Debtor. | Bankruptcy Court Case No.:<br>2:20-bk-13849-BR<br><br>Adversary Proceedings No:<br>2:22-ap-01098-BR |
| Multiple Energy Technologies, LLC,<br><br>Appellant.<br><br>v.<br><br>Hologenix, LLC,<br><br>Appellee. | District Court Case No.:<br>2:22-CV-07510-FMO<br><br>**JOINT BRIEF REGARDING APPELLANT MULTIPLE ENERGY TECHNOLOGIES, LLC'S APPEAL FROM (1) FINDINGS OF FACT, CONCLUSIONS OF LAW AND (2) JUDGMENT** |

# TABLE OF CONTENTS

**Page(s)**

I. STATEMENT OF APPELLATE JURISDICTION.......................................1

II. SUMMARY OF THE CASE ..................................................................1

   A.  Appellant's Summary of the Case ...........................................1

      1.  The Relationship Between the Debtor and MET ............................1

      2.  The Debtor's Bankruptcy Case .......................................2

      3.  The Debtor's Old Plan ...............................................2

      4.  The Appellate Order..................................................3

      5.  The Debtor's Unauthorized Transfers to Insiders.........................5

      6.  The Debtor's January 2022 Plan......................................5

      7.  MET is Granted Permission to Seek Avoidance of Insider Liens and Transfers .....................................................6

      8.  Debtor Commences an Adversary Proceeding against MET seeking return of the $100,000 paid under the Settlement Agreement ...........................................................8

      9.  The Debtor Files a Modified Plan.....................................8

      10.  The Confirmation Hearing ...........................................9

      11.  The Bankruptcy Court's Resolution of the Debtor's Adversary Proceeding ........................................................10

   B.  Appellee's Summary of the Case.........................................12

III. STATEMENT OF THE ISSUE PRESENTED...........................................15

IV. ISSUES AND CONTENTIONS .........................................................16

   A.  The Bankruptcy Court erred in granting summary judgment in favor of the Debtor. .......................................................16

      1.  The Bankruptcy Court Ignored Evidence Relating to MET's Mere Conduit Defense ..............................................16

      2.  The Bankruptcy Court Failed to Consider the Value Provided by MET to the Debtor and Erred in Finding that There Was No Contemporaneous Exchange .........................................17

      3.  The Bankruptcy Court Erred by Not Fully Evaluating MET's Evidence Presented in Connection with the MET MSJ..................20

   B.  The Bankruptcy Court Did Not Err in Granting Summary Judgment in Favor of the Debtor.........................................................21

      1.  The Bankruptcy Court Correctly Ruled that MET Presented No Admissible Evidence in Support of its Defenses .........................21

      2.  MET's Mere Conduit Defense Is Neither Material nor Even a Legitimate Defense Because the $100,000 Transfer Was "for the Benefit" of MET – 11 U.S.C. § 547(b)(1) ..............................25

      3.  Even If the Mere Conduit Defense Were Relevant (Which It Is Not), the Bankruptcy Court Correctly Ruled that It Does Not Apply Here, and the Issue Is Not Material .................................27

-i-

4.   The Bankruptcy Court Correctly Ruled that There Was No
Contemporaneous Exchange of New Value for MET Releasing
Unsecured Potential Litigation Claims ..........................................29

V.   RELIEF REQUESTED ..................................................................................32

A.   Appellee's Statement of Relief Requested ...........................................32

-ii-

ER-064

Case 2:22-cv-07510-FMO   Document 40-4   Filed 11/16/23   Page 4 of 43   Page ID #:2232

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Albino v. Baca*,
  747 F.3d 1162 (9th Cir. 2014) ...............................................................16

*Alfa Mut. Fire Ins. Co. v. Memory (In re Martin)*,
  184 B.R. 985 (M.D. Ala. 1995) ...........................................................17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S.Ct. 2505 (1986)........................................21, 22, 25

*Beeler v. Jewell (In re Stanton)*,
  303 F.3d 939 (9th Cir. 2002) .................................................................16

*Bonded Financial Services Inc. v. European Am. Bank*,
  838 F.2d 890 (7th Cir.1988) ..................................................................27

*Carrillo v. Su (In re Su)*,
  290 F.3d 1140 (9th Cir. 2002) ..............................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................22

*Committee of Creditors Holding Unsecured Claims v. Koch Oil Co.
  (In re Powerline Oil Co.)*,
  59 F.3d 696 (9th Cir.1995) ...................................................................30

*Danning v. Miller (In re Bullion Reserve of N. Am.)*,
  922 F.2d 544 (9th Cir.1991) ..................................................................26

*Debtor's Chapter 11, Subchapter V Plan
  dated January 4, 2022, Modified June 21, 2022* ................................2, 5, 8, 9, 10

*Declaration of Seth Casden in Support of Debtor's Motion to
  Confirm Chapter 11, Subchapter V Plan*,
  *dated January 4, 2022, as Modified June 21, 2022*................................8

*Dibidale of Louisiana, Inc. v. Am. Bank & Trust Co., New Orleans*,
  916 F.2d 300 (5th Cir. 1990) .................................................................20

-iii-

ER-065

*Energy Co-op. Inc. v. SOCAP Int'l, Ltd. (In re Energy Co-op. Inc.)*,
    832 F.2d 997 (7th Cir.1987) ......................................................................31

*Evergreen Foods, Inc. v. Thomas J. Lipton Co. (In re Greene)*,
    1992 Bankr. LEXIS 2619 (Bankr. S.D. Ga. 1992) ......................................18

*FTC v. Pul'g Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir.1997) ....................................................................25

*Gilbert v. Tx. Mental Health & Mental Retardation*,
    919 F.Supp. 1031 (E.D. Tex. 1996) ...........................................................20

*Henry v. Off'l Comm. Of Unsecured Creditors of Walldesign, Inc. (In
    re Walldesign, Inc.)*,
    872 F.3d 954 (9th Cir.2017) ......................................................................26

*In re Cocolat, Inc.*,
    176 B.R. 540 (Bankr. N.D. Cal. 1995) .......................................................17

*In re E.R. Fegert, Inc.*,
    887 F.2d at 959 ...........................................................................................32

*In re Goldshtadt*,
    2019 WL 4200802 (9th Cir. B.A.P. Sept.4, 2019) .....................................22

*In re Hibbs*,
    161 B.R. 259 (Bankr.C.D.Cal.1993) ..........................................................22

*In re JWJ Contracting Co., Inc.*,
    287 B.R. 501 (9th Cir.B.A.P.2002) ......................................................17, 30

*In re Powerine Oil Co.*,
    59 F.3d 969 (9th Cir.1995) ........................................................................31

*Janas v. Reuter Equip. Co. (In re JWJ Contracting Co.)*,
    74 F. App'x 779 (9th Cir. 2003) ...........................................................15, 18

*Kosmala v. Imhof (In re Hessco Industries, Inc.)*,
    295 B.R. 372 (9th Cir.B.A.P.2003) ............................................................26

*Lane v. Celotex Corp.*,
    782 F.2d 1526 (11th Cir. 1986) ............................................................20, 21

-iv-

ER-066

*Lease-A-Fleet v. Wolk (In re Lease-A-Fleet)*,
    151 B.R. 341 (Bankr. E.D. Pa. 1993) .......................................................18, 30, 31

*Lewis v. Diethorn*,
    893 F.2d 648 (3d Cir. 1990) .......................................................................18, 30

*Lindquist v. Dorholt (In re Dorholt, Inc.)*,
    224 F.3d 871 (8th Cir. 2000) ................................................................................20

*Lubman v. C.A. Guard Masonry Contractor, Inc. (In re Gem Constr.
    Corp. of Virginia)*,
    262 B.R. 638 (Bankr. E.D. Va. 2000)...................................................................17

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990)..............................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................22

*Santos v. Scindia Steam Navigation Co.*,
    598 F.2d 480 (9th Cir. 1979) ...............................................................................16

*Scott v. Harris*,
    550 U.S. 372 (2007)..............................................................................................22

*Shen v. Diamant (In re Yu)*,
    215 F.3d 1335 (9th Cir. April 4, 2000) (unpublished) ........................................30

*Universal Service Administrative Co. v. Post-Confirmation Comm.
    Of Unsecured Creditors (In re Incomnet, Inc.)*,
    463 F.3d 1064 (9th Cir.2006) .........................................................................27, 28

*Upstairs Gallery, Inc. v. Macklowe West Development Co., LP (In re
    Upstairs Gallery, Inc.)*,
    167 B.R. 915 (9th Cir.B.A.P.1994) ................................................................30, 31, 32

*Weinman v. Dragul (In re Cornerstar Wine & Liquor, LLC)*,
    650 B.R. 583 (Bankr. D.Colo. 2023)...................................................................19

*Wirum v. Goel (In re Signet Solar, Inc.)*,
    532 B.R. 750 (N.D. Cal. 2015).............................................................................4

-v-

ER-067

*Womack v. Houk (In re Bangert)*,
   226 B.R. 892 (Bankr.D.Mont.1988) ................................................................32

**STATUTES**

11 U.S.C.
   § 108................................................................................................................13
   § 349..................................................................................................................7
   § 349(b)..............................................................................................................7
   § 349(b), (i) ......................................................................................................7
   § 502(d), and (4) ............................................................................................11
   § 546(a)(1)(A) ................................................................................................13
   § 547(a)(2) ................................................................................................29, 31
   § 547(b)(1) ..................................................................................................25, 26
   § 547(b), (2) ................................................................................................11, 31
   § 547(g) ............................................................................................................32
   § 550(a)(1) ........................................................................................................26
   § 550(a), (3) ......................................................................................................11
   § 1129..................................................................................................................9
   § 1191..................................................................................................................9

28 U.S.C. § 158(a) ..................................................................................................1

Bankruptcy Code
   Section................................................................................................................19
   Section 108(a)(2) ..............................................................................................8
   Section 547......................................................................................2, 12, 13, 29
   Section 547(c)(1) ............................................................................19, 20, 31, 32
   Section 1129(a)(7) ..............................................................................................2
   Sections 1129(a)(7), 1129(a)(5), 1129(a)(3) and 1191(c) ....................................3

**OTHER AUTHORITIES**

Black's Law Dictionary..........................................................................................29

Bryan Garner, Black's Law Dictionary (2d Pocket Ed. 2001) ..............................29

FED.R.BANKR.P. 7033, 7034, 7036 ........................................................................14

FED.R.CIV.P. 33(b)(2), 34(b)(2)(A), 36(a)(3) ........................................................14

Fed. R. Civ.P. 56(a) ........................................................................................11, 21

-vi-

FED.R.EVID. 1002 ................................................................................................24

FED.R.EVID. 1003 ................................................................................................24

FED.R.EVID. 1004 ................................................................................................24

FED.R.EVID. 1007 ................................................................................................24

Federal Rules of Bankruptcy Procedure Rule 8012 ...............................................34

FRCP 56 ...............................................................................................................25

Rule 56(c) ......................................................................................................22, 23

Pursuant to this Court's Case Management Order Re: Bankruptcy Appeals [B.R. 22-37, 10840-43], Appellant Multiple Energy Technologies, LLC ("MET") and Appellee Hologenix, LLC ("Debtor") (together, "Parties") respectfully submit this Joint Brief in connection with MET's appeal of: (i) the *Judgment* [B.R. 10540-43]; and (ii) the *Findings of Fact, Conclusions of Law and Order (1) Granting Plaintiff's Motion for Summary Judgment and (2) Denying Defendant's Cross-Motion for Summary Judgment* [B.R. 10544-57], both entered by the U.S. Bankruptcy Court for the Central District of California ("Bankruptcy Court").

## I.    STATEMENT OF APPELLATE JURISDICTION

This is an appeal of a Judgment and interlocutory Order entered by the Bankruptcy Court on December 7, 2022. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

## II.    SUMMARY OF THE CASE

### A.    Appellant's Summary of the Case

#### 1.    The Relationship Between the Debtor and MET

Prior to the commencement of the Debtor's Chapter 11 case, the Debtor and MET were engaged in certain litigation commenced against Debtor by MET. On the eve of trial of that litigation, MET and the Debtor reached a settlement (the "Settlement Agreement") whereunder the Debtor agreed to pay $2.5 million to MET comprising: (a) a $100,000 payment upon execution of the Settlement Agreement; (b) $1.4 million to be paid on or before April 23, 2020; and (c) and four payments of $250,000 each to be made in 2021. B.R. 10155-61.

While negotiating the settlement, the Debtor represented to MET that it had a funding source for the $1.4 million payment, but requested the installment schedule to ensure it had adequate funds to pay the remainder of the amounts due under the Settlement Agreement. B.R. 1985. The Parties agreed that, if the Debtor defaulted on

-1-

ER-070

any of its payments, MET could file a stipulated judgment against the Debtor for the entire settlement amount on twenty-four hours' notice. B.R. 778-784.

Unbeknownst to MET, on February 24, 2020 – just two weeks before agreeing to settle – Seth Casden, the Debtor's Chief Executive Officer ("Casden"), his brother, his step-father, and other statutory and non-statutory insiders filed UCC-1 Financing Statements purporting to perfect liens on all of the Debtor's assets. B.R. 38-90, 515-52.

### 2.    The Debtor's Bankruptcy Case

On April 22, 2020 (the "Petition Date") – one day before it was due to make the $1.4 million settlement payment to MET – the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court. B.R. 1-21.

### 3.    The Debtor's Old Plan

Debtor filed its original *Chapter 11, Subchapter V Plan* (the "Old Plan") on June 2, 2020. B.R. 553-99. MET objected to confirmation of the Old Plan, arguing, *inter alia*, that it did not satisfy the "best interest of creditors test" under Section 1129(a)(7) of the Bankruptcy Code because, in a Chapter 7 liquidation, the liens purportedly securing the claims of certain insiders would be subject to avoidance under Section 547 of the Bankruptcy Code, resulting in greater recoveries for non-insider creditors than the Old Plan provided. *Id.* MET further argued that the continued involvement of Casden and other insiders of the Debtor was inconsistent with the interest of creditors and that the compensation afforded to officers under the Old Plan was grossly excessive and contrary to the requirements of Section 1129(a)(5). *Id.* In addition, MET argued that the Old Plan did not satisfy the good faith requirement of Section 1129(a)(3) because it sought to preserve the claims of Casden and other insiders at the expense of other non-insider creditors. *Id.*

-2-

ER-071

Following an October 6, 2020 hearing, the Bankruptcy Court entered an order confirming the Old Plan over MET's objections, finding that it satisfied Sections 1129(a)(7), 1129(a)(5), 1129(a)(3) and 1191(c) of the Bankruptcy Code. B.R. 2919-3010, 3016-28, 3029-41.

On November 2, 2020, MET timely appealed confirmation of the Old Plan and moved for a stay pending appeal, which was denied by the Bankruptcy Court. B.R. 3075-86, 3218-19. The Old Plan's became effective pursuant to its terms on November 12, 2020.  However, on December 22, 2020, this Court stayed implementation of the Old Plan pending MET's appeal. B.R. 3220-23.

### 4.    The Appellate Order

On September 27, 2021, this Court vacated confirmation of the Old Plan. *See* B.R. 3289; *see also* B.R. 3290. Among other things, this Court found that the Bankruptcy Court erroneously excluded evidence presented by MET. B.R. 3288 at 7-9 ("the Bankruptcy Court erred in excluding the [2020] Butler Declaration, so the court must 'presume prejudice unless it is more probable than not that the error did not materially affect the [outcome].'") (citation omitted). This Court found that it was "likely that the exclusion of evidence adversely affected the outcome of the [Old] Plan." B.R. 3288 at n. 30.

The Court found that the Debtor had not offered the Old Plan in good faith due to Casden's obvious conflicts of interest, given that he holds the largest secured claims against the Debtor, such claims being potentially subject to challenge by a Chapter 7 Trustee, and that his declaration served as Debtor's primary evidentiary basis to assert that any preference action would not be in the best interest of creditors; further evidence of Casden's obvious conflict. B.R. 3281 at18-22. Specifically, the Court stated:

Here, factual findings were necessary to address, at a minimum, the fact that Casden, Hologenix's CEO, holds a large portion of the secured claims

-3-

vulnerable to scrutiny by a hypothetical Chapter 7 trustee and Casden also served as the primary evidentiary basis for Hologenix's contention that a hypothetical Chapter 7 trustee's preference action was not in the best interests of creditors. … That Casden and his relatives controlled most of the liens that were the subject of the Class 1 and 2 liens … raised obvious conflicts with respect to Hologenix's ability to execute its fiduciary duties as well as to whether Hologenix proposed the Plan in good faith. … As the Plan proponent, Hologenix and Casden were obligated to address the conflict caused by their own actions but there is no indication in the record that they made any effort to do so.  In short, the potential for self-dealing and conflict arising from these circumstances are relevant to the § 1129(a)(3)'s good faith inquiry and must be addressed by the finder of fact.

B.R. 3281-82 (12:18-13:11) (emphasis added) (internal citations omitted). This Court also found that Debtor failed to submit competent evidence or a proper liquidation analysis in support of its solvency. Indeed, the Court expressly held that Debtor's prepetition solvency analysis was not supported by any competent evidence in the record and the supporting calculations held no evidentiary value. *See* B.R. 3278-79 (at 9:19-10:19) (*citing Wirum v. Goel (In re Signet Solar, Inc.)*, 532 B.R. 750, 756 (N.D. Cal. 2015)).

The Parties appeared for a status conference with the Bankruptcy Court on November 16, 2021, at the conclusion of which Debtor (reluctantly) agreed to withdraw the Old Plan and to file an amended Chapter 11 plan addressing the deficiencies identified in the Appellate Order. B.R. 3460-62. The Parties memorialized these agreements in a stipulation that was so-ordered on December 9, 2021. B.R. 3452-59. On December 9, 2021, the Court also signed an order mandating the Debtor to file its November 2021 monthly operating report on December 16, 2021; to file its November 2020 to October 2021 monthly operating reports on or before January 4, 2022 and to file a new plan on January 4, 2022. *See* B.R. 3460-62.

-4-

### 5.    The Debtor's Unauthorized Transfers to Insiders

Meanwhile, after the Petition Date and without prior filing of the requisite Notice Setting/Increasing Insider Compensation, Debtor paid Casden $251,018 on account of 2020 salary and bonus compensation, much of which Debtor previously represented had been voluntarily waived.[1] Following confirmation of the Old Plan, Debtor paid Casden $92,724 as a cure amount for his employment contract.

Similarly, after December 20, 2020, when this Court stayed implementation of the Old Plan pending MET's appeal, and before serving the requisite notice on January 9, 2022, Debtor paid its directors a total of $140,000, including the Class 2 Claimants as defined herein. Only once these unauthorized post-petition transfers were brought to light by MET – *i.e.*, only when the Debtor got caught – did Casden and the directors agree to repay the unauthorized transfers. B.R. 4133-58, 5691-719.

On July 25, 2022, the Bankruptcy Court ordered Casden to repay the $251,018 in unauthorized post-petition transfers. *See* B.R. 6908-11. On August 8, 2022, Casden repaid $251,018 to the Debtor. *See* B.R. 883341.

### 6.    The Debtor's January 2022 Plan

On January 4, 2022, Debtor filed *Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022* [B.R.  3942-91](the "Jan. 2022 Plan") accompanied by the *Declaration of Seth Casden in Support of the Debtor's Motion to Confirm Chapter 11, Subchapter V Plan, dated January 3, 2022; and (II) Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022* [B.R. 4038-4074] ("Casden Dec. I"). The Jan. 2022 Plan was further supported by an expert report (the "Grobstein Report") of Howard B. Grobstein, C.P.A. of the accounting firm of Grobstein Teeple LLP, attached as Exhibit "A" to the *Declaration of Howard Grobstein in Connection with (I) Debtor's Motion*

---

[1] In the Old Plan, Casden touted that he had taken a voluntary salary reduction in light of the pandemic. Notices of Setting/Increasing Insider Compensation similarly reference Casden's salary "waiver."

-5-

ER-074

*to Confirm Chapter 11, Subchapter V Plan, dated January 3, 2022; and (II) Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022* [B.R. 4075-4116] ("Grobstein Dec. I").

For purposes of distribution under the Jan. 2022 Plan, the Debtor designated the Northern Trust Company of Delaware (the "Class 1 Claimant") as having a "Class 1" claim, and the following as having "Class 2" claims against the Debtor: (i) Casden: (ii) Alvaro Pascotto Revocable Trust; (iii) Julien Born; and (iv) Murali Sundar (collectively, the "Class 2 Claimants") and all insiders. *See* B.R. 3954-56.

**7.    MET is Granted Permission to Seek Avoidance of Insider Liens and Transfers**

On February 2, 2022, MET filed *Multiple Energy Technologies, LLC's Notice of Motion and Motion for Standing to Pursue Certain Causes of Action Belonging to Debtor's Estate; Memorandum of Points and Authorities and Declaration of Derrick Talerico in Support Thereof* (the "Standing Motion"). *See* B.R. 5168-235. In the Standing Motion, MET requested, among other things, an order from the Bankruptcy Court authorizing MET to pursue certain causes of action belonging to the Debtor's estate against the Class 1 Claimant and Class 2 Claimants. *Id.*.  Specifically, MET sought authority to pursue claims against the Class 1 Claimant and Class 2 Claimants: (i) to avoid certain liens allegedly securing claims against the Debtor; and (ii) to avoid and recover certain post-petition transfers of property of the Debtor's estate thereto (*i.e.*, the unauthorized transfers to the Debtor's board of directors). *See* B.R. 5182-83. The Standing Motion was granted by an Order of the Bankruptcy Court dated March 30, 2022. B.R. 5343-544D. The Bankruptcy Court also noted that "because it was clear the Debtor had no intention of ever filing this, these preference actions, and only because MET asked me to and I approved, that's the only reason, I think, we're even here on that [settlement of insider liens]." B.R. 6851 at 22-25.

-6-

MET commenced an adversary proceeding, on behalf of the Debtor, against the insiders seeking to avoid their alleged liens against the Debtor's assets as well as other preferential pre-petition transfers and post-petition transfers made to Casden and Debtor's board members. *See* B.R. 10149-10178. Thereafter, the insiders (except Murali Sundar) reached a settlement with the Debtor wherein the liens were "avoided and rendered null" except "[i]n the event that this case is dismissed, pursuant to 11 U.S.C. § 349(b), (i) the Liens avoided by the Settlement shall be reinstated; (ii) the transfer of the Liens for the benefit of the estate shall be vacated; and (iii) the Liens shall revest with the respective lienholders set forth in paragraphs 1 through 6 above." BR 10919. Had MET not brought this avoidance action only after the Debtor refused to do so, there would not have been any settlement.

MET did not object to the avoidance of the liens as that was the same relief it had sought in the adversary proceeding against the Debtor's insiders. B.R. 6090 at ¶ 5. Rather, MET objected to the proposed order because "[t]he order must make clear that the Settlement cannot predetermine the effect of dismissal under 11 U.S.C. § 349 or alter MET's right under 11 U.S.C. § 349 to request 'for cause' that avoidance of Settling Defendants' liens survive dismissal." *Id.* Specifically, MET argued that the proposed order "deprives MET of the right to move-and the Court to order – under 11 U.S.C. § 349(b) that the avoided liens not be reinstated in the event in the event of dismissal, which § 349(b) clearly contemplates." *Id.*, ¶ 7. MET offered alternative language to correct this issue that was rejected by the Debtor. *Id.* at ¶ 9.

On September 28, 2022, the Bankruptcy Court issued an order approving the settlement and added that "nothing herein shall limit or waive the right of any party to seek an order from the Court directing that the Liens shall not be reinstated in the event this [bankruptcy] case is dismissed." B.R. 9667 at ¶ 8.

-7-

ER-076

**8.      Debtor Commences an Adversary Proceeding against MET seeking return of the $100,000 paid under the Settlement Agreement**

On April 20, 2022, just subsequent to entry of the order granting the Standing Motion and on the eve of the expiration of statute of limitations under Bankruptcy Code section 108(a)(2), the Debtor commenced an adversary proceeding against MET seeking to avoid, as a preferential transfer, the $100,000 it had paid to MET in or around March 6, 2020 under the Settlement Agreement in exchange for MET's release and dismissal of its prepetition *litigation* against the Debtor. *See* B.R. 10149-10178. Commencement of the action against MET was clearly in retaliation for MET being granted authority to avoid the insider liens (including Casden's alleged lien) and improper post-petition transfers on behalf of the Debtor.  Simply put, the adversary proceeding against MET was retribution for MET standing in the shoes of the Debtor to seek causes of action on behalf of the Debtor's estate and creditors that its management inappropriately and inexplicably refused to commence.

**9.      The Debtor Files a Modified Plan**

On June 21, 2022, Debtor filed *Debtor's Chapter 11, Subchapter V Plan dated January 4, 2022, Modified June 21, 2022* ("Modified Plan") (B.R. 10686-737) accompanied by the *Declaration of Seth Casden in Support of Debtor's Motion to Confirm Chapter 11, Subchapter V Plan, dated January 4, 2022, as Modified June 21, 2022* (B.R. 5913-49) ("Casden Dec. II"), and the *Declaration of Howard Grobstein in Connection with (I) Debtor's Motion to Confirm Chapter 11, Subchapter V Plan, dated January 3, 2022; and (II) Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022* (B.R. 4075-16) ("Grobstein Dec. II"). Grobstein Dec. II included an updated liquidation analysis prepared in connection with the Modified Plan, intended to replace the liquidation analysis originally included in the Grobstein Report. *See* B.R. 4088. On

-8-

ER-077

Case 2:20-bk-13849-BR   Doc 1144   Filed 03/31/26   Entered 03/31/26 21:14:40   Desc
Main Document    Page 125 of 190

Case 2:22-cv-07510-FMO   Document 40-4   Filed 11/16/23   Page 17 of 43   Page ID #:2245

July 13, 2022, The Debtor provided MET with a supplement to the Grobstein Report, which included a revised solvency analysis. The Modified Plan classified insider claims separately from non-insider claims such that insider claims survive discharge and enjoy a 100% distribution, whereas non-insider claims would receive 6 to 12 cents on the dollar and the claims do not survive discharge.

MET objected to the Modified Plan, arguing that it clearly did not meet the requirements of 11 U.S.C. § 1129, as modified by 11 U.S.C. § 1191. *See* B.R. 6234-69. Among other objections, MET asserted that Debtor completely ignored this Court's well-founded concerns about Casden's self-dealing and obvious conflicts of interests, and instead proposed an unfairly discriminatory Modified Plan allowing all insider claims to be paid in full, while non-insider general unsecured creditors will receive only a nominal recovery. *Id.* Whereas the Subchapter V Trustee – an impartial party – supported the Old Plan, he objected to the Modified Plan, echoing MET's concerns that the Modified Plan unfairly discriminates against non-insider claims in violation of § 1191(b). *See* B.R. 6225-26.

### 10.  The Confirmation Hearing

On August 9 and 10, 2022, the Bankruptcy Court held a hearing on confirmation of the Modified Plan. *See* B.R. 8850-979, 8980-9141. Both MET and the Subchapter V Trustee objected to confirmation. During the Confirmation Hearing, the Bankruptcy Court heard MET's live witness cross-examination of the Debtor's fact witness (Casden) and Debtor's financial expert (Grobstein). MET's expert witness, Thomas Pastore, ASA, CFA, CMA, CPA (inactive) ("Pastore"), was present throughout the Confirmation Hearing but was not cross-examined by Debtor nor provided an opportunity to testify by the Bankruptcy Court. *Id*. Despite not hearing Pastore testify, the Bankruptcy Court stated "[a]nd I really wanted to hear today and yesterday, my main concern was to hear the actual people that had not been -- … not only Mr. Casden,

-9-

ER-078

… [b]ut even more – well, equally important, from the experts." B.R. 8953 at 2-9. In fact, the Bankruptcy Court noted "[a]nd I read of course the declarations of both the experts, but I – because the cross-examination, I got to hear actually in person, and quite thorough cross-examination of Mr. Grobstein." *Id*. at 18-21.

Debtor lodged proposed findings of fact and conclusions of law as well as an order confirming the Modified Plan. B.R. 9142-244, 9245-67. MET objected to both. B.R. 9313-70, 9371-662. Thereafter, on October 12, 2022, the Bankruptcy Court confirmed the Modified Plan and largely adopted the Findings as lodged by the Debtor (the "Confirmation Order"). B.R. 9802-87, 9887-903. A significant majority of the Findings were never stated by the Bankruptcy Court during the Confirmation Hearing, but rather were taken verbatim from Debtor's 97-page proposed findings of fact and conclusions of law. *Compare* B.R. 9802-87 to 9142-244. MET timely appealed the Findings and the Confirmation Order on October 13, 2022. B.R. 9904-10012.

## 11.    The Bankruptcy Court's Resolution of the Debtor's Adversary Proceeding

On October 11, 2022, the Debtor filed a *Notice of Motion and Motion for Summary Judgment or, in the Alternative, Patrial Summary Judgment; Memorandum of Points and Authorities and Declarations in Support Thereof* (the "Debtor's MSJ"). *See* B.R. 10205-451. In the Debtor's MSJ, Debtor argued that summary judgment should be granted in its favor due to: (i) MET's admissions in its Answer; (ii) MET's failure to produce documents to Debtor in response to certain discovery requests "despite its representation that it would do so"; and (iii) MET's failure to propound any discovery of its own to Debtor. *See* B.R. 10213.

On November 1, 2022, MET filed its *Opposition to Hologenix LLC's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment and Multiple Energy Technologies, LLC's Cross Motion for Summary Judgment* (the "MET MSJ").

-10-

ER-079

*See* B.R. 10452-71. In the MET MSJ, MET argued that summary judgment should be granted in its favor, rather than in favor of the Debtor, as: (i) MET was a mere conduit rather than an initial transferee of the $100,000 paid to it under the Settlement Agreement; (ii) MET received less than it would in a hypothetical Chapter 7 and, thus, was not liable for the return of the $100,000; (iii) the transfer of the $100,000 was a contemporaneous exchange for new value; and (iv) MET's verified interrogatory responses were evidence that summary judgment should be granted in MET's favor. *See* B.R. 10456 at ¶¶ 3-6.

On December 7, 2022, the Bankruptcy Court entered Judgment against MET, and in favor of the Debtor, thus granting the Debtor's MSJ and denying the MET MSJ. *See* B.R. 10540-43. In finding in favor of Debtor and against MET, the Bankruptcy Court Ignored Evidence Relating to MET's Mere Conduit Defense and did not Consider the Value provided by MET to the Debtor in exchange for the $100,000 settlement payment. On December 7, 2022, the Bankruptcy Court also entered its *Findings of Fact, Conclusions of Law and Order (1) Granting Plaintiff's Motion for Summary Judgment and (3) Denying Defendant's Cross-Motion for Summary Judgment.* *See* B.R. 10544-57.  In so doing, the Bankruptcy Court stated,

> There is no genuine dispute as to any material fact and the Plaintiff is entitled to a judgment as a matter of law pursuant to Fed. R. Civ.P. 56(a) on (1) Plaintiff's first [claim for relief] to avoid the $100,000 Preferential Transfer pursuant to 11 U.S.C. § 547(b), (2) Plaintiff's second [claim for relief] to recover the $100,000 Preferential Transfer from Defendant pursuant to 11 U.S.C. § 550(a), (3) Plaintiff's third [claim for relief] to disallow any and all claims of Defendant against Plaintiff, including but not limited to, Defendant's [Proof of Claim No.] 15 pursuant to 11 U.S.C. § 502(d), and (4) each and all of Defendant's alleged Affirmative Defenses against the [claims for relief].

*See* B.R. 10556-57. However, the Bankruptcy Court made these "findings" without providing any analysis as to how it came to its conclusions. Rather, the Bankruptcy

-11-

ER-080

Court simply concluded that it should grant summary judgment in favor of Debtor and against MET. *See* B.R. 10540-43. During the oral argument, the Bankruptcy Court simply stated "I just don't think that's new value. Anyway, in any case, it wasn't contemporaneous. It was the next day. Not going to quibble about the timing, but in any case, I just don't buy that as well that argument. It's not defined in the Bankruptcy Code. New value -- *I know what new value looks like and it's not - - it's not that* and it was not contemporaneous in any case." B.R. 10111-12 at 38:22-39:4 (emphasis added). The Bankruptcy Court also noted ". . . I thought it was on – it was from MET's standpoint kind of adding insult to injury in the case. . .it seems to be obvious that it's a preference." B.R. 10114 at 11-16.

**B.    Appellee's Summary of the Case**

Appellee Hologenix contends that MET's summary of the case misstates, mischaracterizes, and omits material facts and proceedings.  In MET's summary of the case, above, MET's sections 3, 4, 5, 6, 7, 9, and 10 are irrelevant to this specific appeal, and are used by MET to simply muddy the water.  To the extent that this Court would like to know more about the Debtor's main bankruptcy case generally and the issues between the parties, the Bankruptcy Court provided a thorough 85-page findings and conclusions related to other issues currently on appeal before this Court.  B.R. 9802-86.

The most salient facts for this specific appeal of an adversary proceeding for recovery of a $100,000 preferential payment from MET pursuant to 11 U.S.C. § 547 are summarized immediately below, and the adversary proceeding case is fairly simple. Prepetition on February 28, 2019, MET filed a lawsuit against Debtor, and, on March 6, 2020, Debtor and MET entered into a settlement (the "Settlement") for, among other things, $2,500,000 unsecured claim in favor of MET and liability releases to Debtor. B.R. 10549.  On March 9, 2020, the Settlement was signed, and Debtor paid $100,000

-12-

to MET, reducing MET's general unsecured claim to $2,400,000. *Id*. Forty-four days later, on April 20, 2020 (the "Petition Date"), Debtor filed for bankruptcy. B.R. 10548, 1, 9812-15.

Faced with the approaching two-year statutory deadline to file avoidance actions under § 547, on April 20, 2022, Debtor filed its complaint (the "Complaint") against MET commencing an adversary proceeding (the "Adversary Proceeding") seeking to avoid and recover the preferential payment of $100,000 paid to MET on March 9, 2020, within the 90-day preference period of Petition Date. B.R. 10149; 11 U.S.C. § 546(a)(1)(A).[2] On June 6, 2022 (just before midnight), MET timely filed its answer (the "Answer") to the Complaint. B.R. 10179.

On June 14, 2022, the parties filed their first joint status report, generally agreeing that 90 days would be sufficient to complete discovery. B.R. 10188-89. The Bankruptcy Court issued a scheduling order setting a deadline of September 23, 2022, to complete factual and expert discovery. B.R. 10194-95. Thereafter, MET essentially neglected the Adversary Proceeding, failed to observe deadlines, and failed to put on its defense, as detailed below.

In the parties' second joint status report, filed on September 13, 2022, Hologenix stated that MET's responses to Hologenix's discovery were due the next day (September 14, 2022), and, in sharp contrast, MET acknowledged that it had not even begun its discovery, stating that MET "intends to propound discovery on Defendant prior to September 23, 2022, with responses thereto due by no later than October 23, 2022." R.R. 10197. Clearly, MET had neglected the case because the Federal Rules of Civil Procedure require 30 days' response time for discovery, this second joint status report was filed on September 13, 2022, and there were only 10 days left until the deadline to complete all discovery, *ergo*, MET had waited too late to propound its

---

[2] In section II.A.8 above, MET incorrectly cites to 11 U.S.C. § 108 for the statutory deadline.

-13-

discovery.   B.R.  10189; 10197; FED.R.CIV.P.  33(b)(2),  34(b)(2)(A),  36(a)(3); FED.R.BANKR.P. 7033, 7034, 7036.  In fact, MET never propounded any discovery of its own.  B.R. 10236.  On the other hand, Debtor had propounded discovery to MET, which MET answered, but MET never produced any documents.  B.R. 10236, 10414-51.

The Bankruptcy Court entered an order stating that Hologenix (not MET) could set a motion for summary judgment on November 22, 2022.  B.R. 10205.  Two weeks later, on October 10, 2022, Hologenix timely filed its motion for summary judgment ("MSJ").  B.R. 10205. On November 1, 2022 (just before midnight), MET filed its opposition (the "Opposition") to the MSJ, but also went a step further, purporting to include MET's "Cross-Motion for Summary Judgment," which Judge Russell had not authorized, and which is not permitted by local rules, which require 42 days' notice and 21 days to respond, though MET was attempting to have it heard on 21 days' notice and give Debtor only 7 days to respond.  B.R. at 10454; 10453; B.R. 7056-1.

Despite MET having had a full 21 days to prepare MET's Opposition, the only evidence that MET submitted in support was a 22-paragraph declaration of its counsel, Nicole Sullivan (the "Unsigned Sullivan Declaration"). 10472-78.  The Unsigned Sullivan Declaration suffered several deficiencies – for starters, the declaration was not signed by Ms. Sullivan but by someone else with the notation "with permission." B.R. 10476.  The Unsigned Sullivan Declaration purported to attach Exhibits "A" and "B" in support of MET's defenses, but there was no "Exhibit A" or "Exhibit B" attached, and instead there were only exhibit cover pages stating "Subject to Motion to file Under Seal."  B.R. 10477-78.  Despite MET's Opposition referring to "a contemporaneously filed motion to file the same [Exhibits "A" and "B"] under seal and/or for *in camera* review," no such contemporaneous motion to file under seal had been filed (and would not be filed until 21 days later on the morning of the MSJ hearing).  B.R. 10458; 10546 (n.1).

-14-

On November 8, 2022, Hologenix timely filed its reply (the "Reply") in support of the MSJ and against MET's Opposition. B.R. 10481. Among other issues, Hologenix pointed out that MET had never submitted the phantom Exhibits "A" and "B" upon MET relied, nor had MET ever filed its motion seeking permission to file those exhibits under seal. B.R. 10488-89.

MET sat on its hands for another two weeks, then on November 22, 2022, the very morning of the hearing on the MSJ, MET filed its long-awaited *ex parte* motion to file Exhibits "A" and "B" under seal. B.R. 10496. Annexed to MET's tardy motion to file under seal was another declaration of its counsel, Nicole Sullivan (the "Late Sullivan Declaration"), with Exhibits "A" and "B" attached in heavily redacted form. B.R. 10501-36. Later that same morning, at 9:22 a.m. the Bankruptcy Court entered an order denying MET's belated motion to file under seal. B.R. 10538-39; 10543 n.1.

On November 22, 2022, the Bankruptcy Court heard and granted Debtor's MSJ in favor of the Debtor and against MET, with a judgment and findings entered on December 7, 2022. B.R. 10540; 10544.

MET missed the deadline to appeal on December 21, 2022, but MET filed its late appeal six days later anyway, and then filed an *ex parte* motion to extend the appeal deadline after the fact. B.R. 10558; 10583.

### III.   STATEMENT OF THE ISSUE PRESENTED

*Issue*: Whether the Bankruptcy Court erred in granting summary judgment in favor of the Debtor and denying MET's motion for summary judgment.

*Standard of Review*: "[T]he Bankruptcy Court's decision to grant summary judgment is reviewed de novo, its factual findings are reviewed for clear error." *Janas v. Reuter Equip. Co. (In re JWJ Contracting Co.)*, 74 F. App'x 779, 782 (9th Cir. 2003) (*citing Beeler v. Jewell (In re Stanton)*, 303 F.3d 939, 941 (9th Cir. 2002); *cf. Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002)).

-15-

ER-084

## IV.   ISSUES AND CONTENTIONS

**A.   The Bankruptcy Court erred in granting summary judgment in favor of the Debtor.**

Summary judgment can only be granted if there are no material questions of fact. *See Santos v. Scindia Steam Navigation Co.*, 598 F.2d 480, 483 (9th Cir. 1979). Where there are questions of fact or credibility determinations that need to be made, summary judgment cannot be granted. *See Albino v. Baca*, 747 F.3d 1162, 1173 (9th Cir. 2014) ("It is black-letter law that in granting summary judgment a district court cannot resolve disputed questions of material fact . . . ."). For the reasons that follow, the Bankruptcy Court erred in holding that there were no questions of fact concerning MET's mere conduit and contemporaneous value defenses.

### 1.   The Bankruptcy Court Ignored Evidence Relating to MET's Mere Conduit Defense

The Bankruptcy Court ignored key evidence concerning the mere conduit defense – the Declaration of Nicole A. Sullivan dated November 1, 2022 ("Sullivan Declaration" (B.R. 10472-80) – that would have defeated summary judgment. In the Sullivan Declaration, MET's counsel, explained – based on her own personal knowledge – that MET never received the $100,000 payment from the Debtor because it was paid directly to its counsel who then paid it to a legal funding company as required by MET's agreement with the funder. B.R. 10475, ¶¶ 16, 19. This evidence was germane to whether MET retained any beneficial interest in the initial $100,000 transferred by the Debtor pursuant to the Settlement Agreement at the time that transfer was made on or about March 9, 2020. This evidence presented a question of fact concerning the intent of the payment and would have precluded summary judgment. Moreover, the Bankruptcy Court failed to provide any reasoning for its decision, which

-16-

is also a fundamental flaw here warranting reversal. When reviewed *de novo*, there is no basis on which to grant summary judgment here.

> **2.** **The Bankruptcy Court Failed to Consider the Value Provided by MET to the Debtor and Erred in Finding that There Was No Contemporaneous Exchange**

Here, the Bankruptcy Court did not consider any evidence or evaluate the value provided by MET in exchange for the $100,000 payment. Instead, the Bankruptcy Court simply granted summary judgment on the grounds that it knows new value when it sees it and this is not it. B.R. 10111-12 at 38:22-39:4.

The fundamental logic behind the new value defense, which "is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *JWJ Contracting*, 287 B.R. 501, 506 (9th Cir. B.A.P. 2002) (*quoting Lubman v. C.A. Guard Masonry Contractor, Inc. (In re Gem Constr. Corp. of Virginia)*, 262 B.R. 638, 645 (Bankr. E.D. Va. 2000)). In other words, "[t]he purpose of the 'new value' defense is to protect transactions that do not diminish the bankruptcy estate." *Alfa Mut. Fire Ins. Co. v. Memory (In re Martin)*, 184 B.R. 985, 993 (M.D. Ala. 1995) (*citing In re Cocolat, Inc.*, 176 B.R. 540, 548 (Bankr. N.D. Cal. 1995)).

Here, the Settlement Agreement and initial settlement payment had tangible benefits to the Debtor's estate and other unsecured creditors (at MET's expense), which were more than sufficient to offset any diminishment of the estate. Occurring on the eve of a scheduled two-week trial, the settlement enabled the Debtor to avoid incurring substantial attorney's fees that would have offset and exceeded the $100,000 settlement payment (given that Debtor incurred over $1 million preparing for trial), as well as the risks attendant to litigation. Moreover, the Settlement enabled the Debtor to fix the amount of MET's previously unliquidated debt at $2.4 million. The Debtor sought to

-17-

claw back the $100,000 settlement payment – the only consideration that MET received for the Settlement, given that the Debtor's performance of its non-monetary obligations under the settlement has been problematic – but still wants MET to be bound by its obligations under the Settlement Agreement, including that MET's claim be fixed at $2.4 million, which directly impacts MET's share of the funds to be distributed under the Debtor's subchapter V plan.

In *Lewis v. Diethorn*, 893 F.2d 648, 650 (3d Cir. 1990), the court held that prepetition payment made by a debtor to settle a lawsuit in exchange for defendants' agreement to remove a *lis pendens* and drop all counterclaims did not constitute an avoidable preferential transfer because the payment was in exchange for freedom of litigation, and thus, represented contemporaneous exchange for new value. While *Lewis* did involve the release of a lien, that was only part of the consideration that was found to constitute a contemporaneous exchange of new value. Indeed, other courts have cited *Lewis* for the broad proposition that "payments in settlement of a lawsuit are not voidable as a preference" even where no lien is involved.  *See, e.g., Evergreen Foods, Inc. v. Thomas J. Lipton Co. (In re Greene)*, 1992 Bankr. LEXIS 2619 (Bankr. S.D. Ga. 1992). Significantly, as noted in *Lease-A-Fleet v. Wolk (In re Lease-A-Fleet)*, 151 B.R. 341, 352 (Bankr. E.D. Pa. 1993), the Third Circuit's ruling in *Lewis* turned in part on the fact that "the debtors … were not prepared to 'give back' the benefits which they received in the payments made for them." Here, unless the Debtor is prepared to "give back" everything that it received under the Settlement Agreement – including the fixing of MET's claim at $2.5 million – it should not have been permitted to avoid the $100,000.00 settlement payment.

Further, under the terms of the Settlement Agreement itself, the release was not unconditional like the release at issue in *JWJ Contracting*. Rather, MET would have been able to immediately enter a Stipulated Judgment against the Debtor in the full settlement amount but for the Debtor's payment of the $100,000, which potentially

-18-

could have improved MET's position *vis a vis* other unsecured creditors. Accordingly, the value provided in exchange for the $100,000 transfer was not only the partial release of MET's unsecured claim (arguably an antecedent debt), but also forbearance from exercising the right to enter a stipulated judgment, which was not a preexisting right but rather was newly and contemporaneously created under the Settlement Agreement.

As such, the value provided in exchange for the $100,000 transfer is not so simple and straightforward and certainly not an issue that could be decided as a matter of law on summary judgment. The Bankruptcy Court should have considered all of these relevant facts on a fulsome record, rather than reflexively granting summary judgment in Debtor's favor. This Court should reverse the granting of summary judgment.

In addition, the Bankruptcy Court stated during the hearing that there was no "contemporaneous" exchange as required pursuant to Bankruptcy Code Section 547(c)(1) (B.R. 10111-12 at 38:22-39:4) but made no specific finding of fact or conclusion of law with respect to contemporaneous value. *See* B.R. 10540-43, 10544-57. Under that Bankruptcy Code Section, a trustee or debtor in possession may not avoid a transfer to the extent that: (i) the parties intended the transfer to be a contemporaneous exchange for new value; and (ii) the transfer was, in fact, a "substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). The Bankruptcy Code does not define the term "substantially contemporaneous" and there is a dearth of legislative history regarding Section 547(c)(1). *Weinman v. Dragul (In re Cornerstar Wine & Liquor, LLC)*, 650 B.R. 583, 594 (Bankr. D.Colo. 2023). Of importance, however, is the fact that the Bankruptcy Code does not require a *simultaneous* exchange, as connoted by use of the modifier "substantially" before contemporaneous *Id*. Indeed, as one court has noted:

> [T]he plain language of the statute is at odds with [a] bright-line test. The statute uses a more elastic term, substantially contemporaneous . . . . Congress knew how to adopt a specific time limit; it did so in the purchase money security interest exception, § 547(c)(3). It chose a less rigid standard

-19-

for § 547(c)(1), no doubt because that provision governs a wider variety of loans and credit transactions. We must construe the statute accordingly.

*Lindquist v. Dorholt (In re Dorholt, Inc.)*, 224 F.3d 871, 874 (8th Cir. 2000).

As noted above, the Debtor's payment to MET was in exchange for, among other things, the partial release of MET's unsecured claim and also forbearance from exercising the right to enter a stipulated judgment. That exchange was not only substantially contemporaneous, but was also *immediately* contemporaneous. In other words, upon the transfer of the $100,000 to MET, the Debtor immediately received the value set forth above. As such, the transfer clearly falls within the parameters of Section 547(c)(1), as it was intended by the Debtor and MET to be a contemporaneous exchange for new value, and was substantially contemporaneous. The Bankruptcy Court erred in denying MET summary judgment on this defense or at the very least not finding that there were questions of fact concerning the value and the timing of the exchange of the value.

**3.      The Bankruptcy Court Erred by Not Fully Evaluating MET's Evidence Presented in Connection with the MET MSJ**

It is well settled that a court tasked with ruling on a motion for summary judgment "must consider all of the evidence before it . . . ." *Dibidale of Louisiana, Inc. v. Am. Bank & Trust Co., New Orleans*, 916 F.2d 300, 307 (5th Cir. 1990); *see also Gilbert v. Tx. Mental Health & Mental Retardation*, 919 F.Supp. 1031, 1037 (E.D. Tex. 1996); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986). Furthermore, "summary judgment can be entered only 'if everything in the record -- pleadings, depositions, interrogatories, affidavits, etc. -- demonstrates that no genuine issue of material fact exists.'" *Lane*, 782 F.2d at 1528 (*quoting* Keiser v. Coliseum Properties, Inc., 614 F.2d 406, 410 (5th Cir.1980)).

In the current instance, the Bankruptcy Court failed to properly evaluate the entirety of the evidence before it in granting the Debtor's MSJ and denying the MET

-20-

MSJ. Particularly, and by no means limiting, the Bankruptcy Court ignored evidence set forth in the Sullivan Declaration; evidence that likely would have precluded the grant of summary judgment in favor of the Debtor because the Sullivan Declaration clearly presented material questions of fact. It is unrealistic to assume that summary judgment in favor of the Debtor was properly granted where the Bankruptcy Court failed to evaluate the entirety of the evidence before it, as summary judgment is only appropriate when *all* of the evidence before a court clearly demonstrates an absence of material questions of fact.  As the Bankruptcy Court did not consider all of the evidence presented by MET, summary judgment in favor of the Debtor was improper.

**B.     The Bankruptcy Court Did Not Err in Granting Summary Judgment in Favor of the Debtor.**

> **1.     The Bankruptcy Court Correctly Ruled that MET Presented No Admissible Evidence in Support of its Defenses**

The Bankruptcy Court correctly ruled that MET had not provided any competent evidence in support of its defenses.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable trier of fact could find for the non-moving party.  The evidence presented in conjunction with any opposition must be sufficient to support a verdict in the non-movant's favor (*i.e.*, sufficient to survive a motion for directed verdict at the close of the evidence).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2512 (1986); *In re Hibbs*, 161 B.R. 259, 264 (Bankr.C.D.Cal.1993).  A factual dispute is "material" only if it might affect the outcome of the proceeding under applicable law. *Anderson*, 477 U.S. at 249.

Once Debtor has met its initial burden of demonstrating the absence of a

-21-

genuine issue of material fact, the non-movant (here, MET) cannot rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial. *See*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson,* 477 U.S. at 249. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'"); *In re Goldshtadt*, 2019 WL 4200802 *1, *7 (9th Cir. B.A.P. Sept.4, 2019) (affirming bankruptcy court's order granting summary judgment in favor of plaintiff because defendant's evidence was clearly contradicted by the record in the bankruptcy case).  Thus, a mere "scintilla" of evidence is insufficient; rather an issue of material fact is genuine only if Defendant, as the non-movant, presents facts such that a *reasonable* fact-finder could find in favor of them. *Anderson,* 477 U.S. at 252, 254.  As stated by the United States Supreme Court:

> The opposing party's evidence, whether or not it has the burden of proof at trial, must be sufficient to create a genuine issue of fact for trial.  When the moving party has carried its burden under Rule 56(c), its opponent must do something more than simply show that there is some metaphysical doubt as to the material facts ....

*Matsushita*, 475 U.S. at 585.

When seeking summary judgment, the movant (here, Debtor) may rely on pleadings, depositions, answers to interrogatories, admissions, or other materials, together with any affidavits or declarations. *See*, FED. R. CIV. P. 56(c). MET never produced any documents in discovery.  B.R. 10236-37, 10438-47.  Therefore, MET

-22-

was barred from utilizing any unproduced documents to defend against the MSJ that were not part of the record.  Nonetheless, MET attempted to introduce new documents that had never been produced in discovery, and, yet, MET still did not present those documents but instead attached only cover sheets to the Unsigned Sullivan Declaration that referred to a "contemporaneous" motion to file under seal. B.R. 10477-78.  Far from being "contemporaneous," MET filed its late motion to file under seal three weeks later on the very morning of the MSJ hearing with two heavily redacted exhibits attached to the Late Sullivan Declaration.  B.R. 10501-36.  The Court denied MET's *ex parte* late motion to file under seal that same morning before the MSJ hearing began. B.R. 10538-39.  As a result, the only "evidence" presented by MET was the 22-paragraph declaration of its counsel, Nicole Sullivan, which was not even signed by Ms. Sullivan.  B.R. 10476AP.

The first 16 paragraphs of the Unsigned Sullivan Declaration recount procedural background and argue about discovery; at the end of paragraph 16, Ms. Sullivan purports to provide competent admissible evidence based on her personal knowledge as to contracts between MET and MET's secret litigation funder Legalist and transfers to Legalist.  B.R. 10472-75 (¶¶1-16)A.  The Unsigned Sullivan Declaration stated that the "Legalist Agreement was not produced in discovery but is attached hereto as Exhibit A."  B.R. at 10475 (¶ 17). However, Exhibit A was merely a cover sheet with no document attached. B.R. 10477. The Unsigned Sullivan Declaration also stated that the "screenshots of the wire transfer showing the receipt of payment in the amount of $100,000 by White and Williams LLP from the Debtor, and the immediate transfer to Legalist of the same is attached hereto as Exhibit B."  B.R. 10475 (¶18).  However, again, Exhibit B was merely a cover sheet with no document attached. B.R. 10478.

Paragraph 19 of the Unsigned Sullivan Declaration was an argumentative legal conclusion as to the mere conduit defense on the naked and self-serving

-23-

assertion that "MET never had any control or dominion over the $100,000 that White and Williams LLP received from Hologenix LLC pursuant to the parties' settlement agreement. B.R. 10475 (¶19). But this was simply Ms. Sullivan's bare conclusory statement, to which the Bankruptcy Court correctly gave no weight. B.R. 12331 (hearing transcript). Paragraphs 20 to 22 of the Unsigned Sullivan Declaration are irrelevant to MET's purported mere conduit defense. B.R. 10475 (¶¶ 20-22).

Thus, the entirety of MET's "evidence" was Ms. Sullivan's summary of the two documents that MET had not even presented to the Court, bookended at both sides by the conclusory argument of MET's counsel. But MET's summary of the documents by counsel's declaration was inadmissible without the documents themselves. "An original writing [or duplicate]… is required in order to prove its content unless these rules or a federal statute provides otherwise." FED.R.EVID. 1002; FED.R.EVID. 1003 (duplicates). None of the possible exceptions in the Federal Rules of Evidence apply here. FED.R.EVID. 1004. MET's Exhibits A and B (together totaling less than 40 pages) were not so voluminous as to be subject to the summarization exception. FED.R.EVID. 1006. MET could not use Ms. Sullivan's declaration in lieu of the document because Ms. Sullivan's testimony was for (not against) MET. FED.R.EVID. 1007 ("The proponent may prove the content of a writing… by the testimony… *of the party against whom* the evidence is offered.") (emphasis added). Thus, MET did not provide evidence sufficient to defend against summary judgment. The purpose of FRCP 56 "is not to replace conclusory allegations of the … answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-89 (1990). "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *FTC v. Pul'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997). The Bankruptcy

-24-

Court did err in finding that there was no evidence to support MET's mere conduit defense where the only purported "evidence" was the naked and self-serving declaration of MET's counsel testifying to the contents of documents that had not even been produced or provided to the Court.

> **2.      MET's Mere Conduit Defense Is Neither Material nor Even a Legitimate Defense Because the $100,000 Transfer Was "for the Benefit" of MET – 11 U.S.C. § 547(b)(1)**

There is no error in the Bankruptcy Court granting summary judgment for the Debtor because the fact of MET's secret arrangement to pay Legalist is not a material fact to the decision and judgment.  To defeat summary judgment, the disputed fact must be both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  MET's secret agreement with Legalist and secret payment of $100,000 from MET to Legalist is immaterial under substantive bankruptcy law because in all instances the $100,000 transfer from Debtor was made "for the benefit" of MET under 11 U.S.C. § 547(b)(1).

Based on the plain language of the Bankruptcy Code alone, MET's mere conduit argument is simply not a valid defense here because ultimately the $100,000 transfer was "for the benefit of MET" under 11 U.S.C. § 547(b)(1). Section 547(b)(1) specifies that "the trustee may… avoid any transfer of an interest of the debtor in property to *or for the benefit* of a creditor."  11 U.S.C. § 547(b)(1) (emphasis added); *see also*, 11 U.S.C. § 550(a)(1) ("to the extent that a transfer is avoided under section ... 547… the trustee may recover… from the initial transferee

-25-

ER-094

of such transfer *or the entity for whose benefit such transfer was made*") (emphasis added).   In a desperate attempt to avoid being labeled a "transferee," MET twists itself with arguments about being a "mere conduit" based on the $100,000 transfer being made to its counsel, White & Williams LLP, and then to MET's secret litigation funder, Legalist.  None of MET's contortions change the plain language of the statute and the fact that the $100,000 transfer was made "for the benefit" of MET.  "If the transfer is for one's benefit, one is classed with initial transferees." *Kosmala v. Imhof (In re Hessco Industries, Inc.)*, 295 B.R. 372, 378 (9th Cir.B.A.P.2003).  "As the Ninth Circuit recognized in *Bullion Reserve*, such parties are liable, *whether or not* they actually benefit from the transfers in question."  *Id.* (emphasis in original).  "Trustees have an absolute right of recovery against the 'initial transferee' and any 'entity for whose benefit such transfer was made.'" *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir.1991); *Henry v. Off'l Comm. Of Unsecured Creditors of Walldesign, Inc. (In re Walldesign, Inc.)*, 872 F.3d 954, 962 (9th Cir.2017).  "Section 550(a)(1) authorizes the trustee to recover from the 'initial transferee' *or 'the entity for whose benefit such transfer was made*."  *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 547 (9th Cir.1991) (emphasis added).

The $100,000 transfer was absolutely for the benefit of MET, as MET acknowledged the $2,500,000 claim under the settlement, payment by the Debtor of $100,000, and resulting claim reduced by said amount to $2,400,000. B.R. 10357-68 (MET's proof of claim and court's order thereon).  What MET did with MET's $100,000 after that was MET's own secretive business.  Therefore, MET's mere conduit defense is irrelevant because MET was the entity for whose benefit such transfer was made.

-26-

**3.      Even If the Mere Conduit Defense Were Relevant (Which It Is Not), the Bankruptcy Court Correctly Ruled that It Does Not Apply Here, and the Issue Is Not Material**

MET's secret agreement with Legalist and secret payment of $100,000 from MET to Legalist is immaterial because the mere conduit defense simply does not apply here under substantive bankruptcy law.  The Ninth Circuit uses the dominion test to determine if a party is an initial transferee or a mere conduit.  *Universal Service Administrative Co. v. Post-Confirmation Comm. Of Unsecured Creditors (In re Incomnet, Inc.)*, 463 F.3d 1064, 1066 (9th Cir.2006).  An over-simplification of the mere conduit defense is: "When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."  *Id.* at 1070 (quoting *Bonded Financial Services Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988)).  MET would have the Court believe that the mere conduit defense applies because "B" [MET] acts as the agent [mere conduit] of "C" [Legalist], but MET is incorrect for the reasons explained immediately below.

Key to the concept of the mere conduit theory is that "A" gives instructions to "B" that makes "B" the agent of "A," for example: "The leading case in this area is the Seventh Circuit's decision in *Bonded Financial Services*.  In *Bonded Financial Services*, a debtor [A] sent a bank [B] a check payable to the bank's order with a note directing the bank [B] to deposit the check into an account that belonged to Michael Ryan [C]…" *In re Incomnet, Inc.*, 463 F.3d at 1070.  "The Seventh Circuit held that the bank was not an initial transferee because it received no benefit from the initial transaction, in which it acted as a financial intermediary without dominion over the money." *Id.*  It is with this background and in this context that the Ninth Circuit quoted the Seventh Circuit to state: "When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Id.*

-27-

Here, Debtor did not give the $100,000 to MET (or its counsel) with instructions to act as agent for the benefit of Legalist.  Indeed, MET's secretive arrangement with Legalist was not even known to Debtor until November 2022 when MET filed its MSJ Opposition. According to the prepetition settlement agreement between Debtor and MET, Debtor owed MET $2,500,000, Debtor paid $100,000 to MET (or to MET's counsel for the benefit of MET) for MET to do with the funds whatever MET wished, and MET acknowledged a reduction of the claim to $2,400,000.  B.R. 10357-68 (MET's proof of claim, prepetition settlement agreement, and court's order thereon).  After the receipt of the $100,000, MET did whatever MET wanted to do with the $100,000 without any direction or instruction from Debtor.  MET was not the agent or mere conduit of the Debtor's transfer of $100,000.  Therefore, the mere conduit defense on these facts must fail, and the Bankruptcy Court did not commit reversible error in finding MET's mere conduit defense to be inapplicable and, therefore, immaterial.

Moreover, the un-redacted information in MET's Exhibits A and B actually disprove MET's mere conduit defense.  Firstly, the agreement between MET and Legalist (Exhibit A) was "made and entered into as of *March 12, 2020*."  B.R. 10504  (emphasis added). Thus, the document making MET the purported "mere conduit" was contrived three days *after* the $100,000 transfer was made on March 9, 2020.  Therefore, even if MET's mere conduit theory had a legal basis (which it does not), MET had dominion over the funds for three days from March 9 to 12, 2020, before purportedly becoming legally bound and relinquishing dominion on March 12, 2020, pursuant to the Legalist agreement.

Secondly, contrary to the testimony in the Unsigned Sullivan Declaration that Exhibit B shows "the receipt of payment in the amount of $100,000 by White and Williams LLP from the Debtor, and the *immediate* transfer to Legalist of the same,"  B.R. 10475 (¶ 18) (emphasis added), Exhibit B actually showed that the

-28-

purported wire out to Legalist did not occur until an entire week later on March 16, 2020.  B.R. 10529.  Black's Law Dictionary defines "immediate" as "occurring without delay; instant."  Bryan Garner, Black's Law Dictionary (2d Pocket Ed. 2001).  Under no circumstance was the transfer to Legalist "immediate," though MET based its "mere conduit" defense on the representations that the transfer to Legalist was "immediate."

4.    **The Bankruptcy Court Correctly Ruled that There Was No Contemporaneous Exchange of New Value for MET Releasing Unsecured Potential Litigation Claims**

There is no material or genuine factual in dispute regarding MET's failure to provide "new value" for Debtor's $100,000 payment because under substantive bankruptcy law a release of unsecured claim liability is not new value, and the Ninth Circuit has been stalwart and consistent on this point, despite MET's protestations to the contrary.

"New value" has a statutory definition in § 547: "In this section… 'new value' means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law… " 11 U.S.C. § 547(a)(2).  MET did not provide any money, goods, or services to the Debtor, but MET argues that MET's litigation releases in the prepetition settlement were a contemporaneous exchange of "new value."  MET is absolutely wrong because the case upon which MET relies is distinguishable on one critically important point – the release was a release of a lien or security interest.  "While releasing a fully secured interest may constitute new value, *the release of an unsecured claim does not*."  *In re JWJ Contracting Co., Inc.*, 287 B.R. 501, 508 (9th Cir.B.A.P.2002) (emphasis added).  MET's release provided no "new value"

-29-

under Ninth Circuit law because MET's litigation claim was a completely unsecured claim without any lien or security interest. "[T]he Ninth Circuit clearly held that new value arises only to the extent that the released claim is secured." *Id.* at 514 (citing *Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerline Oil Co.)*, 59 F.3d 696, 973 (9th Cir.1995)).

Furthermore, in an unpublished decision, the Ninth Circuit rejected the premise of *Lewis v. Diethorn*, 893 F.2d 648, 650 (3d Cir.1990) advanced by MET that release of litigation liability is new value; the Ninth Circuit emphasized the importance of the release of a lien and distinguished that case as "not on point because the payment there lifted an equitable ***lien*** from the property of the estate. As the *Lewis* court explained, this is not a preference because what the debtor received 'was not the freedom from liability on an antecedent debt, but the freedom from the risk of litigation, together with the rise in the value of property which resulted when the ***lis pendens*** was lifted.'" *Shen v. Diamant (In re Yu)*, 215 F.3d 1335 *1, *1 (9th Cir. April 4, 2000) (unpublished) (emphasis added). Without a lien to release as new value, the "payment of the debt did not increase the value of [debtor']s estate. *Id.* Similarly, the Ninth Circuit Bankruptcy Appellate Panel has also rejected the premise advanced by MET under *Lease-A-Fleet v. Wolk (In re Lease-A-Fleet)*, 151, B.R. 341, 352 (Bankr.E.D.Pa.1993), that a liability release of an unsecured claim can form new value, ruling that "[debtor] received nothing of value in exchange for the termination of a lease agreement other than a release of liability," the payment for which was a voidable preferential transfer. *Upstairs Gallery, Inc. v. Macklowe West Development Co., LP (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 919 n.3 (9th Cir.B.A.P.1994). Moreover, *In re Lease-A-Fleet* was once again a case involving a creditor holding a security interest. *In re Lease-A-Fleet*, 151 B.R. at 349-50. The Ninth Circuit is emphatic and consistent in its ruling that "new value" for a release is only for the release of a claim only to the extent

ER-099

that it is secured, and not to the extent it is unsecured.  *In re Powerine Oil Co.*, 59 F.3d 969, 973 (9th Cir.1995).  There is no new value in exchange for MET's release of unsecured claim liability.

Congress' definition of "new value" in Bankruptcy Code § 547(a)(2) is exclusive and not open-ended.  *Energy Co-op. Inc. v. SOCAP Int'l, Ltd. (In re Energy Co-op. Inc.)*, 832 F.2d 997, 1002-03 (7th Cir.1987).  A release of liability does not fall within the definition of "new value" set forth in 11 U.S.C. § 547(a)(2). *Id.* at 1003.  "To hold otherwise would be inconsistent with the contemporaneous exchange exception's purpose.  We refuse to stretch § 547(a)(2)'s language beyond Congress' clear intent."  *Id.*  "The release does not free up any assets for other creditors… All the payment for the settlement and release does is deplete the debtor's estate at the other creditors' expense, frustrating Congress' intent to promote fair distribution among creditors."  *Id.* at 1004.  Accordingly, MET's "release" to the Debtor in the settlement did not and cannot constitute "new value" under § 547(a)(2) and § 547(c)(1).

Furthermore, the "release" by MET was not a "contemporaneous exchange." "Merely because the parties settled and this settlement resulted in a payment to the creditor, it does not follow that the settlement creates a new obligation for which the payment may be deemed outside the scope of § 547(b)(2) and as a 'contemporaneous exchange for new value' under § 547(c)(1)."  *Upstairs Gallery, Inc. v. Macklowe West Development Co., LP (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 919 (9th Cir.B.A.P.1994).  "Creation and contemporaneous payment of a new debt in cancellation of an antecedent debt violates both the form and policy against preferences."  *Id.* at 919.  A compromise or settlement agreement of a claim does not affect the time when the debt first arose.  *Id.* at 918.

"When a creditor threatens to exercise a legal remedy against a debtor, and in exchange for not so doing extracts a payment for antecedent debt, nothing of

-31-

value has accrued to the debtor estate to compensate other creditors for the loss of that payment… Such a transaction falls squarely within the ambit of the preference law, rather than within its exceptions." *Womack v. Houk (In re Bangert)*, 226 B.R. 892, 903 (Bankr.D.Mont.1988) (internal quotation and citation omitted). "[T]he underlying rationale of the section 547(c)(1) exception [for contemporaneous exchange of new value] is that such payments do not diminish debtor's estate." *In re E.R. Fegert, Inc.*, 887 F.2d at 959. Here, the Debtor's $100,000 payment reduced the Debtor's estate by $100,000.

Even if a release of unsecured litigation liability were "new value" (which it is not), MET provided no evidence that the "release" was actually of any "value." MET had the burden of proving a specific measure of "new value" as the party asserting the defense of contemporaneous value under 11 U.S.C. § 547(c)(1). *See*, *In re Bangert*, 226 B.R. at 902 ("burden of proving the specific measure of the new value is on the party seeking the § 547(c)(1) shelter"); 11 U.S.C. § 547(g). MET presented absolutely no evidence of the purported "new value" from MET's release of liability to Debtor as the Unsigned Sullivan Declaration was silent on such supposed "value." B.R. 10472-76.

## V. RELIEF REQUESTED

### A. Appellant's Statement of Relief Requested

MET requests that this Court reverse the Bankruptcy Court's ruling, deny the Debtors MSJ, and grant the MET MSJ.

### B. Appellee's Statement of Relief Requested

Hologenix requests that this Court affirm the Bankruptcy Court's ruling that granted Hologenix's MJS and denied MET's procedurally improper purported "cross-motion for summary judgment."

Dated: October 13, 2023

**WHITE AND WILLIAMS LLP**

-32-

ER-101

_/s/ Nicole A. Sullivan_____

Nicole A. Sullivan
Thomas E. Butler
_Attorneys for Appellant Multiple
Energy Technologies_

Dated: November 12, 2023      **LEVENE, NEALE, BENDER,
YOO & GOLUBCHIK L.L.P.**

By:__/s/ John-Patrick M. Fritz_
RON BENDER
JOHN-PATRICK M. FRITZ
Attorneys for Hologenix, LLC

-33-

ER-102

## CORPORATE DISCLOSURE STATEMENT

### Appellant Statement

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellant Multiple Energy Technologies, LLC hereby discloses that it is a nongovernmental corporate party, and that no parent corporation or publicly held corporation owns 10% or more of its stock.

### Appellee Statement

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Hologenix, LLC hereby discloses that it is a nongovernmental corporate party, and that no parent corporation or publicly held corporation owns 10% or more of its stock.

-34-

ER-103

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| In Re: ) | Case No. 2:23-bk-16904-BR |
| ) | |
| SETH HALDANE CASDEN, ) | Chapter 11 |
| ) | |
| Debtor. ) | Los Angeles, California |
| _____ ) | Tuesday, February 17, 2026 |
| ) | 10:00 a.m. |
| ) | |
| In Re: ) | Case No. 2:20-bk-13849-BR |
| ) | |
| HOLOGENIX, LLC, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| MULTIPLE ENERGY TECHNOLOGIES, ) | |
| LLC, ) | Adv. No. 2:25-ap-01067-BR |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DISCOVER BANK d/b/a DISCOVER ) | |
| CARD, ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| MULTIPLE ENERGY TECHNOLOGIES ) | |
| LLC, ) | Adv. No. 2:24-ap-01022-BR |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CASDEN, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

MULTIPLE ENERGY TECHNOLOGIES, )
LLC,                          )  Adv. No. 2:25-ap-01068-BR
                              )
          Plaintiff,          )
                              )
      vs.                     )
                              )
DEVOTO,                       )
                              )
          Defendant.          )
_____)
                              )
MULTIPLE ENERGY TECHNOLOGIES, )
LLC,                          )  Adv. No. 2:25-ap-01069-BR
                              )
          Plaintiff,          )
                              )
      vs.                     )
                              )
ARIA RESORT & CASINO,         )
                              )
          Defendant.          )
_____)
                              )
MULTIPLE ENERGY TECHNOLOGIES, )
et al.,                       )  Adv. No. 2:22-ap-01101-BR
                              )
          Plaintiffs,         )
                              )
      vs.                     )
                              )
NORTHERN TRUST COMPANY,       )
                              )
          Defendant.          )
_____)

CONT'D STATUS CONFERENCE RE
CHAPTER 11 CASE

iii

CONT'D HRG. RE DEBTOR'S MOTION FOR ORDER:
(1) APPROVING DISCLOSURE STATEMENT,
(2) ESTABLISHING VOTING, PLAN CONFIRMATION AND OTHER PROCEDURES,
(3) SCHEDULING PLAN CONFIRMATION HEARING AND SETTING OTHER RELATED DATES AND DEADLINES, AND
(4) PROVIDING OTHER ANCILLARY AND RELATED RELIEF

CONT'D HRG. RE MOTION FOR PROTECTIVE ORDER REGARDING 2004 EXAMINATION OF AND DOCUMENT PRODUCTION OF THE NORTHERN TRUST COMPANY OF DELAWARE

CONT'D STATUS CONFERENCE RE COMPLAINT TO:
1) AVOID AND RECOVER PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. SECTION 544, 548, 550 AND 551; AND
2) DISALLOW CLAIMS OF DEFENDANT PURSUANT TO 11 U.S.C. SECTION 502(d)

CONT'D STATUS CONFERENCE RE COMPLAINT FOR DETERMINATION OF NON DISCHARGEABILITY OF A DEBT

CONT'D STATUS CONFERENCE RE COMPLAINT TO:
1) AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. SECTIONS 3439.04, 3439.05, ET SEQ. AND
2) DISALLOW CLAIMS OF DEFENDANT PURSUANT TO 11 U.S.C. SECTION 502(d)

iv

CONT'D STATUS CONFERENCE RE COMPLAINT TO:
1) AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. SECTIONS 544, 547, 548, 550 AND 551, CAL CIV CODE SECTIONS 3439.04, 3459.05, ET SEQ; AND
2) DISALLOW CLAIMS OF DEFENDANT PURSUANT TO 11 U.S.C. SECTION 502(d)

CONT'D STATUS CONFERENCE RE COMPLAINT TO:
1) AVOID LIENS PURSUANT TO 11 U.S.C. SECTION 544, 547, 549 AND 550;
2) AVOID AND RECOVER PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. SECTIONS 547 AND 550;
3) RECOVER CERTAIN UNAUTHORIZED PURSUANT TO 11 U.S.C. SECTION 549 AND 550; AND
4) DISALLOW CLAIMS OF DEFENDANTS

CONT'D HRG. RE STATUS ON REMAND

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BARRY RUSSELL
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Seth Haldane Casden:          GREGORY M. SALVATO, ESQ.
                                  Salvato Boufadel, LLP
                                  505 North Tustin Avenue
                                  Suite 282
                                  Santa Ana, California 92705
                                  (213) 484-8400

*Briggs Reporting Company, Inc.*

v

APPEARANCES:  (cont'd.)

For Hologenix, LLC:                     JOHN-PATRICK M. FRITZ, ESQ.
                                        Levene, Neale, Bender, Yoo &
                                          Golubchik, LLP
                                        2818 La Cienega Avenue
                                        Los Angeles, California 90034
                                        (310) 229-1234


For the Subchapter V Trustee            GREGORY K. JONES, ESQ.
  for Hologenix, LLC:                   Stradling, Yocca, Carlson &
                                          Rauth
                                        10100 Santa Monica Boulevard
                                        Suite 1450
                                        Los Angeles, California 90067
                                        (424) 214-7044


For The Northern Trust                  MICHAEL B. REYNOLDS, ESQ.
  Company of Delaware, as               Snell & Wilmer, LLP
  Trustee for the Seth                  600 Anton Boulevard
  Casden Resulting Trust:               Suite 1400
                                        Costa Mesa, California 92626
                                        (714) 427-7000

                                        NICOLE A. SULLIVAN, ESQ.
                                        White & Williams, LLP
                                        810 Seventh Avenue, Suite 500
                                        New York, New York 10019
                                        (212) 244-9500


For Multiple Energy                     ROYE ZUR, ESQ.
  Technologies, LLC:                    Elkins, Kalt, Weintraub,
                                          Reuben & Gartside, LLP
                                        10345 West Olympic Boulevard
                                        Los Angeles, California 90064
                                        (310) 746-4400


Court Recorder:                         Sarah Clark/Dawnette Francis
                                        United States Bankruptcy Court
                                        Edward R. Roybal Federal
                                          Building
                                        255 East Temple Street
                                        Los Angeles, California 90012

*Briggs Reporting Company, Inc.*

vi

Transcriber:                    Briggs Reporting Company, Inc.
                                9711 Cactus Street
                                Suite B
                                Lakeside, California 92040
                                (310) 410-4151

1

LOS ANGELES, CALIFORNIA TUESDAY, FEBRUARY 17, 2026 10:00 AM

--oOo--

(Call to order of the Court.)

THE CLERK:  Okay.  Recalling 31 through 39, Seth Casden and Hologenix.

MR. REYNOLDS:  Good morning, your Honor.  Michael Reynolds of Snell and Wilmer, appearing on Matter Number 33 only for Northern Trust Company of Delaware.

THE COURT:  Here, Stacy -- excuse me a second. Stacy, I need the files.  Okay.

All right.  Why don't you give you appearances.

MR. ZUR:  Good morning, your Honor.  Roye Zur of Elkins Kalt on behalf of Multiple Energy Technologies --

THE COURT:  Okay.

MR. ZUR:  -- on all Casden and Hologenix matters.

THE COURT:  Okay.

MR. SALVATO:  And good morning, your Honor. Gregory Salvato.  I'm appearing on behalf of Debtor Seth Casden, who is also present in the courtroom for this and the other --

THE COURT:  All right.

MR. SALVATO:  -- Hologenix matters.

THE COURT:  All right.

MR. FRITZ:  Good morning, your Honor.  J.P. Fritz of Levene, Neale, Bender, Yoo and Golubchik, for the Chapter

2

11 Debtor and Debtor-in-possession Hologenix, LLC.

THE COURT:  All right.

And we have Mr. Jones, who I would assume -- I always -- sometimes don't look -- don't look down to see who's on Zoom, but, Mr. Jones, I always allow the trustee, the Sub V Trustees to -- to be Zoom.

So let me ask you --

MR. JONES:  (Indiscernible.)

THE COURT:  Hi.  I'm not sure if you have any -- I would like to ask, but there's a lot of stuff going on.  Do you have any -- any opinions or anything you'd like to say about the things that are on calendar?

MR. JONES (via Zoom):  Yeah.  For the record, Greg Jones, Subchapter V Trustee in this case.  There's a lot going on I think, but I --

THE COURT:  Right.  Yes.

MR. JONES:  -- but I do think -- my gut reaction is to allow the Debtor to try to confirm the plan that's existing based on some of the rulings that the district court made.  I think there's a way to do that.

If that doesn't work, I think Debtor should be able to allow -- to file an amended plan given everything. I understand the delay that's been going on, but a lot of it is --

THE COURT:  It's been a while.  I was trying to

3

think.  I remember hoping that -- I don't care how they rule, but I was just hoping that the circuit would actually make a rule (sic), and I could move on with the case, but they haven't, and that's okay, too.  But I can understand in reading their -- the opinion, that they figure they don't have jurisdiction.

So I'm not sure -- that's why we're here I guess today, is to -- okay.  I assume -- well, there were certain things.  It's been so long -- it's been, what, a year?  I can't remember when I -- when it went up to appeal, but it's been a long time.

MR. FRITZ:  Yes, your Honor.  Thank you.  For the record, J.P. Fritz --

THE COURT:  Okay.  But what about -- but let me -- let me ask.  Is there -- first of all, Mr. Casden, what about for matters as far as Mr. Casden?  He's -- his case really depends -- well, there are two things.  In great part, his ability to reorganize obviously depends on what the circuit does in Hologenix, because that's his business, but there's more to it than that.

MR. SALVATO:  That's correct, your Honor.  The last time we were here was on the motion by MET to file -- to ask for appointment of a trustee --

THE COURT:  Right.

MR. SALVATO:  -- which was denied, and that is now

4

on appeal to the district court.  And the first briefs are due --

THE COURT:  I remember they did it.  I lost track of what's --

MR. SALVATO:  I think it was --

THE COURT:  And my view is, it's really no fault of Mr. Casden that -- all this time, it's just that the -- and appeal basically of Hologenix is what did it.  But, yes, again, people are -- have a right to appeal.  So that -- so that's presently before the district court?

MR. SALVATO:  It's before the district court.  I think the opening brief's due next month, so.

THE COURT:  Okay.  Anything else as far as Mr. Casden?

MR. SALVATO:  That's really it.  We're really following along in the main -- the main act is the Hologenix case.

THE COURT:  Well, right.  It has been from the very beginning.  And so, okay.  So, thank you.

Okay.  So now about -- yes?

MR. ZUR:  Can I just add something?

THE COURT:  Sure.  Sure.

MR. ZUR:  Just really -- really quickly.

THE COURT:  Why don't you give your appearance again.

*Briggs Reporting Company, Inc.*

5

MR. ZUR:  Yeah.  Again, Roye Zur on behalf of MET.

THE COURT:  All right.

MR. ZUR:  The only other thing I'd add about the Casden case that -- that probably impacts how the case moves forward is, I believe the oral argument on the underlying judgment by MET against Mr. Casden --

THE COURT:  That's right.  I forgot about that.

MR. ZUR:  -- that oral argument is scheduled I believe for mid-April.

THE COURT:  And that's in the district court as well?

MR. ZUR:  No, that's in the Ninth Circuit.

THE COURT:  No.  Well, the opinion was at the district court.  It's got to be in the circuit court, right?

MR. ZUR:  Correct.  Right.  So that' before the Ninth Circuit.  I believe that's going to be argued in mid-April.  I believe it's the 15th.  So we should have, hopefully, resolution on that soon.

THE COURT:  Okay.  Well, thank you.  No, I totally forgot about that.  Let me see.

MR. ZUR:  And obviously --

THE COURT:  That's the main multi-million-dollar judgment --

MR. ZUR:  -- obviously that's going --

THE COURT:  -- you have against Mr. Casden.

6

MR. ZUR:  Right.  And obviously, your Honor, that's going to affect what happens in that case as far as nondischargeability goes --

THE COURT:  Yes.

MR. ZUR:  -- because I think that's what your Honor has been waiting on --

THE COURT:  Yes.

MR. ZUR:  -- on nondischargeability.

THE COURT:  Right.  Okay.  Well, thank you.

MR. SALVATO:  I don't disagree with that.  I would just -- wanted to recall or ask the Court about what looked like a motion for fees for Northern Trust.  And I'm not sure if that was a request --

THE COURT:  There was some -- yeah, right.  There was a -- what -- that's the -- that's the -- well, the trust, and I -- that's right.  There's so many.  That's why I kept asking.  Yes.  There was a question of wanting fees because they -- they were asked to do things and weren't -- and so forth.  Yes.  Well, that one is issue.  I've seen one.  What about -- what about that?

MR. SALVATO:  Yes, your Honor.

THE COURT:  Why don't you come to the podium. What -- where did that end up?  I mean, I know it's been going on for some time with privileges and so forth, and I knew it was there, but it is -- have you -- is, I guess, has

7

MET, have they given up -- maybe I'm asking the wrong person, give up in the sense of needing more information? You -- and it sounds like that's what you've said has happened, right?

MR. REYNOLDS:  Well, it seems that we've -- we have reached a point where they're are no longer asking for additional information.

THE COURT:  Well, that's what I thought.

MR. REYNOLDS:  Yeah.

THE COURT:  Let me ask you this.  What kind of -- is that still the case, is that -- because that's where I ended up.  Your question is, well, we've done all this extra effort.  They don't now only want -- now it's the time that they pay for our efforts, more or less, is that your statement?

MR. REYNOLDS:  I think that would summarize it, yes.

THE COURT:  Well, you have executive summary, but was the case as far as you're not -- as far as getting information out them, MET is -- that's pretty much it?

MR. REYNOLDS:  I'm not aware of anything specific, your Honor, but my co-counsel, Ms. Sullivan, who's in New York, and probably on the Zoom, I've asked her to confirm for me.  So, I can't --

THE COURT:  Okay.  Well, this -- no, counsel here

8

for the trust would know that, but I was -- you know, there are always two sides -- always two sides --

MR. REYNOLDS:  I appreciate it.  Thank you.

THE COURT:  But assuming that's the case, that -- and at what point did you -- I'm trying to remember because it's been going on for so long.  Have you made a formal motion with numbers and so forth?

MR. REYNOLDS:  Yes, we did include in our status report per the Court's --

THE COURT:  Well, it's a status report but not a motion.  That's my question.

MR. REYNOLDS:  Yes, that's correct.  It was not a motion, but in -- we've had so many status reports in the --

THE COURT:  No, no.

MR. REYNOLDS:  Yeah.

THE COURT:  And it's good, but my memory was it's in the status report, but if you want -- you want me to order them to pay anything, that has to be by a motion, right?

MR. REYNOLDS:  We can certainly do that by motion. The last --

THE COURT:  Well, a status report won't do it unless you've made a formal -- putting it in a status report doesn't tell me that you're entitled to it.

MR. REYNOLDS:  Well, and what we were hoping is,

9

is that MET would agree to this. In fact, the last communication we had with Ms. Sullivan was that she would get to us in advance of the status conference --

THE COURT: No, read --

MR. REYNOLDS: -- and let us know.

THE COURT: I read your -- my question is this. Because I know that you've raised a question. I don't even remember under what principle of law that you're -- I'm not going to rule on it today, but I'm just curious from my standpoint what -- what's the basis of it. I just don't remember. It's been going on for so long. The basis for them paying -- you want them to pay for what, for your efforts to come up with all the information?

MR. REYNOLDS: Yes, your Honor, that is correct.

THE COURT: And the basis for that would be?

MR. REYNOLDS: The basis would be that we're a -- we're a third party, non-party to any of this and --

THE COURT: No, I understand that, but still -- I get that --

MR. REYNOLDS: Yeah.

THE COURT: -- why you would be upset. But what's the basis for -- for -- you haven't filed a motion yet.

MR. REYNOLDS: You're right.

THE COURT: But what --

MR. REYNOLDS: We have not filed a motion.

10

THE COURT:  And I don't -- you could be right.  I have no idea under the -- I have to follow the law, whatever it is.  Is there a law that says that they have to pay you for your efforts?

MR. REYNOLDS:  Yeah.  Well, we'll certainly put it in the motion.

THE COURT:  Okay.

MR. REYNOLDS:  If they're not willing to -- to do so.

THE COURT:  I'm curious, what would be --

MR. REYNOLDS:  But our understanding was they --

THE COURT:  -- what would be the -- I'm just curious now more -- I'm not ruling on it, but -- because off the top of my head I can't think of it, but again, this whole area of -- of the trust and getting the information, I don't recall ever -- not that it hasn't happened, that anybody's asked for being compensated for the effort.

You know, clearly, you put -- I can tell from previous communications, that there was an effort put in to get these various documents and so forth.  But what -- I mean, I'm -- and I'm not going to hold you to it, but I'm just curious myself, what's the basis for them to say, okay, we'll pay you x number of dollars?

MR. REYNOLDS:  Well, your Honor, I would say the inherent equitable powers of the Court to shift the cost and

11

the burden of complying with discovery requests that --

THE COURT: Well, okay, but there must be cases on that. What I'm saying is, I don't recall -- I've had -- the only time that I -- again, I'm not saying you're wrong, I'm curious. When you're dealing with discovery disputes, I've awarded, you know, call it sanctions or fees, only when the -- one of the sides did something wrong.

MR. REYNOLDS: Yeah. And I don't think this is a case of --

THE COURT: And that's generally what I do.

MR. REYNOLDS: Yeah.

THE COURT: And so, I don't recall -- I'm not saying you --

MR. REYNOLDS: Yeah.

THE COURT: -- don't have the right to --

MR. REYNOLDS: This is all --

THE COURT: -- just as a matter of equity -- you know, equity does have meet some basis in law, too.

MR. REYNOLDS: Well, but this is all being done under Rule 2004. I don't think there are any allegations by either side that somebody has misbehaved and should be sanctioned. However, it would certainly be appreciated if -- you know, we could have worked -- if we could have gotten some sort of response back from MET saying, you know, number one, yes --

12

THE COURT:  I get --

MR. REYNOLDS:  -- we're done.

THE COURT:  No, I hear --

MR. REYNOLDS:  We've had enough.

THE COURT:  I hear what --

MR. REYNOLDS:  We -- you don't need to drive up to Los Angeles this morning --

THE COURT:  -- I hear what you're saying.

MR. REYNOLDS:  -- you know.

THE COURT:  And they may or not agree, but I so far have not heard any legal principle.  I've heard -- you know, I get it, if you had to go through the effort.

MR. REYNOLDS:  Yeah.

THE COURT:  But for me, I need to -- so just think about -- you could -- I can't stop you -- I'm not saying I won't agree, but you'd need to have some actual authority, not just it would be fair.  That's not a rule of law, but --

MR. REYNOLDS:  Well, fair enough, your Honor. We'll file a motion if that's what it takes, but since we've got Ms. Sullivan on the line, and I haven't been able to get her to respond to us --

THE COURT:  Well, no, I don't want --

MR. REYNOLDS:  -- for two weeks, it'd be nice to hear.

THE COURT:  But, no, as far as -- but I am -- as

13

far as I'm concerned at this point, I don't see her on the line in any case.  Well, maybe you are.

MR. REYNOLDS:  I do.  I see her.

THE COURT:  Actually, is she on?

MR. REYNOLDS:  I --

THE COURT:  I see your name.

MR. REYNOLDS:  Unless there's more than one.

THE COURT:  Let me ask you.  Ms. Sullivan, can you hear me?  I'll let you -- you're there just observing, but I have the power to let you say something.  A very simple question.  Is there any -- is there anything you need still of the trust?

MS. SULLIVAN (via Zoom):  Thank you, your Honor. Nicole Sullivan from White and Williams.

THE COURT:  A simple yes or no.

MS. SULLIVAN:  We had asked for updates --

THE COURT:  Is there anything else you need from the trust?  Which doesn't answer the question, that they'd like to be compensated for their efforts, but is there anything through --

MS. SULLIVAN:  Well, I don't think it -- I don't think it's a simple yes or no.  It's something we had to work out with Northern Trust because we had asked for something and they didn't want to produce it.  And then we were discussing with the client --

14

THE COURT:  Unless your answer --

MS. SULLIVAN:  -- whether to let it go or not.

THE COURT:  -- is at this point -- well, what -- then I would like you to do, because it would not be -- I hear what you're saying, but if -- it could be a very -- is there something specific for both sides -- at some point it might -- your side might be unreasonable, but they want to know right now, what is it -- you said something about that they haven't responded.  But what is it that they haven't responded that you want them to respond to?

MS. SULLIVAN:  No, they've responded.  They said they didn't want to produce any additional statements --

THE COURT:  Well, no.  The response --

MS. SULLIVAN:  -- because Mr. Casden is continuing to --

THE COURT:  Well, let me stop you.  Ms. Sullivan, have you -- you've made specific requests.  My question is very simple.

MS. SULLIVAN:  Yes.

THE COURT:  Have they refused -- I assume you made these requests in writing?

MS. SULLIVAN:  Yeah.  She spoke with Mr. Reynolds co-counsel, Ms. Murray, over e-mail.

THE COURT:  Well, either you -- one of you did it.  Have they not complied with your request?

15

MS. SULLIVAN:  There's not an easy yes or no to that, your Honor.

THE COURT:  Well, it should be yes or no. Equivocation doesn't help with me.  It's a very simple question.  So what I'm going -- I'm going to say, because at some point --

MS. SULLIVAN:  So --

THE COURT:  -- if one of the sides is acting unreasonably, mainly if you're asking for them now to do things you haven't asked for, I might consider sanctions, but I'm not considering that at this point.

I'm saying, I've got you -- so what I'm saying is, I am not going to order you now, because this has brand new to me, I mean, this discussion, but I would think it would be very -- you know, they are -- they are a separate third party here.  And I would be very careful --

MS. SULLIVAN:  It's it's --

THE COURT:  -- if they -- there had been a lot of discovery, and I -- my assumption was so far that you've gotten what you need.  If you don't, I strongly suggest you put something in writing so they can respond.  That has nothing to do at the moment with your request, but I think in all fairness to the trust, they want -- they want this to be ended.  So I strongly suggest, if you have any that you -- I'd like you to respond to them if you have any further

16

requests.  I'll give you one week from today to do that.  If you have any further requests, period.  And if you do find --

MS. SULLIVAN:  Thank you, your Honor.

THE COURT:  I mean, I have no -- I have no basis to know whether those are reasonable, but if you don't -- and respond.  And if the answer is no, then at least they will know that they are done with you as far as further requests.

The other question about paying for the time, that's a different question.  So, thank you, Ms. Sullivan.  And I think at least that -- that answers your question.

MS. SULLIVAN:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

MR. REYNOLDS:  Thank you, your Honor.

THE COURT:  All right.  And again, if you wish to file something, so be it.  But, anyway, anything else that's left?  We need -- we need to do something about the appeal.

MR. FRITZ:  Yes, your Honor.  Again for the record, J.P. Fritz for Hologenix, LLC.

THE COURT:  Yeah, that's the one I don't -- I'm not quite sure what to do.

MR. FRITZ:  Yes, your Honor.

THE COURT:  Except, really the ball's in your court in a sense.  You appealed -- you appealed.  I have

17

confirmed -- there were certain things that I did.  I remember those.  One of those is confirm the plan, and a few other things.  There were employment contracts and so forth. There were other things.  And the district court disagreed, and you appealed that.  So what we're now at is what the district court ruled.  So the question is -- I can't -- I've already -- they've already -- the district court said, no, you have to do certain things.

My question is, what -- are you going to amend the plan?  Do we need a factual hearing?  I've read the opinion, I'm just not sure what you want.  Of course I'll ask the other side, too.  What do you want me to do?

MR. FRITZ:  Thank you, your Honor.  For the record, Hologenix -- J.P. Fritz for Hologenix, LLC.

We would like to submit briefing to the Court to amplify the findings and conclusions on the plan and the executory contract, and explain on the basis --

THE COURT:  Well, the district -- the district court said I have -- used the wrong standard, as I recall.

MR. FRITZ:  Yes, your Honor.

THE COURT:  Okay.  And that's the law.  I mean, you know, I did what I did, but obviously if the district said that I used the wrong standard, then I should do it -- and the correct standard.

Anything else that the district court said I

18

should do?

MR. FRITZ:  Your Honor, the district court remanded the plan for the -- based -- because the district court said that the incorrect standard was used for interpreting fair and equitable.

THE COURT:  That's one thing.

MR. FRITZ:  "That's one thing."  The district court remanded on the executory contract assumptions saying that the incorrect legal standard was used because it should -- whether to assume or reject, it should be based on the inherent fairness test.

THE COURT:  Okay.

MR. FRITZ:  And then the third thing, the district court remanded the motion for summary judgment on the $100,000 preference payment --

THE COURT:  Right.

MR. FRITZ:  -- because the Court did not consider -- or did not give any weight to the declaration of Ms. Sullivan.

THE COURT:  Right.

MR. FRITZ:  And so on remand, we would like to submit briefing to the Court on to why the -- in considering those -- the record as it is --

THE COURT:  Well, no.

MR. FRITZ:  -- why the Court should confirm --

19

THE COURT:  By the way, I don't intend to have a new trial or anything.  The -- that on this record I can certainly, for instance, consider different things.  I don't anticipate at the moment -- to save everybody else a lot of effort, time and expense, to what -- I think what you say is reasonable.  Let me hear from the other side.  Anything that they -- he's missed.

MR. FRITZ:  Your Honor, I just want to -- before Mr. Zur takes the podium, I just wanted to clarify.  Yes, we're not asking to expand the record on any of these matters.

THE COURT:  Yeah.  On that --

MR. FRITZ:  We're just asking for -- for legal --

THE COURT:  -- record, you -- the different standards.

MR. FRITZ:  -- for legal briefing.

THE COURT:  And to -- and at least in the $100,000, the preference action you're talking about, that I need to consider her -- her testimony.

MR. FRITZ:  Her declaration.

THE COURT:  Yeah.

MR. FRITZ:  Yes, your Honor.  Thank you.

THE COURT:  Okay.  Is that -- does that -- it sounds pretty good, but I don't know if there's anything you've missed that -- and again, I will -- what do you --

20

are those the issues?

MR. ZUR:  Your Honor, those are the issues.  I do want to respond to Mr. Fritz' suggestion, if I may.

THE COURT:  Sure.  Sure.

MR. ZUR:  I don't know how you can look at the same plan that's four years old in 2026 when it was proposed in 2022, with projections that I think pretty clearly did not --

THE COURT:  Well, why don't we do this.  You may be right --

MR. ZUR:  -- materialize.

THE COURT:  -- but that -- I think the idea of a brief -- and again, that would be one of your arguments that you may need new evidence.  So I'm saying at this point I'm not going to allow that, but if it turns out that indeed things are stale because of -- because of predictions of feasibility and what have you, if that's what you're saying, I'm not going to determine that now, but you may be right.

MR. ZUR:  I think the one thing that you should also consider, your Honor, is not just about the projections and did they actually materialize in the way that they were -- the way that they were presented, but also the plan, we now know would not have been feasible, right?  We have actually the benefit over the last four years of performance, right?

21

THE COURT:  Well, I -- I have no idea.

MR. ZUR:  Well, I can tell you --

THE COURT:  Well, you -- no, I don't want you to tell me.  You may -- I'm not saying you're right or wrong, I'm saying I want this in the papers.

MR. ZUR:  I understand.

THE COURT:  I -- and again, you may very well be right that I have no -- quite frankly, I have no idea of all the numbers and so forth.  So, it seems to me the best thing is to what counsel suggested, and you can point out why, you know, why -- you can have -- you can have certain -- it may be that I would allow -- originally, I was thinking just it was simple just on argument, but it seems to me if indeed you're alleging that things have changed, you would need a declaration or two as to that fact.

MR. ZUR:  What I would suggest, your Honor, is I think the Court has a lot of options in front of it in terms of how to proceed.  It's almost like an OSC, right?  How are we proceeding here?  I think on one hand, there are arguments for converting this case, just based on what's happened over the last four years.

On the other, there's the option of moving forward with a amended plan.  I don't know how you can move forward with the current plan, but let them argue --

THE COURT:  Well, you may be right --

*Briggs Reporting Company, Inc.*

22

MR. ZUR:  -- let them argue how.  Right.

THE COURT:  -- but I can't make that finding now.

MR. ZUR:  Right, right.  So what I would -- what I would suggest, your Honor, is that the Court simply set an OSC and the parties can brief these issues.  And the options I think are pretty clear.  You can either propose a new plan, you can convert this case based on evidence that you'll have before you, or you can allow them somehow to move forward with the current plan.

THE COURT:  My only question is, is I originally said that there would be no new evidence, but if you're -- I have -- now that you're saying that the -- things have changed so much, that they're not feasible for whatever reason, that would require evidence, would it not?

MR. ZUR:  Well, look.  It's either -- it's --

THE COURT:  No, no.  Answer my question.  If you're saying that because of the lack of performance or whatever, I don't know what the facts are, you would need -- you can't just say it, you would need to --

MR. ZUR:  Absolutely.  But it wouldn't be evidence -- it would be evidence of what's happened, right?

THE COURT:  Yes.  Not changing anything.

MR. ZUR:  Yes.

THE COURT:  What's happened in the -- exactly.

MR. ZUR:  Yeah, absolutely.  I mean, we're looking

23

way past -- whatever it was, June of 2022, to the present and that's what --

THE COURT: Okay. Well, let me stop you then. That seems reasonable. I hadn't really thought what you had just said. Again, I don't know if you're right or not, but if indeed it is -- the plan was how many years? Is it four years? It'd been that long?

MR. FRITZ: Yeah. Thank you, your Honor.

THE COURT: I had lost track. I knew it was a long time. Has it been four years since the district court ruled?

MR. FRITZ: For the record, your Honor, J.P. --

THE COURT: Well, actually when they filed the plan --

MR. FRITZ: -- J.P. Fritz.

THE COURT: -- is four years. The district court ruled, and then it's been, what, a couple years on the circuit or something like that?

MR. FRITZ: Yes, your Honor. J.P. Fritz for Hologenix.

THE COURT: Yeah.

MR. FRITZ: The Court confirmed this plan at a hearing in August of 2022.

THE COURT: Right.

MR. FRITZ: MET requested a stay pending appeal.

24

This Court denied that stay.

THE COURT: Right.

MR. FRITZ: The district court entered a stay pending appeal almost immediately within a couple of days during the holidays.

THE COURT: Okay.

MR. FRITZ: The district court issued its ruling in March of 2024. In --

THE COURT: So it has been a couple years.

MR. FRITZ: -- in March of 2025, the Ninth Circuit issued its order saying, we accept these appeals, brief the issues, and also brief jurisdiction.

THE COURT: Right.

MR. FRITZ: After everything was briefed, two weeks ago we got the order from the Ninth Circuit --

THE COURT: Right.

MR. FRITZ: -- that said, well, we decided we don't have jurisdiction after all.

THE COURT: Right.

MR. FRITZ: But our --

THE COURT: Okay.

MR. FRITZ: I think from Hologenix --

THE COURT: Well, we're all bound by it, so here we are.

MR. FRITZ: We're all bound by it. And the

25

Hologenix position is that the plan has been stayed at the request of MET for all of these years --

THE COURT:  But what about the question of the facts may have changed?

MR. FRITZ:  Yes.  Specifically, your Honor, Subchapter V plans that are confirmed in this way set forth projected disposable income payments to creditors.

THE COURT:  Right.

MR. FRITZ:  They can be paid throughout --

THE COURT:  I get it.  But if those projections are changed because of --

MR. FRITZ:  -- throughout the (indiscernible) or early.

THE COURT:  -- what's happened in the meantime?

MR. FRITZ:  But the Court confirmed that plan.  So if there is a way to pay that money, that is a feasible plan.  And the Ninth Circuit --

THE COURT:  Well, actually, no.  I think -- you know, more I think about it, I think you're right.  That if we're -- if we're talking about just the plan, I'd have to look at the plan at that time and whether -- I think -- I know I just changed my mind on the new evidence of -- you do -- it is the plan.  And the question is, at that time, that's what we're talking about.

The circuit says I would have to look at the --

26

the plan in the district court.  I think you're right.  I don't think at this point I need anything new.  It's what -- it's whether or not that plan, whether I should have confirmed that plan under that standard.  I think that's correct.

I don't think the -- so I'm going to leave it this way.  I don't think at this point -- you can put, again, any brief, but I'm not going to allow any new evidence.  I'm going to follow what the -- what the district said I did wrong.  And I think that I should do it as of -- as of the plan.  That's what the -- it may be as a practical matter things have changed, but that -- but that is not the issue before me.  The issue before me is, should I have confirmed that plan given the issues you've said.  So I think I've changed my view, at the moment anyway.

So there will be no -- there will be no -- you can argue it, but I don't want any new declarations as far as any -- any new evidence.  It's a -- to say it's a little tricky would be an understatement, but I think I should really look at it as of four years ago what the plan was, and if -- and if I look at what they've asked me to do, the district court said I should have done, the circuit now says do it basically, and if I agree, then I can, you know, confirm it or I can disagree.  I have no idea what I am going to do.

27

So I'm going to do this then.  It should take you not a lot -- I don't know if I have to continue this for a period.  The Casden one, that will just be -- that kind of trails along because it's also an appeal, but I'll keep them together to the extent that counsel want to appear on those.

I'll give you, what, maybe how long -- well, I guess my question is, the briefing should go -- on the issue I guess the burden is on the Debtor, so the Debtor goes first, MET would respond in the briefing, then you would respond.  That makes sense to me anyway.

MR. FRITZ:  Yes.  Thank you, your Honor.  For the record, J.P. Fritz --

THE COURT:  How long would it take you to -- I'm sure no doubt you've thought -- both sides, you've thought about this, maybe on different paths, but you've thought about at least -- and maybe just a limited issue is to -- now I will consider a different standard and consider Ms. Sullivan's evidence or whatever the district court wanted me to do.  I don't -- I remember the issues.  I don't remember exactly what they -- I know the district court, I didn't consider certain evidence with Ms. Sullivan.  So, yes, I remember were the issues.  By the time I see your papers I will know exactly what -- especially on the evidentiary objections.

So how long will it take you to file -- you have

28

an advantage because you know pretty much what you're going to do.

MR. ZUR:  I don't see that advantage.

THE COURT:  Yeah.  Well, no, but an advantage in the sense of timing.  That you'll go first, then you'll go. But -- and I think you're both -- you're all good lawyers involved.

MR. FRITZ:  Your Honor, I would request three --

THE COURT:  Should --

MR. FRITZ:  -- three weeks, and an equal amount of time for --

THE COURT:  Okay.

MR. FRITZ:  -- MET to respond.

THE COURT:  All right.  Okay.  So why don't we do this.  Let me give you --

MR. FRITZ:  Mostly because we have three different remands and a lot of it is transferring the record of appeal back into our bankruptcy docket.

THE COURT:  Yeah, but you know what the issue -- the issue is -- remember, we're backing -- the appeals are one thing.  It's really the district court order we're talking about now, not the -- not the circuit.

It's just basically, what did -- quite frankly, I generally remember what the district court told me to do, but that it's been so long.  I must admit, I know generally,

29

but I'd have to actually be specific, and of course you guys will focus me on it, and I will certainly re-read the district court opinion when I -- when I rule. Do exactly what I should do.

So, three week --

MR. FRITZ: Three weeks for Hologenix.

THE COURT: Okay. All right.

MR. FRITZ: Three weeks for MET to reply.

THE COURT: Why don't we do this. Let me give you --

MR. FRITZ: And then two weeks for our reply.

THE COURT: Stacy here keeps me out of trouble. Give me the dates, three weeks from today. I don't think we need a written order, but it would be on the record that you will have to file your -- your brief regarding what I should do and how -- and comply with what the district court told me to do, essentially.

So, what's three weeks from today?

THE CLERK: Three weeks from today is March 10th.

THE COURT: "March 10th."

THE CLERK: Yes.

THE COURT: That sounds about right.

Okay. So March 10 for you to file your opening brief, so to speak. Three weeks after that would be?

THE CLERK: Is March 31st.

30

THE COURT:  "March 31st."  I was wondering how many -- I forget.  I count on my hand which months have 31. Okay.  March 31, counsel to -- for MET, to reply.

And then another three weeks to reply?

MR. FRITZ:  Yes, your Honor.  April 21?

THE COURT:  If you say so.  Was that right? You're probably -- you're probably looking at a -- I'm not looking at a calendar.

Is that right?  Sounds about right.

THE CLERK:  Yeah, April 21.

THE COURT:  Okay, to respond.  And then maybe a couple weeks after that we'll have a hearing on it, whenever we -- whatever is available.

THE CLERK:  We have to do the May 26 at 10:00, Judge.

THE COURT:  Okay.  That is May what?

THE CLERK:  26 at 10:00.

THE COURT:  Okay.  May 26 at 10:00 will be the -- and again, that will be obviously an in-person hearing.  And I'll continue to May 26 all the Casden matters.  You can appear or not as you -- but I don't think there will be any -- well, who knows.  There's the -- well, the briefs, I remember -- I forgot already.  (Indiscernible) gave us some dates when the -- when it was --

MR. SALVATO:  April 15th is the oral argument, and

Case 2:20-bk-13849-BR   Doc 1144   Filed 03/31/26   Entered 03/31/26 21:14:40   Desc
Main Document   Page 188 of 190

31

the district court brief was March 11th.  Oral argument on the Ninth Circuit case, April 15th.

THE COURT:  Well, I would like certainly a two week -- again, two weeks -- getting back to Mr. Casden, two weeks prior to the May 26, again, in both cases actually, a status report.

MR. SALVATO:  Very well.

THE COURT:  And if you know by that something report, you're certainly welcome of course, because obviously you're interested in what happens obviously in Hologenix, but -- all right.  Well, it's been fascinating. It's -- let's see what happens.

MR. FRITZ:  Thank you, your Honor.

MR. SALVATO:  Very well.

THE COURT:  Thank you.  Thank you very much.

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Holly Steinhauer          3-23-26
Transcriber                   Date

*Briggs Reporting Company, Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10345 Olympic Boulevard, Los Angeles, California 90064.

A true and correct copy of the foregoing documents entitled (*specify*): **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSES TO DEBTOR'S BRIEFS FILED AFTER REMAND FROM THE DISTRICT COURT** will be served or were served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 31, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Todd M Arnold    tma@lnbyg.com**
- **Ron Bender    rb@lnbyg.com**
- **Thomas E Butler    butlert@whiteandwilliams.com, sullivann@whiteandwilliams.com;millnamowm@whiteandwilliams.com;panchavatis@whiteandwilliams.com**
- **Robert Carrasco    rmc@lnbyg.com, rmc@lnbyg.com**
- **Oscar Estrada    oestrada@ttc.lacounty.gov**
- **Theodore W Frank    frank@psmlawyers.com, knarfdet@gmail.com;navarro@parkermillsllp.com**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Michael S Greger    mgreger@allenmatkins.com, kpreston@allenmatkins.com**
- **Brian T Harvey    bharvey@buchalter.com, docket@buchalter.com;dbodkin@buchalter.com;pjolley@buchalter.com**
- **Gregory Kent Jones (TR)    gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com**
- **Raffi Khatchadourian    raffi@hemar-rousso.com**
- **Tinho Mang    tmang@marshackhays.com, tmang@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com**
- **Ron Maroko    ron.maroko@usdoj.gov**
- **Juliet Y. Oh    jyo@lnbyg.com, jyo@lnbyb.com**
- **Carmela Pagay    ctp@lnbyg.com**
- **Yvonne Ramirez-Browning    yvonne@browninglawgroup.com, veronica@browninglawgroup.com**
- **Kurt Ramlo    RamloLegal@gmail.com, kr@ecf.courtdrive.com,ramlo@recap.email**
- **Gregory M Salvato    gsalvato@salvatoboufadel.com, calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com**
- **James R Selth    jselth@yahoo.com, jselth@yahoo.com,maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com**
- **Zev Shechtman    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul.com;Shelly.Guise@saul.com;Isaiah.Bribiesca@saul.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                           **F 9013-3.1.PROOF.SERVICE**

- **Heidi J Sorvino     sorvinoh@whiteandwilliams.com, millnamowm@whiteandwilliams.com;sullivann@whiteandwilliams.com;panchavatis@whiteandwilliams.com;butlert@whiteandwilliams.com**
- **Alan Stomel     alan.stomel@gmail.com, astomel@yahoo.com**
- **Annie Y Stoops     annie.stoops@afslaw.com, yvonne.li@afslaw.com**
- **Nicole Sullivan     sullivann@whiteandwilliams.com, vulpioa@whiteandwilliams.com,arthura@whiteandwilliams.com**
- **Derrick Talerico     dtalerico@wztslaw.com, maraki@wztlfirm.com,sfritz@wztlfirm.com,admin@wztlfirm.com**
- **United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov**
- **Larry D Webb     Webblaw@gmail.com, larry@webblaw.onmicrosoft.com**
- **David Wood     dwood@marshackhays.com, dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alinares@ecf.courtdrive.com**
- **Roye Zur     rzur@elkinskalt.com, lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com**

**2. SERVED BY UNITED STATES MAIL**:

On (*date*) **March 31, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 31, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 31, 2026 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**