| | |
|---|---|
| RON BENDER (State Bar No. 143364)<br>JOHN-PATRICK M. FRITZ (State Bar No. 245240)<br>LEVENE, NEALE, BENDER,<br>YOO & GOLUBCHIK L.L.P.<br>2818 La Cienega Avenue<br>Los Angeles, California 90034<br>Telephone:  (310) 229-1234<br>Facsimile:   (310) 229-1244<br>Email: RB@LNBYG.COM; JPF@LNBYG.COM; KR@LNBYG.COM;<br><br>Attorneys for Chapter 11<br>Debtor and Debtor in Possession | FOR COURT USE ONLY |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>HOLOGENIX, LLC,<br><br>      Debtor and Debtor in Possession. | CASE NUMBER:  2:20-bk-13849-BR<br>Chapter 11 Case<br>Subchapter V<br><br><br>**NOTICE OF LODGMENT OF ORDER IN BANKRUPTCY CASE RE:**<br><br>Debtors Motion To Confirm Debtors Chapter 11, Subchapter V Plan, Dated January 4, 2022, Modified June 21, 2022 |

PLEASE TAKE NOTE that the order titled **Amended And Supplemental Findings Of Fact And Conclusions Of Law,** *Upon Remand,* **In Support Of: (1) Order Confirming Debtor's Chapter 11, Subchapter V, Plan Dated January 4, 2022, Modified June 21, 2022; And (2) Order Authorizing Assumption Of Executory Contract With Seth Casden** was lodged on June 23, 2026, and is attached.  This order relates to the motion which is docket number 658

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                    Page 1                    **F 9021-1.2.BK.NOTICE.LODGMENT**

RON BENDER (State Bar No. 143364)
JOHN-PATRICK M. FRITZ (State Bar No. 245240)
LEVENE, NEALE, BENDER,
YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Facsimile:   (310) 229-1244
Email: RB@LNBYG.COM; JPF@LNBYG.COM

Attorneys for Chapter 11
Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | ) Case No.: 2:20-bk-13849-BR |
| | ) |
| HOLOGENIX, LLC, | ) Chapter 11 Case |
| | ) Subchapter V |
| Debtor and Debtor in Possession. | ) |
| | ) **AMENDED AND SUPPLEMENTAL** |
| | ) **FINDINGS OF FACT AND** |
| | ) **CONCLUSIONS OF LAW, *UPON*** |
| | ) ***REMAND*, IN SUPPORT OF: (1) ORDER** |
| | ) **CONFIRMING DEBTOR'S CHAPTER** |
| | ) **11, SUBCHAPTER V, PLAN DATED** |
| | ) **JANUARY 4, 2022, MODIFIED JUNE 21,** |
| | ) **2022; AND (2) ORDER AUTHORIZING** |
| | ) **ASSUMPTION OF EXECUTORY** |
| | ) **CONTRACT WITH SETH CASDEN** |
| | ) |
| | ) Hearing: |
| | ) Date:   May 26, 2026 |
| | ) Time:  10:00 a.m. |
| | ) Place: Courtroom 1668 |
| | )       255 East Temple Street |
| | )       Los Angeles, CA 90012 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

1

On May 26, 2026, at 10:00 a.m., the Honorable Barry Russell, United States Bankruptcy Judge for the Central District of California (the "Court") held a hearing (the "Remand Hearing") live in-person in Courtroom 1668 on the 16th Floor of the United States Bankruptcy Courthouse located at 255 East Temple Street, Los Angeles, California, to consider the confirmation of the *Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022, Modified June 21, 2022* [ECF 657] (the "Plan") filed by Hologenix, LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Case"), and the *Notice of Motion and Motion for Entry of an Order Authorizing Assumption of Executory Contract with Seth Casden*" (the "Contract Motion") [ECF 609], after the District Court's judgment (the "Judgment") [ECF 947] and decision (the "Decision") [ECF 946] remanding this Court's *Order Confirming Debtor's Chapter 11, Subchapter V, Plan Dated January 4, 2022, Modified June 21, 2022* (the "Plan Order") [ECF 763], as amended [ECF 870], and this Court's *Order Authorizing Assumption of Executory Contract with Seth Casden* (the "Contract Order") [ECF 761],  for further findings of fact and conclusions of law.

John-Patrick M. Fritz, Esq., appeared on behalf of the Debtor.  Nicole Sullivan, Esq., and Roy Zur, Esq., appeared on behalf of Multiple Energy Technologies, LLC ("MET"). Gregory Salvato, Esq. appeared on behalf of Seth Casden ("Mr. Casden").  Gregory K. Jones, Esq. appeared on his own behalf via Zoom video-conference in his capacity as the Subchapter V Trustee (the "Subchapter V Trustee") appointed in the Case.

### I.    AMENDMENT AND SUPPLEMENT TO THE FFCL

**A.**    On October 12, 2022, the Court entered its findings of facts and conclusions of law  ("FFCL") [ECF 762], in support of confirmation of the Plan.

**B.**    The FFCL are incorporated here by reference as though set forth in full and modified and supplemented by the presently signed and entered amended and supplemental findings of facts and conclusions of law (the "ASFFCL").  Unless otherwise stated with specificity or implied by context, initial capitalized defined terms used in this ASFFCL have the same meanings as ascribed to them in the FFCL, Plan Order, and Contract Order.

2

## II. THE RECORD

**A.** In support of, opposition to, or in connection with the Plan, the Contract Motion, the Hearing, and the Remand Hearing on the Plan and Contract Motion upon remand, the parties in interest filed the following, and the Court read and considered the same, in conjunction with plan confirmation pursuant to 11 U.S.C. § 1191:[1]

(i)     All the pleadings and documents already listed in the FFCL;

(ii)    All of the pleadings and documents already listed in the Plan Order;

(iii)   All of the pleadings and documents already listed in the Contract Order;

(iv)   The District Court's Judgment;

(v)    The District Court's Decision;

(vi)   The Ninth Circuit's order (the "Ninth Circuit Order") [ECF 1128];

(vii)  The Debtor's Brief in Support of Granting Motion to Assume Executory Employment Contract with Seth Casden after Remand from the District Court (the "Contract Remand Opening Brief") [ECF 1135];

(viii) The Debtor's Brief in Support of Confirming Plan After Remand from the District Court (the "Plan Remand Opening Brief") [ECF 1136];

(ix)   Multiple Energy Technologies, LLC's Response to Debtor's Brief in Support of Confirming Plan After Remand from the District Court (the "Plan Remand Answering Brief") [ECF 1141];

(x)    The Notice of Unpublished Authorities Cited in Multiple Energy Technologies, LLC's Response to Debtor's Brief in Support of Confirming Plan After Remand from the District Court [ECF 1142];

(xi)   Multiple Energy Technologies, LLC's Response to Debtor's Brief in Support of Granting Motion to Assume Executory Employment Contract with Seth Casden

---

[1] *See*, [ECF 1154] (5/26/2026 Hg Tr.) 9:14 (Court to MET's counsel: "I've read all your papers."); *see also*, 9:18-19 (Court to MET's counsel: "I've read your papers three or four times."); *see also*, 27:21-22 (Court: "I've read the briefs three or four times.").

3

after Remand from the District Court (the "Contract Remand Answering Brief")
[ECF 1143];

(xii)    The Request for Judicial Notice in Support of Multiple Energy Technologies, LLC's Responses to Debtor's Briefs Filed After Remand from the District Court (the "RJN") [ECF 1144];

(xiii)    Debtor's Reply in Support of Confirming Plan After Remand from the District Court (the "Plan Remand Reply") [ECF 1146];

(xiv)    Debtor's Reply Brief in Support of Granting Motion to Assume Executory Employment Contract with Seth Casden Ater Remand from the District Court (the "Contract Remand Reply") [EC 1147];

(xv)    Debtor's Request for Judicial Notice in Support of Debtor's Reply Briefs After Remand Filed on April 21, 2026 (the "2nd RJN") [ECF 1148]; and

(xvi)    The Subchapter V Trustee's Statement Regarding Confirmation of Plan After Remand (the "Subchapter V Trustee Remand Statement") [ECF 1151].

**B.**    The Court may consider the cumulative record and evidence amassed throughout the case in confirming a plan. *In re Acequia, Inc.*, 787 F.2d 1352, 1359 (9th Cir. 1986).[2] Therefore, in addition to the foregoing pleadings, documents, and evidence, the Court considered the record in the Case, the docket in the Case, and the oral arguments of counsel made on the record at the Remand Hearing [ECF 1154] (5/26/2026 Hg Tr.). Without limitation, the Court has also considered  the evidence and oral argument from the hearings on August 9 and 10, 2022.  As set forth in the FFCL, a copy of the August 9, 2022, hearing transcript (the "8/9/22 Hr Tr") is available on the docket.  ECF 736; ECF 738.  As set forth in the FFCL, a copy of the August 10, 2022, hearing transcript (the "8/10/22 Hr Tr") is available on the docket. ECF 735; ECF 739.

---

[2] *See*, [ECF 1154] (5/26/2026 Hg Tr.) 12:10 (Court: "I have read the record… over and over.") and 13:16-17 (Court: "So I've reviewed the record.  I've read all the briefs.").

**C.**    Upon consideration of the foregoing, the Court has separately and concurrently signed the Court's Amended Order Upon Remand Confirming the Debtor's Chapter 11, Subchapter V Plan, Dated January 4, 2022, Modified June 21, 2022 (the "Amended Plan Order"), and the Amended Order Upon Remand Authorizing Assumption of Executory Contract with Seth Casden (the "Amended Contract Order") to accompany this, the Court's ASFFCL. The Plan, as modified by the FFCL, ASFFCL, and Amended Plan Order, is referred to herein as the "Plan."

**D.**    Upon consideration of the foregoing, and good cause appearing, pursuant to Rule 52 of the Federal Rules of Civil Procedure (the "FRCP") as made applicable by Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "FRBP" or "Bankruptcy Rules"), the Court hereby makes the following findings of fact and conclusions of law with respect to confirmation of the Plan:

**III.    PROCEDURAL BACKGROUND**

With regards to the Plan, the District Court remanded the Plan Order stating that the Bankruptcy Court's interpretation of §1191(c) "appears to reflect an incorrect application of the law." ECF 946 (Decision) 4:18. Because the "fair and equitable" language of §1191(c) is written with the prefaced word "includes," what a court may consider to be "fair and equitable" is not limited to the terms set forth in §1191(c). ECF 946 (Decision) 4:22- 5:1.  The District Court further stated that the three-to-five-year commitment period for projected disposable income in §1191(c)(2)(A) refers to "all… projected disposable income" for that period, and because "all" means "100%," the five-year statutory cap of §1191(c)(2)(A) applies only to 100% of disposable income, leaving courts at liberty to determine whether additional income after year five is "fair and equitable" as long as it is some quantum less than 100%: "§1191(c)(2)(A) does not prohibit the provision of some amount of disposable income that is less than 100% after five years; that is, a plan could require 100% of debtor's disposable income in years one through five, 75% in years six through eight, and so on." ECF 946 (Decision) 5:18-20.

5

"In sum, the Bankruptcy Court erred in finding that Met was entitled to only 'three-to-five years' of projected Disposable Income… which led the Bankruptcy Court to overlook a substantial part of the Plan, including the provisions entitling certain creditors to 100% recovery." ECF 946 (Decision) 6:14-17. "Thus… the Bankruptcy Court [was] required to consider whether Met's recovery was unfairly discriminatory in light of the disposition of assets beyond disposable income." ECF 946 (Decision) 5:1-3.

With regards to the Contract, the District Court remanded the Contract Order instructing the Bankruptcy Court to determine whether the assumption of the Contract met the inherent fairness standard of *In Marquam Inv. Corp.*, 942 F2d 1462 (9th Cir.1991) and *Pepper v. Litton*, 308 U.S. 295, 306-07, (1939).

Debtor appealed, and the Ninth Circuit ordered the parties to fully brief all issues, including appellate jurisdiction; after the Debtor and MET fully briefed the issues, the Ninth Circuit dismissed the appeals without passing on the merits of the District Court's Decision. ECF 1128 (order) 4 n.1.

## IV. THE COURT WILL CONFIRM DEBTOR'S PLAN

### A. This Plan Can Be Confirmed

The Ninth Circuit specifically stated for this Case that "[t]he district court left open the possibility that ***the bankruptcy court could confirm the same plan*** or confirm a different plan." ECF 1128 (Ninth Circuit Order) 3 (emphasis added).[3]   Here, this Court will confirm Debtor's Plan for the reasons, findings, and conclusions discussed in this ASFFCL.

The District Court's Decision decided a new interpretation of "fair and equitable" under §1191(c) that is limited by neither disposable income nor a three-to-five-year commitment period ("Commitment Period").  On remand, the Court must determine whether the Plan is "fair and equitable" under the District Court's interpretation of §1191(c) and whether the Plan does

---

[3] Pagination cites to bankruptcy ECF documents are to the pages at the top of the page in the Court Clerk's ECF ribbon.

6

not discriminate unfairly in light of the disposition of assets beyond disposable income and beyond the three-to-five-year commitment period.

The District Court decided only what §1191(c) means as a matter of law, that it is not limited to disposable income, and it is not limited to a three-to-five-year period.  ECF 946 (Decision) 6:14-15.  The District Court's Decision on the Plan concluded that "the Bankruptcy Court erred in finding that Met was ***entitled to only*** 'three-to-five years' of projected Disposable Income…"  ECF 946 (Decision) 6:14-15 (emphasis added).  This Court emphasizes the words "entitled" and "only" because the District Court's holding is a ruling as a matter of law that the FFCL "reflect[s] an incorrect application of the law" on § 1191(c), which "first" is not limited to disposable income and, "second," is not limited to five years.  ECF 946 (Decision) 4:16-18.  The District Court did not reverse or remand as a matter of factual finding that MET is entitled to more than three-to-five years' of projected Disposable Income; rather, only that §1191(c), as a matter of law, permits the Bankruptcy Court to consider more in determining what is "fair and equitable."[4]  Accordingly, the District Court's Decision left open what "fair and equitable" means in this particular Case on these particular facts. "The district court left open the possibility that ***the bankruptcy court could confirm the same plan*** or confirm a different plan."  ECF 1128 (Ninth Circuit Order) 3 (emphasis added).[5]  For all the reasons explained in these ASFFCL the Plan is fair and equitable to MET and Class 3 based on applying the particular facts of this Case to the District Court's interpretation of §1191(c).

Moreover, the District Court specifically never reached the question of whether the Plan discriminates unfairly, only noting that the difference in class treatments is "dramatic." In light of detailed analysis of Subchapter V as modern composition law in these ASFFCL, the Court

---

[4] *See*, [ECF 1154] (5/26/2026 Hg Tr.) 14:10-13 (noting that the District Court's law of the case is that §1191(c) allows the Court to consider property beyond a five-year Commitment Period but does not require property beyond a five-year Commitment Period).

[5] Pagination cites to bankruptcy ECF documents are to the pages at the top of the page in the Court Clerk's ECF ribbon.

finds and concludes that the Plan does not discriminate unfairly because of the Plan's allocation of property under the Plan, as discussed in greater detail in Section VI of the ASFFCL below.

**B. MET's Objection to Confirmation of This Plan on the Existing Record Is Overruled**

The Court overrules MET's objection that this Court cannot confirm this Plan because of the passage of time since the confirmation in 2022. Firstly, again, the Ninth Circuit specifically stated for this Case that "[t]he district court left open the possibility that ***the bankruptcy court could confirm the same plan*** or confirm a different plan.[6] Secondly, MET has cited no case law authority for MET's argument that on remand the court must reopen the record for new evidence to review anew feasibility of a plan under §1129(a)(11) or the hypothetical liquidation analysis under §1129(a)(7) as of the date of the remand hearing.

MET's cited case of *In re Curiel* does not stand for MET's proposition that on remand the trial court must re-evaluate feasibility anew on a new record,[7] for *Curiel* involved simply whether a plan met the standards of feasibility at the original plan confirmation.[8] Likewise, MET's cited case of *In re Las Vegas Monorail Co.*, 462 B.R. 795, 798 (Bankr.D.Nev.2011),[9] is a trial-level decision where the bankruptcy court evaluates the feasibility of a plan at the original plan confirmation hearing – there is no appeal at all, much less any discussion of whether to re-address feasibility after remand.[10]

Similarly, MET's cited cases of *In re Premier Network Servs., Inc.*, 2005 WL 6443624 *1, *3 (Bankr.N.D.Tex. July 1, 2005), and *In re Moore*, 81 B.R. 513, 516 (Bankr.S.D. Iowa 1988),[11] are nothing more than trial-level decisions where the bankruptcy courts evaluate the best-interest-of-creditors test of plans at the original plan confirmation hearings (and in neither

---

[6] ECF 1128 (Ninth Circuit Order) 3 (emphasis added).

[7] ECF 1141 (MET Plan Answering Brief) 14:1-2]

[8] *In re Curiel*, 651 B.R. 548, 563 (9th Cir.B.A.P.2023).

[9] ECF 1141 (MET Plan Answering Brief) 15:1-4.

[10] *In re Las Vegas Monorail Co.*, 462 B.R. 795, 798 (Bankr.D.Nev.2011).

[11] ECF 1141 (MET Plan Answering Brief) 15:13.

8

case did those debtors provide "current" financial information at their original plan hearings) – there were no appeals, much less any discussion of whether to re-address §1129(a)(7) anew on remand.[12]

Furthermore, denying confirmation of this Plan based upon the passage of time during the appeals would be unfair to the Debtor and its estate.  MET obtained a stay of this Court's Plan Order (over Debtor's objection) from the District Court, arguing it was necessary to prevent equitable mootness.[13] Now MET argues the stay that MET itself obtained has caused equitable mootness: "… the Court cannot… assess confirmation based on stale, four-year-old facts and evidence."[14]    That outcome is not fair to Debtor particularly at this stage when the District Court remanded with respect to only one novel interpretation of law and did not rule on any of the issues that MET actually raised on appeal.

The Court also overrules MET's objection that the Debtor's bankruptcy case should be dismissed or converted to chapter 7.  MET's cited case of *In re American Capital Equipment, Inc.*, 405 B.R. 415, 427 (Bankr.W.D.Penn.2009), is far off point.  That case involved five plans that were never confirmed, no appeals, and – most importantly – a finding by the trial court that "the Debtor… will not be able to effectuate a confirmable plan going forward, regardless of how much more time the Court might afford… because… such parties have already expressed to the Court, at several hearings, ***their unwillingness to rectify certain of the flaws that the Court has identified***…"[15]

Here, Debtor confirmed both of the two plans that it proposed, and although those plans were remanded twice, the second time was not on any issue raised by the parties but on a novel issue raised *sua sponte* by the District Court. Moreover, here, Hologenix has never been

---

[12] *In re Premier Network Servs., Inc.*, 2005 WL 6443624 *1, *3 (Bankr.N.D.Tex. July 1, 2005); *In re Moore*, 81 B.R. 513, 516 (Bankr.S.D. Iowa 1988).

[13] *See*, ECF 858 (MET Mtn) 37:10-11.

[14] ECF 1141 (MET Plan Answering Brief) 13:22-23.

[15] *In re American Capital Equipment, Inc.*, 405 B.R. 415, 427 (Bankr.W.D.Penn.2009) (emphasis added).

recalcitrant in a refusal to rectify any flaws the Court might identify (indeed, this Court has twice confirmed Debtor's plans).  The Debtor has always diligently proposed its plans within a short period of time: (1) within 45 days of the Petition Date;[16] (2) within 49 days of the first status conference on remand on November 16, 2021;[17] and (3) within just 14 days of the status conference hearing on June 7, 2022, when the Court set the plan confirmation briefing schedule.[18]  There were less than six months between the Petition Date and the first plan confirmation hearing in October 2020,[19] and only nine months[20] between the remand status conference in November 2021 and the second plan confirmation hearing in August 2022.[21]  Thus, Debtor's active chapter 11 period has been only 15 months (6 months for the first confirmation, and 9 months for the second confirmation), with the rest of the past six-year period involving appeals.

## V.      THE PLAN IS FAIR AND EQUITABLE

### A.  The Plan Is Fair and Equitable

The District Court's interpretation of §1191(c) is that "fair and equitable" can include (but is not required to include) more than what the text of §1191(c) provides.  The Court finds and concludes that the Plan is fair and equitable under the particular circumstances of this Case in light of the historical and statutory sources for interpreting "fair and equitable" for providing Class 3 and MET with no more than three years of projected disposable income.

"Includes" as used in §1191(c) is non-limiting. 11 U.S.C. § 102(3).  However, "fair and equitable"  are "words of art" that "include" specific uncodified requirements developed over decades of bankruptcy jurisprudence,[22] and the word "includes" should not be read to give courts

---

[16] *See*, ECF 83.

[17] *See*, ECF 422, 452.

[18] *See*, ECF 647, 657.

[19] ECF 1, 248.

[20] Of those nine months, six months of delay was on account of MET's extensive and litigious plan discovery.  *See*, ECF 762 (FFCL) 23 (¶¶106, 107), 25 (¶114).

[21] ECF 422, 735.

[22] *In re Bonner Mall Partnership*, 2 F.3 899, 912 (9th Cir.1993) ), *appeal dismissed*, 115 S.Ct.

"free-floating discretion" to add new concepts *ad hoc*.[23] "When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statue indicates, a general matter, the intent to incorporate its administrative and judicial interpretations as well."[24] "Statutory analysis of the Bankruptcy Code is a 'holistic endeavor,'" which may often "require[] reference to various statutory and historic sources."[25] Therefore, understanding what "fair and equitable" includes for §1191(c) should be determined by an analysis of statutory and historical sources, as discussed immediately below.

### B. Historic Sources

#### 1. "Fair and Equitable" Prior to 1978 Bankruptcy Code

"Fair and equitable" as "words of art" in the Bankruptcy Code,[26] have their origin in equity receivership reorganization and were first codified (without definition) in 1934 as part of §77B(f)(1) of the Bankruptcy Act, then repealed and replaced by Chapter X of the Bankruptcy Act of 1938.[27] "The Chandler Act [1938] revised the Bankruptcy Act of 1898… and, in chapters X, XI… [and] XIII…., provided for corporate reorganizations, arrangements, … [and] wage earners' plans," each chapter using the words of art "fair and equitable" but each with its own meaning on account of each's important differences.[28]

"Chapter X, devised as a substitute for the equity receivership, [was] specially adapted to the reorganization of large corporations whose securities [were] held by the public… while

---

386 ((recognizing that "fair and equitable" of §1129(b)(2) "includes" the new value exception because "[t]he Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so."); *id.*at 913 n.33 (one aspect of uncodified "fair and equitable" is the long-established rule that no senior class be paid more than in full).

[23] *See*, *In re PG&E Corp.*, 46 F.4th 1047, 1064 (9th Cir.2022).

[24] *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018).

[25] *In re PG&E Corp.*, 46 F.4th at 1053 (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 365, 371 (1988)).

[26] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 452 (1940) (citing *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482 (1939) and *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939)).

[27] *In re Bonner Mall Partnership*, 2 F.3 at 913 n.32.

[28] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. at 461 (1940) (J. Roberts, dissenting); *id.* at 467.

Chapter XI which is particularly adapted to the speedy composition of debts of small individual and corporate businesses, omits the machinery for reorganization set up by Chapter X…"[29]

What is "fair and equitable" for a public corporation in a plan of reorganization in Chapter X is the absolute priority rule set forth in *Case v. Los Angeles Lumber*.[30] The "traditional" absolute priority rule was a prominent requirement of "fair and equitable" for equity receiverships,[31] requiring senior classes to be paid in full before junior classes received anything, regardless of whether the junior class dissented. [32]

But that absolute priority rule was neither applicable to nor practical for Chapter XI, which was an "arrangement only with respect to unsecured creditors without alteration of the relations of any other class of security holders."[33]   "Congress deleted the 'fair and equitable' requirement from Chapter XI in 1952."[34]  As of 1952, "Chapter X had an absolute priority rule; Chapter XI did not."[35]  For "small individual or corporate businesses," "where subordinate creditors or the stockholders are the managers of its business, the preservation of going-concern value through their continued management of the business may compensate for reduction of the

---

[29] *Id.* at 447.

[30] *Id.* at 452-53; *see*, *Case*, 308 U.S. at 116-17 (the "fixed principle" of *Boyd*, of the "rule of full or absolute priority").

[31] *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 520-21 (1941).  ("The full and absolute priority rule of *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482 (1913) and *Case*…, would preclude participation by the equity interests in any of those assets until the bondholders had been made whole.")

[32] *See*, Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 143 n.80, 81 (1979) (herein, "Cramdown I").

[33] *U.S. Realty & Imp. Co.*, 310 U.S. at 452-53.

[34] 7 COLLIER ON BANKRUPTCY ¶1129.LH[6][b] at 1129-201, 1129-202 (Richard Levin & Henry J. Sommer eds. 16th ed.) (herein, "COLLIER"); *see*, 7 COLLIER ¶1129.03[4][a] at 1129-92 ("Chapter XI was not subject to the fair and equitable requirement"); *id.* at ¶1129.03[4][c][i][A] at 1129-111 n.181 ("Congress deleted the fair and equitable requirement from Chapter XI in 1952. …  As the accompanying House Report stated, 'the fair and equitable rule, as interpreted in [*Boyd* and *Case*] cannot be realistically applied in a Chapter XI… Were it so applied… no corporate debtor where the stock ownership is substantially identical with management could effectuate an arrangement except by payment of the claims of all creditors in full.'") (internal citations omitted).

[35] *In re Bonner Mall Partnership*, 2 F.3d at 915 n.34.

12

claims of the prior creditors without alternation of the management's interests, which would otherwise be required by the *Boyd* case [228 U.S. 482 (1913) (i.e., absolute priority rule)]."[36]

> This was part and parcel of the theory of composition: if you had to pay the full going concern value of the enterprise to your creditors, even though they might agree to accept less, composition was never possible.  This might have been acceptable public policy to an enterprise like a publicly-held corporation, where the equity ownership might come and go.  It was less palatable in the case of the typical Chapter 11 debtor – a sole proprietorship or a closely-held 'family' corporation.[37]

Chapter XIII also involved "composition" plans.[38]

### 2.   "Fair and Equitable" Under The Bankruptcy Code - 1978 to 2019

In 1978, Congress codified "fair and equitable" to "include" specific treatment of secured claims, unsecured claims, and equity interests in §1129(b).[39]  The 1978 Bankruptcy Code's treatment of secured creditors under §1129(b)(2)(A) was "completely novel."[40]  The absolute priority rule was codified under §1129(b)(2)(B) and (C) with respect to general unsecured creditors and equity holders in 1978.[41]  As contrasted with the "traditional" absolute priority rule, in 1978 Congress enacted a "relaxed" version of the absolute priority rule in § 1129(b)(2) where senior classes could give up something to junior classes so long as intervening junior classes did not dissent. [42]  Because §1129(b)(2) uses the word "includes," it continues to embrace uncodified aspects of "fair and equitable," but these are meant to be limited to the concepts in these "words of art" developed over more than 100 years of pre-Bankruptcy Code

---

[36] *U.S. Realty & Imp. Co.*, 310 U.S. at 454 (citing *Case*, 308 U.S. at 121-22); Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989) ("This absolute priority rule had never been a principle of composition law").

[37] Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. at 977.

[38] 8 COLLIER, ¶1300.36[3] at 1300-81.

[39] *Zachary v. California Bank & Trust*, 811 F.3d 1191, 1194 (9th Cir.2016).

[40] Klee, "*Cramdown I*", 53 Am. Bankr. L.J. 133, 143 (1979).

[41] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citations omitted).

[42] *See*, Klee, "*Cramdown I*", 53 Am. Bankr. L.J. at 143 n.80, n.81.

case law, such as:[43]

    (A)  No senior class may be compensated more than in full;[44]

    (B) A senior dissenting class must be compensated for its loss of priority relative to a junior class (sometimes referred to as "step-up");[45]

    (C) Potentially, a senior dissenting class is entitled to be compensated for rights to postpetition interest;[46]

    (D) Potentially, forcing a senior dissenting class to take inferior securities if a junior class receives superior securities or cash;

    (E) No issuing 'worthless securities';

    (F) No gratis issuance of reorganization securities to preserve continuity of management;

    (G) The new value exception.[47]

### 3.  "Good Faith" Under Chapter 13 of the 1978 Bankruptcy Code

Despite "fair and equitable" having been part of Chapter XIII, Chapter 13 never uses the phrase "fair and equitable."[48] Nonetheless, Congress enacted Chapter 13 in 1978 with an equally malleable phrase "good faith" as a plan confirmation requirement. [49]

Importantly, Congress also set a plan duration of not "longer than three years, unless the court, for cause, approves a longer period… not… longer than five years."[50]   The limited 3-to-5-year Commitment Period was a direct evolution from Chapter XIII and Congress' concern

---

[43] *See*, Klee, *Cramdown II*, 64 Am. Bankr. L.J. 229, 231-41 (1990).

[44] *In re Bonner Mall Partnerships*, 2 F.3d at 913 n.33 ("well-established [uncodified] component of 'fair and equitable'" in §1129(b)(2)).

[45] *Du Bois*, 312 U.S. at 528-29.

[46] *Id.* at 527; (the "solvent debtor exception" requires payment of post-petition interest to creditors as one of the traditional uncodified aspects of the absolute priority rule); *In re PG&E Corp.*, 46 F.4th at 1054.

[47] *In re Bonner Mall Partnerships*, 2 F.3d at 901.

[48] *See generally*, §§1301-1330; *see also*, §§1201-1230 ("fair and equitable" not used in Chapter 12).

[49] Volume B COLLIER App. Pt. 4(a), 4-141 (§1325(a)(3) as enacted in 1978).

[50] *Id.* at 4-140 (§1322(c) as enacted in 1978).

that creditor pressure resulted in plans of seven to ten years as a type of "involuntary servitude."[51]

By early 1980, many lower court decisions were denying chapter 13 plans as failing the "good faith" requirement because – regardless of the length of the plan – they did not provide "substantial repayment" to unsecured creditors.[52]    In 1982, the Ninth Circuit overruled these lower courts and "decline[d] to impose a substantial-repayment requirement… under the guise of interpreting 'good faith.'"[53]    Congress set a minimum repayment standard in §1325(a)(4), that creditors must receive at least what they would have received in a hypothetical chapter 7 liquidation.[54]    "The presence of an explicit statutory standard… strongly suggests that Congress did not intend to substitute a more rigorous standard when it imposes a general good-faith requirement."[55]    Prompted by the rash of decisions imposing a "substantial-repayment" requirement, Congress enacted a new subsection 1325(b) specifying a mandatory minimum of three years of "all of the debtor's projected disposable income" for Chapter 13 plans if a trustee or unsecured creditor objected.[56]

### C.  "Fair and Equitable" Under Subchapter V and Modern Composition Law

In August 2019, Congress enacted the Small Business Reorganization Act, commonly referred to as "Subchapter V."[57]  Subchapter V codifies "fair and equitable" in §1191(b) to "include" specific detailed provisions in §1191(c),[58]  with language almost identical to Chapter

---

[51] *In re Greer*, 60 B.R. 547, 555 (Bankr.C.D.Cal.1986) ("Under Chapter XIII of the Bankruptcy Act, plans frequently extended as long as seven to ten years.  Congress was concerned that this amounted to involuntary servitude… In consequence, in the Bankruptcy Code Congress limited the duration of a plan to three years, except upon a finding of 'cause.'") (internal citation omitted).

[52] *Id.* at 550-52 (recounting history).

[53] *In re Goeb*, 675 F.2d 1386, 1389 (9th Cir.1982).

[54] *Id.* at 1388.

[55] *Id.*

[56] *In re Greer*, 60 B.R. at 552 and n.7; *In re Metz*, 620 F.2d 1495, 1499 (9th Cir.1987); *In re Welsh*, 711 F.3d 1120, 1128-29 (9th Cir.2013).

[57] *In re Orange County Bail Bonds*, 638 B.R. 137, 143 n.5 (9th Cir.B.A.P.2022).

[58] *In re Curiel*, 651 B.R. 548, 561 (9th Cir.B.A.P.2023).

15

11's §1129(b).[59] Subchapter V adopts specific cramdown treatment for secured claims directly from Chapter 11,[60] but Subchapter V has no specific cramdown treatment for unsecured creditors or equity interest holders and specifically rejects the traditional Chapter 11 cramdown treatment for those stakeholders. [61]

Instead, without mentioning unsecured creditors or equity, §1191(c)(2)(A) provides that "all projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years, as the court may fix" must be applied to make plan payments.[62] The 3-to-5-year period of §1191(c)(2) clearly has its origins in Chapters 12 and 13.[63] Yet, neither Chapter 12 nor Chapter 13 have a "fair and equitable" plan requirement, and, thus, this Court looks to case law discussing "good faith" in Chapter 13 (a malleable phrase in the absence of the words of art "fair and equitable") for guidance on what "fair and equitable" means in relation to the 3-to-5-year Commitment Period in Subchapter V.

The Ninth Circuit noted that "good faith" is not defined, but then analyzed its history and meaning in bankruptcy law through the phraseology of "fair" and "equitable" in the *Goeb* decision.[64] "One case that we … find instructive is *American United Mutual Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940), under former Chapter IX, that 'the offer of the plan and its acceptance are in good faith,' … the [Supreme] Court… focused on '***equity*** and good conscience."[65] "A bankruptcy court is a court of equity… and is guided by ***equitable***

---

[59] §1129(b)(2) & §1191(c) ("fair and equitable… includes the following…").

[60] §1191(c)(1) (incorporating §1129(b)(2)(A)).

[61] §1191(c); §1181(a) (making §1129(b) inapplicable in Subchapter V).

[62] §1191(c)(2)(A).

[63] *See*, Paul W. Bonapfel, A Guide to the Small Business Reorganization Act of 2019, 93 Am. Bankr. L.J. 571, 612-13 (Winter 2019) (comparing Chapters). 8 COLLIER ¶1200.01[2] at 1200-4 ("In modeling chapter 12 on chapter 13, which does not have the absolute priority rule, Congress allowed farmers to confirm reorganization plans without providing for payment in full to unsecured creditors."); *compare*, §1222(c) & §1322(d)(1)&(2).

[64] *In re Goeb*, 675 F.2d at 1390-91.

[65] *Id.* at 1390. (emphasis added). The decision, *City of Avon Park*, 311 U.S. 138, 140-41 (1940), involved a Chapter IX composition plan.

doctrines…"[66]  "A bankruptcy court must inquire whether the debtor… ***unfairly*** manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an ***inequitable*** manner."[67] The inquiry of whether something is "unfair" and "inequitable," is quite clearly the same inquiry as whether something is "fair and equitable."[68] Thus, case law addressing the chapter 13 "good faith" requirement for 3-to-5-year plans are informative to addressing the Subchapter V "fair and equitable" requirement for 3-to-5-year plans.

More recently, the Ninth Circuit cited *Goeb* (with its similar language of "unfairly" and "inequitable") and held that courts cannot use the rubric of "good faith" to alter what Congress has already determined for plans.[69]   Even "zero-payment" plans can be proposed in good faith so long as they pass the best-interest-of-creditors test in §1325(a)(4) and devote all projected disposable income to the plan as required by §1325(b)(1)(B).[70]

"The Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so."[71]  While 'the Bankruptcy Code can of course override by implication,' any such implication must be unambiguous.'"[72] "[T]he normal rule of statutory construction [is] that if Congress intends for legislation to change the interpretation of

---

[66] *Id.*

[67] *Id.*; *see also*, *In re Welsh*, 711 F.3d at 1128 (citing *Goeb* for same "acted equitably" and not "unfairly manipulated").

[68] *See*, *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 118 (1939) (relating "fair and equitable" to similar phrases of "equitable and fair" and "fairly and equitably treated" and "adequate and equitable" and "just, fair, and equitable and like phrases").

[69] *In re Sisk*, 962 F.3d 1133, 1150 (9th Cir.2020) ("The good faith inquiry is not a vehicle to promulgate bankruptcy requirements not already in the Code.  Courts cannot add to what Congress has enacted under the guise of interpreting good faith."); *Ahlers*, 485 U.S. at 206 ("whatever equitable powers remain in bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

[70] *In re Metz*, 820 F.2d at 1499.

[71] *In re Bonner Mall Partnership*, 2 F.3 at 912; *In re PG&E Corp.*, 46 F.4th at 1057-58 (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998)); *see*, *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (same, regarding chapter 13 projected disposable income).

[72] *In re PG&E Corp.*, 46 F.4th at 1058 (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 546 (1994)).

17

a judicially created concept, it makes that intent specific."[73] "This rule is followed with particularity in construing the Bankruptcy Code."[74] "Once it has been shown that Congress was a aware of a pre-Code practice, the remaining inquiry… is whether it has made clear its intent to change that practice."[75] As can be shown from the historical origins of the 3-to-5-year Commitment Period in Chapters 13, Congress was aware of an established practice of this limited period.

"Where, as here, Congress adopts a new law, it normally can be presumed to have had knowledge of the interpretation given to the old law."[76] Congress presumably knew that there is no body of case law interpreting the 3-to-5-year Commitment Period of Chapter 13 as being limited to 100% of income for that Commitment period plus an additional quantum less than 100% for periods after year 5, and, therefore, there is no basis to interpret §1191(c)(2)(A) in such a way. "[T]his Court has been reluctant to interpret the Bankruptcy Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."[77] Neither this Court nor the Debtor has found any legislative history in favor of reading §1191(c)(2)(A) beyond the 3-to-5-year Commitment Period.[78] MET has not brought any such legislative history to the Court's attention in this regard either. Moreover, legislative history on the Commitment Period in Chapter 13 suggests that Congress prohibited any such expansion beyond five years as "involuntary servitude."[79] "Where the text of the Code does not unambiguously abrogate pre-Code practice, courts should presume that Congress intended it to continue unless the legislative

---

[73] *In re Bonner Mall Partnership*, 2 F.3 at 912 (cleaned up, internal citation omitted).

[74] *Id.*

[75] *Id.*

[76] *Ahlers*, 485 U.S. at 211 (cleaned up, internal quotes and cites omitted).

[77] *Zachary v. California Bank & Trust*, 811 F.3d 1191, 1198 n.5 (9th Cir.2016) (quoting *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992)).

[78] F COLLIER App.Pt. 41cc at App.Pt. 41-370 to App.Pt. 41ff at App.Pt. 41-411.

[79] *In re Greer*, 60 B.R. at 555.

history dictates a contrary result."[80] Thus, in modeling Subchapter V on Chapter 13 with the 3-to-5-year limitation on plans, there is no basis to extend a Commitment Period beyond 5 years on the thin reed of an ambiguous *sub silentio* combination of "includes" and "all" in §1191(c)(2)(A) to permit at judicial roaming inquiry of any quantum of the Debtor's projected disposable income less than 100% for any number of years *ad infinitum*. The Court should "expect more than simply statutory silence if, and when Congress were to intend a major departure" from a longstanding norm.[81]

Furthermore, interpreting "all" in §1191(c)(2)(A) as meaning "100%" in conjunction with the non-limiting "includes" of the "fair and equitable" requirement of §1191(b) to provide courts with *carte blanche* to rove beyond Congress' very specific 3-to-5-year Commitment Period, simply invites the very problem that the Ninth Circuit warned of when interpreting the Bankruptcy Code's equitable principles for the fair and equitable requirement: "We join our sibling circuits… in emphasizing that the solvent-debtor exception, though equitable in nature does not give bankruptcy judges free-floating discretion to redistribute rights in accordance with their personal views of justice and fairness."[82] There is no reason, here, to interpret §1191(c) in a manner to disregard Congress' clear 3-to-5-year structure in favor of a judicial free-floating exercise of redistributive rights based on each different judge's personal views of justice and fairness.

"Congress enacted subchapter V as an expedited process for small business debtors to reorganize quicky, inexpensively, and efficiently."[83]   From a practical perspective, an interpretation of §1191(c)(2)(A) devoid of Congress' 3-to-5-year temporal limit increases unpredictability and expense for cramdown confirmation leaving the debtor and creditors of

---

[80] *In re Bonner Mall Partnerships*, 2 F.3d at 913 (citing *Dewsnup*, 502 U.S. at 419).

[81] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) ("Congress… does not … hide elephants in mousehole.").

[82] *In re PG&E Corp.*, 46 F.4th at 1064 (internal quotes omitted).

[83] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.A.P.2022) (internal citations and quotations omitted).

each case wondering where each particular bankruptcy judge will fall on the spectrum between 3-to-5 years, at the one end, and full repayment of debt, at the other.

Subchapter V does not have an absolute priority rule.[84]  This is reinforced by Congress' formulation of a debtor's exclusive right to propose and modify a plan in Subchapter V.[85]  An equity holder's exclusive right to propose a plan is a type of property right that violates the absolute priority rule in a cramdown plan in Chapter 11.[86]  However, Subchapter V provides the right to propose a plan exclusively to the debtor and no other.[87]  This harkens back to the origins of Chapter XI and composition law: "This was part and parcel of the theory of composition: if you had to pay the full going concern value of the enterprise to your creditors, even though they might agree to accept less, composition was never possible."[88]  Chapter XI was "an extension, adjustment, or accommodation of unsecured claims without disturbing either secured claims or stock interests."[89]  "Composition contemplates that the business proceeds with the eventual end of rehabilitation."[90]

Synthesizing the foregoing bankruptcy jurisprudence into Subchapter V, Congress rejected the absolute priority rule in favor of a modern composition law where equity interests keep their interests in the debtor, unsecured creditors are paid some quantum of their claims, and the rehabilitation eventually ends.  Moreover, Congress set a very specific 3-to-5-year Commitment Period, aware that composition plans of seven or ten years were akin to

---

[84] §1181(a) (excluding §1129(b) from Subchapter V).

[85] §1189(a) and §1193.

[86] *Bank of America Nat. Trust and Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 456 (1999); *see*, 7 COLLIER ¶1129.03[4][a] at 1129-91 & 1129-92 (as contrasted with Chapter X, because Chapter XI had no absolute priority rule, it was not a problem that the Chapter XI debtor remained a debtor-in-possession in control of the estate with exclusive right to propose the reorganization plan).

[87] §1189(a).

[88] Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989).

[89] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 464 (1940) (J. Roberts, dissenting).

[90] *Lorber v. Vista Irr. Dist.*, 143 2d 282, 285 (9th Cir.1944) (Chapter IX municipality case).

"involuntary servitude." [91] An interpretation of §1191(c)(2)(A) that permits courts to consider the debtor's disposable income beyond the 3-to-5-year Commitment Period begins a slippery slope towards looking for a "substantial repayment" and eventually leads to the judicial reenactment of the absolute priority rule where equity holders cannot keep their interests until the senior creditors are paid in full, resulting in involuntary servitude for small business owners who can keep their businesses only after completing plans much longer than 3-to-5 years, adjudged by each court on a case-by-case basis.

The parallels between Chapter 13 and Subchapter V with respect to the three-to-five-year periods are undeniable.[92] The fundamental tenant of composition law, which caused Congress to eliminate the absolute priority rule for small businesses in Chapter XI, is that at some point rehabilitation ends and the insiders retain their interests without paying creditors in full:

> This was part and parcel of the theory of composition: if you had to pay the full going concern value of the enterprise to your creditors, even though they might agree to accept less, composition was never possible. This might have been acceptable public policy to an enterprise like a publicly-held corporation, where the equity ownership might come and go. It was less palatable in the case of the typical Chapter 11 debtor – a sole proprietorship or a closely-held 'family' corporation.[93]

MET's attempts to undermine the parallels between Chapter 13 and Subchapter V by distinguishing Chapter 13 as being for "individual wage earners," is a hollow distinction because without the three-to-five year protection in Subchapter V, the sole proprietor or family members working in the closely-held family business are stuck in the same indentured servitude longer than five years until creditors or paid in full or, alternatively, they give up the family business. Indeed, chapter 12 provides the same type of three-to-five-year protection to family farmers,

---

[91] *In re Greer*, 60 B.R. at 555.

[92] *See*, Paul W. Bonapfel, A Guide to the Small Business Reorganization Act of 2019, 93 Am. Bankr. L.J. 571, 612-13 (Winter 2019) (comparing Chapters).

[93] Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989); *see also*, ECF 1144 (RJN) 59-61.

which may not be individuals,[94] and, hence, the debtor need not be an "individual" to need to be protected from the indentured servitude of perpetual labor until creditors are paid in full by application of the absolute priority rule. Subchapter V eliminated the absolute priority rule. 11 U.S.C. § 1181(a). In its place, Congress has inserted a construct of a three-to-five-year commitment period for paying creditors. 11 U.S.C. § 1191(c). Even under the District Court's interpretation of §1191(c) as non-limiting, the parallels between Subchapter V, on the one hand, and Chapters 12 and 13, on the other hand, are obvious and strongly suggestive of similar motives.

The District Court's Decision as the law of the case that §1191(c)(2)(A) is not limited to five years, so long as the quantum of disposable income after year five is less than 100%. But in light of all of the history of the 3-to-5-year limitation from Chapter 12 and 13, that there should be very compelling reasons for exceeding that 3-to-5-year commitment period, and on the facts of this particular Case, this Court finds and concludes that there is no reason to exceed three years or disposable income for this Plan to be fair and equitable.

**D. Statutory Construction**

The Supreme Court applies the statutory canon of construction that the specific governs the general when interpreting "fair and equitable" cramdown requirements.[95] "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," requiring that a specific cramdown condition apply to specific facts, notwithstanding the generalized freedom that might be granted from a hyperliteral reading of the statute.[96] "[T]he canon avoids… the superfluity of a specific provision that is swallowed by the general one."[97]

---

[94] *See*, 8 COLLIER ON BANKRUPTCY ¶ 1200.1[2] (Richard Levin & Henry J. Sommer eds. 16th ed.).

[95] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

[96] *Id.*

[97] *Id.*

22

"[G]eneral language of a statutory provision, although broad enough to include, will not be held to apply to a matter specifically dealt with in another part of the same enactment."[98]

In interpreting "fair and equitable" for Chapter 11, the Supreme Court opined that interpreting "or" in §1129(b)(2)(A) to avoid what the statute specifically proscribes would be "hyperliteral and contrary to common sense."[99]   Likewise, reading "includes" and "all" in §1191(b) and §1191(c)(2)(A) to expand §1191(c)(2)(A)'s Commitment Period beyond five years in derogation of the explicit proscription "not to exceed 5 years" would be hyperliteral and contrary to common sense and render the Congressional limit "not to exceed 5 years" practically meaningless, as creditors and courts could add 99% of projected disposable income from year 6 onward until paid in full (i.e., the return of the absolute priority rule).

The ordinary meaning of "all" may be 100%, but the ordinary meaning of a word is not to be extrapolated into similar but different contexts.[100] When Congress refers to percentages in the Bankruptcy Code, including "100%" and less than 100%, it does so specifically.[101]   If Congress had meant §1191(c)(2)(A) to be expressed in percentages with "all" meaning "100 percent," for 3-to-5 years, plus other quanta less than 100% after year 5, Congress would have done so expressly.

When Congress enacted a detailed statute regarding 3-to-5-years of "all projected disposable income" in Chapter 13, the Ninth Circuit observed that the judicial inquiry under the malleable phrase "good faith" is narrowed accordingly."[102]   Congress spoke directly on the 3-

---

[98] *Id.* at 646.

[99] *Id.* at 645.

[100] *Hamilton v. Lanning*, 560 U.S. 505, 515 (2010) (contrasting "multiplied" and "projected" for determining disposable income).

[101] *See,* §727(a)(9)(A) ("100 percent"); §727(a)(9)(B)(i) ("70 percent"); §1182(1)(A) ("50 percent"); §101(2(A) ("20 percent"); §101(18) ("50 percent"); §101(19A)(i) ("80 percent"); §326(a) ("25 percent… 10 percent… 5 percent… 3 percent…"); §702(b) ("20 percent"); §707(b)(2)(A)(i)(I) ("25 percent"); §1325(b)(2)(A)(ii) ("15 percent"); §1326(b)(3)(B)(ii) ("5 percent"); *see also, In re Greer*, 60 B.R. 547, 553 (Bankr.C.D.Cal.1986) ("Congress could have required that a  chapter 13 plan provide that unsecured creditors to be paid in full [i.e., 100%] [or] … 70%, or 30%, or some other minimum amount of their claim.  However, Congressed decided against this approach.").

[102] *In re Welsh*, 711 F.3d 1120, 1129-1131 (9th Cir.2013).

23

to-5-year limit of Subchapter V plans in multiple places - §1191(c)(2)(A), §1191(c)(2)(B), §1192(1), and §1193(c) – a "not to exceed five years," and, thus, the judicial "fair and equitable" inquiry should be narrowed accordingly.

Strict textual arguments using malleable phrases cannot be used to give breadth to a discrete statutory term without "flout[ing] a 'fundamental canon of statutory construction': that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"[103] Courts cannot alter the balance that Congress has struck among creditors and debtors in the Bankruptcy Code's distribution scheme, even where the courts believe that the creditors would be sincerely better off.[104] A capacious reading of "all" and "includes" to expand beyond that five-year limit disregards Congress' distribution scheme and backslides towards the absolute priority rule by judicial fiat, primarily on the basis that "they fear a windfall to the debtor at the expense of [] unsecured creditors," which the Ninth Circuit admonished against in Chapter 13 decades ago.[105] "In interpreting statutory language we are not confined to the specific provision at issue but may look to the structure of the law as a whole and to its object and policy."[106] In light of the foregoing statutory construct analysis, although the District Court Decision permits this Bankruptcy Court to add property beyond the three-to-five-year Commitment Period and beyond projected Disposable Income, here, based on the facts of this particular Case, for this particular Plan, this Court finds and concludes that the Plan is fair and equitable as it is.

### E. MET Does Not Advocate for a Different Interpretation of "Fair and Equitable" as a Matter of Law

---

[103] *United States v. Miller*, 145 S. Ct. 839, 853 (2025) (quoting *Davids v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)); *In re Flores*, 735 F.3d 855, 859 (9th Cir.2013).

[104] *Czyzewski*, 580 U.S. at 471.

[105]  *In re Goeb*, 675 F.2d 1386, 1388 (9th Cir.1982).

[106] *In re Bonner Mall Partnership*, 2 F.3d at 915; *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466-67 (2017) (internal cites and quotes omitted); *id.* ("the word 'cause' is too weak a reed upon which to rest so weighty a power" as to disregard Congress' distribution scheme in the Bankruptcy Code).

24

The Court has read MET's Ninth Circuit appeal answering brief attached to the 2nd RJN, as well as MET's Plan Remand Answering Brief, and this Court notes that MET has not advocated for a different interpretation of "fair and equitable" under 11 U.S.C. § 1191(c) as a matter of law.  Moreover, at every level of this dispute, MET's understanding of "fair and equitable" under §1191(c) has been the same as the Debtor's understanding and focused on the proper calculation of "disposable income" with a focus on plan projection expense line items, not on expanding the commitment period beyond Congress' statutory 3-to-5-year period.[107]

At both the Ninth Circuit appellate level and before this Bankruptcy Court on remand, MET had two opportunities to respond and argue against Debtor's analysis that Subchapter V is composition law, but MET has never mounted a cogent intellectual answer to Debtor's detailed "fair and equitable" analysis and synthesis of 100 years of composition law culminating in Subchapter V.[108] MET has derided Debtor's analysis as a "fallacy" and chided Debtor for "fail[ing] to provide a single case cite in support of it," and "manufactured argument," and discussion of "outdated and irrelevant cases decided under the former Bankruptcy Act."[109]  But MET fails to acknowledge the obvious from reading Debtor's detailed historical analysis on this issue, that composition law for small businesses was dormant from 1978 (when chapter 11 of the modern Bankruptcy Code replaced and repealed Chapter XI of the Bankruptcy Act) until 2020 (when Subchapter V was enacted for small business reorganization).  There has been no opportunity for any case law on small business composition law for over 40 years, and a substantial part of the analysis must return to the pre-Code jurisprudence to understand it. Moreover, in the six years since the enactment of Subchapter V, this Court is unaware of any case decision comparable to the District Court's Decision that "§1191(c)(2)(A) does not prohibit the provision of some amount of disposable income that is less than 100% after five years; that is, a plan could require 100% of debtor's disposable income in years one through five, 75% in

---

[107] 2ND RJN Ex. 2 (9th Cir. ECF 49.1 at 7-9).

[108] ECF 1148 (2ND RJN Ex.2 (9th Cir. ECF 49.1 at 5-7)).

[109] ECF 1141 (MET Plan Remand Answering Brief) 11:12-15.

years six through eight, and so on." ECF 946 (Decision) 5:18-20.  Not even MET ever raised this interpretation of §1191(c).  MET's inability to mount an intellectually defensible response is a strong indication that Debtor is correct in Debtor's analysis of Subchapter V as modern composition law for small businesses, and this Court agrees with the Debtor's analysis.  In light of the foregoing, based on the record of this Case, for this Plan, this Bankruptcy Court finds and concludes that this Plan is fair and equitable as is.

### F.  The District Court's Decision Is the Law of the Case

This Bankruptcy Court is not rejecting the District Court's mandate for interpreting 11 U.S.C. § 1191(c) as a matter of law as the law of the case, and this Bankruptcy Court is not collaterally attacking the District Court's Decision.  The District Court's Decision is a limitation on the interpretation of 11 U.S.C. § 1191(c) as a matter the law, but it is not a limitation on the application of the law to these facts.  "As the Supreme Court has held, on remand, a trial court 'may consider and decide any matters left open by the mandate of this court.'" *In re Lahijani*, 2008 WL 8444818 *1, *3 (9th Cir.B.A.P. June 11, 2008) (quoting *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979)). And, the Ninth Circuit in this particular Case clearly stated: "The district court left open the possibility that ***the bankruptcy court could confirm the same plan*** or confirm a different plan." ECF 1128 (Order) 3 (emphasis added).  Here, the Court finds and concludes that the Plan is still "fair and equitable" under the District Court's interpretation of 11 U.S.C. § 1191(c), which can include (but is not required to include) more than what the text of §1191(c) provides.

This Court's analysis in this ASFFCL is necessary and appropriate to understand what "fair and equitable" means in light of the complex 100-year case law and jurisprudence on the matter, which is necessarily helpful in deciding the issue as a matter of application of the law to the facts here in this Case.

The appellate mandate on remand permits and requires this Court to determine how the Plan is "fair and equitable" in light of the Decision, and the ASFFCL addresses the issue as a matter of applying the facts to the law.  The Ninth Circuit has chastised lower courts for simply

reversing direction on remand without actually analyzing and applying the facts to the law on remand. *See, Firth v. U.S.*, 554 F.2d 990, 995 (9th Cir.1977) ("Unlike the district court's first decision, its decision on remand did not itemize the lost wages award in any way. To justify such a drastic increase in this aspect of plaintiff's recovery, some explanation should be provided."). Here, the ASFFCL details legal authority and well-reasoned analysis to explain what "fair and equitable" means under the District Court's Decision interpreting §1191(c) and why the Plan is "fair and equitable," which is required for this Court's analysis on remand. Without this Court's detailed analysis in these ASFFCL on remand, this Court would be at risk of the same problem that confronted the district court in *Firth* and yet another possible remand. *Id.* ("Because the district court's decision on remand lacks any information as the factors considered… a meaningful review of whether the $150,000 lost wages award is supportable is impossible ... therefore, although we do not relish this function, we feel compelled to remand to the district court for the limited purpose of its making more detailed findings and conclusions…"). These detailed ASFFCL are meant to prevent the parties and the Court from facing yet another remand for lack of detailed findings and conclusions on the issue of how to apply the "fair and equitable" test that the District Court decided.

The District Court did not reverse or remand as a matter of factual finding that MET is entitled to more than three-to-five years' of projected Disposable Income for the Plan to be fair and equitable. Rather, only that §1191(c), as a matter of law, permits the Bankruptcy Court to consider more in determining what is "fair and equitable." The ASFFCL does not violate any appellate mandate by explaining why the Plan is "fair and equitable" to Class 3 with three years of projected disposable income based on the facts of this particular Case, even though §1191(c) would legally permit more (as a matter of law) if the right facts were present (which they are not in this particular Case). Notably, MET has not made any argument as to what else in addition to three years of projected disposable income is required for this Plan to be "fair and equitable," such as the enumerated uncodified aspects of "fair and equitable" [*see*, ECF 1136 (Brief) 21:11-23] or otherwise. Here, in light of the historical and statutory sources, as well as the record in

the Case, and this Court's independent searching inquiry of the foregoing, the Court finds and concludes, for all the reasons discussed in the ASFFCL, that the Plan is "fair and equitable" to MET and Class 3 as is.

### G. Conclusion that Debtor's Plan Is Fair and Equitable

This Bankruptcy Court has read the briefs on remand three or four times.[110] With respect to the enactment and lengthy history of the development of Chapter 13 and Subchapter V as modern composition law, this Bankruptcy Judge is "one of the few people around who's been around… for that long" to know that "lengthy history.[111]   And this Bankruptcy Court "totally agree[s] with the arguments made by the Debtor."[112]

In light of the foregoing, despite the District Court's Decision that "fair and equitable" may include disposable income beyond the three-to-five-year Commitment Period, here, in this Case, nothing in the record supports such a radical departure from the historical understanding of that phrase and the limited Commitment Periods of composition law.  The Plan is "fair and equitable" to Class 3 with the Plan's three-year Commitment Period of projected disposable income.

Moreover, here, in Debtor's Case, none of the uncodified standards of "fair and equitable" apply to MET and Class 3, and, therefore, none of them are required to make the Plan "fair and equitable":

(A) No class senior to MET is being compensated more than in full;

(B) There is no senior dissenting class losing its priority relative to a junior class with a "step-up";

(C) No senior dissenting class is being paid post-petition interest;

(D) No senior dissenting class is being forced to take inferior securities while a junior class receives superior securities or cash;

---

[110] [ECF 1154] (5/26/2026 Hg Tr.) 27:21-22.
[111] [ECF 1154] (5/26/2026 Hg Tr.) 26:3-7.
[112] [ECF 1154] (5/26/2026 Hg Tr.) 7:24-25.

(E) Debtor is not issuing 'worthless securities' to MET or Class 3;

(F) Debtor is not issuing gratis securities to preserve continuity of management;

(G) The new value corollary does not apply in Subchapter V because the absolute priority rule does not apply in Subchapter V.

Therefore, the Court finds and concludes that the Plan is "fair and equitable" with respect to Class 3 and MET.

**H.  The Plan Is Fair and Equitable Under 11 U.S.C. § 1191(c)(2)(B)**

The Court finds and concludes that the Plan is "fair and equitable" under §1191(c)(2)(B). Congress wrote §1191(c)(2)(A) and (B) in the alternative as parallel provisions, permitting debtors to pay (A) 3-to-5 years of projected disposable income over 3 to 5 years, or (B) the present value of that same period.[113]  Although §1191(c)(2)(A) refers to "*all of the* projected disposable income… in the 3-year period… not to exceed 5 years," §1191(c)(2)(B) omits "all of," and instead refers only to "the value of property to be distributed under the plan in the 3-year period… not to exceed 5 years… is not less than [__]"[114] *the* projected disposable income of the debtor."[115]

Debtor's Plan includes an option for payment of the present "value of the property to be distributed under the plan in the 3-year period… not less than the projected disposable income of the debtor" under §1191(c)(2)(B).[116] "Fair and equitable" in §1191(c)(2)(A) and (B) are written in the alternative for three-to-five-years of projected disposable income or the present value of that period.[117]  The Plan meets the "fair and equitable" standard of §1191(c)(2)(B) because it provides the present value of the property from the Commitment Period

---

[113] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.A.P.2022).

[114] This [__] space is where §1191(c)(2)(B) omits reference to "all of" which appears in §1191(c)(2)(A).

[115] §1191(c)(2) (emphasis added).

[116] ECF 762 (FFCL) 74-75; ECF 657 (Plan) 20-21.

[117] *In re Orange County Bail Bonds*, 638 B.R. 137, 146 (9th Cir.B.A.P.2022); ECF 762 (FFCL) 74.

uncomplicated by the interpretation of "all" as "100%" in §1191(c)(2)(A) and without the further complication of what quantum less than 100% might be implicated after year 5.

As noted above, although Section 1191(c) "includes" many uncodified aspects of "fair and equitable" that developed over the course of more than 100 years of bankruptcy jurisprudence, none of those uncodified aspects are present here in this Case. Therefore, the Plan is "fair and equitable" under §1191(c)(2)(B) by providing Class 3 with the present value of projected disposable income for the Commitment Period.[118]

## VI.    THE PLAN DOES NOT DISCRIMATE UNFAIRLY

This Court finds and concludes that the Plan does not discriminate unfairly against MET or Class 3. Notably, chapter 11 (including Subchapter V) permits some amount discrimination as "fair," and it is only "unfair" discrimination that is prohibited. *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr.M.D.Tenn.1989) (collecting examples of fair and unfair discrimination). The Plan clearly involves discrimination between Classes 2 and 4, on the one hand, and Class 3, on the other hand. The question this Court must address is whether the Plan's discrimination is fair.

The unfair discrimination "requirement is separate and independent of the more-often litigated 'fair and equitable' rule."[119] The unfair discrimination "provision requires that a plan '*allocate* value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims.'"[120]

The District Court has decided, as the law of the case, that "fair and equitable" is not statutorily limited to disposable income and not statutorily limited to the three-to-five-year commitment period. However, for all the reasons explained above, "fair and equitable" in this

[118] The Court notes that, to the extent that Debtor's net present value discount would result in Class 3 receiving less than those creditors would receive in a hypothetical liquidation under §1129(a)(7), Debtor has agreed to pay the hypothetical liquidation amount to Class 3. *See*, ECF 1136 (Plan Remand Opening Brief) 22:22- 23:3.

[119] 7 Collier ¶1129.03[3] at 1129-77, n.12; §1191(b).

[120] *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir.1986) (quoting 5 Collier ¶1129.03)) (emphasis added); *In re Monarch Beach Venture, Ltd.*, 166 B.R. at 437 (quoting Collier ¶1129.03) ("treatment which allocates value to the class…"); Op.Br.49.

30

Debtor's particular Case is the three-year Commitment Period projected Disposable Income. Moreover, the Court finds and concludes that the Plan's allocation of assets within and after the Commitment Period and Disposable Income is fair discrimination for the reasons discussed below.

Understanding fair and unfair discrimination between insider and non-insider classes in Subchapter V plans requires an understanding of Subchapter V as composition law.  As discussed in Sections V.C and V.E of these ASFFCL above, Subchapter V is composition law addressing non-insider unsecured debt within the Commitment Period (whether limited to three-to-five years or, as decided by the District Court, for a longer period at less than 100% disposable income) and leaving the insider debt-equity capital structure to be addressed afterward. Composition law, is "an extension, adjustment, or accommodation of unsecured claims without disturbing… stock interests," and "[c]omposition contemplates that the business proceeds with the eventual end of rehabilitation."[121]  The "fair and equitable" composition of unsecured debts in Subchapter V ends after the Commitment Period set forth in §1191(c)(2) (the eventual end of rehabilitation), and the business thereafter proceeds with the insiders addressing their own debt-and-equity capital structure. [122]

The District Court reasoned "… if Chapter 11 plans were truly limited to disposable income and capped at five years, the Plan's provisions for Class 2 and 4 creditors would contravene both requirements."[123]  As composition law, Debtor's Plan is a three-year plan because it provides non-insider Class 3 with three years of projected Disposable Income.[124] Insider Classes 2 and 4 will not be paid anything for five years.[125]  The contrasting treatment shows Class 3 will receive all Debtor's projected Disposable Income for a three-year

[121] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 464 (1940) (J. Roberts, dissenting) and *Lorber v. Vista Irr. Dist.*, 143 2d 282, 285 (9th Cir.1944)).

[122] *U.S. Realty & Imp. Co.*, 310 U.S. at 454; Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989)).

[123] ECF 946 (Decision) at 5 (ln.6-10).

[124] ECF 762 (FFCL) 33; ECF 657 (Plan) 20-21.

[125] ECF 762 (FFCL) 33; ECF 657 (Plan) 17, 22.

Commitment Period, while Classes 2 and 4 receive none.[126]   The insider-debt-capital structure is left to address among insiders after the composition rehabilitation ends.

Not all Subchapter V plans are limited to five years.  A plan may have multiple classes of creditors, including secured creditor classes, unsecured creditor classes, accepting classes, and rejecting classes.[127]  Debtor's Plan is one such example with some classes accepting and others rejecting the Plan.[128]  Even where multiple classes accept a plan (thus, enabling the Court to confirm as to those accepting classes without resort to §1191(b)), if only one class rejects, then the plan must be confirmed by §1191(b) because of that one rejecting class, but the 3-to-5-year temporal limit of §1191(c)(2) applies only for treatment of those specific classes confirmed pursuant to §1191(c)(2) while no temporal limit applies to treatment of accepting classes.[129] Furthermore, there is no temporal limit for secured creditor cramdown.[130]

Debtor's Plan is a three-year composition law plan.  The Court must determine at what point the composition plan ends such that Debtor's insiders retain their debt-and-equity structure to address among the insiders after the composition ends.  In this particular Case, on these facts, what is "fair and equitable" is to end the Commitment Period at three years of Disposable Income, and there are no uncodified aspects of "fair and equitable" to add to the treatment of Class 3.  Although the District Court's interpretation of § 1191(c) provides the Court with discretion to do so, under the particular facts of this particular Case, "fair and equitable" treatment of Class 3 merits neither property beyond the Commitment Period nor property beyond Disposable Income. The Debtor's Plan does not unfairly discriminate by *allocating* all

---

[126] ECF 762 (FFCL) 33.

[127] 11 U.S.C. §§ 1122 & 1123(a)(1) (designation of classes); 11 U.S.C. § 1126 (accepting and rejecting classes).

[128] ECF 762 (FFCL) 26; ECF 657 (Plan) 15-23.

[129] *See*, §1191(a) (no temporal limit); *see*, *In re Sisk*, 962 F.3d 1133, 1146 (9th Cir.2020) (no minimum duration for consensual plans in Chapter 13 because Bankruptcy Code sets no such minimum, and §1322(b)(11) permits any provision not inconsistent with the code); *see*, §1123(b)(6) (permitting any provision in plan not inconsistent with the code).

[130] *See*, §1191(c)(1); *see*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specified cramdown treatment applies).

of Debtor's projected Disposable Income for the Commitment Period to non-insider Class 3 and leaving the insiders' debt-and-equity structure in Classes 2, 4, 5, and 6 to address after the composition ends.

It bears noting that non-insider Class 3 is paid first and paid in cash within three years of the Plan's effective date, while insider Class 2 holds convertible notes meant to be converted to equity, and the Class 2 and 4 maturity dates are extended for 5 years.[131] There is no guaranty that Classes 2 or 4 will ever be paid by the time their claims mature or convert to equity.  Cash is superior to promissory notes because the former is certain and the latter is speculative.[132]  The suggestion that insiders' claims are being paid in full is wrong; rather, the insider claims are being denied any recovery during this composition Plan.

Therefore, the Court finds and concludes that the Plan allocates property under the Plan in a manner that is fair discrimination; accordingly, the Plan does not discriminate unfairly.

Contrary to MET's arguments, Debtor is not "invent[ing] a different 'composition'-based standard for unfair discrimination."[133]   "The standards for unfair discrimination under §1191(b) are the same as under §1129(b)(1)."[134]  At its core, the unfair discrimination "provision requires that a plan '***allocate*** value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims.'"[135]   MET's answering brief on remand never addresses allocation, and, thus, knowing that some amount of discrimination is permitted, MET never addresses the fundamental concept of when the Plan's allocation of property rises to the point of being "unfair" discrimination.[136]

---

[131] ECF 657 (Plan) 17-22.

[132] *Matter of Central R. Co. of New Jersey*, 579 F.2d 804, 812 n.18 (3d Cir.1978).

[133] ECF 1141 (MET Plan Remand Answering Brief) 12:16-17.

[134] *In re Trinity Family Prac. & Urgent Care PLLC*, 622 B.R. 236, 265 (Bankr.S.D.Tex.2020).

[135] *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir.1986) (quoting 5 Collier ¶1129.03)) (emphasis added); *In re Monarch Beach Venture, Ltd.*, 166 B.R. at 437 (quoting Collier ¶1129.03) ("treatment which allocates value to the class…"); *see also*, ECF 1144 (RJN) 88.

[136] *See generally*, ECF 1141 (MET Plan Remand Answering Brief).

Debtor's position is intelligent and defensible, that Subchapter V is composition law, and "[c]omposition contemplates that the business proceeds with the eventual end of rehabilitation."[137]    The "fair and equitable" composition of unsecured debts in Subchapter V ends after the Commitment Period set forth in §1191(c)(2) (the eventual end of rehabilitation – which, according to the District Court, could be longer than 5 years if the projected disposable income commitment after year 5 is less than 100%), and the business thereafter proceeds with the insiders addressing their own debt-and-equity capital structure.[138]

Contrary to MET's assertions otherwise, the District Court did not reject Debtor's "composition law plan" theory.[139]    The District Court could not have rejected (much less "explicitly rejected") Debtor's composition-law theory because these issues were never raised to the District Court, the District Court raised its interpretation of §1191(c) *sua sponte* without any briefing from the parties, and the Debtor explained the composition-law theory of the Plan for the first time in the briefing at the Ninth Circuit.[140]    Moreover, the District Court noted that the difference in treatment between Class 3 and Classes 2 and 4 is "dramatic," but the District Court declined to reach a conclusion on that issue.[141]    The District Court remanded because of a misapplication of §1191(c) for "fair and equitable," but now on remand, after explaining why the Plan is "fair and equitable" to Class 3 under the District Court's interpretation of §1191(c), this Court finds and concludes that the ***allocation*** of property under the Plan is ***fair*** discrimination in light of the Debtor's insider equity-debt capital structure.  In summary, based on the analysis provided, this Court looks at the entire Plan (even beyond three-year treatment for Class 3) and determines that the Plan discriminates fairly by providing Class 3 with all of

[137] *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 464 (1940) (J. Roberts, dissenting); *Lorber v. Vista Irr. Dist.*, 143 2d 282, 285 (9th Cir.1944)).

[138] *See*, *U.S. Realty & Imp. Co.*, 310 U.S. at 454 (composition law); Ayers, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963, 977 (Apr. 1989)) (composition law).

[139] ECF 1141 (MET Plan Remand Answering Brief) 12:20-22, 13:9 ("***explicitly*** rejected by the District Court") (emphasis added).

[140] *See*, ECF 1144 (RJN) 53-54, 56-86.

[141] ECF 946 (Decision) 6:17-19.

the Projected Disposable Income of the 3-year Commitment Period, and by leaving the residual property for the insider debt-equity capital structure after year 3 when the rehabilitation ends under the composition-law theory.

MET unfairly attacks Debtor's characterization of its insider debt-equity capital structure as being contrary to the terms of the Plan and an indication of unfair discrimination.[142]  The Debtor had no need to explain the treatment of insider debt and equity as an insider capital structure in the Plan or in the Plan briefing in 2022.  It was only after the District Court's *sua sponte* and novel reading of §1191(c) as limitless and free to expand even beyond the three-to-five-year limit of §1191(c)(2)(A) that Debtor was required to research and explain the history and uncodified aspects and limits of "fair and equitable," under Chapter 11 and its predecessor insolvency laws for over 100 years to explain composition law and the relevance of an insider-debt-equity capital structure.  And, after analyzing the history of composition law and explaining it in its briefs to the Ninth Circuit and here on remand, this Court finds and concludes that Debtor is correct, and the Plan should be confirmed.

The challenge for this Court under the District Court's Decision on §1191(c), is that without a statutory limit on the three-to-five-year commitment period of §1191(c)(2), each court must decide when the rehabilitation ends and equity holders move on.  Moreover, in each instance each court could decide not to add projected disposable income in any quanta between 0% and 99.99% from year 6 onward with a creditor recovery ranging from the absolute minimum of what is required under §1129(a)(7) up to creditor repayment in full, which would be the return of the absolute priority rule, seemingly in derogation of Congress' elimination of that rule under §1181(a).  In order to give effect to Congress' elimination of the absolute priority rule under §1181(a), and recognizing that the Court has latitude to decide what is "fair and equitable" under §1191(c), once the determination of "fair and equitable" is made in terms of the property under a plan, it is logical and fair discrimination to allocate all of that property to

---

[142] ECF 1141 (MET Plan Remand Answering Brief) 13:26-28.

the non-insider creditor classes.  That is what Debtor has done here and why the Plan does not discriminate unfairly.

As an illustration of why the Plan's allocation of property under the Plan is fair discrimination, this Court notes several examples of different treatments of Classes 2, 3 and 4, proposed by MET in MET's Ninth Circuit brief and Debtor's reply thereto.[143] In every example where MET has proposed some different Plan treatment with respect to Classes 2, 3, and 4 – sometimes to equalize insider and non-insider treatment, but more often to make insider treatment much worse – in none of those scenarios did MET's re-allocation of property to non-insider Class 3 creditors improve.[144]

## VII.    THE ASSUMPTION OF THE CONTRACT SATISFIES THE INHERENT FAIRNESS STANDARD

### A.    The Inherent Fairness Standard.

The Debtor and MET agree, as ordered by the District Court, citing *Pepper v. Litton*, that: "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."[145]  The Court finds and concludes that the assumption of the Contract between the Debtor and Mr. Casden satisfies the inherent fairness standard.

The "inherent fairness" test in *Pepper v. Litton* and *Marquam* arises from the bankruptcy court's equitable principles rather than any state law doctrine, as neither *Marquam* nor *Pepper v. Litton* mention California, Delaware, or any other state law as the basis of the "inherent fairness" test or in applying it.[146]  "[F]or many purposes courts of bankruptcy are essentially

---

[143] *See*, ECF 1148 (2ND RJN Ex.2 (9th Cir. ECF 49.1 at 23-27)); *see also*, ECF 1148 (2ND RJN Ex.1 (9th Cir. ECF 40.1 at 36-41)).

[144] *See*, ECF 1148 (2ND RJN Ex.2 (9th Cir. ECF 49.1 at 23-27)); *see also*, ECF 1148 (2ND RJN Ex.2 (9th Cir. ECF 40.1 at 36-41)).

[145] ECF 946 (Decision) 8 (quoting Pepper v. Litton, 308 U.S. 295, 306-07, 60 S.Ct. 238, 245 (1939)); *see also*, ECF 1143 (MET Contract Remand Answering Brief) 9:17-19; *see also*, ECF 1135 (Contract Remand Opening Brief) 6:10-11.

[146] *See generally*, *In Marquam Inv. Corp.*, 942 F2d 1462 (9th Cir.1991); *see generally*, *Pepper v. Litton*, 308 U.S. 295 (1939).

courts of equity, and their proceedings inherently proceedings in equity.[147]  "[A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence."[148]  "[T]he court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. … And the bankruptcy trustee may collaterally attack a judgment offered as a claim against the estate for the purpose of showing that it was obtained by collusion of the parties or is founded upon no real debt." [149]  "That *equitable power* also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation."[150]  "Its disallowance or subordination may be necessitated by certain cardinal principles of *equity* jurisprudence." [151]

It is with this background of equity jurisdiction that the Supreme Court arrived at the "inherent fairness" test for insider transactions, which the Ninth Court later cited, quoted, and relied upon in stating: "Their [i.e., insiders'] dealings with the corporation are subjected to rigorous scrutiny… to prove the good faith of the transaction [and] also show its inherent fairness… ***The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain***."[152]  The allowance or disallowance of insider claims in bankruptcy is an "exercise of [the bankruptcy court's] equitable jurisdiction."[153]  Therefore, if the "inherent fairness" test applies, it is the test arising in the bankruptcy court's equity jurisdiction, not from Delaware's "entire fairness" or California's "inherent fairness" tests.

**B.    MET's Several Case Cites on Other Standards Are Not on Point.**

---

[147] *Pepper*, 308 U.S. at 304 (internal quotes and cites omitted).

[148] *Id.* at 305.

[149] *Id.* at 305-06 (internal quotes and cites omitted).

[150] *Id.* at 306  (emphasis added).

[151] *Id.* (emphasis added).

[152] *Id.* at 306-07 (1939); *In re Marquam Inv., Corp.*, 942 F.2d at 1465 (quoting and citing *Pepper v. Litton*) (emphasis added).

[153] *Pepper*, 308 U.S. at 307-08.

MET has cited several cases involving adversary proceedings and lawsuits for breaches of fiduciary duty that have no bearing on whether to assume to the Contract, particularly in light of the District Court's mandate to apply the "inherent fairness" test of *Pepper v. Litton*.  Because these cases are not on point, the Court rejects MET's arguments attempting to improperly apply these inapplicable standards.  For one, MET's cited case of *In re TransCare Corp.*, is not on point because it involved a chapter 7 adversary proceeding complaint for state law breach of fiduciary duty claims, for which "[t]he parties agreed that the ***entire*** fairness standard governed," which is different from ***inherent*** fairness. *In re TransCare Corp.*, 638 B.R. 691, 698 (Bankr.S.D.N.Y.2022) (emphasis added to show difference).  MET's cited case of *In re AWTR Liquidation, Inc.*, is not on point because it is another adversary proceeding lawsuit filed after a plan was confirmed and the executory contract assumption/rejection deadline had passed, and that lawsuit included state law claims for breach of fiduciary duty governed by state law.  *In re AWTR Liquidation, Inc.*, 548 B.R. 300, 309 & 311 (Bankr.C.D.Cal.2016).  MET's cited case of *Pereira v. Cogan*, is not on point because it is yet another adversary proceeding, this one involving a chapter 7 trustee's motion for partial summary judgment on breach of promissory note causes of action under Delaware state law and the defense of offset for executive employment compensation. *Pereira*, 267 B.R. at 503-05. Finally, MET's cited case of *Brown v. Brewer* is not on point because it did not even involve a bankruptcy case, and applied Delaware's "entire fairness" (not, inherent fairness) test to a Delaware state law cause of action for breach of fiduciary duties by directors and officers. *Brown v. Brewer*, 2010 WL 2472181 *1, *3 (C.D.Cal. June 17, 2010).  The Court rejects MET's argument for applying these inapplicable standards where the law of the case and mandate is to apply the "inherent fairness" standard from *Pepper v. Litton* and *In re Marquam*.

**C.    The Assumption of the Contract Satisfies the Inherent Fairness Standard Based on the Record as of the Hearing on August 9 and 10, 2022, on the Contract Motion and Plan Confirmation.**

The Court finds and concludes, for the reasons explained below, that the Debtor carried its burden of proof for granting the Contract Motion and assuming the Contract under the inherent fairness standard.  MET confuses "heightened scrutiny" as being a "burden of proof," which it is not. "Preponderance of evidence" is the "burden of proof," though the court must evaluate the contract with a level of "heightened scrutiny." MET has no case cite to support a different "burden of proof," and even *Brown v. Brewer*, a case cited by MET, stated that "entire fairness" is "the test applied when analyzing a breach of fiduciary duty," *Brown v. Brewer*, 2010 WL 2472182 *1, *4 (C.D.Cal. June 17, 2010), but *Brown* still applied the "preponderance of evidence" standard for the burden of proof. *Id.* at *2 n.3.

Debtor's Contract Motion stated that assumption of insider contracts is subject to heightened scrutiny, particularly based on evidence of market rate compensation.[154]  MET's Contract Opposition argued for, *inter alia*, "inherent fairness" and "rigorous scrutiny" based on *Marquam* and *Pepper v. Litton*.[155]  Holgoenix replied that it met the test for "inherent fairness" and "rigorous scrutiny" because Debtor had submitted an expert report on market-rate compensation, the declaration of a professional executive recruiter on market rates, and declarations of independent board members (not Casden) showing the Contract had the earmarks of an arms-length transaction.[156]

Although neither the Bankruptcy Court's FFCL nor the Contract Order used the words "inherent fairness," the record reflects that the Bankruptcy Court had applied rigorous scrutiny in granting the Contract Motion, and the record supports a finding that assumption of the Contract meets the inherent fairness test.  For the reasons stated herein, the Court finds and concludes that the assumption of the Contract satisfies the inherent fairness standard supported by the record.

---

[154] ECF 609 (Motion) 10.

[155] ECF 628 at 4.

[156] ECF 630 at 8-12.

The Supreme Court in *Pepper v. Litton* emphasized that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."[157] In applying those equitable powers, "technical considerations will not prevent substantial justice from being done."[158]    The record supports the conclusion that this Court applied rigorous scrutiny, determined that the Contract was made in good faith, and that it carries the earmarks of an arm's length bargain, as reflected in the FFCL entered contemporaneously with the Contract Order, even though the Contract Order and FFCL did not use the precise words "inherent fairness."  Here, in these ASFFLC, the Court uses the words "inherent fairness" and explains why the standard is met here for the assumption of the Contract.

Firstly, before addressing "inherent fairness," assumption of the Contract with Mr. Casden is supported at the very least by an exercise of reasonable business judgment because it benefits the estate.[159] Under Mr. Casden's leadership, Debtor grew its business, survived chapter 11, and maintained operations despite relentless litigation against it by competitor MET, which attempted to litigate Hologenix out of existence.[160]  The Bankruptcy Court had already approved the Contract's compensation at the base level of $300,000 per year after a highly contested insider compensation hearing.[161]    The Contract is less expensive than other executive compensation packages, as Hologenix's COO had recently been hired away to another company for a higher salary, and because Hologenix realizes a 15% to 20% savings on payroll and tax costs because Casden is a member of the LLC.[162]  Additionally, under Mr. Casden's leadership

---

[157] *Id.* at 304 (internal cites and quotes omitted).

[158] *Id.* at 305.

[159] *See, Sharon Steel Corp. v. National Fuel Gas Distribution Corp. (In Re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3rd Cir. 1989); *see also, NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In Re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845 (Bankr.W.D.Pa.1987).

[160] ECF 609 (Casden Decl.) 16-17.

[161] ECF 609 (Casden Decl.) 16-18; ECF 762 (FFCL) 41, 50.

[162] ECF 609 (Casden Decl.) 16; ECF 762 (FFCL) 49.

the Debtor's employees grew from three to thirteen full-time employees, and revenue growth increased each year from 2016 to 2021.[163]

As to approving the assumption of the Contract under heightened scrutiny: "The essence of the [inherent fairness] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." [164]  Debtor's Contract Motion stated that executory contracts for insiders are subject to a higher level of scrutiny,[165] and insider compensation is guided by market rates.[166]  Where there is no evidence of the market rate, the court may subjectively determine the appropriate compensation.[167] Logically, the market rate is the earmark of an arm's length bargain.

Mr. Casden's compensation under the employment contract is market rate, as supported by the expert witness report of Howard Grobstein on executive compensation.[168] Mr. Casden's base salary had already been approved by the Bankruptcy Court in March 2022 as part of the highly contested insider compensation hearings objected to by MET (and that order was never appealed).[169]  The Bankruptcy Court set forth its reasoning related to Casden's compensation under the Contract in its FFCL signed concurrently with the Order, explained the highly contested hearing originally on June 7, 2022, which was continued so the Motion could be addressed concurrently with plan confirmation on August 9, 2022, and discussed in detail the two expert reports on market rate compensation related to the Contract, how both MET's

---

[163] ECF 609 (Casden Decl.) 16-18.

[164] *Pepper*, 308 U.S. at 306-07; *In re Marquam Inv., Corp.*, 942 F.2d at 1465 (quoting and citing *Pepper v. Litton*).

[165] ECF 609 (Motion) 10; *In re Biderman Indus. U.S.A., Inc.,* 203 B.R. 547, 551 (Bankr.S.D.N.Y.1997).

[166] *In re Athos Steel and Aluminum, Inc.*, 69 B.R. 515, 521-22 (Bankr.E.D.Penn.1987) (setting officer compensation based on market rates during chapter 11 case) ("To its credit the debtor produced evidence of market value in the form of a survey of the salaries of steel company executives."); *In re Crouse Group, Inc.*, 75 B.R. 553, 559 (Bankr.E.D.Penn.1987) (chapter 11 case). ECF 609 (Motion) 10.

[167] *In re Crouse Group, Inc.*, 75 B.R. at 559; ECF 609 (Motion) 10.

[168] ECF 609 (Motion) 10; ECF 455 (Grobstein Decl.) 10, 18; ECF 762 (FFCL) 35, 51-52.

[169] ECF 609 (Casden Decl.) 16 (¶19);  ECF 618 (order) 1-3; ECF 762 (FFCL) 41, 50.

expert's report and Hologenix's expert report converged to support the same compensation in the Contract, and based thereon concluded "Mr. Caden's executive compensation and executory employment contract is reasonable, supported by market data, expert testimony, and should be assumed and approved."[170]

The assumption of the Contract carries the earmarks of a better-than-an-arms-length bargain because instead of insisting on immediate or "prompt" cure as required by §365(b)(1)(A), Casden testified on cross-examination that he would defer payment of the cure cost of his Contract over time so that there would not be a Plan default and so that Class 3 could be paid in accordance with the confirmed Plan, which the Bankruptcy Court made part of its FFCL.[171]

Debtor's board members (none of whom are relatives of Casden) unanimously supported the assumption of the Contract, which also supports a finding that it has the earmarks of an arms-length transaction.[172]  The Contract was signed on Hologenix's behalf by board member Scott Carlin – not Casden.[173]  MET baldly objected that the board members were "rubberstamps" but never called them for cross-examination, took depositions, or submitted its own counterevidence.[174]  Debtor submitted reply declarations for board members Carlin and Margolin specifically countering this allegation that they were mere rubber stamps.[175]  MET filed a motion to strike, alleging that this information should have been part of the original declarations.[176]  The Bankruptcy Court struck the reply declarations,[177] though Debtor objected that the reply declarations should stand because they directly addressed the allegation of being

---

[170] ECF 761 (Order) 1; ECF 762 (FFCL) 34-35, 51-52.

[171] ECF 762 (FFCL) 80-81; ECF 736 (Hrg Tr.) 129-130.

[172] ECF 610, 611, 625, 626, 627.

[173] ECF 609 (Casden Decl.) 32.

[174] ECF 628 (MET Opp.) 1-8.

[175] ECF 632 (Carlin Decl.) 1-5; ECF 631 (Margolin Decl.) 1-5.

[176] ECF 637 (MET Opp.).

[177] ECF 761 (Order) 3.

42

mere rubberstamps by providing more detail to support their background qualifications.[178]  But even the original declarations set forth sufficient basis that these board members were capable and competent fiduciaries – for example, Margolin's original declaration stated that she is the former President of Anthem Blue Cross, California."[179]  The support of the board members other than Casden supports a finding of an arms-length bargain.  Further support for the earmarks of an arms-length bargain is found in the declaration of professional executive placement recruiter, Ms. Sydney McArthur, regarding market rates of compensation, who testified that CEO salaries in Los Angeles for small companies with 10 to 25 employees are more than the Contract's $300,000 base plus $150,000 performance bonus.[180] Debtor's prior CEO (the former CEO of Converse, Inc., the shoe company) received even higher compensation than Casden, adding support that the Contract carries the earmarks of an arms-length bargain.[181]

In *Marquam*, the Ninth Circuit decided that an insider had not met the inherent fairness test or survived rigorous scrutiny on a claim objection where there was nothing to support the claim of $120,000 of insider legal billings.[182] But, here, Debtor submitted substantial evidence to meet the inherent fairness test, including a copy of the Contract (signed by board member Carlin, not Casden), a declaration by a third-party recruiter (Ms. McArthur) as to market rates, an expert report (Mr. Grobtsein) on CEO market rate compensation, and declarations from independent board members to support the fair price of the market rate and the fairness of the transaction at arm's length (as detailed with record cites above).

The burden of proof for assumption or rejection and cure of executory contracts is by a preponderance of evidence.[183]  The Debtor put on its case to grant the Motion by a

---

[178] ECF 647 (6/7/2022 Hrg Tr.) 5-11.

[179] ECF 611 (Margolin Decl.) 1-3.

[180] ECF 613 (McArthur Decl.) 1-2.

[181] ECF 630 (Casden Decl.) 20-21; ECF 762 (FFCL) 52.

[182] *Marquam Inv. Corp.*, 942 F.2d at 1464-65.

[183] *In re Pyramid Operating Authority, Inc.*, 144 B.R. 795, 890 (Bankr.W.D.Tenn.1992) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)); *In re Joshua Slocum, Ltd.*, 103 B.R. 601, 606 (Bankr.E.D.Penn.1989).

preponderance of the evidence, and, in response, MET failed to put on competent evidence to refute the Debtor's case.[184]   The only evidence submitted by MET was an argumentative declaration of its local counsel to undermine the credibility of the executive recruiter declarant, Ms. McArthur,[185] and, later, in connection with plan confirmation, MET's expert report on executive compensation.[186]   Debtor's expert submitted an expert declaration in reply on the executive compensation Contract issue.[187]

At the hearing on the Plan and Contract, on August 9, 2022, MET cross-examined Mr. Casden, who testified about the history of his employment contract and the timing and Debtor's consideration of bankruptcy, the adjustments to compensation because of Covid-19 in 2020, and the insider compensation payment issues that the Bankruptcy Court had already ruled on previously though final orders that were never appealed.[188]   The Bankruptcy Court heard the live cross-examination testimony of Debtor's expert, Mr. Grobstein, and considered the market rate of Mr. Casden's contract and determined that assumption of the Contract was a good decision.[189]   The Bankruptcy Court also found that the declaration testimony of MET's expert witness, Mr. Pastore, showed Mr. Casden's executory Contract compensation was reasonable market rate, with detailed citation to the record.[190]

When evaluating Mr. Grobstein's expert report and Mr. Pastore's expert declaration, the Bankruptcy Court made findings that the figures on executive compensation for Mr. Casden as the CEO converge to approximately the same compensation; that is, Mr. Grobstein's report used a data set of larger companies and selected the smallest decile from the report, while Mr. Pastore' declaration used a data set of smaller companies (of which the Debtor would be in highest end

---

[184] LBR 9013-1(c)(3), 9013-1(f)(2), 9013-1(h), and 9013-1(i)); ECF 762 (FFCL) 29.

[185] ECF 628 (MET Opp.) 8.

[186] ECF 701 (Pastore Decl.) 35.

[187] ECF 722 (Grobstein Decl.) 14-15.

[188] ECF 736 (Hrg Tr.) 133-149.

[189] ECF 762 (FFCL) 34-35, 51-52; ECF 735 (Hrg Tr.) 10, 53-55.

[190] ECF 762 (FFCL) 51-52.

with revenues at or above $5 million) and when selecting the largest decile for that report, the two figures for executive compensation are essentially the same.[191]

The Bankruptcy Court found both Grobstein's testimony and Casden's testimony to be "very credible," and that between the two competing experts, due to Grobstein's experience "there's no comparison" between the two.[192]  The Bankruptcy Court found and concluded, with support in the record, that the data Pastore relied on for his executive compensation critique was not reliable because, although Pastore's declaration stated that the data set was for Los Angeles companies, when questioned in deposition, Pastore testified that the data set in fact had no regional breakdown at all but was national in scope without distinction to locale.[193]  The Bankruptcy Court found and concluded that Pastore did not apply any methodology of premiums or discounts to adjust for locale or make any other adjustments.[194]  The Bankruptcy Court found and concluded that the Contract's compensation is appropriate market rate and necessary to incentivize and fairly compensate for services, with detailed support in the record.[195]

In *Athos Steel*, the court analyzed the evidence in the market survey and made findings as to the appropriate level of compensation for the insider, adjusting for the size of the debtor compared to the size of the companies in the survey.[196]  The Bankruptcy Court specifically considered Debtor's expert witness' report on market rate executive compensation and MET's cross-examination of Casden and Grobstein.[197]  The Bankruptcy Court included in its FFCL a detailed discussion of the appropriateness of Casden's compensation based on market data, citing that a "higher level of scrutiny" was necessary for evaluating this insider transaction (with citation to *Binderman*, *Athos Steel*, and *Crouse Group*), and – after two days of live cross-

---

[191] ECF 762 (FFCL) 51; ECF 701 (Pastore Decl.) 35; 455 (Grobstein Decl.) 10, 18; ECF 735 (Hrg Tr.) 54-56.

[192] ECF 735 (Hrg Tr.) 106-107; ECF 762 (FFCL) 73.

[193] ECF 701 (Pastore Decl.) 18-19; ECF 762 (FFCL) 73.

[194] ECF 762 (FFCL) 73.

[195] ECF 762 (FFCL) 51-52.

[196] *In re Athos Steel and Aluminum, Inc.*, 69 B.R. 515, 521-22 (Bankr.E.D.Penn.1987).

[197] ECF 761 (Order) 2.

examination testimony, including MET's cross-examination about the employment contract – that both Grobstein and Casden were "very credible," and that in comparing Debtor's expert report and MET's expert report on executive compensation, the data converged and supported the amount of Mr. Casden's employment contract, and that the continued employment of Mr. Casden was appropriate as he was qualified, competent, and experienced.[198]

The Court overrules MET's objection to assumption of the Contract that parallels a fraudulent transfer theory under 11 U.S.C. §548(a)(1)(B)(ii)(IV) as misplaced in the context of contract assumption under 11 U.S.C. § 365. If MET had desired to allege fraudulent transfer related to the Contract, then that should have been part of MET's derivative fraudulent transfer lawsuit against Mr. Casden under §548(a)(1)(B)(ii)(IV),[199] which is wholly apart from the "inherent fairness" inquiry for Contract assumption.  On February 22, 2022, MET filed its "Motion for Standing to Pursue Certain Causes of Action Belonging to Debtor's Estate," seeking derivative standing to sue Casden and other insiders for alleged fraudulent transfers, preferential transfers, and post-petition unauthorized transactions under §544 , §547, §548, and §549.  ECF 502 (MET Mtn for Derivative Standing). On March 30, 2022, this Court granted MET derivative standing to sue Casden for estate causes of action, which could have included avoidance of an insider employment agreement as a fraudulent transfer under §548(a)(1)(B)(ii)(IV).[200]

Notably, Congress enacted a very specific statute to address unfair insider employment contracts as being voidable as constructively fraudulent transfers. 11 U.S.C. §548(a)(1)(B)(ii)(IV).  Upon obtaining derivative standing, MET actually filed a fraudulent transfer lawsuit against Mr. Casden and pleaded 11 U.S.C. §548(a)(1).[201]   However, MET did not allege that the Contract was a type of fraudulent transfer, and it cannot do so now by using a mere objection to an assumption Motion.  As the Ninth Circuit has noted, doing so would be

---

[198] ECF 762 (FFCL) 34-35, 49-52.

[199] ECF 1143 (Response) 10:11- 11:9 (Section "C" – "The Timing of the Employment Agreement Suggests Evasion, Not Good Faith").

[200] ECF 557 (order).

[201] ECF 587 (commencing 2:22-ap-01101-BR).

improper because "adjudicating the validity of a contract at the time of rejection would turn a summary proceeding into a full trial on the merits, a result that would be inconsistent with the procedures found in the Bankruptcy Code."[202]  Consistent with the Ninth Circuit's decisions in *G.I. Industries, Inc.* and *Pomona Valley Medical Group, Inc.*, had MET desired to invalidate the Contract based on it being a type of fraud or the product of a breach of fiduciary duty, then MET should done so in its adversary proceeding.

"At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."[203] Even where an executory contract is assumed, it does not extinguish the separate unresolved cause of action related thereto.[204]

This Court can examine whether to assume the Contract under the "entire fairness" standard without going to the length of subsuming a §548(a)(1)(B)(ii)(IV) adversary proceeding for fraudulent transfer within §365 motion practice.  Indeed, subsuming a §548(a)(1)(B)(ii)(IV) adversary proceeding for fraudulent transfer within §365 motion practice would be impractical because  debtors would be required to set up and knockdown every conceivable strawman argument in the motion before the creditor makes such objections or be left at the mercy of attempting to address them on reply and being accused of failing to include those points in the motion in the first place, which is precisely what occurred when MET objected that Debtor's

---

[202] *In re G.I. Industries, Inc.*, 204 F.3d 1276, 1282 (9th Cir.2000); *see also*, *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 673 (9th Cir.2007). It is of no consequence that the decision in *G.I. Industries, Inc.* involved rejection rather than assumption of an executory contract, for that decision cites favorably to *Orion Pictures Corp.*, for the same proposition, which did involve the assumption of an executory contract. *In re G.I. Industries, Inc.*, 204 F.3d at 1282; *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir.1993).

[203] *In re Orion Pictures Corp.*, 4 F.3d at 1098-99.

[204] *In re G.I. Industries, Inc.*, 204 F.3d at 1282; *In re Orion Pictures Corp.*, 4 F.3d at 1099.

board members were "rubber stamps" and the Bankruptcy Court struck the reply declarations.[205] Nowhere could this be better demonstrated than by MET's discussion of the motion practice associated with the Contract Motion where MET challenges Debtor's evidence, does not cross-examine witnesses, and attacks any effort Debtor makes to respond with evidence on reply.[206] The inherent fairness standard does not require this Court to subsume a §548(a)(1)(B)(ii)(IV) trial within motion practice. Rather, the inherent fairness test only requires that Debtor prove that the "transaction carries the earmarks of an arm's length bargain."[207]  For all the reasons explained in these ASFFCL, the Contract meets the inherent fairness test.

Considering all of the foregoing, the Bankruptcy Court applied rigorous scrutiny to the Contract, supporting a finding that assumption of the Contract meets the "inherent fairness" test because, as demonstrated by the months-long, multi-hearing contested procedures surrounding the Contract: (1) in January 2022 MET filed an opposition to Casden's compensation under the Contract, and the Court held a contested hearing on the compensation in March 2022 to approve in part and deny in part that compensation; (2) in March 2022, the Bankruptcy Court granted MET derivative standing to sue Casden for estate causes of action, which could have included avoidance of an insider employment agreement as a fraudulent transfer under §548(a)(1)(B)(ii)(IV); (3) in June 2022 the Bankruptcy Court held the first contested hearing on the Motion; (4) the Bankruptcy Court permitted  deposition and live cross-examination of Hologenix's expert witness; (5) the Bankruptcy Court examined expert witness declarations from both sides; (6) the Bankruptcy Court heard and observed MET's cross-examination of Casden and Grobstein; and (7) the Bankruptcy Court held a two-day trial. The record reflects that the assumption of the Contract is inherently fair because it carries the earmarks of an arms-length bargain, primarily being market rate, as proven with contested expert testimony, executive recruiter declaration, declarations of independent board members, and subjected to

[205] ECF 1135 (Contract Remand Opening Brief) 9-10.

[206] ECF 1143 (MET Contract Remand Answering Brief) 15-18.

[207] ECF 946 (Decision) 8 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)).

MET's cross-examination in open court.  On this record, the Bankruptcy Court finds and concludes that the assumption of the Contract meets the inherent fairness test.

### VIII. THE COURT DID NOT ADOPT DEBTOR'S PROPOSED FFCL VERBATIM

The Court overrules and rejects as meritless MET's argument that this Court "adopt[ed]" Debtor's proposed FFLC "verbatim."[208]    The Court has read MET's Ninth Circuit appellate answering brief attached to the 2nd RJN, wherein MET made the same allegation against this Bankruptcy Court that: "The Bankruptcy Court abused its discretion by *rubber-stamping* a Plan (and Appellant drafted FFCL)."[209]

The Court overrules and rejects MET's argument that this Court "rubberstamped" or "adopted verbatim" Debtor's proposed FFCL as meritless because, as shown by the record between August 2022 to October 2022, this Court permitted extensive briefing by the parties on the proposed FFCL, but MET discredited itself by making numerous arguments unsupported by the record, and substantial parts of Debtor's proposed findings were cut by this Court so that the Court made the FFCL its own, as accurately detailed in Debtor's Ninth Circuit appellate reply brief attached to the 2nd RJN.[210]

This Court is again permitting extensive briefing by the parties on the proposed ASFFCL, and this Court is not adopting verbatim or rubberstamping these ASFFCL.  It is the Court's normal practice to ask the prevailing side to prepare the proposed findings of fact and conclusions of law, and "It's not a rubber stamp."[211]    The reason that the ASFFCL largely reflect the positions taken by the Debtor is precisely because the Court "totally agree[s] with the arguments made by the Debtor."[212]

---

[208] ECF 1143 (MET Contract Remand Answering Brief) 6:19-25 (alleging that this Court "largely adopted the Debtor's draft FFCL…taken verbatim from Debtor's 97-page proposed findings of fact and conclusions of law.").

[209] ECF 1148 (2ND RJN – 40.1 at 9) (emphasis added).

[210] ECF 1148 (2ND RJN 49.1 at 19-22).

[211] ECF 1154 (5/26/2026 Hg Tr.) 7:15-27.

[212] ECF 1154 (5/26/2026 Hg Tr.) 7:24-25.

## IX.    MET'S EXPERT WITNESS WAS NOT DENIED THE OPPORTUNITY TO TESTIFY AT THE HEARING

The Court rejects and overrules as meritless MET's argument that this Court denied MET the opportunity to put on MET's expert witness.[213]  MET never raised this issue to this Court but instead raised it for the first time on appeal. *See generally*, BK record.  MET's allegation lacks merit because MET had knowingly agreed to the procedures for direct testimony by declaration and live testimony only for cross-examination, Debtor's expert (Grobstein) was more credible because of his extensive bankruptcy experience (and by comparison, Pastore had practically none), and Pastore's declaration was so weak that Debtor had no need to cross-examine, and MET never raised a protest about this issue to this Court at the Hearing, but raised it as an issue only months later for the first time on appeal.[214]  MET's argument is rejected, and MET's objection are overruled.

## X.    CONCLUSION

The Plan is confirmed as being fair and equitable and not discriminating unfairly based on the record in the Case.  The Contract Motion is granted because assumption of the Contract meets the inherent fairness test based on the record in the Case.

###

---

[213] ECF 1143 (MET Contract Remand Answering Brief) 6:5-6 ("… although MET's expert witness, Thomas Pastore ("Pastore"), was present, he was neither cross-examined nor provided an opportunity to testify by the Court."); ECF 1143 (MET Contract Remand Answering Brief) 14:20-21 ("The Court's credibility findings were based on the ability to hear Debtor's witnesses live while it was not afforded the same opportunity for MET's witness."); ECF 1143 (MET Contract Remand Answering Brief) 14:19 (describing this issue of live testimony as one of "fundamental unfairness and infringement of MET's due process rights.").

[214] ECF 1144 (RJN) 97-101; ECF 1148 (2nd RJN 49.1 at 44-47).

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

**A true and correct** copy of the foregoing document **NOTICE OF LODGMENT** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 23, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On June 23, 2026 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the `document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 23, 2026  I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| | |
|---|---|
| The Honorable Barry Russell<br>United States Bankruptcy Court<br>Edward R. Roybal Federal Building and Courthouse<br>255 E. Temple Street<br>Bin outside of Suite 1660<br>Los Angeles, CA 90012 | |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 23, 2026 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                    Page 2                    **F 9021-1.2.BK.NOTICE.LODGMENT**

- **2:20-bk-13849-BR Notice will be electronically mailed to:**

   Todd M Arnold     tma@lnbyg.com
- Ron Bender     rb@lnbyg.com
- Thomas E Butler     butlert@whiteandwilliams.com,
  sullivann@whiteandwilliams.com;millnamowm@whiteandwilliams.com;panchavatis@whiteandwilliams.com
- Robert Carrasco     rmc@lnbyg.com, rmc@lnbyg.com
- Oscar Estrada     oestrada@ttc.lacounty.gov
- Theodore W Frank     frank@psmlawyers.com, knarfdet@gmail.com;navarro@parkermillsllp.com
- John-Patrick M Fritz     jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
- Michael S Greger     mgreger@allenmatkins.com, kpreston@allenmatkins.com
- Brian T Harvey     bharvey@buchalter.com,
  docket@buchalter.com;dbodkin@buchalter.com;pjolley@buchalter.com
- Gregory Kent Jones (TR)     gjones@sycr.com,
  smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com
- Raffi Khatchadourian     raffi@hemar-rousso.com
- Tinho Mang     tmang@marshackhays.com,
  tmang@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com
- Ron Maroko     ron.maroko@usdoj.gov
- Juliet Y. Oh     jyo@lnbyg.com, jyo@lnbyb.com
- Carmela Pagay     ctp@lnbyg.com
- Yvonne Ramirez-Browning     yvonne@browninglawgroup.com, veronica@browninglawgroup.com
- Kurt Ramlo     RamloLegal@gmail.com, kr@ecf.courtdrive.com;ramlo@recap.email
- Gregory M Salvato     gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- James R Selth     jselth@yahoo.com,
  jselth@yahoo.com,maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com
- Zev Shechtman     Zev.Shechtman@saul.com,
  Zev.Shechtman@ecf.courtdrive.com;hannah.richmond@saul.com;LitigationDocketing@saul.com;Shelly.Guise@saul.com;Isaiah.Bribiesca@saul.com
- Lindsey L Smith     lls@lnbyb.com, lls@ecf.inforuptcy.com
- Randye B Soref     rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Heidi J Sorvino     sorvinoh@whiteandwilliams.com,
  millnamowm@whiteandwilliams.com;sullivann@whiteandwilliams.com;panchavatis@whiteandwilliams.com;butlert@whiteandwilliams.com
- Alan Stomel     alan.stomel@gmail.com, astomel@yahoo.com
- Annie Y Stoops     annie.stoops@afslaw.com, yvonne.li@afslaw.com
- Nicole Sullivan     sullivann@whiteandwilliams.com,
  vulpioa@whiteandwilliams.com,arthura@whiteandwilliams.com
- Derrick Talerico     dtalerico@wztslaw.com, maraki@wztlfirm.com,sfritz@wztlfirm.com,admin@wztlfirm.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Larry D Webb     Webblaw@gmail.com, larry@webblaw.onmicrosoft.com
- David Wood     dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alinares@ecf.courtdrive.com
- Roye Zur     rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                           Page 3          **F 9021-1.2.BK.NOTICE.LODGMENT**